IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| GUN OWNERS OF AMERICA, INC., *et al.*, | )<br>)<br>) |
| Plaintiffs, | ) Civil Action No. 18-cv-___ <br>) |
| v. | )<br>) |
| MATTHEW WHITAKER, *et al.*, | )<br>) |
| Defendants. | )<br>) |

**Verified Declaration of Richard (Rick) Vasquez**

I, Richard (Rick) Vasquez, am competent to state and declare the following based on my training, experience, personal knowledge, and prior qualification in federal courts as an expert. If called as a witness, I can testify as follows.

**Employment History**

1. Currently, I am an independent firearms technology expert employed by those in the firearm community. In this capacity, I assist manufacturers, dealers, and others in understanding and complying with firearms laws and regulations. Additionally, I provide training on the Gun Control Act and the National Firearms Act to civilian and government organizations.

2. I am a former employee of the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"). During my 14-year tenure, I held the positions of Acting Chief of the Firearms Technology Branch ("FTB"), Assistant Chief (Senior Technical Expert) of the FTB, and Acting Chief of the Firearms Training Branch. I provided instruction for ATF personnel on the definitions of firearms in the Gun Control Act ("GCA") and the National Firearms Act

("NFA").  Additionally, I developed a machinegun identification course and instructed this course to ATF counsel, special agents, ATF investigators, and numerous federal prosecutors.

3. In these roles, I was responsible for evaluating firearms, non-firearms, and firearm accessories, consistent with the Standard Operating Procedures ("SOP") of the FTB.  I was the one who wrote the first generation of these SOPs, and was responsible for overseeing determinations on whether a particular item constituted a firearm, non-firearm, or merely a firearm accessory.

4. As a result of my knowledge, experience, and training, I have been qualified as an expert by numerous federal courts, and have provided testimony in a number of cases.

**Background**

5. During my tenure at ATF, I was responsible for clarifying the use of a single pull of the trigger versus a single function of the trigger as it applies to whether a firearm is a machinegun.  Additionally, I was responsible for the technical input and clarification of a machinegun provided in ATF Ruling 2006-2.

6. In my capacity as the Assistant Branch Chief (Senior Technical Expert) for the ATF, I evaluated the Slidefire stock, other bump-fire devices, and the bump-fire technique.  The agency concluded, consistent with my Slidefire analysis, that the Slidefire stock was neither a firearm under the GCA nor a machinegun under the NFA.

7. My conclusion that the Slidefire stock was neither a firearm nor a machinegun was reviewed and affirmed by ATF Chief Counsel and higher authorities within ATF.

**Bump Stock Operation**

8. The Slidefire, which is a bump stock device, does not fire automatically with a single pull or function of the trigger.

9. A bump stock does not fire automatically (nor does it fire more than one round) by the single pull or function of the trigger.

10. Rather, a bump stock is designed to cradle a firearm, allowing it to reciprocate to the rear utilizing the inertia of the fired cartridge, commonly called "recoil." At the end of its rearward travel, without human input, the firearm will stop because it has no energy, springs, or motors to propel it back forward.

11. When firing a weapon with a bump stock such as a Slidefire attached, the trigger finger sits on a shelf integral to the stock. The firearm is pushed into the trigger finger by the shooter's non-shooting hand/arm. If a shooter can counteract the recoil of the firearm at the end of the recoil, in order to push the firearm again forward, the shooter can cause the weapon to fire another shot, with a separate pull of the trigger. It is a separate pull of the trigger because, when the firearm fires and recoils after the trigger finger has engaged the trigger, the trigger becomes disengaged from the trigger finger.

12. Because the firearm can slide back and forth in a bump stock such as the Slidefire, once the timing is mastered, the shooter can pull the trigger to start the firing sequence and, while pushing the firearm forward from the recoiled position, pull the trigger into his stationary trigger finger again, causing a second pull of the trigger and a second fired shot. As long as the shooter continues to engage the trigger through this method of pulls (by the firearm's recoil) and pushes (by his support hand), the firearm will fire. This creates an enhanced rate of semiautomatic fire.

13. It is important to see, realize, and note that a bump stock such as the Slidefire is nothing more than a stock that cradles a firearm. There are no mechanical, spring, electrical, or other components that assist the action of the device. After lengthy analysis, using all of the standards that have been established by the FTB/ATF, neither the Slidefire nor the technique called "bump fire" could be classified as a machinegun or a machinegun conversion device, as it does not fit the definition of a machinegun as stated in the GCA and NFA.

a. Bump stock devices do not permit a continuous firing cycle with a single pull of the trigger. Rather, the trigger must be released, reset, and fully pulled rearward before a subsequent round can be fired.

b. To fire, the bump-stock device requires continuous physical manipulation by the shooter, and is solely dependent on the shooter's skill.

