# UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

GUN OWNERS OF AMERICA, Inc.
*et al.*

Plaintiffs,

v.

MATTHEW WHITAKER,
*et al.*

Defendants.

Case No.  1:18-cv-01429-PLM-RSK
Hon. Paul L. Maloney
United States District Judge

## BRIEF IN OPPOSITION TO PLAINTIFFS'
## MOTION FOR PRELIMINARY INJUNCTION

The Department of Justice ("DOJ") issued the Final Rule at issue in this case, *Bump-Stock-Type Devices*, 83 Fed. Reg. ("FR") 66514 (Dec. 26, 2018) ("Final Rule"), to ensure that "bump stocks"—firearms attachments that, when employed, permit ordinary semi-automatic rifles to function as machineguns—are not used to circumvent 18 U.S.C. § 922(o), the statute prohibiting the sale of new machineguns to the public.  By acting on a presidential instruction to adopt this Final Rule, DOJ has corrected a confusing and erroneous agency interpretation of Section 922(o), to the expected benefit of public safety.  Plaintiff seeks a preliminary injunction to keep the rule from going into effect, claiming that DOJ's actions are arbitrary and capricious under the Administrative Procedure Act ("APA") and that DOJ's interpretation "contradict[s] the clear terms of an unambiguous statute." Because they cannot demonstrate a likelihood of success on these claims or prevail on the other factors required for a preliminary injunction, Plaintiffs' motion should be denied.

## INTRODUCTION

A bump stock is an apparatus used to replace the standard stock on an ordinary semi-automatic firearm, thereby allowing a shooter to use the weapon at a rate of fire similar to that of an

automatic weapon, like a machinegun.  *See* 83 FR 66514.  Over the last decade, DOJ's Bureau of

Alcohol, Tobacco, Firearms, and Explosives ("ATF") has issued classification determinations

concluding that certain models of these devices are lawful firearms parts, unregulated at the federal

level.  Subsequently, many bump stocks have been readily available for private purchase, and hundreds

of thousands have been sold.  On October 1, 2017, several rifles with attached bump stocks were used

to commit a deadly attack on concertgoers in Las Vegas, Nevada, in which hundreds of rounds of

ammunition were rapidly fired by the perpetrator at a large crowd, killing 58 people and wounding

approximately 500.

       Machineguns have long been regulated under the National Firearms Act of 1934 ("NFA"), and

since passage of the Firearm Owners Protection Act of 1986 ("FOPA"), the sale of new machineguns

to members of the public has been prohibited.  ATF has worked diligently to apply the definition of

machinegun consistently to bump stocks.  In 2006, ATF concluded that one model of bump stock, the

"Akins Accelerator," was not a machinegun, then quickly recognized that its determination was in

error and reversed itself.  Since 2008, ATF has concluded that some other bump stocks—which lacked

a mechanical spring (or similar device) instrumental to the operation of the Akins Accelerator—were

not machineguns.  These decisions included one classification of a device submitted by the same

manufacturer as the bump stocks used by the Las Vegas perpetrator.

       After the Las Vegas shooting, members of Congress and the public asked ATF to re-

examine its past classification decisions for bump stocks to determine whether those decisions had

been correct.  In addition, President Trump instructed the Attorney General "to dedicate all available

resources to…propose for notice and comment a rule banning all devices that turn legal weapons into

machineguns."  Presidential Memorandum, *Application of the Definition of Machinegun* . . ., 83 FR 7949

(Feb. 20, 2018) ("Presidential Memorandum").  DOJ proceeded to issue a notice of proposed

rulemaking ("NPRM"), collect and review over 186,000 comments, and ultimately, to announce the

Final Rule, which amends the definition of "machinegun" in DOJ's regulations.[1]

The Department's actions are fully consistent with the text of the statute and the APA. The statutory terms interpreted in the Final Rule ("automatically" and "single function of the trigger") are undefined in the statute, and the Department has reasonably interpreted those terms, applied those definitions to bump stocks, and corrected past classification errors in light of those new definitions, as an agency is entitled to do. The Final Rule is therefore within DOJ's rulemaking authority and the contents of the rule are neither arbitrary nor capricious. The Department's interpretation is also a reasonable application of the text of the statute: once definitions of the undefined terms in the statutory definition have been provided, the statute is reasonably interpreted to include bump stocks as machineguns. For these reasons, and because Plaintiffs have also not established that the other factors required for entry of a preliminary injunction have been met, no injunction should issue.

## STATUTORY AND REGULATORY BACKGROUND

### A. Statutory Framework

Over the last century, Congress has imposed increasingly strict regulations on machineguns as part of the interconnected framework of federal laws regulating the interstate firearm market, including the Gun Control Act of 1968 ("GCA"), 18 U.S.C. Chapter 44; the NFA; and the FOPA. Together, these statutes generally prohibit the possession by members of the public of machineguns manufactured after the effective date of the FOPA. *See* 18 U.S.C. § 922(o). These statutes share a common definition of machinegun, and this case challenges DOJ's interpretation of terms within that definition and clarification that the definition includes bump stocks.[2]

---

[1] In this brief, except in direct quotations, Defendants will use the single-word spelling used in federal law, "machinegun," rather than the two word version more commonly used in ordinary writing, "machine gun." *See* 26 U.S.C. § 5845(b); 27 CFR 447.11.

[2] The Final Rule amends the regulations of ATF, which is charged with the administration and enforcement of the GCA and the NFA. The Final Rule was promulgated by the Attorney General and DOJ, who are responsible for overseeing ATF. *See* 28 C.F.R. § 0.130(a)(1). NFA provisions still refer

The NFA, the first major federal statute to regulate firearms, required all persons engaged in the business of selling "firearms" (including machineguns)[3] and all firearms owners to register with the government, and subjected the making and sale of regulated firearms to a series of application and authorization requirements.[4]  *See* 26 U.S.C. Ch. 53.  The NFA targeted "lethal weapons . . . [that] could be used readily and efficiently by criminals."  H.R. Rep. No. 83-1337, at A395, *reprinted in* 1954 U.S.C.C.A.N. 4017, 4542.  Under the NFA, a "machinegun" is defined as:

> any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger . . . [including] any part designed and intended solely and exclusively . . . for use in converting a weapon into a machinegun.

26 U.S.C. § 5845(b).

In 1968, Congress passed the GCA, intended to "regulate more effectively interstate commerce in firearms" to reduce crime and misuse, "assist the States and their political subdivisions to enforce their firearms control laws," and "help combat . . . the incidence of serious crime."  *See* 18 U.S.C. § 921 *et seq.*; S. Rep. No. 89-1866, at 1 (1966).  The GCA supplanted some prior firearms regulations, but exists alongside the NFA.  *See* Pub. L. No. 785, 52 Stat. 1250 (1938) (repealed 1968).  The GCA followed on the heels of other federal legislation that stressed Congress's findings of an extensive interstate commerce in firearms and the need for adequate federal control over such traffic.

---

to the "Secretary of the Treasury," 26 U.S.C. Ch. 53, however. Pub. L. 107-296, 116 Stat. 2135 (2002), transferred the functions of ATF to DOJ, under the general authority of the Attorney General.  26 U.S.C. § 7801(a)(2); 28 U.S.C. § 599A(c)(1).

[3] Although the NFA applies to "firearms," the term "firearms" is defined in the statute as a narrow set of dangerous weapons, (*e.g.*, machine guns, short-barreled shotguns, short-barreled rifles, and several items that would not ordinarily be considered "firearms," such as silencers, rockets, and grenades), not the full class of weapons labeled as "firearms" in ordinary parlance.  *See* 26 U.S.C. § 5845.

[4] Congress passed the NFA pursuant to its taxation powers, and the NFA is codified in the Internal Revenue Code.  Chapter 53 specifies that each maker of a regulated firearm "shall, prior to . . . making [it] . . . obtain authorization," 26 U.S.C. § 5841(c), including by: (1) fil[ing] "a written application . . . to make and register the firearm"; (2) paying "any tax payable"; and (3) receiving approval from ATF.  26 U.S.C. § 5822.

