**UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION**

**GUN OWNERS OF AMERICA, INC.,**
*et al.*,

       **Plaintiffs,**                       Case No. 1:18-cv-01429
                                               Hon. Paul L. Maloney

v.

**MATTHEW WHITAKER,** *et al.*,

       **Defendants.**

---

**REPLY BRIEF IN SUPPORT OF PLAINTIFFS'
MOTION FOR PRELIMINARY INJUNCTION**

**I.    THE FINAL RULE REWRITES THE STATUTE TO SUIT A POLITICAL AGENDA.**

    **A.    Defendants Assert No Statutory Ambiguity.**

Defendants never dispute that the statutory definition of "machinegun" is unambiguous. Rather, Defendants claim only that the statute does not "clearly exclude[]" bump stocks. Defendants' Brief in Opposition to Plaintiffs' Motion for Preliminary Injunction ("Opp.") 14. Having failed to contest this issue, Defendants waived it.[1]

Defendants nevertheless purport to "interpret" the term "machinegun" in an unambiguous statute, claiming their new interpretation is "reasonable," and thus not arbitrary and capricious.[2] Opp. 14. In doing so, Defendants admit the Final Rule rewrites the statute: "once definitions ... have been

---

[1] *See* Dillery v. City of Sandusky, 398 F.3d 562, 569 (6th Cir. 2005); *see also* Estate of Romain v. City of Grosse Pointe Farms, 2018 U.S. Dist. LEXIS 105494, *6 (E.D. Mich. June 25, 2018).

[2] *See* United States v. TRW Rifle 7.62x51mm Caliber, 447 F.3d 686, 689 n.4 (9th Cir. 2006) ("because the statute is unambiguous, we simply follow the standard course of applying the definition to the facts.").

provided" — but apparently not until then — "the statute is reasonably interpreted to include bump stocks...."[3] Opp. 3. In another pending case, Defendants admitted that, "[a]bsent the revised definition ... ATF could not 'restrict'" bump stocks. Guedes v. ATF, USDC-DC, No. 18-2988, ECF #16 at 33 ("Guedes Opp."); *see also* Opp. 26. Defendants have admitted the Final Rule constitutes an "expansion[4] of the definition" of machinegun. Guedes Opp. 10. In another case, the government called it a "revision" of the statute. Codrea v. ATF, USDC-DC, No. 18-3086, ECF #16 at 4 ("Codrea Opp.").

Defendants assert that ATF may "expand" the statutory language to include bump stocks unless "the statutory text clearly excluded bump stocks." Opp. 14. *Au contraire. Expressio unius est exclusio alterius.* It is axiomatic that Congress must be explicit when defining what constitutes a federal crime. *See* United States v. Gradwell, 243 U.S. 476, 485 (1917). The fact that Congress did not "clearly exclude" bump stocks from the statute does not mean bureaucrats are free to "expand" the definition as they see fit. Administrative agencies do not wield unlimited power, constrained only by express statutory language. Rather, ATF may only interpret the statute as written. Yet Defendants

---

[3] Plaintiffs contended the statute is clear and unambiguous and, thus, Defendants are entitled to no deference. Memorandum in Support of Plaintiffs' Motion for Preliminary Injunction ("Pl. Memo") 20-22. Apparently Defendants agree, since they assert neither Chevron deference nor ambiguity. Indeed, in Guedes, Defendants concede they are due no deference. Guedes Opp. 29. And, as the Supreme Court noted, "[t]he critical point is that criminal laws are for courts, not for the Government, to construe. *See, e.g.*, United States v. Apel, 571 U. S.359, 571 U.S. 359, 369 ... (2014) ('[W]e have never held that the Government's reading of a criminal statute is entitled to any deference'). We think ATF's old position no more relevant than its current one — which is to say, not relevant at all." Abramski v. United States, 573 U.S. 169, 191 (2014).