c. When the shooter maintains constant forward pressure with the non-trigger hand on the barrel shroud or foregrip of the rifle, <u>and</u> keeps his trigger finger on the device's extension ledge with constant rearward pressure, the trigger must be released, reset, and pulled completely rearward each time a subsequent round is discharged. This mechanical operation is no different from any factory semi-automatic firearm.

d. The bump stock device does not permit automatic fire by harnessing the recoil energy of the firearm. Harnessing the energy would require the addition of a device such as a spring or hydraulics that could automatically absorb the recoil, and then use this energy to activate the device. If a firearm equipped with a bump stock did harness the recoil energy, then it would be capable of being fired with one hand — without the use of the non-shooting hand pushing the firearm forward.

e. The cyclic rate of a firearm is neither increased nor decreased by the use of a bump stock device, as the cyclic rate of a particular firearm is the mechanical rate of fire. This can be explained in laymen's terms as how fast the firearm cycles (*i.e.* loads, locks, fires, unlocks, ejects), which is an objective — not subjective — mechanical standard.

f. All factory semi-automatic firearms have an inherent ability to be bump fired. The act of bump firing is a technique, which does not require any device, and can be performed with the use of one's finger, belt loop, or rubber band.

g. A firearm in a bump stock/Slidefire stock cannot be a machinegun, because it requires an individual to apply forward pressure when the firearm is fired. It also requires a thought process by the individual to continually push the firearm forward, bringing the trigger into contact with the finger.

### Statutory Language

14. The statutory criteria for determining if an item is a machinegun or part or combination of parts constituting a machinegun is as follows:

a. Machineguns are defined and regulated by the GCA and NFA. Machineguns have been regulated since 1934 as part of the NFA. Since the inception of the NFA, the statutory definition of a machinegun has had some changes by Congress. Some of the changes have added additional components to the definition, such as the addition of conversion devices, and combinations of parts from which a machinegun can be assembled.

b. Currently, the complete definition of a machinegun is as follows: As defined in 26 United States Code, Chapter 53, section 5845(b): **Machinegun.** *The term 'machinegun'*

*means any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger. The term shall also include the frame or receiver of any such weapon, any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machinegun, and any combination of parts from which a machinegun can be assembled if such parts are in the possession or under the control of a person.*

15.     **There are several elements within the definition of a machinegun, and each will be explained.**

a. **"any weapon which shoots"**  If you have a weapon that, when loaded, the trigger is pulled with "a single function of the trigger," and it shoots continuously, it is a machinegun capable of automatic fire.  This is very easy to understand, and this section is used to classify any weapon that shoots automatically for whatever reason.  A firearm does not have to empty a magazine automatically when you pull the trigger; if it shoots multiple rounds when the trigger is pulled only once, it is a machinegun.

b. "**is designed to shoot**"  Whether a firearm is made to be a machinegun from the factory or modified into a machinegun configuration with design features that allow it to accept machinegun components designed for automatic fire, it is a machinegun whether it shoots automatically or not.  Machineguns such as the AK47, M16, and M249 were designed by the manufacturer to have the capability of shooting automatically.  These types of weapons have design features that differ from their semiautomatic variants. The

receivers of these machineguns will generally accept different parts than will a semiautomatic version.

c. **"or can be readily restored to shoot"** This applies to weapons that previously shot automatically because of design features that allowed the weapon to shoot automatically, yet in their current condition do not shoot automatically, but can be easily restored to automatic fire. This section has also been applied to machinegun receivers that had been severed into sections with a tool such as a band saw, with the intent of making it appear to be destroyed so it could be removed from the classification of machinegun, but with the intent of being reconstructed as a machinegun at a later date. For example, a machinegun receiver that is cut in half with a band saw is not destroyed, as it can be easily welded back to a complete receiver.

d. **"The term shall also include the frame or receiver of any such weapon"** A firearm receiver with the design features of a machinegun is a machinegun all by itself. Those features are the mechanical design that is imparted into the receiver that allows the firearm to accept machinegun components, which in turn allow it to shoot automatically. For example, an <u>AK47 receiver has a hole in the proper location and proper dimension to accept an automatic sear retaining pin</u>. This design feature makes it a machinegun receiver. Also, the M16 receiver has a hole in the proper location to accept a machinegun sear pin. If all of the components of a machinegun are thrown away, it can't shoot, as it is only a receiver. However, that receiver still has the design features to make a machinegun, and it is a machinegun as defined. Taking a semiautomatic variant receiver without such features, and modifying the receiver into the same configuration as a

7

machinegun receiver, would change the classification of the semiautomatic receiver to a machinegun receiver.