*See* Pub. L. No. 90-351, 82 Stat. 197 (1968).

In 1986, Congress again turned its attention to firearms, examining, *inter alia*, the hazards of machineguns and the desirability of their control.  *See* H.R. Rep. No. 99-495, at 2, 7 (1986), *reprinted in* 1986 U.S.C.C.A.N. 1327-33 (describing proposed machinegun restrictions as "benefits for law enforcement" and citing "the need for more effective protection of law enforcement officers from the proliferation of machineguns"); *id.* at 4 (describing machineguns as "used by racketeers and drug traffickers for intimidation, murder and protection of drugs and the proceeds of crime"); 132 Cong. Rec. 9,602 (1986) (statement of Sen. Kennedy) ("The only thing that has changed about the machinegun situation since the 1968 act . . . is that machineguns have become a far more serious law enforcement problem.").  Congress therefore enacted the FOPA, intended "to strengthen the [GCA] to enhance the ability of law enforcement to fight violent crime and narcotics trafficking." H. R. Rep. No. 99-495, at 1, 1986 U.S.C.C.A.N. 1327.  Among its provisions, FOPA added 18 U.S.C. § 922(o) to the GCA.  Section 922(o)(1) makes it "unlawful for any person to transfer or possess a machinegun," subject to the following exceptions:

> (A) a transfer to or by, or possession by or under the authority of, the United States or any department or agency thereof or a State, or a department, agency, or political subdivision thereof; or
>
> (B) any lawful transfer or lawful possession of a machinegun that was lawfully possessed before the date this subsection takes effect.

*Id.* § 922(o)(2).  The FOPA and GCA incorporate the NFA's definition of "machinegun."  *See* 18 U.S.C. § 921(a)(23).[5]

_____

[5] The legislative history of the specific amendment that added § 922(o) is limited.  Because "§ 922(o) is closely intertwined with other federal gun legislation," however, the Courts of Appeals "have referred to legislative history not only of § 922(o) itself, but also of other federal gun legislation generally," finding that Congress need not "rearticulate its old findings every time it adds an additional provision." *United States v. Haney*, 264 F.3d 1161, 1169 n.3 (10th Cir. 2001); *see generally* David Hardy*, FOPA: A Historical and Legal Perspective*, 17 Cumb. L. Rev. 585, 589-605 (1987).

**B.  Regulatory Interpretation of Machinegun Definition in Firearms Statutes**

The Final Rule arises in part from the fact that Congress did not define the NFA terms "automatically" and "single function of the trigger."  DOJ is interpreting those terms in the context of bump stocks, pursuant to delegated authority to promulgate regulations necessary to enforce the GCA and NFA.  *See* 18 U.S.C. 926(a); 26 U.S.C. 7801(a)(2)(A), 7805(a); 28 CFR 0.130(a)(1)-(2).  Courts have recognized the leading regulatory role of DOJ and ATF with respect to machineguns, including in the context of interpreting the definition of "machinegun" and component terms such as "automatically." *See United States v. Dodson*, 519 F. App'x 344, 348-49 & n.4 (6th Cir. 2013) (acknowledging ATF's role in interpreting the NFA definition of "machinegun"); *F.J. Vollmer Co. v. Higgins*, 23 F.3d 448, 449-51 (D.C. Cir. 1994) (upholding ATF classification regarding machinegun receivers); *York v. Sec'y of Treasury*, 774 F.2d 417 (10th Cir. 1985).

**1.  Past Regulation of Bump Stocks**

In 2002 and 2004, a Florida inventor asked ATF whether the Akins Accelerator, a specific model of a bump stock that "cradles a semiautomatic rifle and uses an internal spring and the force of recoil to reposition and refire the rifle," would be classified as a machinegun under the NFA.  *Akins v. United States*, 312 F. App'x 197, 198 (11th Cir. 2009).  ATF tested a prototype of the device and, based on its interpretation of the statutory term "single function of the trigger" to refer to a single movement of the trigger, concluded it did not constitute a machinegun.  *Id.*  After receiving further requests to classify similar devices, ATF reversed its view, assessing that the phrase "single function of the trigger" is best interpreted as a "single pull of the trigger" by the shooter's finger, not a single trigger motion.  ATF Ruling 2006-2, at 2 (citing *NFA: Hearings Before the Comm. on Ways and Means, House of Representatives, Second Session on H.R. 9066*, 73rd Cong., at 40 (1934)) ("NFA Hearings"), available at: https://go.usa.gov/xEDCC (last visited Feb. 9, 2019).  ATF therefore ordered the inventor "to register the devices he possessed or to surrender them," *Akins*, 312 F. App'x 199, and

issued a policy statement concluding that "devices attached to semiautomatic firearms that use an internal spring to harness the force of the recoil so that the firearm shoots more than one shot with a single pull of the trigger are machineguns." 83 FR 66516. The inventor sued, and ATF prevailed. *Akins*, 312 F. App'x at 198.

In a series of classification decisions between 2008 and 2017, ATF concluded that such devices were not machineguns. Although ATF assessed these devices to act with a "single pull of the trigger," the bump stocks did not fire "automatically" because they lacked internal springs or other mechanical parts that channeled recoil energy. 83 FR 66517. A consequence of this conclusion is that bump stocks fell outside the scope of federal firearms regulations, *see id.*, and became popular with those seeking lawful substitutes for the high rate of fire provided by machineguns. An estimated 520,000 bump stocks were sold at an average price of approximately $300, many to individuals who, like Plaintiffs, "relied on" the past ATF determinations "that bump stocks are legal to own, and that they do not convert a semi-automatic firearm into an automatic one." Mot. at 26; *see* 83 FR 66538.

## 2. Development of the Final Rule

The public attention given to bump stocks in the wake of their use by the Las Vegas perpetrator led DOJ to revisit its prior analysis of the terms used to define machinegun in 26 U.S.C. 5845(b), along with whether bump stocks properly should be classified as machineguns. *See* 83 FR 66516-17. As an initial step, ATF published an advance notice of proposed rulemaking ("ANPRM") in the Federal Register. *See Application of the Definition of Machinegun to "Bump Fire" Stocks and Other Similar Devices*, 82 FR 60929 (Dec. 26, 2017). The ANPRM solicited comments concerning the market for bump stocks, including information about the number and cost of bump stocks made and sold. *See id.* at 60930-31.

On February 20, 2018, the President issued a memorandum to the Attorney General concerning "bump fire" stocks and similar devices. *See* Presidential Memorandum, 83 FR 7949. The

memorandum instructed DOJ, working within established legal protocols, "to dedicate all available resources to complete the review of the comments received [in response to the ANPRM], and, as expeditiously as possible, to propose for notice and comment a rule banning all devices that turn legal weapons into machineguns." *Id.* Carrying out that directive, DOJ published an NPRM proposing changes to the regulations in 27 C.F.R. §§ 447.11, 478.11, and 479.11 that would interpret the meaning of the terms "single function of the trigger" and "automatically." *See* 83 FR 13442 (Mar. 29, 2018). DOJ received over 186,000 comments on the NPRM, reviewed those comments, and drafted the Final Rule, addressing the comments raised. *See generally* 83 FR 66519-43. On December 18, 2018, DOJ announced the Final Rule, which was published in the Federal Register on December 26, 2018. *See id.*; *DOJ Announces Bump-Stock-Type Devices Final Rule* (Dec. 18, 2018), *available at*: https://go.usa.gov/xEDrx (last visited Jan. 29, 2019).