[4] Just last year, the Supreme Court held "[t]he statute's unambiguous ... definition, in short, **precludes the [agency] from more expansively interpreting that term**." Dig. Realty Trust, Inc. v. Somers, 138 S.Ct. 767, 782 (2018) (emphasis added).

admit that, under the statute as written, bump stocks could not be banned. For that reason, the Final Rule was both beyond the scope of ATF's authority to enact, and arbitrary and capricious.

Defendants fret that, without the Final Rule, bump stocks could "circumvent 18 U.S.C. § 922(o)." Opp. 1. But as Plaintiffs explained, "bump fire stocks were specially designed to fall outside the statutory definition of a machinegun...." Pl. Memo 1. This has been Defendants' position for years. Suddenly now they fear that, unless permitted to expand the statute, bump stocks will "undercut Congress's regulation of machineguns...." Opp. 14. Even if that speculation were true, it would be an issue for Congress to address, not ATF.

**B.    Defendants Admit the Final Rule Was Issued Due to a Political Directive, Rather than Legal Analysis.**

Defendants admit they promulgated the Final Rule in response to "a presidential instruction to adopt this Final Rule," and are simply "[c]arrying out that directive...." Opp. 1, 2, 8. Defendants nevertheless "explicitly reject[]" that the Final Rule is a political decision, instead claiming it "adopts the 'best interpretation of the statute'...." Opp. 26.

Yet Defendants confess that they set out to "interpret[] ... 'automatically' and 'single function of the trigger' ... **in the context of bump stocks**...." Opp. 6 (emphasis added). But agencies may not change how they "interpret" a law carrying criminal penalties with a particular result in mind — particularly one they have been ordered by the President to reach. Rather, agencies must craft regulations **in the context of the law** that Congress enacted. Here, it is obvious Defendants set out to implement the President's end goal of banning bump stocks, then worked backwards to find a way to rationalize it.

### C. Rewriting a Criminal Statute by Changing a Key Word Is Not an "Interpretation" but a Usurpation of Congressional Authority.

Defendants claim "[t]he Final Rule **interprets** the phrase 'single function of the trigger' to mean 'a single pull of the trigger....'" Opp. 14 (emphasis added). That is neither an "interpretation" nor a "clarification," but an amendment. ATF has deleted Congress's word and substituted its own — replacing "function"[5] with "pull" — to suit its agenda.

Agencies are not free to edit statutes at will. In 2014, the Supreme Court rejected EPA's decision to "tailor" a statutory requirement by substituting a numerical threshold the agency preferred in place of the one Congress enacted: "EPA's rewriting of the statutory thresholds was impermissible.... An agency has no power to 'tailor' legislation to bureaucratic policy goals by rewriting unambiguous statutory terms ... to suit its own sense of how the statute should operate." Utility Air Regulatory Group v. EPA, 573 U.S. 302, 325-26 (2014). Likewise here, the agency's "need to rewrite ... should have alerted [ATF] that it had taken a wrong interpretive turn." *Id.* at 328.[6]

---

[5] Defendants never dispute Plaintiffs' contention that bump stocks do not fire multiple rounds by a "single function of the trigger." Defendants only attempt to convince the Court to convert "function" to "pull." Defendants' concession that bump stocks do not fit under the statute as written is quite telling. As Judge Friedrich noted at both oral arguments in the D.C. bump stock cases, ATF's "interpretation" changes the statute from its firearm-centric focus to a shooter-centric focus — from objective firearm mechanics to subjective human intent. Yet an agency's actions are "arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider...." Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43-44 (1983). Here, Congress dictated that ATF look at "what the trigger is doing," and instead ATF has looked at "what the shooter is doing." Pl. Memo 7.

[6] An agency may not, "under the guise of interpreting a regulation ... create *de facto* a new regulation." Christensen v. Harris County, 529 U.S. 576, 588 (2000).