e. **"Any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machinegun"** These are commonly called conversion devices. These devices are generally a modified part for a semiautomatic weapon, or a fabricated part that replicates the function of an automatic sear. These conversion devices can be "dropped in" to a semiautomatic weapon with little to no fitting. Since the only purpose of these parts is to make a semiautomatic weapon shoot automatically, they are classified as machineguns. For example, the AR15 Drop in Auto Sear (DIAS) is a machinegun all by itself. It has one purpose, and that is to replicate the M16 machinegun sear.

f. **"or combination of parts designed and intended"** In addition to devices like the DIAS, the M2 conversion unit, for example, has 7 parts designed to convert an M1 carbine into a machinegun. A person must possess all parts for the combination to be considered a machinegun. The Akins Accelerator, which consists of a stock, spring, and a reciprocating device, and is used to convert a Ruger 10/22 into a machinegun, is also considered to be a conversion device.

g. **"and any combination of parts from which a machinegun can be assembled if such parts are in the possession or under the control of a person."** This is a broad section of the definition. If you are making a semiautomatic variant of a machinegun, yet you have all of the components necessary to make a machinegun, you need to proceed with caution. There are circumstances under which an individual is in possession of

everything it takes to fabricate a machinegun.  Possession of parts or plans for a machinegun are not prohibited.  However, for example, if a person is in possession of a semiautomatic weapon, a template showing where to drill the hole to convert the semiautomatic weapon into a machinegun, the drill bits and fixtures to ensure the holes were drilled to the proper dimension and location, and the machinegun parts to assemble the machinegun, the person could be in possession of a machinegun under this section of the definition.  This is known as "constructive possession."

### ATF Processes & Procedures

16.    The definitions found in the NFA, the GCA, historical letter opinions, rulings, and SOPs housed in the FTB are used as a standard to classify any firearm, part, or accessory.  Along with these stated parameters, there has also been a human element in making these classifications.  Typically, many of ATF's classifications are simple, such as when a firearm either shot automatically, or when it was manufactured with the design characteristics of a machinegun.

17.    However, when there was a new design such as a Slidefire bump stock, a more rigorous process was followed, beginning with an analysis by the technician assigned to the product, up to and including the Director of ATF, the Attorney General's office, and even congressional staffers.

18.    In 2006, during my tenure at ATF, FTB was responsible for determining whether the Akins Accelerator was a machinegun, with its spring-activated stock which, when attached to a firearm, produced automatic fire.  This ruling laid the groundwork for a definition of devices

that later would be classified as machineguns because of their ability to continue to fire, without aid from the shooter, and by a single pull of the trigger.

19. As a result of this process, ATF carefully prepared and issued ATF Ruling 2006-2, which states: *"The Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) has been asked by several members of the firearms industry to classify devices that are exclusively designed to increase the rate of fire of a semiautomatic firearm. These devices, when attached to a firearm, result in the firearm discharging more than one shot with a single function of the trigger. ATF has been asked whether these devices fall within the definition of machinegun under the National Firearms Act (NFA) and Gun Control Act of 1968 (GCA). As explained herein, these devices, once activated by a single pull of the trigger, initiate an automatic firing cycle which continues until either the finger is released, or the ammunition supply is exhausted. Accordingly, these devices are properly classified as a part 'designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machinegun' and therefore machineguns under the NFA and GCA."*

20. Years later, the Slidefire bump stock went through this same level of scrutiny, to ensure ATF was making the correct decision. After the initial review by the technician, it was reviewed internally by me as the Assistant Chief and technical advisor. It was further reviewed by the ATF Office of Chief Counsel (OCC), Deputy Assistant Directors (DADs), Assistant Directors (ADs), and the ATF Director. Each person in the chain of command reviewed the device, and determined and agreed that this bump stock was not a machinegun as defined in the statutes and the regulations. The Slidefire did not fire automatically. It did not fire more than one shot with a single function or single pull of the trigger.

21. ATF's claim today, that all of its prior work on bump stocks was somehow careless or thoughtless, "did not include extensive legal analysis," and "does not reflect the best interpretation of the term 'machinegun,'" is without support.

**Analysis of ATF's Regulation**

22. ATF's regulation uses the term "harnesses the energy" in describing the operating system of a bump stock such as the Slidefire stock. Yet all semiautomatic firearms operate from the action of harnessing the energy of the gases or from blow back. Action of the gases is when a firearm uses a portion of the gas from the ignited gunpowder to cycle the firearm, or it uses a blow back method of operation. Both of these systems "harness" the energy of the fired cartridge to cycle the firearm.

23. When a semiautomatic firearm fires, it cycles a fresh round of ammunition and resets mechanical components, and the shooter releases the trigger sufficiently to allow the fire control components to reset.

24. Using the new standard provided in ATF's regulation — that the bump stock such as the Slidefire "harnesses" the energy to shoot automatically — places all semiautomatic firearms at risk of being classified as machineguns.