### 3. The Final Rule

The Final Rule sets forth DOJ's interpretations of the terms "single function of the trigger" and "automatically," clarifies for members of the public that bump stocks are machineguns, and overrules ATF's prior, erroneous classification decisions treating bump stocks as unregulated firearms parts. *See* 83 FR 66516; 66531 (explaining that "the previous classification[s] . . . relied on the mistaken premise that . . . such devices do not enable 'automatic' firing"). The Final Rule also instructs "current possessors" of bump stocks "to undertake destruction of the devices" or to "abandon [them] at the nearest ATF office." *Id.* at 66549. Current owners of bump stocks have 90 days to comply in order to "avoid criminal liability."[6] *Id.* at 66530.

The analysis in the Final Rule mirrors that in the NPRM. First, consistent with ATF's position since 2006, the Final Rule explains that the Department is interpreting the phrase "single function of

---

[6] This 90 day period began upon publication in the Federal Register on December 26, 2018.

the trigger" to mean a "single pull of the trigger" as well as "analogous motions." *Id.* at 66515. In addition, to account for the manner in which firing is initiated by a single pull of the trigger, the Final Rule explains that it is clarifying the term "automatically." *Id.* Under the interpretation set forth in the Final Rule, "automatically," in the context of the statutory definition of machinegun, means "as the result of a self-acting or self-regulating mechanism that allows the firing of multiple rounds through a single pull of the trigger." *Id.* at 66554. The Final Rule explains that these definitions are being adopted because they "represent the best interpretation of the statute." *Id.* at 66521.

Relying on these definitions, the Final Rule sets forth the conclusion that "[t]he term 'machinegun' includes a [bump stock]." *Id.* at 66554. As the Final Rule explains, this clarification is needed because the firing sequence is "automatic." *Id.* at 66531. This conclusion is based on the determination that, as long as: 1) the trigger finger remains stationary on the ledge provided by the design of the device; 2) the shooter maintains constant rearward pressure on the trigger; and 3) the shooter constantly pushes forward with the non-trigger hand on the rifle through the barrel-shroud or fore-grip; then, the firearm's recoil energy is harnessed in a continuous back-and-forth cycle. *Id.* at 66532. In this way, a bump stock constitutes a "self-regulating" or "self-acting" mechanism that allows the shooter to attain continuous firing after a single pull of the trigger. *Id.* Thus, bump stocks are machineguns because they convert an otherwise ordinary semiautomatic firearm[7] into a machinegun by acting as a self-regulating mechanism that, after a single pull of the trigger, harnesses the recoil energy of the semiautomatic firearm in a manner that allows the trigger to reset and continue

---

[7] "The term 'semiautomatic rifle' means any repeating rifle which utilizes a portion of the energy of a firing cartridge to extract the fired cartridge case and chamber the next round, and which requires a separate pull of the trigger to fire each cartridge." 18 U.S.C. § 921(a) (28). The term "semi-automatic firearm," is not specifically defined in federal law, but generally refers to any weapon that after a round of ammunition is fired, chambers the next round of ammunition and can then be fired with a separate pull of the trigger. *See, e.g.,* N.Y. Penal Law § 265.00(21) (McKinney 2018) ("'Semiautomatic' means any repeating rifle, shotgun or pistol . . . which utilizes a portion of the energy of a firing cartridge or shell to extract the fired [round] . . . and chamber the next round, and… requires a separate pull of the trigger to fire each cartridge or shell").

firing without additional physical manipulation of the trigger by the shooter, so long as the shooter also maintains constant rearward pressure on the trigger and constant forward pressure with the non-trigger hand on the rifle through the barrel-shroud or fore-grip.  *See id.* at 66514, 66516.

In addition to setting forth the analysis above, the Final Rule describes and provides responses to the 186,000+ comments received on the NPRM.  *See* 83 FR at 66519-43.  This includes responses to Plaintiffs' comments, *compare* Regulations.gov, Comment ID ATF-2018-0002-18178, *available at*: https://www.regulations.gov/document?D=ATF-2018-0002-18178 *with* 83 FR 66526-27, 66531-32, 66534.  *See id.*  Plaintiffs do not allege that the Final Rule fails to respond to their comments.

## STANDARD OF REVIEW

"Preliminary injunctions are extraordinary and drastic remedies never awarded as of right." *O'Toole v. O'Connor*, 802 F.3d 783, 788 (6th Cir. 2015).  "[T]hat is why the plaintiff bears the burden to justify relief, even in . . . cases" involving core individual rights, such as the First Amendment or the Second Amendment.  *O'Toole*, 802 F.3d at 788.  Meeting this burden requires "a clear showing that the plaintiff is entitled to such relief." *Southern Glazers Distributors of Ohio v. Great Lakes Brewing*, 860 F.3d 844, 848-49 (6th Cir. 2017) (quoting *Winter v. NRDC*, 555 U.S. 7, 24 (2008)).

 "[A] plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter*, 555 U.S. at 20, 24.  The Sixth Circuit has stated that these "[f]our factors guide the decision to grant a preliminary injunction," and the Supreme Court has further explained that a plaintiff cannot prevail without some showing on each of those factors.  *See id.* at 23-24, 31-32 (holding that "proper consideration of" balance of equities and public interest "alone requires denial of the requested injunctive relief" and thus finding no need to address likelihood of success).[8]

---

[8] Although the Sixth Circuit has in the past "often cautioned that these are factors to be balanced, not

## ARGUMENT

**I.      Plaintiffs Have Not Established a Likelihood of Success on Their Claims.**

Because a preliminary injunction is an extraordinary and drastic remedy, the party seeking

such relief must show "clear authority" in favor of success. *Aristotle Publishing v. Brown*, 61 F. App'x

186, 188 (6th Cir. 2003). This requires Plaintiffs to make a "strong" or "substantial" showing, not

just to demonstrate that they have an equal likelihood of success or failure on their claims. *See*

*Southwest Williamson County Community Ass'n, Inc. v. Slater*, 243 F.3d 270, 277 (6th Cir. 2001) ("strong

likelihood of success" required); *Rock & Roll Hall of Fame & Museum, Inc. v. Gentile Prod.*, 134 F.3d

749, 756 (6th Cir. 1997) (reversing grant of preliminary injunction because the court "abused its

discretion when it concluded that the [movant] had shown a strong likelihood" of success).

To succeed in their claims challenging the substance of the Final Rule, Plaintiffs must

demonstrate that DOJ's interpretations are "arbitrary, capricious, an abuse of discretion, or

otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), and Plaintiffs will not be able to meet

this standard. "The arbitrary and capricious standard is the least demanding form of judicial review

of administrative action." *Watson v. Solis*, 693 F.3d 620, 623 (6th Cir. 2012). The "scope of review

under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment

for that of the agency." *Davidson v. Dep't of Energy*, 838 F.2d 850, 855 (6th Cir. 1988). So long as the

agency "examine[d] the relevant data and articulated a satisfactory explanation for its action," a

Court will not set aside its decision. *Id.*

This is particularly true where the question at bar is the analysis of a scientific or mechanical

---

prerequisites to be met," *Great Lakes Brewing*, 860 F.3d 849, *Great Lakes* casts doubt on the continued
viability of this approach after *Winter*. *See id.* (recognizing that "[a] preliminary injunction issued where
there is simply no likelihood of success on the merits must be reversed"); *cf. Singh v. Carter*, 185 F.
Supp. 3d 11, 16 (D.D.C. 2016) (explaining that the continued viability of the D.C. Circuit's "sliding
scale" approach to preliminary injunctions is highly doubtful in the wake of *Winter*). Regardless of
which approach is followed, preliminary injunctive relief is inappropriate here.

device, like the bump stock here, because of an agency's presumed knowledge regarding "scientific determinations . . . in an area within the agency's expertise." *Kentucky Resources Council v. EPA*, 467 F.3d 986, 991 (6th Cir. 2006); *see United States v. One TRW, Model M14, 7.62 Caliber Rifle*, 294 F. Supp. 2d 896, 900 (E.D. Ky. 2003) (review of ATF firearms classifications "under an arbitrary and capricious or similar standard" is based on agency's "consistency, formality, and relative expertness").  Although Plaintiffs identify a hodgepodge of statements in the Final Rule with which they disagree, they have not established that any part of the Final Rule lacks a satisfactory explanation, is unreasonable, or is otherwise arbitrary and capricious.  Accordingly, Plaintiffs cannot establish a substantial likelihood of success on their claims.