4

The words "function" and "pull" are not synonyms, nor are they even related concepts. At best, it could be said that "pull" is one of many ways a "function" can be achieved.[7] Therein lies a major problem for the agency. Triggers are not only pulled, but also pushed, paddled, switched, etc. *See* 83 Fed. Reg. 66518 n.5. Defendants attempt to rescue their use of "single pull" by adding new language to the Final Rule not present in the Notice of Proposed Rulemaking (83 Fed. Reg. 13442).[8] Now, ATF "interprets the phrase 'single function of the trigger' to mean 'a single pull of the trigger,' **along with 'analogous motions**.'" Opp. 14 (emphasis added). First, ATF changed the statute from "function" to "pull." Now it realizes that "pull" is not encompassing enough and must be further changed to include push, paddle, switch, button, and flip. Of course, the statutory term "function" encompasses all ways a trigger can be activated, as Congress no doubt was aware. Indeed, it is patently obvious that Congress understood how to clearly define a machinegun in 1934, avoiding the need for the rhetorical games ATF is now playing.

### D. Defendants Seek to Adopt "Ordinary Terminology" to Replace the Statutory Text.

Defendants claim they are free to replace the statutory term "function" with "pull" because "'[p]ull the trigger' is the ordinary, accepted **terminology** for how to discharge a firearm...." Opp. 15 (emphasis added). But while agencies and courts often use the ordinary accepted **meaning** when interpreting statutory terminology, an agency certainly is not free to replace the terminology itself with language that suits the agency's agenda. Here, Congress chose the technical term "single function of

---

[7] At best, "function" and "pull" can be represented by a Venn diagram, wherein some "functions" are "pulls," and some "pulls" are "functions," but they are certainly not interchangeable terms, as the government claims.

[8] Although the Eleventh Circuit once approved (erroneously, Plaintiffs contend) of "single pull" in Akins v. United States, 312 Fed. Appx. 197 (11th Cir. 2009), it never considered ATF's latest revision.

the trigger," which Defendants argue Congress did not mean, since it departed from the terminology in common use. On the contrary, Congress's deliberate departure from the ordinary terminology ("pull"), especially given the "ubiquity of this usage" (Opp. 15), indicates a legislative desire that "single function of the trigger" describe the operation of the firearm, not the actions of the shooter.

In Guedes, Defendants asserted their interpretation of the statute should be upheld "so long as the terms are given their 'ordinary, accepted meaning.'" Guedes Opp. 29. However, under the "ordinary-meaning canon," "[w]ords are to be understood in their ordinary, everyday meanings — **unless the context indicates that they bear a technical sense**." *See* A. Scalia and B. Garner, Reading Law, p. 69 (West Publishing: 2012) (emphasis added). Here, "single function of the trigger" clearly bears a technical meaning; even more so since Congress departed from the "ordinary terminology." ATF is not free to interpret it colloquially.

E.  **Defendants Seek to Change Both the Law and the Facts.**

Defendants admit ATF previously recognized on multiple occasions that "bump stocks ... **lacked** internal springs or other mechanical parts that **channeled** recoil energy." Opp. 7 (emphasis added). The Final Rule, however, claimed that "bump-stock-type devices ... **channel** recoil energy." 83 Fed. Reg. 66516 (emphasis added). Now, Defendants claim only that a bump stock merely "**helps a shooter channel** recoil energy...." Opp. 23 (emphasis added). This is not the only "alternative fact" being asserted.

In 2010, ATF ruled that a bump stock "has no automatically functioning mechanical parts or springs and performs no automatic mechanical function...." Exhibit 1. ATF now claims that bump stocks "function[] as a self-acting or self-regulating mechanism...." 83 Fed. Reg. 66515.

Next, "[i]n 2013, ATF correctly admitted that bump stocks 'require[] **continuous multiple inputs** by the user for each successive shot.'" Pl. Memo 14. ATF now claims that bump stocks "enabl[e] the shooter to **continue** the firing sequence ... **without conscious input or direction** to the trigger finger." Guedes Opp. 25 (emphasis added).