25. The only way ATF could protect all semiautomatic weapons from being classified as machineguns under the new rule is to set a standard for the maximum rate of fire before a firearm is classified as a machinegun. For example, a semiautomatic would not be regulated as a machinegun if it did not fire more than XX rounds per minute. Of course, it is entirely unclear who would set that standard, and how would it be regulated.

26. The foundation of ATF's regulation appears to be an attempt to implement a rule that could later be modified to regulate all semiautomatic rifles as machineguns. Yet a bump stock like the Slidefire is an accessory, without any energy source other than the shooter applying unspecified forward pressure.

27. ATF's regulation is deceptive, misleading, and wrong in the analysis of the bump stock/Slidefire system of operation.

### Analysis of Bump Stocks

28. My professional opinion on whether or not a bump stock such as the Slidefire stock is a machinegun when affixed to a compatible semiautomatic firearm is as follows:

a. Will a firearm equipped with a bump stock such as a Slidefire stock **fire "automatically"** as that term is defined in the statute?

No. A bump stock such as the Slidefire requires the shooter to push the firearm forward after every shot, bringing the trigger into contact with the trigger finger. Contrary to ATF's claim, there is no feature of a bump stock such as the Slidefire that "harnesses the firearm's recoil energy in a continuous back-and-forth cycle that allows the shooter to attain continuous firing after a single pull of the trigger...." This language from the ATF's Notice of Proposed Rulemaking leaves out the fact that the shooter must gauge the appropriate amount of force, and push the firearm forward when the firearm reaches the end of its recoil cycle.

b. Will a bump stock such as the Slidefire fire more than one round with a **single function of the trigger**?

No. A bump stock such as the Slidefire requires the shooter to push the firearm forward after every shot, bringing the trigger into contact with the trigger finger each time a shot is fired.

c. Will a bump stock such as the Slidefire fire more than one round with a **single pull of the trigger**?

No. A bump stock such as the Slidefire requires the shooter to push the firearm forward after every shot, bringing the trigger into contact with the trigger finger.

d. Will a bump stock such as the Slidefire fire more than one round **without a trigger reset**?

No. All semiautomatic firearms require that triggers be reset before the trigger can be pulled again. In the Slidefire, the trigger separates from the trigger finger upon recoil, which provides sufficient space for the trigger to reset. If the shooter does not properly push the firearm forward again, it will not fire a second shot.

e. Will a bump stock such as the Slidefire fire more than one round when the trigger is pulled **with one hand only**, and the firearms is not touched by the shooter's other hand?

No. The function of a bump stock requires a mental process of consciously pushing the firearm forward to counteract recoil, in order to re-engage the trigger finger.

f. Will a bump stock such as the Slidefire fire as a result of a **"Self-Acting or Self-Regulating Mechanism?"**

No. There is not a mechanical, electrical, hydraulic, or spring activated component that causes a firearm in the cradle of a bump stock such as the Slidefire to travel forward to engage the trigger. This is all a conscious process of the shooter pushing the firearm

13

forward, dependent entirely on variables such as the shooter's skill, grip, pressure, posture, and thought process.

g.  Will the Slidefire fire by "**harnessing the recoil energy** of the semiautomatic firearm?"

No.  The following statement in ATF's Notice of Proposed Rulemaking is false and misleading:  "*a device that allows a semiautomatic firearm to shoot more than one shot with a single pull of the trigger by harnessing the recoil energy of the semiautomatic firearm to which it is affixed so that the trigger resets and continues firing without additional physical manipulation of the trigger by the shooter. When a shooter who has affixed a bump-stock-type device to a semiautomatic firearm pulls the trigger, that movement initiates a firing sequence that produces more than one shot. And that firing sequence is 'automatic' because the device harnesses the firearm's recoil energy in a continuous back-and-forth cycle that allows the shooter to attain continuous firing after a single pull of the trigger, so long as the trigger finger remains stationary on the device's ledge (as designed).  Accordingly, these devices are included under the definition of machinegun and, therefore, come within the purview of the NFA.*"

It is not the bump stock "device" that harnesses recoil energy; it is the shooter's body that harnesses the recoil energy.  The firearm only moves rearward in a bump stock such as the Slidefire due to the inertia of the recoil.  After the initial firing of the firearm, if a shooter does not consciously push the firearm forward, the firearm will stop in the stock at the end of recoil.  The action of the shooter, physically and with a mental thought pushing the firearm forward in the cradle, allows it to shoot a second round.

h.  What is your opinion as to whether a device is a machinegun because it "**mimics**" or gives the appearance of automatic fire?

I can mimic the call of a goose, but that does not make me a goose. A firearm either has the features of a machinegun listed in the text of the statute, or it does not. A bump stock like the Slidefire is a stock that holds a firearm in a cradle and that, if used as designed, allows the shooter to increase his rate of semiautomatic fire.

I declare under penalty of perjury that the foregoing is true and correct.  Executed on December 3, 2018.

_____
Richard Vasquez