### A. The Bump Stock Rule Is Reasonable In Light of Congress's Purpose in Limiting the Availability of Privately-Owned Machineguns.

Far from having "relied on factors which Congress has not intended it to consider," Mot. at 4, the central premise of the Final Rule comes directly from Congress's mandate that dangerous, automatic weapons that readily produce high effective rates of fire should not be unregulated. Congress concluded at the time it adopted the NFA that "there is no reason why anyone except a law officer should have a machinegun."  H.R. Rep. No. 73-1780, at 1 (1934); *see also* S. Rep. No. 82-1495, at 1-2 (1952) (explaining that the NFA had as its "principal purpose . . . to control the traffic in machineguns and sawed-off shotguns, the type of firearms commonly used by the gangster element").  Thus, "although the [NFA] is ostensibly a revenue-generating statute enacted under Congress's taxation power, it is clearly designed to regulate the manufacture, transfer, and possession of dangerous weapons . . . close analysis of the relevant provisions reveals an unmistakable intent to prohibit possession of any machinegun the manufacture or importation of which was not explicitly authorized by [ATF]").  *United States v. Newman*, 134 F.3d 373 (6th Cir. Jan. 21, 1998) (unpublished).

Congress held the same view at the time of enactment of the GCA.  *See United States v.*

*Jennings*, 195 F.3d 795, 799 n.4 (5th Cir. 1999) (noting Congress's "specific declaration and finding

that . . . machineguns . . . are primarily weapons of war" (quoting S. Rep. No. 90-1501, at 28

(1968))).  And in adopting the FOPA, Congress continued to pay heed to the fact that law

enforcement officers required "more effective protection . . . from the proliferation of

machineguns."  H.R. Rep. No. 99-495, at 2, 7 (1986), reprinted in 1986 U.S.C.C.A.N. 1327-33.[9]

Congress repeatedly singled out machineguns for special regulatory treatment because "[m]achine

guns are more dangerous in their likely effects" than other firearms: "[t]hey not only fire very

quickly, but they are harder to shoot in a discriminating way, at least in their fully automatic mode."

Eugene Volokh, *Implementing the Right to Keep and Bear Arms for Self-Defense*, 56 UCLA L. Rev. 1443,

1482 (2009).

 The compatibility of the Final Rule with congressional purpose was stressed by many of the

thousands of supportive comments to the NPRM, which explained that bump stocks enable

shooters to fire semi-automatic weapons automatically, achieving the same high effective rates of

fire that Congress sought to control in banning machineguns.  *See* 83 FR 66521 ("commenters

opined that the regulation . . . will have the same dramatic benefit originally intended by" the NFA

and GCA).  Many of the commenters emphasized that the "devices cause a decrease in shooter

accuracy," and "that because the devices enabled rapid but inaccurate fire, they pose[d] a particular

risk to large-scale public events, such as the Las Vegas concert."  83 FR 66520; *see* 18 U.S.C. §

922(o); *United States v. Brock*, 724 F.3d 817, 824 (7th Cir. 2013) ("Congress has grouped together

sawed-off shotguns, machineguns, and a variety of dangerous explosive devices for stringent

restrictions on possession and strict registration requirements for those that can be possessed

---

[9] At the time, machineguns were being increasingly "used by racketeers and drug traffickers for
intimidation, murder and protection of drugs and the proceeds of crime."  H.R. Rep. No. 99-495 at
4, 1986 U.S.C.C.A.N. at 1330.  The strictures of the NFA and GCA had proven inadequate to
protect the public from these weapons.

lawfully").  As these comments observe, if bump stocks continue to be misclassified as unregulated items, the result would be to undercut Congress's regulation of machineguns and other dangerous weapons.  *See id.* at 66520-21.[10]

To be sure, Congress's purpose would be "irrelevant to the interpretation" of the statute if the statutory text clearly excluded bump stocks.  *Davis v. Mich. Dep't of Treasury*, 489 U.S. 803, 808–09 n. 3 (1989); *see U.S. v. Callahan*, 801 F.3d 606, 618 (6th Cir. 2015) ("reference to legislative history is inappropriate when the text of the statute is unambiguous"); A. Raymond Randolph, *Dictionaries, Plain Meaning, and Context in Statutory Interpretation*, 17 Harv. J.L. & Pub. Pol'y 71 (1993).  However, the Final Rule makes clear that this is not what the agency has done: the terms "automatically" and "single function of the trigger" contained in the definition of "machinegun" in the NFA are undefined, and the best interpretation of these terms includes bump stocks, because they serve as a self-acting mechanism that harnesses recoil energy to allow the trigger of a firearm to reset and continue firing without additional physical manipulation of the trigger by the shooter, so long as the shooter maintains continued rearward pressure on the trigger and forward pressure on the barrel shroud or forestock.  *See* 83 FR 66532.  Plaintiffs' arguments fail to demonstrate otherwise.

## B. The Final Rule Interprets "Single Function of the Trigger" and "Automatically" in a Manner Consistent With Their Ordinary, Accepted Meaning.

### 1. A "Single Function" of the Trigger is Reasonably Interpreted As a "Single Pull" of the Trigger.

The Final Rule interprets the phrase "single function of the trigger" to mean "a single pull of the trigger," along with "analogous motions," explaining that this "is the best interpretation of the

---

[10] Plaintiffs take issue with the statement in the Final Rule that bump stocks "accelerate the firearm's cyclic firing rate to mimic automatic fire," 83 FR 66516, supposing that this means that the agency "conclude[d] that it must ban bump stocks on behalf of Congress . . . because they are similar in effect to machineguns."  *See* Mot. at 16-17.  As the Final Rule explains, however, the fact that bump stocks assist shooters in firing faster is not the basis for the Final Rule nor the reason bump stocks are machineguns.  *See* 83 FR 66533-34.  Rather, this explanation is provided in the Final Rule to emphasize that the Final Rule is consistent with Congress's intent.

statute" and "reflect[s] ATF's position since 2006." 83 FR 66518. "Pull the trigger" is the ordinary, accepted terminology for how to discharge the typical firearm in common use today, as well as in the era when the NFA was enacted. *See, e.g.*, Webster's New World Dictionary 1177 (3d ed. 1988) (defining "Russian roulette" as involving "aim[ing] a gun . . . and pull[ing] the trigger"); Dwight Eisenhower, *Address to the American Society of Newspaper Editors* (Apr. 17, 1958), in Public Papers of the Presidents (1958) ("It is far more important to be able to hit the target than it is to haggle over who makes a weapon or who pulls a trigger"). And this phrase has made it into common parlance as an idiom meaning "to make a final decision." *See* Idioms, The Free Dictionary, "pull the trigger," *available at:* https://idioms.thefreedictionary.com/pull+the+trigger (last visited Jan. 29, 2018). Recognizing the ubiquity of this usage, the Supreme Court has described a machinegun within the NFA's definition as one that "fires repeatedly with a single pull of the trigger." *Staples v. United States*, 511 U.S. 600, 602 n.1 (1994).

This interpretation of "single function of the trigger" formalizes an interpretation more than a decade old, first set out by ATF in the 2006 ruling that corrected the original misclassification of the Akins Accelerator. *See* ATF Rul. 2006-2. There, ATF concluded that a device "activated by a single pull of the trigger, initiat[ing] an automatic firing cycle which continues until either the finger is released or the ammunition supply is exhausted," should be classified as a machinegun. The ruling noted, as the Final Rule does, that this "determination is consistent with the legislative history of the NFA." *Id.* In particular, Congress received testimony in 1934 that a gun "which is capable of firing more than one shot by a single pull of the trigger, a single function of the trigger, is properly regarded . . . as a machinegun," whereas "[o]ther guns [that] require a separate pull of the trigger for every shot fired . . . are not properly designated as machineguns." NFA Hearings at 40.