In 2008, ATF explained that "every subsequent shot depends on the shooter applying the appropriate amount of forward pressure...." Exhibit 12. "Now ... ATF claims that bump stocks operate 'without additional physical manipulation of the trigger....'" Pl. Memo 14.[9]

Finally, in 2012, ATF distinguished bump stocks from "devices that require only a single pull of the trigger...." ATF Letter to William M. Thornberry, July 13, 2012. Now, ATF claims that bump stocks "initiate a continuous firing cycle with a single pull of the trigger...." 83 Fed. Reg. 66514.

These above examples do not evidence a different interpretation of the law, but rather a contradictory recitation of the facts. ATF claims that bump stocks do not operate the way they did in 2008, even though bump stocks' design and operation (and the laws of physics) have not changed. ATF claims its newfound "understanding" is justified because it had not yet formally defined the word "automatically." Yet ATF's new "alternative facts" apply to both prongs of the statute. ATF has manufactured and adopted a set of "facts," torturing both language and logic, designed to achieve its preferred result of banning bump stocks in contradiction of more than a decade of contrary ATF interpretations.[10]

---

[9] Defendants assert that "there is a ... **constant intent** by the shooter to continue to pull on the trigger," while they concede that a "bump stock [enables firing] **without conscious input or direction** to the trigger finger." Guedes Opp. 24-25 (emphasis added).

[10] ATF has "offered an explanation for its decision that runs counter to the evidence before the agency, [and] is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." Motor Vehicle Mfrs. at 43.

## II. BUMP STOCKS DO NOT FUNCTION AUTOMATICALLY.

### A. Bump Stocks Are Not a Mechanism.

Defendants curiously argue that "a bump stock provides an empty, yet constrained, space, and this space functions as a self-regulating mechanism that helps a shooter channel recoil energy...." Opp. 23.

First, a bump stock does not "provide an empty space" — presumably meaning space for the firearm and trigger to recoil rearward away from the trigger finger. Rather, it is the shooter's support hand pushing the firearm away from his body that provides separation (between his body and the firearm) for the firearm to recoil. Yet Defendants admit that forward pressure — not a bump stock — is necessary to bump fire. Opp. 9. The "empty space" necessary for bump firing is present whether one bump fires with a bump stock, a belt loop, or even bare hands.

Second, it is quite an assertion that "**empty ... space** functions as a self-regulating **mechanism**." To be sure, Defendants argue in favor of an expansive meaning of "mechanism" to include not only "moving parts" but also an "'instrument or process....'" Opp. 21. But "empty space" is neither of those — empty space[11] is certainly not a mechanism.

Third, a bump stock does not "**channel** recoil energy" or even "assist" a shooter in doing so. *See* 83 Fed. Reg. 66516. As a verb, "channel" means "to direct toward or into some particular course."[12] Bump stocks do not "direct" energy either forward or rearward. To be sure, the normal recoil of the firearm pushes the firearm rearward (into the bump stock), and then the shooter's forward pressure pushes the firearm forward (and away from the bump stock). But the bump stock isn't

---

[11] https://www.dictionary.com/browse/space.

[12] https://www.dictionary.com/browse/channel.

8

responsible for these motions; rather, physics are — specifically, Newton's Third Law of Motion. This linear back-and-forth path **exists with or without a bump stock**. In other litigation, Defendants actually conceded that bump stocks do not channel energy, admitting that "the channeling ... relies on 'the shooter's maintenance of pressure ... and constant rearward pressure on the device's extension ledge....'" Guedes Opp. 26.

Finally, even if a bump stock could be said to "channel" energy, the Final Rule never uses the word "channel." Rather, the Final Rule alleges that bump stocks act by "**harnessing** the recoil energy...." 83 Fed. Reg. 66553-54 (emphasis added). "Harness" has an entirely different (and more complex) meaning from "channel." Channel means "**to direct** toward or into some **particular course**." To "harness" means to "gain **control** over for a **particular end**."[13] A ditch channels (directs) water, but a dam harnesses (collects, stores) water much like a battery. Watering down the test from "harness" to "channel" is another attempt by the government to move the goal posts.