Plaintiffs object that "single pull" improperly disregards "the mechanical process through which a trigger goes when each shot is fired" by "describ[ing] what the shooter is doing" rather than "what

the trigger is doing." Mot. at 6-7. But past judicial interpretations have recognized the primacy of the shooter's actions over the mechanical functioning of a trigger. In *United States v. Fleischli*, 305 F.3d 643, 655-56 (7th Cir. 2002), the Seventh Circuit recognized that the definition of "single function of the trigger" reasonably encompassed "an electronic on-off switch rather than a more traditional mechanical trigger," thereby concluding that a "minigun" was a machinegun. In doing so, the Court rejected arguments that the minigun was not a machinegun because it was fired with an "electronic switch" rather than a traditional trigger. The "switch served to initiate the firing sequence and the minigun continued to fire until the switch was turned off or the ammunition was exhausted. The minigun was therefore a machinegun." *Id.* (superseded by statute). This illustrates that the statutory definition is not understood to rest solely on the "function" of a trigger. In *Akins*, the Eleventh Circuit then relied on *Fleischli* and the NFA's legislative history to conclude that the interpretation of "single function of the trigger" to mean a "single pull of the trigger" "is consonant with the statute and its legislative history." *Akins*, 312 F. App'x at 200.

### ii. The Final Rule Reasonably Interprets the Term "Automatically."

The Final Rule's interpretation of "automatically" as meaning "the result of a self-acting or self-regulating mechanism that allows the firing of multiple rounds through a single function of the trigger" likewise accords with the plain meaning of that term. 83 FR 66553-54. As the Final Rule explains, "'automatically' is the adverbial form of 'automatic,' meaning '[h]aving a self-acting or self-regulating mechanism that performs a required act at a predetermined point in an operation[.]'" 83 FR 66519 (quoting Webster's New International Dictionary 187 (2d ed. 1934); 1 Oxford English Dictionary 574 (1933) (defining "automatic" as "[s]elf-acting under conditions fixed for it, going of itself.")). This is consistent with the analysis employed by the Seventh Circuit Court of Appeals in interpreting the definition of machinegun in *United States v. Olofson*, 563 F.3d 652, 658 (7th Cir. 2009). There, the Court explained that the statutory definition "delineates how the discharge of multiple

rounds from a weapon occurs: as the result of a self-acting mechanism . . . set in motion by a single function of the trigger and . . . accomplished without manual reloading." *Id.* This use of the term "automatically"—to describe a device that assists in the channeling of energy into the subsequent operation of the trigger, but nevertheless includes some degree of manual input—is no different than other common uses of the term "automatic." For example, in a car, an "automatic" transmission in a car relieves a driver from a portion, but not all, of the burdens of a manual gearshift.

Plaintiffs contend that "automatically" cannot properly be read to encompass a process that requires "continuous control, direction, intervention, or guidance by a human being." Mot. at 11. Even a "true machinegun," Mot. at 11, requires such "continuous control," however. To be effective, machineguns require immense concentration and human guidance, lest they spray their fire dangerously and randomly. Indeed, many military machineguns are designed for use on a fixed or portable mount, because a trained soldier cannot reasonably be expected to provide sufficient control. And, as Plaintiffs necessarily acknowledge, a continuous "squeeze of the trigger [by a shooter] . . . *is* needed . . . to fire a machinegun automatically." Mot. at 11.

### 2. The Final Rule Reasonably Applies Its Interpretations To Conclude That Bump Stocks Are Machineguns Within the Meaning of the Statute.

The Final Rule's clarification that bump stocks are part of the regulatory definition of machine-gun is also reasonable. As the Department explained, incorporating the Final Rule's interpretations of "automatically" and "single function of the trigger" into Congress's definition logically supports the Final Rule's clarification of the definition of "machinegun" to make clear that a machinegun includes a bump stock. The Final Rule's discussion of the mechanics of a bump stock, as installed on a commonly-owned semi-automatic firearm, demonstrates the correctness of this conclusion.

First, [w]hen a shooter who has affixed a bump-stock-type device to a semiautomatic firearm

pulls the trigger," that action helps to initiate "a continuous back-and-forth cycle that allows the shooter to attain continuous firing after a single pull of the trigger." 83 FR 66519. As the Final Rule explains, this cycle requires several elements to ensure that "a firing sequence that produces more than one shot" occurs. *Id.* One is that "the trigger finger remains stationary on the device's ledge." *Id.* Another is that "constant forward pressure" is maintained "with the non-trigger hand" on the appropriate part of the rifle. 83 FR 66518, 66532. When those conditions are satisfied and "a shooter who has affixed a bump-stock-type device to a semiautomatic firearm pulls the trigger, that movement initiates a firing sequence that produces more than one shot." 83 FR 66519. The "single pull of the trigger" is the shooter's initial, conscious finger movement to initiate the firing sequence. 83 FR 66532. The "automatic" element is the assistance the bump stock provides in "directing the recoil energy of the discharged rounds into the space created by the sliding stock." *Id.* The self-acting or self-regulating mechanism is the combination of the shooter's inputs on the trigger, the extension ledge, and the barrel shroud or fore-grip, along with the aforementioned "space" that provides a "constrained linear rearward and forward path[]." *Id.* Using this analysis, the Final Rule reasonably concludes that a bump stock is a machinegun.

Plaintiffs challenge this conclusion on a number of grounds. First, Plaintiffs contend that "bump stocks . . . operate through a rapid series of trigger pulls, not a single pull." Mot. at 8. Relying on a fragment of a dictionary definition, Plaintiffs suggest that because "'pull' means 'to exert force upon,' or 'to use force in drawing, dragging or tugging,' . . . a shooter must physically touch a trigger in order to pull it," and that each touch of the trigger therefore represents a separate "pull." Mot. at 8-9. This analysis is flawed because it ignores both the full dictionary definition and places too much stock in the physical separation between trigger and finger that occurs in bump firing. As the complete version of a comparable dictionary definition sets out, the verb pull means:

> To exert upon (something) a force which tends to draw, drag, or snatch it towards
> oneself, or away from its present position (whether or not movement takes place as a

18

result); to drag or tug at."

"Pull, v." *OED Online*. Oxford University Press, December 2018 (last visited Feb. 8, 2019). This definition makes clear that the relevant elements are the overall "exert[ion]" and its direction with regard to "its present position." *Id.* And because it is immaterial to the definition "whether or not movement takes place as a result," the fact that the trigger itself bumps against a shooter's finger does not limit whether a single pull is occurring, as long as it is all a part of a single "exert[ion]." Here, even though "the trigger . . . lose[s] contact with the finger" so that it can "manually reset," Mot. at 9 (quoting Final Rule at 66517), there is a constant exertion on the bump stock, permitting the movements of the trigger to be classified properly as a "single pull of the trigger."[11]

　　　　Second, Plaintiffs object that a bump stock does not fire "automatically" because there is a "critical element of human control" in providing the "proper combination of . . . forces," *i.e.*, "constant forward pressure" and "constant rearward pressure" on the bump stock. Mot. at 11. Plaintiffs' objection to the involvement of human control, however, is belied by the very dictionary definition of "automatically" that Plaintiffs cite, which does not require an absence of human control, but only "*little* or no human control." *See* Mot. at 10-11 (citing https://en. oxforddictionaries.com/definition/automatic). In essence, Plaintiffs' disagreement with the bump stock rule is one of degree: how much human intervention is necessary to render a bump stock "manual" rather than "automatic." In the Final Rule, DOJ has reasonably set forth an answer: a bump stock is a self-acting or self-regulating mechanism because it reduces to "little" the required degree of shooter involvement when it "direct[s] the recoil energy of the discharged rounds" through the guidance of the shooter's arms and "into the space created by the sliding stock in