**B.  Defendants Admit Bump Stocks Do Not Harness Energy.**

Plaintiffs argued that the Final Rule "confuse[s] and obfuscate[s] the way bump stocks operate." Pl. Memo 15. In their Opposition, Defendants seek to walk back some of their erroneous statements, admitting that "certain statements in the Final Rule could be misinterpreted." Opp. 20 n.12. For example, Defendants admit the Final Rule alleges that the bump stock "**itself ... harnesses** the recoil energy," that a bump stock "**eliminates the requirement that a shooter manually capture** and direct recoil energy," and that "bump stocks ... are specifically **designed to capture** the recoil energy." *Id.* (emphasis added).

---

[13] https://www.dictionary.com/browse/harness.

Plaintiffs originally pointed out that "[b]ump stocks 'harness' nothing, they are just a piece of plastic. They contain no springs, batteries, capacitors, generators, etc." Pl. Memo 15. Defendants admit the truth of that statement. *See* Opp. 22. Plaintiffs explained bump stocks "require **the shooter** to capture and direct the recoil energy...." Pl. Memo 16 (emphasis added). Defendants attempt to save the Final Rule from its errors by deflecting, claiming "**the context makes clear** that the agency understands that **humans play the primary role** in absorbing and releasing the recoil energy." Opp. 20 n.12 (emphasis added). In other words, the "context" should cause the rule to be read to mean the opposite of what the Final Rule expressly states. On the contrary, if the "context" makes anything "clear," it is that the Final Rule portrays bump stocks falsely.

Apparently abandoning their claim that bump stocks "harness" energy, Defendants now allege that a bump stock only "**assists the shooter in harnessing** and directing the firearm's recoil." Opp. 22 (emphasis added). Of course, nothing in the Final Rule discusses "assistance" in harnessing energy, and the Final Rule on its face applies only to devices which "harness[] the recoil energy" (83 Fed. Reg. 66554), not devices which "assist" a shooter in doing so. Again, Defendants seek to widen the goal posts they originally established.

### C. "Automatically" Is Not a Matter of "Degree."

Defendants agree something which is "automatic" works with "'*little* or no human control.'" Opp. 19. Defendants concede bump stocks require additional input that machineguns do not — forward pressure on the firearm by the support hand. At oral argument before Judge Friedrich in Guedes on February 6, 2019, government counsel stated that forward pressure by the support hand is an "element of added input." Nevertheless, Defendants allege that bump stocks should still be treated as automatic because the issue "is one of degree: how much human intervention is necessary...." Opp.

10

19. Defendants contend that bump stocks, even with the added human input, are **still automatic enough**[14] to be considered machineguns.

Defendants are wrong. The question of what constitutes "automatically" is decidedly **not** "one of degree." Rather, Congress has specified the boundaries of what constitutes "automatically": a machinegun is "any weapon which shoots ... automatically ... **by a single function of the trigger**." 26 U.S.C. § 5845(b) (emphasis added). A "single function of the trigger" is the starting and the ending point of just how much human input is allowable to still render a firearm "automatic." Since Defendants admit bump stocks require more human input than a single function of the trigger, bump stocks require more input than the statute permits. Thus, they are not machineguns, and ATF has no authority to treat them as such.

### D. Bump Stocks Fail Defendants' Own Test for "Automatically."

Defendants set out the reasons they believe bump stocks are "automatic":

> "1) the trigger finger remains stationary on the ledge provided by the design of the device;
> 2) the shooter maintains constant rearward pressure on the trigger; and
> 3) the shooter constantly pushes forward...." [Opp. 9.]

Bump stocks do not meet prongs one and two of that test.