---

[11] A comparable example would include the pulling of a long rope using a hand-over-hand motion. For example, if a boater brings aboard a line that is trailing in the water, he might employ both hands in sequence as he coils it. Neither hand remains in constant contact with the rope, but it would be appropriate to describe his actions as pulling the line aboard in a single pull.

constrained linear rearward and forward paths." *Id.* at 66518.[12]  As the Final Rule explains, this

degree of human involvement is consistent with the analysis set forth by the Seventh Circuit: "[*U.S.*

*v.*] *Olofson* . . . requires only that the weapon shoot multiple rounds with a single function of the

trigger 'as the result of a self-acting mechanism,' *not* that the self-acting mechanism produces the

firing sequence without any additional action by the shooter."  *Id.* at 66519 (quoting 563 F.3d 658

(emphasis added)).  Thus, Plaintiffs have not established that the Final Rule's line-drawing decision

is unreasonable, arbitrary, or capricious.[13]

    Moreover, in their later discussion of safety, Plaintiffs implicitly recognize the degree of

control that a bump stock automatically adds to the act of bump firing.  Plaintiffs suggest that the

Final Rule will harm public safety because bump stocks are necessary to "permit controlled and

therefore safe bump fire," which would otherwise require "a large berm and careful attention" for

safety to be maintained at a shooting range.  Mot. at 27.  This underscores that bump stocks are

providing an "automatic" function in ensuring that appropriate human input and intervention

---

[12] If read in isolation, certain statements in the Final Rule could be misinterpreted to suggest that the classification of bump stocks as machineguns relies on the absence of human involvement in the harnessing of recoil energy.  *See, e.g.,* 83 FR 66518 ("[T]he device itself then harnesses the recoil energy of the firearm, providing the primary impetus for automatic fire"); *Id.* at 66532 (the bump stock "design eliminates the requirement that a shooter manually capture and direct recoil energy"); 83 FR 66533 ("bump stocks . . . are specifically designed to capture the recoil energy").  However, the context makes clear that the agency understands that humans play the primary role in absorbing and releasing the recoil energy.  *See, e.g., Id.* at 66518 ("Shooters . . . direct[] the recoil energy of the discharged rounds into the space created by the sliding stock"); *id.* at 66532 ("the shooter . . . direct[s] the recoil energy . . . .").

[13] Nor does Plaintiffs' effort to supplement their analysis with a declaration by a former ATF official (the ex-Acting Chief of the Firearms Technology Branch Rick Vasquez) demonstrate that ATF's current rulemaking is arbitrary or capricious.  Mr. Vasquez's testimony as a former agency employee cannot supplant the current views of those charged with interpreting the firearms statutes.  *See Via Christi Regional Med. Ctr. v. Leavitt,* 2006 WL 2773006 (D. Kan. Sept. 25, 2006) ("opinion testimony . . . [of] former agency officials . . . is of limited value . . . [because] the personal opinion of such officials as to what the regulations were intended to mean . . . does not bind the agency"); *Christmann & Welborn v. Dep't of Energy,* 589 F. Supp. 576, 581 (N.D. Tex. 1984) ("former government officials' personal opinions as to intent of an agency [cannot] bind the government").

facilitate the act of bump firing in a safer manner.

Plaintiffs also object to the conclusion in the Final Rule that a bump stock "functions as the result of a self-acting or self-regulating mechanism," relying on a dictionary definition that asserts a mechanism must contain "moving parts." Mot. at 12 (citing https://www.dictionary.com/browse/mechanism"). But "mechanism" need not be so narrowly defined, and so Plaintiffs' "moving parts" requirement is incorrect. A mechanism need not even be physical: one definition states that a "mechanism" is an "instrument or process, physical or mental, by which something is done or comes into being." "Mechanism, n. . . . 3." *American Heritage College Dictionary*. Houghton Mifflin, 2000; *see also* "mechanism, n." *OED Online*. Oxford University Press, December 2018 (last visited Jan. 8, 2019) ("2a. A system of mutually adapted parts working together in a machine or in a manner analogous to that of a machine.").[14] The mere fact that a bump stock lacks moving parts does not mean that a bump stock is not a mechanism.

Indeed, in arguing further that the "mechanism" involved in bump firing is "human—a shooter," and not "mechanical," Plaintiffs' further analysis concedes that "mechanism" may be defined more broadly. *See* Mot. at 12 (citing Black's Law Dictionary for the proposition that a "mechanism" includes "components, elements, or parts, and the associated energy"). Plaintiffs contend that because the shooter is "generating counter opposing forces, reacting to and utilizing the recoil energy of the firearm," Mot. at 13, the bump stock is not a mechanism at all. But the fact that there is *another*, biological mechanism—the shooter—involved in bump firing does not mean

---

[14] A "machine" likewise does not require moving parts. The lever, pulley, wheel-and-axle, inclined plane, wedge, and screw have been described as the "simple machines" for centuries. *See, e.g.*, "machine," Charles Hutton, *A Philosophical and Mathematical Dictionary*, vol. 2, London (1815), available at: https://books.google.com/books?id=lsdJAAAAMAAJ (last visited Feb. 8, 2019); Isaac Newton, *The Mathematical Principles of Natural Philosophy*, vol. 1 at 24 (Andrew Motte, trans., 1729) (1687) ("[F]rom hence are easily deduced the forces of Machines, which are compounded of Wheels, Pulleys, Leavers, Cords and Weights"), available at: https://books.google.com/books?id=Tm0FAAAAQAAJ (last visited Jan. 9, 2019).

that the bump stock itself is not a mechanism.  All parties agree that firing with a bump stock requires at least four things: a semi-automatic rifle, a bump stock, ammunition, and a human being. The fact that Plaintiffs believe that only two of these (the rifle and the human being) are "mechanisms" and the Final Rule concludes that three of these are mechanisms does not render the Final Rule arbitrary and capricious.

Finally, Plaintiffs challenge ATF's description of how bump stocks "channel[], harness[] and direct[] the firearm's recoil energy to slide the firearm back and forth so that the trigger automatically re-engages by bumping the shooter's stationary finger," Mot. at 15 (quoting Final Rule at 66516), alleging that "[b]ump stocks simply do not operate" this way.  Contrary to Plaintiffs' argument, however, the fact that bump stocks are "just a piece of plastic" and "contain no springs, batteries, capacitators, [or] generators," Mot. at 15, does not contradict the Final Rule's conclusion that they constitute "device[s]" that assist the shooter in "captur[ing] and direct[ing] the recoil energy" of a semi-automatic rifle.  *See* 83 FR at 66533.  It is of course the case that the shooter is *also* involved in capturing and directing the recoil energy, as is the case with a classic machinegun such as a fully-automatic M-16.  But just as a lever (which can be nothing more than a piece of plastic, resting on a fulcrum) channels the user's force to a load at the other end, assisting the user in lifting the load, so too does a bump stock channel force applied by the shooter to assist the shooter in bump-firing.  As Plaintiffs concede, "a bump stock is useful . . . for bump firing," Mot. at 16, and it is "useful" precisely because it assists the shooter in harnessing and directing the firearm's recoil.  *See* 83 FR 66516, 533.

### 3.  The Fact That Non-Automatic Firearms May Be Bump-Fired Does Not Demonstrate That the Bump Stock Rule is Arbitrary and Capricious.

Plaintiffs take issue with the fact that the Final Rule treats different forms of bump-firing differently based on the type of device being used, claiming that is it "incomprehensible how . . . bump fire using a plastic bump stock is illegal, while bump fire using a rubber band would remain

legal." Mot. at 18. The Final Rule reasonably explains the distinction: unlike a belt loop or a rubber band, bump stocks are "designed to be affixed" to a semiautomatic firearm. 83 FR 66515; 83 FR 66533. There is nothing arbitrary or capricious about a regulation that distinguishes among products designed to operate in conjunction with a regulated firearm, and those being repurposed from other uses, such as a belt loop or a rubber band. Moreover, as the Final Rule explains, a bump stock does do something more than a shooter's finger, a belt loop, or a rubber band would do in isolation—a bump stock provides an empty, yet constrained, space, and this space functions as a self-regulating mechanism that helps a shooter channel recoil energy that can then be used in resetting the trigger for the purpose of rapidly firing another round. *See* 83 FR 66531-32.