First, addressing the question as to whether a person could simply remove the bump stock's finger "ledge" and thereby avoid classification as a machinegun, ATF's Final Rule stated that "[t]he Department does not believe that removing the trigger ledge is sufficient to affect a bump-stock-type

---

[14] Defendants point to Plaintiffs' argument that bump stocks permit "'controlled and therefore safe bump fire.'" Opp. 20. Defendants argue that this "underscores that bump stocks are providing an 'automatic' function...." *Id.* That is nonsensical. Firearm sights permit a shooter to engage in "controlled and therefore safe" firing of the rifle, but certainly do not "provid[e] an 'automatic' function."

device's classification as a machinegun." 83 Fed. Reg. 66537. But how can the extension ledge be **necessary** to the bump stock's "automatic" operation, yet **irrelevant** to its classification as a machinegun?

Second, Defendants have admitted numerous times that a shooter maintains "constant rearward pressure on the device's extension ledge" — not the firearm's trigger — and that "'the trigger ... lose[s] contact with the finger'" between shots. Opp. 19. Defendant is correct. Indeed, how could a shooter simultaneously maintain constant contact with both the bump stock extension ledge and the trigger, when the trigger and the extension ledge are constantly articulating towards and away from each other? *See* Exhibit 34. The answer is obvious — the concepts are mutually exclusive and cannot simultaneously be true.

### III. BUMP STOCKS DO NOT FIRE WITH A SINGLE FUNCTION OR SINGLE PULL.

#### A. Defendants Claim a Shooter Can Pull the Trigger without Touching It.

Defendants dispute the simple truth that "a shooter must physically touch a trigger in order to pull it." Pl. Memo 8. Although Defendants admit that, when bump firing, the shooter's trigger finger is physically separated from the trigger between shots (Opp. 19), they somehow dispute that bump fire involves a "'rapid series of trigger pulls.'" Opp. 18. Rather, Defendants assert that Plaintiffs "place[] too much stock in the physical separation between trigger and finger." *Id.* According to Defendants, all that matters is that bump fire "is all a part of a single 'exert[ion],'" whatever that means. *Id* at 19. In <u>Guedes</u>, Defendants claimed the "constant exertion on the bump stock ... corresponds to constant **intent** by the shooter **to continue to pull** the trigger...." <u>Guedes</u> Opp. 24 (emphasis added). In other words, according to Defendants, it doesn't matter that a shooter doesn't **actually** continue to pull the trigger; all that matters is that he **intends to** continue to pull the trigger.

With this leap of logic, Defendants have abandoned Congress's technical definition based on firearm mechanics and replaced it with a definition that turns on conscious or subconscious intent by a shooter. Even if Defendants were correct that ATF has "presumed knowledge regarding 'scientific determinations'" (Opp. 11-12), it has no expertise in determining a person's mental state.

### B. Defendants Admit Bump Stocks Are Not the Impetus for Bump Fire, nor Do They "Accelerate" Bump Fire.

Defendants characterize a bump stock as "an apparatus ... **allowing** a shooter to use the weapon at a rate of fire[15] similar to that of an automatic weapon." Opp. 1-2 (emphasis added). However, Defendants quickly abandon that argument. Opp. 14 n.10. According to Defendants, though, their error does not matter: "the fact that bump stocks [only] **assist** [but do not allow] shooters in firing faster **is not the basis for the Final Rule** nor the reason bump stocks are machineguns." *Id.* (emphasis added). According to Defendants, factual inaccuracies in the Final Rule are irrelevant.