To be sure, the statute makes no distinction among "combination[s] of parts from which a machinegun can be assembled" based on whether those parts are specifically designed for the purpose of creating a machinegun. Yet it is reasonable for the Final Rule to draw this distinction to avoid the absurdity that would otherwise result. *See Guzman v. Dep't of Homeland Security*, 679 F.3d 425, 432 (6th Cir. 2012) ("Interpretations of a statute which would produce absurd results are to be avoided if alternative interpretations consistent with the legislative purpose are available"). Numerous devices can be broken down into a combination of ordinary parts such as screws, bolts, springs, and the like, or even into their constituent material components, such as metals, rubber, and fabrics. In enacting Section 922(o), Congress could not reasonably have intended to ban rubber bands, belt loops, screws, and other everyday items. *See Guzman*, 679 F.3d at 432. The logical implication of the ban on a "combination of parts" to be assembled for a machinegun is that the ban extends only to those parts *designed* to be so assembled.

Nor is it the case that the definitions in the Final Rule are arbitrary or capricious because semi-automatic firearms possess some of the same attributes as bump stocks. Plaintiffs express their fear that the Final Rule could thereby lead to a "ban [on] the most popular semiautomatic rifles in

America" by reclassifying those weapons as machineguns.  Mot. at 20.  Plaintiffs' fears are

unfounded.  As an initial matter, whereas bump stocks are "designed for . . . [the] primary purpose"

of facilitating the use of semi-automatic firearms in an automatic firing sequence initiated by a single

pull of the trigger, 83 FR at 66533, semi-automatic firearms are specifically designed *not* to fire

automatically.  *See Staples*, 511 U.S. at 602 n.1 (1994) (distinguishing "automatic" and

"semiautomatic" weapons).  That is the essence of the distinction that Congress made in defining

machineguns as those weapons that fire more than one round with a single function of the trigger,

and no reasonable regulation could collapse that distinction by reclassifying semi-automatic firearms

as automatic "machineguns."[15]  *See F.J. Vollmer Co., Inc. v. Magaw*, 102 F.3d 591, 597 (D.C. Cir. 1996)

(a "broad definition of machineguns" that sweeps in semi-automatic firearms "may actually be

inconsistent with Congressional intent" because Congress has "left the [NFA]'s definition of

semiautomatic rifles unchanged, choosing not to restrict the possession or transfer of any

semiautomatics").  Finally, Plaintiffs neglect that the Second Amendment protects against the

"prohibition of an entire class of 'arms' that is overwhelmingly chosen by American society for that

lawful purpose," *Dist. of Columbia v. Heller*, 554 U.S. 570, 628 (2008), which supplies the "limiting

principle that would keep [the Government] from . . . target[ing] semiautomatic firearms as a class."

Mot. at 20.

---

[15] Further, Congress has provided a definition of "semiautomatic rifle" as a separate category of
weapon from a machine gun.  "The term 'semiautomatic rifle' means any repeating rifle which
utilizes a portion of the energy of a firing cartridge to extract the fired cartridge case and chamber
the next round, and which requires a separate pull of the trigger to fire each cartridge."  18 U.S.C. §
921(a)(28).  The existence of this separate definition precludes an interpretation of "machine gun"
that would encompass ordinary semiautomatic rifles.  *See Hanson Cold Storage Co. v. Chizek Elevator &
Transport, Inc.*, 205 F. Supp. 3d 920, 925 (W.D. Mich. 2016) ("when the legislature use[s] different
terms within similar statutes, courts imply that different meanings were intended"); *accord United
States v. Bean*, 537 U.S. 71, 76 n.4 (2002) ("The use of different terms within related statutes generally
implies that different meanings were intended") (quoting 2A N. Singer, Sutherland on Statutes and
Statutory Construction § 46:06, p. 194 (6th ed. 2000)).

### 4. The Final Rule Provides a Reasoned Explanation For Changing Course From Previous ATF Classification Decisions Regarding Bump Stocks.

Plaintiffs also contend that the Final Rule lacks any reasoned explanation for its reversal of previous ATF classification decisions regarding bump stocks and should also be rejected as arbitrary and capricious on that basis. *See* Mot. at 23. The Final Rule addressed this issue directly, making no secret of the fact that the application therein of the definitions of "single function of a trigger" and "automatically" to bump stocks represent a "change [in] course" that requires the Department "to reconsider and rectify its past classifications." 83 FR at 66530-31. Courts have long recognized that "an initial agency interpretation is not instantly carved in stone." *Metropolitan Hosp. v. H.H.S.*, 712 F.3d 248, 266 (6th Cir. 2013) (internal quotations omitted). "So long as any change is reasonably explained, it is not arbitrary and capricious for an agency to change its mind in light of experience . . . or further analysis." *New England Power Generators Ass'n* v. *FERC*, 879 F.3d 1192, 1201 (D.C. Cir. 2018); *see F.C.C. v. Fox Television Stations, Inc.*, 567 U.S. 239, 250 (2012) ("an agency, in the ordinary course, should acknowledge that it is in fact changing its position and show that there are good reasons for the new policy."). And it is appropriate for an agency to act and implement a change in position "based on a fuller understanding of . . . a safety issue," as long as it explains "its previous reluctance" to adopt the position now taken. *Radio Ass'n on Defending Airwave Rights v. Fed. Highway Admin.*, 47 F.3d 794, 804-05 (6th Cir. 1995).

Here, the Final Rule provides a straightforward explanation for Defendants' decision to review the prior interpretations, which led to the change in position adopted in the Final Rule. In light of the use of bump stocks by the Las Vegas perpetrator and the large number of casualties in that mass murder, Defendants acted on requests from the public and Members of Congress, and instructions from the President, and revisited the past classification decisions and analysis. *See* 83 FR 66528-29. Upon doing so, the agency recognized that it had erred in the application of the statutory definition, resulting in the misclassification of some bump stocks. *See id.*; 83 FR 66531. To address

this misclassification, Defendants concluded that the statutory definition and its application needed to be clarified, and this rulemaking ensued. *See generally id.*

As to the application of the definitions of "single function of the trigger" and "automatically" to reverse previous ATF classification decisions, it is axiomatic that the Department and ATF possess the authority "to reconsider and rectify errors" because an "agency, like a court, can undo what is wrongfully done by virtue of its order." *Gun South Inc. v. Brady*, 877 F.2d 858, 862 (11th Cir. 1989) (quoting *United Gas Improvement Co. v. Callery Properties*, 382 U.S. 223, 229 (1965)); *see also Dun & Bradstreet Corp. Foundation v. U.S. Postal Service*, 946 F.2d 189, 193 (2d Cir. 1991) ("It is widely accepted that an agency may, on its own initiative, reconsider its interim or even its final decisions, regardless of whether the applicable statute and agency regulations expressly provide for such review"). The now-reversed classification decisions, along with ATF's past statements regarding its authority to regulate bump stocks, amount to such errors when considered in light of the new rule. *See* 83 FR 66531. Although, absent the Final Rule's definition of "automatically," it was correct for ATF to rule that "when affixed to a semiautomatic firearm," a bump stock "does not make that firearm fire automatically," Mot. at 21, that conclusion is no longer valid. Such past statements do not now preclude DOJ from "changing its position and show[ing] that there are good reasons for the new policy," *Fox*, 567 U.S. at 250, based on the experience learned from the use of bump stocks in Las Vegas.