In the Final Rule, as well as in their briefing in Guedes, Defendants claimed that bump stocks "**accelerate** the firing rate [a shooter] can attain **relative to his or her use without a bump stock**." Guedes Opp. 22 (emphasis added); *see* 83 Fed. Reg. 66516. But Defendants have recognized that bump fire existed long before the invention of bump stocks, and will continue unimpeded in the absence of bump stocks. *See* 83 Fed. Reg. 66551; *see also* Exhibit 2. It is not the bump stock that enables bump fire. Rather, it is the bump fire **technique** — performed by the shooter, not the device — that allows a shooter to shoot rapidly. Pl. Memo 13. A bump stock just makes the bump fire

---

[15] Bump stocks do not help a shooter fire any faster when compared to bump firing without a bump stock. Even if they did, that factor is irrelevant as to what constitutes a machinegun. Congress did not outlaw any particular "rate of fire" when it outlawed machineguns. Once again, Defendants attempt to distract from the mechanics-based statute, and move to a results-oriented test. Again, "bump fire is not automatic fire simply because it 'mimics' automatic fire." Pl. Memo 16.

technique easier and safer to control. Pl. Memo 27. As Plaintiffs have explained, the mechanics — and the "rate of fire" — of bump fire with a bump stock and without a bump stock are identical. Shooters using bump stocks to bump fire[16] do not shoot any faster than shooters bump firing without bump stocks.[17]

### IV.  DEFENDANTS OFFER LITTLE OPPOSITION TO THE PUBLIC INTEREST/PUBLIC SAFETY PRONGS.

Defendants theorize — without evidence — that the Final Rule furthers public safety, even though public safety was not the reason for the Final Rule. Opp. 28. On pages 2, 7, 25, 26, and 28 of their Opposition, Defendants allege bump stocks were "used" in Las Vegas. *See also* 83 Fed. Reg. 66516, 66518. However, on page 27 of their Opposition, Defendants more accurately allege only "reported use." Yet Defendants cite no source as proof bump stocks were "used" in Las Vegas, nor can Plaintiffs find any government source stating as much. Defendants have not contested that ATF never physically examined the Las Vegas firearms, and thus has no idea whether they were modified in other ways, such as containing machinegun parts. Compl. ¶¶ 116-124. Nor have Defendants contested Plaintiffs' allegation that the government has no evidence of actual use of bump stocks in any crime.

As for the public interest prong, Defendants ironically malign Plaintiffs' call for "the proper exercise of the legislative powers" (Pl. Memo 27), then claim "the public interest is in implementing congressional priorities" (Opp. 29). Of course, "[i]t is in the public interest for ... an agency to implement properly the statute it administers." Mylan Pharms., Inc. v. Shalala, 81 F. Supp. 2d 30, 45 (D.D.C. 2000).

---

[16]  *See, e.g.*, https://www.youtube.com/watch?v=VCx1rgxXVKA at 0:17.

[17]  *See, e.g.*, https://www.youtube.com/watch?v=7RdAhTxyP64 at 0:55.

          Respectfully submitted,

          By: /s/ Kerry L. Morgan
          Kerry L. Morgan (P32645)
          Attorney for Plaintiffs
          PENTIUK, COUVREUR & KOBILJAK, P.C.
          2915 Biddle Avenue, Suite 200
          Wyandotte, MI  48192
          Tel:  (734) 281-7100
          Fax:  (734) 281-2524
          KMorgan@pck-law.com

          Robert J. Olson
          William J. Olson
          Jeremiah L. Morgan
          Herbert W. Titus
          WILLIAM J. OLSON, P.C.
          370 Maple Avenue West, Suite 4
          Vienna, VA  22180
          Tel:  (703) 356-5070
          Fax:  (703) 356-5085
          wjo@mindspring.com

February 25, 2019

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief is in compliance with Local Civil Rule 7.2(c), which provides that this brief "shall not exceed four thousand three hundred (4,300) words, to include any headings, footnotes, citations and quotations. Not to be included in the word count limit are the case caption, cover sheets, any table of contents, any table of authorities, signature block, attachments, exhibits, and affidavits."

As directed by the Rule, I have used the "word count" function in Corel Word Perfect 6X5 and obtained 4,297 countable words.

          By: /s/ Kerry L. Morgan
          Kerry L. Morgan (P32645)
          Attorney for Plaintiffs

February 25, 2019