Contrary to Plaintiffs' argument, moreover, the Final Rule explicitly rejects the proposition that it was "enacted pursuant to a political decision . . . without justification in fact or law." Mot. at 2, 27. Rather, the Final Rule explains that it adopts the "best interpretation of the statute," 83 FR 66518, and is based on the need to "define[] the terms 'automatically' and 'single function of the trigger.'" *Id.* at 66528; *see id.* at 66529 (explaining "the impetus for this rule"). The Supreme Court has recognized that both "Presidential oversight" and "political pressure from Congress" are appropriate

26

reasons for agency policy changes.  *F.C.C. v. Fox*, 556 U.S. 502, 523 (2009).

In sum, DOJ has acted reasonably, and Plaintiffs have not established a substantial likelihood of success on the merits.

## II.    The Balance of Equities Does Not Tip in Plaintiffs' Favor and an Injunction is Not in the Public Interest.

As Plaintiffs acknowledge, the final two elements of the preliminary injunction analysis "merge when the Government is the opposing party."  Mot. at 3 (quoting *Al-Sarih v. Sessions*, 2018 U.S. App. LEXIS 2482 at *4 (6th Cir. 2018)); *see Nken v. Holder*, 556 U.S. 418, 435 (2009).  In considering these factors, the Court must "pay particular regard for the public consequences in employing the extraordinary remedy of injunction."  *Winter*, 555 U.S. 7.  Implementation of the Final Rule serves important public values that outweigh the harm to Plaintiffs of the abandonment or destruction of their bump stocks.  As explained below, the equities here do not favor Plaintiffs.[16]

First, the bump stock rule makes clear throughout that its adoption will likely promote public safety.  *See* 83 FR at at 66515 ("a desired outcome of this final rule is increased public safety"); *id.* at 66520 ("this rule reflects the public safety goals of the NFA and GCA"); *accord* NPRM, 83 FR at 13447 (reported use of bump stocks by Las Vegas perpetrator made "individuals aware that these devices exist—potentially including persons with criminal or terrorist intentions—and made their potential to threaten public safety obvious").  This public safety benefit would be undercut by an injunction which would allow a terrorist or criminal to use a lawfully-possessed bump stock to carry out a large-scale attack.  For this reason, public safety tilts the equities in favor of Defendants, particularly here, where

---

[16] Defendants do not contest Plaintiffs' contention that implementation of the Final Rule will lead to the "forced surrender, confiscation, or destruction" of Plaintiffs' bump stocks, thereby causing Plaintiffs to "lose the use and enjoyment of those items . . ." Mot. at 24.  The touchstone of irreparable harm is whether "adequate compensatory or other corrective relief will be available at a later date," *Wisc. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985) (internal quotations omitted), and Plaintiffs have established that it will not.  Thus, Defendants concede that Plaintiffs have met the irreparable harm prong of the preliminary injunction standard.

public safety is the mandate prescribed by Congress in the NFA and GCA.  *See Proctor v. Dist. of Columbia*, 310 F. Supp. 3d 107, 117 (D.D.C. 2018) (public safety justification supported balancing the equities in favor of governmental defendants); *Gale v. O'Donohue*, --- F. App'x ---, 2018 WL 6132050 (6th Cir. Nov. 21, 2018) (dangers to civilians warrant finding balance of equities in favor of Government's law enforcement interests).

Plaintiffs respond that the Final Rule has purportedly "disclaimed" the Government's interest in public safety.  Mot. at 25.  Plaintiffs misapprehend the Final Rule's discussion of this issue.  Although the bump stock rule is justified entirely by "the functioning of the device and the application of the relevant statutory definition," 83 FR at 66529, this does not mean that implementation of the Final Rule would not advance public safety.  To the contrary, a "desired outcome" of the Final Rule *is* "increasing public safety."  83 FR at 66537.  And because the use of bump stocks by the perpetrator of the Las Vegas mass murder has "made individuals aware that these devices exist," the risk that these devices will be used further and thereby "threaten public safety" is readily apparent.  83 FR at 66528.

In addition, implementation of the Final Rule reflects a particularized interest in advancing the safety of law enforcement personnel.  As the Final Rule noted, "[a] ban [on bump stocks] . . . could result in less danger to first responders when responding to incidents."  83 FR 66551.  This "public[] interest in the safety of . . . law enforcement officials is both legitimate and weighty." *United States v. Denny*, 441 F.3d 1220, 1225-26 (10th Cir. 2006) (quoting *Penn. v. Mimms*, 434 U.S. 106, 110 (1977)).  As with the interest in public safety, this interest would not be advanced during the pendency of an injunction, and this further tips the balance of the equities in favor of Defendants.

Plaintiffs contend in the alternative that the balance of equities favors an injunction because permitting continued possession of bump stocks will make shooting "safer," and because a preliminary injunction is needed to ensure "the proper exercise of legislative powers."  Mot. at 26-

27. Each of these arguments is based on an erroneous premise. With regard to whether bump stocks are needed to avoid the use of less "controllable methods of bump fire," Mot. at 27, Plaintiffs presuppose that shooters will be inclined to engage in bump fire absent the presence of bump stocks. Yet the very popularity of bump stocks suggests otherwise: shooters have likely flocked to the use of bump stocks precisely because they do not want to engage in alternative methods of bump fire that are not as safe. *See* 83 FR 66533-35; *compare* Mot. at 28 (describing bump stocks as "a law-abiding firearm enthusiast's accessory of choice"). Similarly, Plaintiffs' claim that an injunction is necessary for "the proper exercise of the legislative powers" conflates the balancing of equities with the likelihood of success on the merits. *See* Mot. at 27-28. For the reasons explained above, the Department has acted properly in interpreting the definition of "machinegun" and concluding that bump stocks fall within that definition.

Indeed, Congress's findings in adopting the GCA and NFA and instituting a general ban on the private acquisition of new machineguns illustrate that the public interest is in implementing congressional priorities and stopping the proliferation of machineguns, including bump stocks. *See, e.g., O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft*, 342 F.3d 1170, 1190-91 (10th Cir. 2003) (congressional findings are important factor in demonstrating public interests affected by preliminary injunction). The protection of the public and law enforcement officers from the proliferation of firepower in criminal hands is a consistent theme that runs through federal firearms legislation, including the NFA, GCA, and FOPA. *See generally* pp. 3-5. In weighing the public interest and balance of the equities at the preliminary injunction stage, "the Court must enforce the priorities of Congress," *United States v. RX Depot, Inc.*, 297 F. Supp. 2d 1306, 1310-11 (N.D. Okla. 2003), and should therefore reject Plaintiffs' contention that an injunction would help enforce compliance with the law.

## CONCLUSION

For the foregoing reasons, Plaintiffs' motion should be denied.


Dated: February 11, 2019                    Respectfully submitted,

                                            ANDREW B. BIRGE
                                            United States Attorney

                                            JOSEPH H. HUNT
                                            Assistant Attorney General

                                            JOHN R. TYLER
                                            Assistant Branch Director

                                            MATTHEW J. GLOVER
                                            Counsel to the Assistant Attorney General

                                            /s/_____
                                            ERIC J. SOSKIN (PA Bar #200663)
                                            Senior Trial Counsel
                                            Federal Programs Branch
                                            U.S. Department of Justice, Civil Division
                                            1100 L Street, NW Rm. 12002
                                            Washington, DC 20530
                                            Telephone: (202) 353-0533
                                            Fax: (202) 616-8470
                                            Email: Eric.Soskin@usdoj.gov

                                            RYAN D. COBB
                                            Assistant United States Attorney
                                            Post Office Box 208
                                            Grand Rapids, MI 49501-0208
                                            (616) 456-2404
                                            Ryan.Cobb@usdoj.gov

                                            *Counsel for Defendants*

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief is in compliance with Local Civil Rule 7.2(b)(i), which provides that this brief "shall not exceed ten thousand eight hundred (10,800) words, to include headings, footnotes, citations and quotations," not counting "the case caption, cover sheets, any table of contents, any table of authorities, the signature block, attachments, exhibits, and affidavits."

As directed by the Rule, I have used the "word count" function in Microsoft Word 2016 and obtained a count of 10,756 words.

/s/_____
ERIC J. SOSKIN
Counsel for Defendants