1                    IN THE UNITED STATES DISTRICT COURT
                    FOR THE WESTERN DISTRICT OF MICHIGAN
2                            SOUTHERN DIVISION

3      _____

4      GUN OWNERS OF AMERICA, INC.,
       GUN OWNERS FOUNDATION,
5      VIRGINIA CITIZENS DEFENSE LEAGUE,
       MATT WATKINS, TIM HARMSEN, and
6      RACHEL MALONE,

7                    Plaintiffs,

8           v.                          CASE NO:  1:18-CV-1429

9      MATTHEW WHITAKER, in his official
       capacity as Acting Attorney
10     General of the United States,
       U.S. DEPARTMENT OF JUSTICE,
11     BUREAU OF ALCOHOL, TOBACCO,
       FIREARMS AND EXPLOSIVES, and
12     THOMAS E. BRANDON, in his
       official capacity as Acting
13     Director, Bureau of Alcohol,
       Tobacco, Firearms, and Explosives,

14                   Defendants.

15     _____/

16

17                           *   *   *   *

18

19                   HEARING on PLAINTIFFS' MOTION
                      FOR PRELIMINARY INJUNCTION

20                           *   *   *   *

21

       BEFORE:    THE HONORABLE PAUL L. MALONEY
22                 United States District Judge
                   Kalamazoo, Michigan
23                 March 6, 2019

24

25

```
 1    APPEARANCES:

 2

 3    APPEARING ON BEHALF OF THE PLAINTIFFS:

 4         ROBERT J. OLSON
           William J. Olson, P.C.
 5         370 Maple Avenue West, Suite 4
           Vienna, Virginia  22180

 6
           KERRY L. MORGAN
 7         Pentiuk, Couvreur & Kobiljak, P.C.
           2915 Biddle Avenue, Suite 200
 8         Wyandotte, Michigan  48192

 9


10
      APPEARING ON BEHALF OF THE DEFENDANTS:
11
           ERIC J. SOSKIN
12         U.S. Department of Justice
           Civil Division
13         Federal Programs Branch
           1100 L Street, N.W., Room 12002
14         Washington, D.C.  20530

15         MATTHEW J. GLOVER
           Counsel to the Assistant Attorney General
16         Civil Division
           950 Pennsylvania Avenue, N.W.
17         Washington, D.C.  20530

18

19

20

21

22

23

24

25
```

|          |    |                                                              |
|----------|----|--------------------------------------------------------------|
|          | 1  | Kalamazoo, Michigan                                          |
|          | 2  | March 6, 2019                                                |
|          | 3  | at approximately 9:10 a.m.                                   |
|          | 4  | PROCEEDINGS                                                  |
| 09:10:18 | 5  | THE COURT:  This is File Number 18-1249; <u>Gun Owners</u>  |
|          | 6  | <u>of America, Incorporated, et al. vs. The Bureau of Alcohol,</u> |
|          | 7  | <u>Tobacco, Firearms and Explosives, et al.</u>            |
|          | 8  | This matter is before the Court on plaintiffs'              |
|          | 9  | motion for a preliminary injunction, which is ECF Number 9. |
| 09:10:42 | 10 | The record should reflect that Attorneys Olson and          |
|          | 11 | Morgan represent the plaintiffs.  Attorneys Soskin and      |
|          | 12 | Glover represent the defendants.                            |
|          | 13 | The Court is ready to proceed.  Mr. Olson, you may          |
|          | 14 | proceed, sir.                                               |
| 09:10:55 | 15 | MR. OLSON:  Yes, sir.  Good morning, your Honor.            |
|          | 16 | THE COURT:  Good morning, sir.                              |
|          | 17 | MR. OLSON:  We are, as the Court is aware, here             |
|          | 18 | to -- for the Court to decide whether 20 days from today an |
|          | 19 | estimated 500,000 Americans, if not many more, are going to |
| 09:11:19 | 20 | be required to destroy or surrender property that they have |
|          | 21 | lawfully owned and the ATF for 10 to 15 years has stated is |
|          | 22 | perfectly lawful to own, and now has suddenly decided       |
|          | 23 | constitutes a machinegun under federal law.  And, your      |
|          | 24 | Honor, I believe that there are two important reasons here  |
| 09:11:40 | 25 | that not only weigh heavily in favor of granting the        |

1    preliminary injunction, but actually require it in this

2    case.

3            The first one is it's been our position since the

4    filing of our Complaint that the federal statute defining a

09:11:53    5    machinegun is clear and unambiguous, and the government

6    actually agrees.  If you look at final rule, I'm looking at

7    Page 66527 of the Federal Register, they say even if the

8    statute is unambiguous -- and they say this two or three

9    times, so they are -- they clearly believe the statute is

09:12:13   10    unambiguous -- and they say even if it's not, and they make

11    their other argument, but and I think that sort of

12    forecloses everything else because the Supreme Court has

13    held, and I'm reading from Connecticut National Bank vs.

14    Tremain, this is Justice Thomas speaking, he says, "When the

09:12:28   15    words of a statute are unambiguous, the judicial inquiry is

16    complete."  The Ninth Circuit in TRW Rifle, it's in our

17    reply brief, they say, "If the statute is unambiguous,

18    courts simply follow the standard course of applying the

19    definition to the facts."

09:12:45   20            ATF does not want this Court, your Honor, to apply

21    the definition to the facts because as ATF admits, and this

22    is their words, "Absent the revised definition, ATF could

23    not restrict bump stocks."  And one of the reasons that that

24    is the case is because bump stocks do not fire more than one

09:13:05   25    round by a single function of the trigger, and that's a

1    statutory term, and we have made that argument a half dozen

2    times and it has never been contested by the government,

3    your Honor.  And again, using their words, the only way to

4    get bump stocks to fall within the statute is to "expand the

09:13:24    5    definition to include language that would then cover bump

6    stocks."  Of course, the Supreme Court has held, we've cited

7    this case, the Digital Realty Trust case in our brief.  They

8    cite, the definition -- "An unambiguous definition precludes

9    the agency from more expansively interpreting the term."

09:13:42    10   And that's honestly what they admit they are doing here.

11   They are expanding the definition to include bump stocks.

12   And if the definition, if your Honor finds the definition to

13   be ambiguous, then I think that raises questions whether

14   there is a void for vagueness argument there then.  It's not

09:13:59    15   clear what statutes a machinegun, and Congress has then

16   failed its duty to clearly define what constitutes a crime.

17         THE COURT:  Well, there have been multiple people

18   prosecuted under the statute criminally, correct, and those

19   convictions were upheld, right?

09:14:14    20         MR. OLSON:  Certainly.  I think--

21         THE COURT:  So the statute, if it meets the

22   threshold of criminal prosecutions, doesn't that implicate

23   that argument here?

24         MR. OLSON:  I think that's been based on the

09:14:28    25   assumption that since 1934 the statute has been unambiguous,

1  and Courts have had no problem interpreting it and implying

2  it in cases.  Suddenly now in 2018, it's ambiguous according

3  to the government.  They have never seen fit to change the

4  definition in all of these years until ordered to do so

09:14:48  5  essentially by President Trump, and to reach a particular

6  conclusion, which their briefing admits that they set out

7  with this particular intent and purpose in mind and then

8  crafted a regulation that would meet the intended result.

9        What ATF --

09:15:06  10        THE COURT:  What rule of statutory construction do

11  you rely on to assert that the statute is unambiguous?  I

12  don't think that's clear from your briefing.

13        MR. OLSON:  I guess that automatically at least we

14  would argue the plain meaning, single function of the

09:15:26  15  trigger as we argued you would -- we argued that you

16  ordinarily would use the plain meaning, but in this case,

17  it's clear from that language and, as the government points

18  out, Congress didn't use the ordinary language, they didn't

19  use pulling the trigger, which is what people ordinarily

09:15:42  20  would talk about when discussing shooting a gun.  They used

21  function of the trigger, and I think there is a reason for

22  that, and it's very clear that Congress meant this term to

23  have a technical sort of scientific definition, and that's

24  what ATF says that their specialty is, is in technical

09:15:58  25  analysis, not in what they have now shifted the statute to.

1    Single pull of the trigger looks at the subjective intent of

2    the shooter and what the shooter is doing, how the shooter

3    is interacting with the gun.  And we get into intent and

4    subconscious thinking, and certainly the ATF is no expert at

09:16:15  5    any of that, your Honor.

6         THE COURT:  Go ahead.  Thank you.

7         MR. OLSON:  In this case, it's interesting to look,

8    because ATF doesn't ever say we are defining machinegun,

9    because Congress has defined a machinegun, it's given a

09:16:30 10    multi-part fairly lengthy definition.  So what ATF says

11    they're doing, and again, their words, they say the terms

12    contained in the definition are undefined.  Of course, they

13    are undefined, because Congress doesn't define definitions

14    and then define the definitions of the definitions, and it

09:16:47 15    just goes on, but that's what ATF purports to do here.  And

16    that's the only way you would get to the result they want is

17    you take machinegun, and for example, one of the elements is

18    that it fires automatically, and that is the definition.

19    But now they want to define automatically as a self-acting

09:17:02 20    or self-regulating mechanism, and then we talk about a

21    mechanism.  So in their brief in opposition on Page 21, we

22    actually get into a discussion and argument about what a

23    mechanism is.  And so now we are three iterations away from

24    what the statute says.

09:17:19 25         When it comes to the other elements, the single

1    function, they have defined it for a number of years as a

2    single pull of the trigger, not a single function of the

3    trigger.  But now in the final rule, they move from single

4    pull of the trigger to single pull of the trigger and

09:17:35   5    analogous motions, because they realize there is a problem

6    with single pull and it doesn't encompass everything, all

7    the ways a trigger could be activated.  And now in their

8    briefing, they have a whole list of analogous motions that

9    they want to be covered under single pull.  And as we point

09:17:51   10    out in our briefing, if you just go with single function,

11    that covers all of the ways a trigger could be activated,

12    covers pulls and pushes and switches and paddles.  And I

13    think Congress recognized that.  Clearly they had

14    machineguns back in 1934 that were activated by paddles or

09:18:08   15    different things that weren't a typical trigger, and so

16    Congress used that terminology so you would look at the

17    trigger and look at its function.

18           So we keep ATF, in order to get where they want,

19    they keep getting further and further away from what the

09:18:24   20    statute and what the definition in the statute actually

21    says, and it sort of begs the question how many iterations

22    you need to have of defining definitions of definitions, and

23    it seems like the answer is as many as it takes until bump

24    stocks are machineguns, your Honor.

09:18:38   25           One of the issues that I wanted to raise was

1    something that the Court's no doubt familiar with, the

2    government's recent filing just last week, the Notice of

3    Supplemental Authority discussing Judge Friedrich's opinion

4    in DC and the issue of deference.  And in our initial

09:18:59   5    briefing, we had argued there is no Chevron deference in a

6    determination like this.

7         THE COURT:  You don't get Chevron deference if the

8    statute is--

9         MR. OLSON:  Certainly, certainly.  Even if the

09:19:11  10    Court decided the statute were ambiguous, ATF has now

11    disclaimed any deference at all.  They say --  They cite the

12    Apel decision, the 2014 Supreme Court Apel decision, and

13    there the Court says we have never held that the

14    government's reading of a criminal statute is entitled to

09:19:28  15    any deference.  And certainly that means Chevron deference,

16    your Honor.  I think the government admits that.  But the

17    other thing I think that that forecloses is --

18         THE COURT:  Well, wasn't the critical word you just

19    spoke, the criminal context or criminal --

09:19:43  20         MR. OLSON:  Criminal statute.

21         THE COURT:  -- as opposed to this is something

22    different, right?

23         MR. OLSON:  This case, your Honor?

24         THE COURT:  Well, this is not a criminal

09:19:51  25    prosecution.  There are certain rules of statutory

1    construction as it relates to criminal statutes which the

2    context is totally different here, right?

3          MR. OLSON:   This is not a criminal prosecution,

4    your Honor, but this is a criminal statute that was enacted,

09:20:06   5    reenacted as Title 2 of the Gun Control Act in 1968.   It's

6    interspersed and intermingled.   The gun Control Act relies

7    on the NFA definition.   Just because we are not here in a

8    criminal matter doesn't mean this should be a different

9    rule, I would think for this case, and then if six months

09:20:25  10   down the line ATF chooses to prosecute someone, the statute

11   has to mean the same thing in both contexts, I would think.

12   And the government has admitted that they are due no

13   deference here.

14          And so I think the important thing is that, you

09:20:39  15   know, if Chevron is out, that also means that 706 deference

16   is out under the APA, your Honor, because that discusses

17   arbitrary and capricious and those sorts of concepts.   And

18   as Judge Friedrich mentioned in her DC opinion, and every

19   other case that I've read on this, it says that Chevron

09:21:01  20   deference and 706(a) -- or 706 deference, they overlap, the

21   analysis is basically the same.   Because in Chevron you're

22   asking whether something is arbitrary and capricious, and in

23   706 you're asking if something is arbitrary and capricious.

24   So the deference, in Apel says, any deference, it doesn't

09:21:18  25   say Chevron deference.   We have held that the government's

1   reading of criminal statute is not entitled to any

2   deference.  I would argue that forecloses 706 deference as

3   well, that it's not just as the government argues, that they

4   had a reasonable interpretation of the statute, that there

09:21:36   5   was nothing foreclosing their argument or anything like

6   that, that it's actually a function for this Court to itself

7   determine what the statute actually means, not so long as

8   ATF has a reasonable interpretation of the statute, we'll go

9   with that, if that makes sense.

09:21:56   10          As we cited in Abramski, the Abramski decision

11   which was decided a few months of after Apel, the Court went

12   even further and they were actually dealing with the case

13   where ATF was a party and they were dealing with an ATF

14   interpretation of the statute, and they said, "ATF's old

09:22:12   15   position is no more relevant than its current one, which is

16   to say not relevant at all.  When the government interprets

17   a criminal statute too broadly, as it sometimes does, or too

18   narrowly, as ATF used in that case, a Court has an

19   obligation to correct its error."  So I would say that even

09:22:27   20   if this Court found the statute to be ambiguous, that it's

21   almost a de novo review of what the statute means, and there

22   is no deference to the government any more than there is

23   deference to the plaintiffs.  It's all just the power to

24   persuade of the briefs.

09:22:43   25          Your Honor, there is one other thing that I wanted

to discuss that we mentioned briefly in our opening brief,
and it came up in both oral arguments in DC in front of
Judge Friedrich, and that was ATF's, their application of
the final rule to rubber bands.  And if you look at
Page 66551 of the final rule, they say that, "Individuals
wishing to replicate the effects of bump stock type devices
could also use rubber bands, belt loops or otherwise train
their trigger finger to fire more rapidly, this would be
their alternative to using bump stock type devices."  And
that has not always been ATF's position.  They have had
opinion letters over the years where they have said if a
rubber band is affixed to a rifle in a certain way, that it
might make it a machinegun.  And so they are basically
counseling people to tread lightly here because we haven't
determined this, but it could be.  But in the final rule,
your Honor, the ATF puts its rubber stamp on rubber bands.
They say go to town.

THE COURT:  Rubber stamp on rubber bands.  Go
ahead.

MR. OLSON:  Sorry.

So you look at a rubber band, your Honor, and you
look at the -- I would obviously argue that under the
statute, a rubber band hooked around the trigger of an AR-15
wrapped around the front of the magazine well and back
around the trigger that provides some forward assistance for

1    the trigger reset, and then when coupled with recoil of the

2    firearm, those two forces together are enough to articulate

3    the trigger, to reset the trigger, and then the shooter

4    would press the trigger and fire another round.  Under the

09:24:41  5    statute, the way it's written, I would say it's still not a

6    machinegun, because it's still firing one round for every

7    mechanical function of the trigger.  You have a trigger

8    break and a trigger reset, one function of the trigger.  But

9    even if you look at ATF's definition that they have

09:24:56  10   constructed and you apply it to a rubber band, a rubber

11   band, it fires, it works automatically, it elongates and it

12   compresses, and doing that is certainly harnessing recoil

13   energy, and it's certainly self-acting and self-regulating.

14   These are all the concepts that ATF throws around in its

09:25:17  15   final rule.

16         And if you -- if just for the sake of argument we

17   go with single pull of the trigger, when you're firing an

18   AR-15, say, with a rubber band, the trigger finger never

19   physically separates from that trigger, so it could be

09:25:34  20   understood to be a single pull of the trigger.  So a rubber

21   band, your Honor, meets every single one of the criteria

22   that ATF itself has established for a machinegun, yet here

23   they say use your rubber bands, don't use your bump stock.

24   A bump stock fits none of the criteria that we've argued

09:25:51  25   under ATF's constructive definition, and yet they're saying

1    bump stocks are machineguns.

2           One of the other things that we have pointed to is

3    semi-automatic firearms themselves, that there is a danger

4    here that, left unchecked and given this new authority to

09:26:09    5    expand the definition and thus expand the statute that a

6    future administration, a future ATF could come in and apply

7    this definition of machineguns to semi-automatic firearms,

8    which everyone hopefully knows are completely different

9    things.  But under the way they have written this final

09:26:28   10    regulation is, you know, a semiautomatic firearm, when you

11    pull the trigger and discharge a round, you set into motion

12    a series of events.  The bolt or slide comes to the rear,

13    the spent casing is ejected, the bolt with a spring assisted

14    goes back forward, strips another round off, and puts it

09:26:47   15    into the chamber, and all the trigger components reset.

16    Your Honor, all of that happens automatically once you have

17    a trigger break.  And all of that happens, it's a

18    self-acting, self-regulating mechanism, and it all happens

19    by harnessing the recoil energy of the fired shot.

09:27:05   20           And what is also interesting is in basic shooting

21    instruction, and when you get into this a little bit, one of

22    the things that shooters are taught is that when you're

23    firing a semi-automatic multiple rounds, you have trigger

24    slack and then you get to sort of a wall, and you have a

09:27:24   25    trigger break, where there would be a 3, 4 or 5 whatever

1    poundage, it is necessary to then discharge the trigger.

2    When that happens, the novice shooter, the instinct is to

3    have their finger jump back off the trigger and lose contact

4    with the trigger, but shooters are taught to just release

09:27:45    5    the trigger enough to allow the trigger to reset.  So if you

6    have that slack and that take-up of the trigger, you don't

7    let off, you don't release all of your pressure on the

8    trigger, so you work in this very small space of trigger

9    break, trigger reset, trigger break, trigger reset, so I

09:28:03   10    would clearly argue against it in such a case, but I could

11    see a scenario where, in the future, ATF could say that's a

12    single pull of the trigger, because your finger never leaves

13    the trigger and it's constantly exerting force on that

14    trigger.  So in that sense, once again, bump stocks fit none

09:28:18   15    of their criteria, and semi-automatics, at least the

16    argument could be made that fit every single one of their

17    criteria, and that's a very dangerous road to go down to

18    adopt a regulation that could be used in the future to ban

19    semi-automatic firearms as a class.

09:28:35   20         THE COURT:  ATF has been consistent since 2006 on

21    the issue of single pull, right?

22         MR. OLSON:  With the Akins accelerator, yes, your

23    Honor.  Well, I would say they've been consistent on single

24    pull, but now they have moved from single pull to single

09:28:50   25    pull and analogous motion.  So now they wish to change that

further.  The Court in Akins never upheld the additional

language, never looked at that, never realized that when you

move from single function to single pull, and then there's

other ways to pull a trigger, that that creates a whole host

of problems that you then have to fix.  So that's one of the

two problems we see with Akins, your Honor.  The other

being, if you look at Akins, and I'm reading on Page -- I'm

not seeing a page cite here that's easily determinable, but

it says, under the APA, "We defer to the agency unless it

acts arbitrary and capriciously on the other elements."  So

they are saying we are giving deference to the agency.

Under Akins and Abramski -- Akins was in 2009, your Honor.

I'm sorry, a lot of cases that begin with A here.  Under

Apel and Abramski, I think that's foreclosed any sort of

deference.  I actually think Akins has not been overruled,

but the basis for the decision has been overruled, your

Honor, the deference.  I don't even think that the Eleventh

Circuit's opinion still governs in the Eleventh Circuit

after those two cases.

Your Honor, if you have any questions, I would be

happy to try to address them.  I don't know that I have

anything further at this time.

THE COURT:  All right.  Thank you.  I'll come back

to you, I'm sure.

Mr. Soskin, go ahead, sir.

|  |  |  |
|---|---|---|
|  | 1 | MR. SOSKIN:  Good morning, your Honor. |
|  | 2 | THE COURT:  Morning. |
|  | 3 | MR. SOSKIN:  Thank you for having us out in defense |
|  | 4 | of the Department of Justice's bump stock rule.  Today I am |
| 09:30:32 | 5 | joined by Mr. Glover who will be addressing issues including |
|  | 6 | the preliminary injunction factors and the department's |
|  | 7 | change of position as far as this final rule.  I'll be |
|  | 8 | addressing the rules, interpretations and applications to |
|  | 9 | the bump stock. |
| 09:30:50 | 10 | And before I go further, I would just like to thank |
|  | 11 | the local U.S. Attorney's Office, which was immensely |
|  | 12 | helpful in this process.  Ryan Cobb couldn't be here today, |
|  | 13 | but he and his colleagues have been tremendous assistance |
|  | 14 | and they would have done a fine job here had the wheels of |
| 09:31:09 | 15 | bureaucracy not dictated for me and Mr. Glover to come out |
|  | 16 | ourselves. |
|  | 17 | So let's start here.  What is -- |
|  | 18 | THE COURT:  We created this weather just for you, |
|  | 19 | Mr. Soskin. |
| 09:31:22 | 20 | MR. SOSKIN:  Well, thank you.  It feels just like |
|  | 21 | home.  I'm originally from South Bend. |
|  | 22 | THE COURT:  Are you really? |
|  | 23 | MR. SOSKIN:  And we had, you know, plenty of |
|  | 24 | surprise lake effect days, so. |
| 09:31:31 | 25 | THE COURT:  Okay.  Did you go to Notre Dame? |

1    MR. SOSKIN:  I did not.  I always thought I would

2    go to Notre Dame, but ended up going to school out of state.

3         THE COURT:  Where did you go to school?

4         MR. SOSKIN:  Williams College in Massachusetts.

09:31:44   5    Also plenty of cold weather and snow there.

6         THE COURT:  Oh, yes, absolutely.

7         MR. SOSKIN:  So what is a bump stock in practical

8    terms?  People use them to be able to shoot faster.  It

9    lets, as various videos that you can find on YouTube will

09:32:03   10   demonstrate, lets a shooter of ordinary skill fire a

11   semi-automatic rifle like you might buy at Wal-Mart or

12   Cabela's almost as fast as the world's fastest shooter, but

13   without all of the training and experience and difficulty

14   required to achieve that level.  This is a case about

09:32:23   15   whether the Department of Justice's rule recognizing that

16   bump stocks are machineguns is not arbitrary, capricious, in

17   conflict with the statute or based on factors that Congress

18   did not intend in its three components.  One, the definition

19   of single function of the trigger as single pull of the

09:32:44   20   trigger, as an ATF did as early as 2006 and courts have

21   subsequently upheld.  Two, interpreting the term

22   automatically to mean as the result of a self-acting or

23   self-regulating mechanism that includes human input as a

24   part.  And three, applying these definitions to a bump stock

09:33:06   25   type device to conclude a bump stock is a machinegun

consistent with how it is used. And because none of those

three elements of the final rule are arbitrary and

capricious, plaintiffs cannot establish a substantial

likelihood of success and are not entitled to their

09:33:24   preliminary injunction.

        Let's start by looking at the text of the statute.

What is it that we are interpreting here? In the National

Firearms Act, Congress defined a machinegun as any weapon

which shoots, is designed to shoot or can be readily

09:33:40   restored to shoot, automatically more than one shot without

manual reloading by a single function of the trigger. And

that's codified in Section 5845(b) of Title 26. That

definition in turn was incorporated into the Gun Control Act

and into the Firearm Owners Protection Act, which enacted 18

09:34:02   U.S.C. 19220, thereby making -- thereby prohibiting the

possession of newly manufactured machineguns prospectively

from that date. The first element--

        THE COURT: Is this statute ambiguous or not?

        MR. SOSKIN: The statute is -- was unambiguous in

09:34:25   its application until we had bump stocks, a new development,

a new type of -- a new type of firearm implement to which

the statute had been applied. So everyone understood what a

machinegun -- that everything that was a machinegun was a

machinegun until this question arose of how do we treat bump

09:34:47   stocks. So you would have to say that at the present time

1    where we live in a world with bump stocks, the statute is

2    ambiguous as to its application to those devices.

3            THE COURT:  What implication does that have for

4    criminal prosecutions of individuals who, assuming the rule

09:35:04  5    goes into effect and is, passes muster with the Appellate

6    Courts, what implication does that position have vis-a-vis a

7    criminal prosecution of someone under the statute?

8            MR. SOSKIN:  Because the final rule now lays out a

9    clarifying definition, that is sufficient in our view to

09:35:27 10    close the ambiguity and permit possession of bump stocks to

11    be prosecuted.  There should be no effect on any

12    conventional device that has always been understood to be a

13    machinegun.

14            THE COURT:  Well, the United States Attorney is not

09:35:44 15    going to be able to rely on Chevron deference in a criminal

16    case, right?

17            MR. SOSKIN:  Well, that's right, your Honor, and we

18    are not able to rely on Chevron deference here for the same

19    reason, your Honor, and that's why we set that out in our

09:35:59 20    Notice of Supplemental Authority.  We are asking -- the

21    final rule sets forth what must be the interpretation of a

22    machinegun as it applies to bump stocks, otherwise --

23    otherwise there will obviously be the challenges that you

24    are identifying for prosecution of those persons.  We can't

09:36:24 25    order people to surrender their bump stocks unless they are,

1    in fact, covered by the criminal prohibition in 9220.

2           THE COURT:  Thank you.

3           MR. SOSKIN:  So the subterms within the statute are

4    left undefined, and contrary to my friend's presentation

09:36:49  5    here, it is not unusual for Congress to promulgate a

6    definition and then promulgate definitions of terms that are

7    within that definition.  If you look at the prohibition, for

8    example, on felon -- what is commonly known as felons in

9    possession of firearms, in 18 U.S.C. 922(g)(1), it relies on

09:37:11  10    a definition that is set forth in I believe 921(a)(20),

11    which in turn relies on the definition of several of those

12    terms in there.  And so it is not an extraordinary

13    proposition for the government, where the statutory

14    definition leaves certain terms undefined, to step in as it

09:37:35  15    has done here and say here is the clarified, meaning here is

16    a regulation defining further what those undefined terms

17    mean.  And the final rule says that a single function of the

18    trigger is a single pull of the trigger and analogous

19    motions.  And that is not an arbitrary and capricious

09:37:55  20    interpretation in light of the significant evidence that

21    supports the appropriateness of this definition.

22           First, of course, is the decade of history of this

23    regulatory interpretation.  As plaintiff's counsel

24    acknowledged, this is not something new that the department

09:38:14  25    is applying for the first time in the final rule.  To the

contrary, ATF began interpreting a single function of the
trigger as a pull in 2006 in the context of the <u>Akins</u>
accelerator device, one of the first bump stock type devices
that ATF was asked to classify, and over which at first it
made an error and classified it as not a machinegun, and
then shortly thereafter reversed its position, classified it
as a machinegun.  That issue was litigated, and the District
Court, the Middle District of Florida and the Eleventh
Circuit, ultimately upheld the reclassification of the Akins
device as a machinegun and relied on the interpretation of
single function of the trigger as a single pull of the
trigger.

THE COURT:  What is new here is pointed out by
Mr. Olson is the analogous motions language.  Could you help
me with that?

MR. SOSKIN:  So the analogous motions language was
a logical outgrowth of the definition set forth in the
proposed rule, and that reflects the agency's efforts to
address the comments that were received in the course of
publishing the notice of proposed rule making, receiving
comments, and then promulgating a final rule.  Many of those
comments suggested that the interpretation of single
function of the trigger, just as single pull of the trigger,
may be inconsistent with the operation of some specific
types of machineguns as recognized in -- as recognized in

courts.  So for example, devices that operate based on a

switch or I think my colleague, my friend was referencing a

paddle, and so those are elements that are analogous, those

are things that are analogous to a pull, and that should

properly be included in the final rules definition.

Where did ATF get the equation of single function

to single pull from?  Well, it came right from the Supreme

Court's opinion in the <u>Staples</u> case, which in the very first

footnote articulated the distinction that the Supreme Court

was going to apply in that opinion between automatic and

semi-automatic weapons, i.e., between machineguns and not

machineguns.  And Justice Thomas wrote, "As used here, the

terms automatic and fully automatic refer to a weapon that

fires repeatedly with a single pull of the trigger."  And

then he continued, "Such weapons are machineguns within the

meaning of the act.  We use the term semi-automatic to

designate a weapon that fires only one shot with each pull

of the trigger."

And therein, the Supreme Court recognized that

function and pull or single function and single pull of the

trigger in this context were synonymous, and that is where

in part the agency drew its 2006 re-- 2006 interpretation

from.  Again, in <u>Akins</u>, the District Court and the Eleventh

Circuit affirmed this view.

However, it's not just based on that, as our brief

1    explained, understanding single function as single pull is

2    also consistent with the ordinary meaning.  And our brief

3    has dictionary definitions for pull the trigger and

4    function.  Judge Friedrich's opinion in DC cited to the 1933

09:42:06    5    Oxford English dictionary definition that was at the time

6    that the National Firearms Act was promulgated for function.

7    And a function is the mode of action by which it fulfills --

8    something fulfills its purpose.  Here I think we all

9    understand that the way a machinegun operates is through the

09:42:28   10    shooter pulling the trigger, and that pull is a description

11    of the way of the function by which a machinegun performs

12    its purpose.  And this has been adopted so widely, of

13    course, that pull the trigger has derivative colloquial

14    meanings.  We think of pull the trigger as being what you do

09:42:49   15    to initiate a significant decision.  You know, Ms. Smith,

16    are you going to pull the trigger on that home purchase?  Or

17    Mr. Johnson, are you going to pull the trigger on your

18    engagement proposal to Ms. Smith?  That understanding that

19    "pull the trigger" is how we initiate the firing of a

09:43:12   20    firearm, helps us make sense out of this definition.

21            Now, plaintiffs object that we have moved from the

22    mechanics of the trigger to the finger, and that the finger

23    is not in the statute.  But function really is about the

24    nature of the operation, and that is the finger as much as

09:43:35   25    it is the trigger.  That's what is required to understand

cases like <u>Fleischli</u>, your Honor, which is the Seventh

Circuit case the parties have cited about a minigun and

whether a minigun operated by a switch can be conceived of

as a -- is properly classified as a machinegun.  The reason

is that it's the nature of the operation, the shooter's

decision to initiate firing.

Automatically is the second element in which a

definition is promulgated in the final rule.  And the final

rule defines automatically as meaning the result of a

self-acting or self-regulating mechanism that allows the

firing of multiple rounds through a single function of the

trigger or a single pull of the trigger.  And this, too, is

not an arbitrary or capricious definition.  In fact, it

accords with the plain text, because it's drawn from a 1934

dictionary, again, at the time that the single function of

the trigger definition was adopted.  And that means having a

-- and that definition highlights the importance that

something automatic performs a required act at a particular

point in an operation.  And that's really important.

Something that is automatic doesn't have to automate the

entire process, it needs to automate a step in the process.

And here, the step that is being automated is the direction

by the shooter of recoil in a useful direction, i.e., into

helping reset the trigger and reengage the firearm to fire

another shot.

1          That is also consistent with past judicial

2     interpretations, your Honor.  For example, we've cited the

3     Olofson case which describes how the discharge of a

4     machinegun occurs as a self-acting mechanism set in motion

09:45:47   5     by a single function of the trigger.

6          Plaintiffs are concerned that the inclusion of a

7     person in this process renders it non-automatic, but I think

8     that objection is belied by a comparison of a bump stock to

9     the kind of device that everyone here agrees is a

09:46:16  10     machinegun, the type of machinegun that has always

11     unambiguously been understood to be encompassed by the

12     statute.  If you compare a video of an individual firing a

13     bump stock equipped rifle with an individual firing a

14     conventional machinegun, what you will see is great

09:46:35  15     similarities in the degree to which this is an automatic act

16     and great similarities in the extent to which the shooter

17     must employ manual measures to maintain control of the

18     firearm, including the person as a component of the firing

19     process does not defeat automaticity.

09:46:59  20          The third element of the final rule is the

21     application of that definition to bump stock devices.  And

22     again here I think it's helpful to return to the big

23     picture.  The incorporation of a bump stock into your

24     ordinary semi-automatic rifle that tens of millions of

09:47:25  25     Americans, if not a hundred million Americans own, and that

1   can be purchased, unlike a post-1986 machinegun, which is

2   illegal, can be purchased almost anywhere.

3          Did Congress intend for a device that allows a

4   shooter to make a semi-automatic rifle function essentially

09:47:51   5   as a machinegun to be exempted when it banned newly

6   manufactured machineguns from private possession?  No, it

7   did not.  As our brief explains, Congress was concerned

8   about preventing the serious law enforcement problems that

9   would develop if machineguns continued to be promulgated --

09:48:13   10   continued to be manufactured and sold to anyone who at that

11   time was willing to pay the small tax.  It had become small

12   over the passage of 60 -- 52 years, I suppose, and be able

13   to acquire those.  That is why the Firearm Owners Protection

14   Act, which as its name suggests, was largely about shielding

09:48:44   15   firearm owners from government action, did include this

16   prohibition.  And Congress saw no problem with doing this,

17   because the only useful advantage that machineguns confer on

18   a shooter is the rate of fire, and that's not really a

19   useful self-defense feature, it's not really a useful

09:49:06   20   hunting feature to be able to fire ammunition at the rate

21   that a machinegun can do.  And so that's why, when you look

22   and you see that these devices are equivalent in their

23   function, it confirms that it was not arbitrary and

24   capricious for the department to adopt this definition.

09:49:29   25          Now, my friend across the aisle here described, I

think, well, the manner in which a bump stock equipped rifle

fires.  The key elements in the department's application of

the definition to a bump stock are that it allows a shooter

to set up essentially a self-regulating mechanism using his

two hands and his shoulder, and the bump stock device, in

previous arguments like that, a kind of air rifle thing, but

there's really nowhere in my field of fire here where I

wouldn't be aiming at one of the Court's personnel, so I'm

going to refrain from doing that, your Honor.  The shooter

shoulders the rifle, places his trigger finger on the ledge

that a bump stock device provides for this purpose, places

the non-trigger hand somewhere else, usually it's on the

barrel shroud or the foregrip of the rifle, and then applies

continuous and appropriate level of forward pressure and

rearward pressure.  And within that zone of pressure and

within the space or along the tube provided for the purpose

by the bump stock device, the mechanism, the rifle

reciprocates while the shooter's intent remains to pull the

trigger.  The existence of that space and the tube, and/or

the tube, they limit the recoil-induced movement and help

the shooter maintain this reciprocating effect within a

narrow linear zone, and that is why the bump stock equipped

rifle appears to fire no differently than a conventional

machinegun.  And it does so easily without all of the

training requirements and experience requirements that are

necessary to achieve that result with unassisted bump
firing.

Plaintiffs have several objections to this
application.  One, which you heard just a few minutes ago,
is that this represents an expansion of the statutory
definition, but it is not an expansion of the text of the
statute.  It's an expansion of the unnecessarily narrow way
in which ATF had been interpreting the statute.  ATF,
subsequent to the Akins accelerator ruling, had judged the
application of the statute to a device based on whether that
device contained a spring.  Why a spring?  Because that's
what they had seen before, that's what they were familiar
with before.  But nothing in the statutory text as the final
rule explains, requires that there be a spring there.

Plaintiffs object, and I addressed this before,
about the change from the trigger to the shooter as
reflected in the change in language or the interpretation of
function as pull.  But pull is fundamentally a concept
that's about the human action.  What is the shooter doing?
In our brief, I think we used the example of pulling in the
line on a boat as a kind of continuous motion that one would
do, and in -- and which might address the next of
plaintiffs' concern, that someone's finger comes off the
trigger in the course of doing this.  But a pull of a rope
illustrates just how one can engage in a single continuous

1    motion with one's hands that does not require continuous

2    contact or pressure.

3         And plaintiffs make much in their reply brief out

4    of the distinction in definitions between harness and

09:53:56   5    channel, but it's not actually as great a difference as they

6    would suggest.  It is true that the rule only uses channel,

7    and we have argued this in terms of harnessing, but the two

8    definitions they supplied make clear that these are really

9    similar and related concepts, that channeling energy is to

09:54:16  10    direct toward or into some particular course; and harness is

11    to gain control over for a particular end.  These are both

12    identical concepts essentially in application to the bump

13    stock where the very purpose of a bump stock.  And no one

14    disputes this, there can be no other purpose to a bump stock

09:54:40  15    is to assist the shooter in making a bump stock function as

16    a machinegun, function automatically so that any person who

17    affixes one to their semi-automatic rifle can achieve the

18    automatic firing cycle that is described in the final rule.

19         I would like to also address a couple of additional

09:55:16  20    points that plaintiff raised in this presentation.  At one

21    point, he discussed something labeled as 706 deference, and

22    suggested that because the department is not relying on

23    Chevron deference here, that somehow APA 7062 and its

24    arbitrary and capricious standard does not apply, but that's

09:55:42  25    not correct, your Honor.  This case is before the Court on

1    application of the Administrative Procedure Act.

2    Plaintiffs' claim is necessarily that the agency violated

3    that standard, the standard set forth in 7062 against

4    arbitrary and capricious, or the other components thereof in

09:56:05  5    its behavior.  And so the statutory standards that Congress

6    has promulgated for review and that degree of statutory

7    deference, that means, and I think plaintiffs' counsel used

8    this term, that means the agency is entitled to adopt any

9    definition that has the power to persuade.  That does apply

09:56:26 10    here, your Honor, regardless of whether Chevron deference

11    applies or not.  There is not a special -- there is not a --

12    there is not an agency assumption separate from Congress.

13          THE COURT:  Was that the position you took before

14    Judge Friedrich?

09:56:45 15          MR. SOSKIN:  Yes, your Honor.  Before Judge

16    Friedrich, the government did not assert that it was

17    entitled to Chevron deference, and I believe we cited the

18    same language from Apel or Apple, in that case that we cited

19    here, your Honor.

09:57:01 20          THE COURT:  Her opinion, though, uses Chevron

21    deference, correct?

22          MR. SOSKIN:  Yes, your Honor.  And Judge Friedrich

23    is correct, we think, in the application of -- the

24    application of principles to reach the conclusion that the

09:57:19 25    final rule was proper.  She's correct as to ambiguity in her

opinion, but in our view, whereas here we are interpreting a

criminal statute, the agency's interpretation must be

persuasive, not just permissible.

THE COURT:  So under no uncertain terms, you're

09:57:38  walking away from Chevron deference on this case?

MR. SOSKIN:  Yes, your Honor.  The Supreme Court

has warned us in the language that plaintiffs' counsel

presented, and this is not a case where what we are doing,

as plaintiffs' counsel highlighted, is telling a half

09:57:58  million owners of bump stocks, that notwithstanding the

letters that they have in their possession that say these

are not regulated by the National Firearms Act, these are

not machineguns, they are now machineguns.  The Court needs

to be persuaded that that position is correct and not simply

09:58:21  defer to it as one permissible interpretation among many.

THE COURT:  Sounds to me like the department is

counting votes on the issue of Chevron deference moving

forward.  I mean I'm -- that was cryptic, but I mean there

is a real issue now, is there not, whether there are five

09:58:43  votes for Chevron deference in the Supreme Court?

MR. SOSKIN:  You're right, your Honor.  And you

know, I point you -- Justice Gorsuch wrote about this issue

just this week.

THE COURT:  Indeed.

09:58:54  MR. SOSKIN:  I guess you may be familiar with the

1    BNSF Railway opinion.  What he highlighted is that in that

2    opinion, much like here, the parties were not asserting that

3    their positions were correct primarily as a result of

4    deference.  I think he noted that when they appeared before

09:59:17   5    the Supreme Court, counsel for BNSF was almost apologetic

6    about asserting to Chevron.

7         THE COURT:  I think there is some description that

8    it was in the last ten seconds of the argument that there

9    was a fleeting reference to Chevron and the attorney nearly

09:59:35  10    apologized for referencing it?

11         MR. SOSKIN:  That's right, your Honor.  But you

12    know, that was in a civil case entirely devoid of the

13    criminal overlay here.  The Supreme Court has not accorded

14    us deference in the past to interpretations of criminal

09:59:51  15    statutes.  And so layering on, you know, various justices'

16    statements about Chevron deference to try to, for the first

17    time, obtain deference to an interpretation of a criminal

18    statute here, you know, that wouldn't make a lot of sense.

19         But importantly, your Honor, there is another issue

10:00:10  20    here.  The final rule makes clear that the department

21    doesn't need deference to prevail in this case.  The final

22    rule expresses the department's view that this is the best

23    interpretation of the statute.  And deference is a heck of a

24    lot more important when there are two equally good readings

10:00:28  25    of the statute, or perhaps when the reading the agency is

urging is the least good of multiple readings of the

statute.  But here the final rule is premised on this being

the best interpretation of the statute.  So there is no

particular reason for us to wade into the judicial murkiness

10:00:47  of Chevron deference.

THE COURT:  Okay.  So that is the best

interpretation in 2019.  There was a previous best

interpretation a decade before, correct?

MR. SOSKIN:  You're right, your Honor.  Prior to

10:01:03  2006, the department -- the agency had not confronted, I

suppose it was prior to 2002 when they first saw an Akins

accelerated, but not really confronted this issue of a

device specially designed and crafted to accomplish this

purpose of converting a semi-automatic into a machinegun by

10:01:27  operating in this way, harnessing the recoil energy such as

this.  There had been, I think, some issues with rubber

bands in the past, which also left the agency somewhat

unclear how to approach it, but you know, one doesn't go out

to sell rubber bands for the purpose of converting --

10:01:49  converting firearms into machineguns, converting

semi-automatic rifles into machineguns, which are firearms

since the statutory definition of firearm is not what we

always refer to.  But, and I should note that, as to the

rubber band issue, plaintiffs' counsel pointed to 66551 in

10:02:11  the final rule.  But at 66533 is the department's real

understanding of why a rubber band is not a machinegun, and

that is, as I just mentioned, that it is not specifically

designed for this purpose.  That is why a box of rubber

bands and a closet full of semi-automatic rifles is not an

arsenal of machineguns.  There might, in fact --  It might,

in fact, be that confronted with an appropriate case of a

device designed to, you know, specially attach rubber bands

to a semi-automatic that the conclusion might be a little

different, but 66533 emphasizes the specifically designed

nature of bump stock devices.

        Two final points, if your Honor has no further

questions for me right now.  One issue is the one that

plaintiffs' counsel raised about whether this definition

turns semi-automatics or risks turning semi-automatic rifles

into machineguns.  And we addressed this in our brief, but I

would like to highlight this again.  There would be a couple

of problems with the department taking that position in the

future.  One is that Congress has also promulgated a

definition of semi-automatic rifle.  And so principles of

statutory interpretation would suggest that Congress did not

intend that to be subsumed within the definition of

machinegun, or it would not have supplied a separate

definition of semi-automatic rifle.  We also highlighted in

our brief that, although plaintiffs have not argued this

case from Second Amendment principles, we think it's likely

1    that any challenge to an interpretation that converted, you

2    know, commonly available self-defense rifles that a

3    plurality of American households possess into unlawful

4    machineguns would almost certainly have to be evaluated in

10:04:40    5    terms of Heller's understanding of the preexisting Second

6    Amendment right to prevent the banning of such weapons.

7           And the second item I would note, one of your

8    questions to plaintiffs' counsel presupposed that ATF has

9    been consistent on single pull since 2006, and I would

10:05:06   10    hesitate to use the word "consistent," your Honor.  I think

11    that following Ruling 2006-2, as some of the individual

12    letters that appear in plaintiffs' exhibits illustrate,

13    there was not sufficient clarity within ATF of how the

14    definition of machinegun was to be understood to do so

10:05:30   15    consistently.  And so the rationals in those opinions -- in

16    those opinion letters are not all consistent with each

17    other.  One reason for adopting the final rule, which as I

18    note is the best interpretation of machinegun, is to ensure

19    that within the government there is that consistency as well

10:05:55   20    as a consistency in its presentation to the public.

21           If you have no further questions.  Thank you.

22           THE COURT:  Thank you.

23           Go ahead, Mr. Olson.

24           Then I'll call on Mr. Glover.

10:06:12   25           MR. OLSON:  Thank you, your Honor.

1           There is a lot there to unpack.  I'm going to try

2      to do my best, if you bear with me.

3           One of the things I wanted to hit on right away was

4      counsel's contention that rubber bands would not be

10:06:26   5      machineguns because they are not designed and intended to be

6      used to construct a machinegun.  That was the same point

7      made at oral argument in DC, and Judge Friedrich jumped all

8      over that.  That's because the statute does not just outlaw

9      things that are designed and intended.  The last section of

10:06:46  10      the statute says, "any combination of parts from which a

11      machinegun can be assembled."  And Judge Friedrich said why

12      wouldn't it fall under this?  And I think it clearly would,

13      your Honor.

14           Congress used the term "designed and intended"

10:06:59  15      three other times in that statute and didn't use it in that

16      last section, and there is a reason for that.  And the

17      Supreme Court has explained, "Where Congress includes

18      particular language in one section of the statute but omits

19      it in another, it is generally presumed that Congress acts

10:07:14  20      intentionally and purposely in the disparate inclusion or

21      exclusion.  That's King vs. United States, 1993.

22           And ATF, for a number of years, has had this --

23      it's known as constructive intent, I guess is what it's

24      called.  That if you have a certain set of objects in a

10:07:35  25      setup so that they are -- and I'll read it the way they say

1       it, "Placed in close proximity in such a way that they serve

2       no useful purpose other than to make a prohibited item, that

3       that would be a machinegun."  So this idea that because a

4       rubber band wasn't marketed that way or intended, obviously

10:07:50   5   no one is saying a rubber band in a desk drawer is a

6       machinegun, but if someone were to construct a device, I

7       think ATF would have a hard time trying to figure out what

8       that is, but the final rule obviously says this is fine, we

9       put our stamp on that.

10:08:12   10       One of the things I want to circle back to is

11      counsel's contention that a bump stock permits a person to

12      shoot faster than without one.  Obviously, the government

13      has admitted that bump fire -- the technique of bump firing

14      can be accomplished with or without a bump stock.  In one of

10:08:31   15   our footnotes in our brief, we have a video of someone bump

16      firing a rifle with a bump stock and a video of someone bump

17      firing a rifle without a bump stock.  I haven't tested it to

18      see, but when you just listen to it, the rate of fire is

19      identical between the two.  Obviously Congress didn't create

10:08:52   20   a rate of fire.

21          One of the other things that Mr. Soskin alluded to

22      was that there is great similarity between bump stocks and

23      machineguns, and no one is disputing that someone who goes

24      to a range and listens to a bump stock and listens to a

10:09:07   25   machinegun would think that these are similar things.  One

1    of the words the government has used in the past is "mimic."

2    It mimics a machinegun.  As we pointed out, just because it

3    looks like something doesn't mean that it is something, and

4    that's sort of where they are going there.

10:09:23    5         One of the other points that was raised was

6    Congress clearly intended that this sort of rapid fire would

7    be banned when it enacted the NFA.  That may be so, that

8    might be true, but that's a problem, as we pointed out, for

9    Congress to solve, because bump stocks were designed, we

10:09:44   10    admit, to get around the statute the way it's written.  And

11    ATF agreed for a decade and a half that they were

12    successful.  There's other things.  There is a, they call it

13    a wrist brace for people who are disabled, that they can

14    wrap around their wrist and shoot a pistol version of an

10:10:03   15    AR-15 or an AK-47.  It looks an awful lot like a stock, your

16    Honor.  People use it as a stock, and it sort of gets around

17    the short-barreled rifle, short barreled shotgun

18    prohibition.  ATF has said that these things are perfectly

19    fine to own.  So there are other things that get around

10:10:20   20    other statutes, and ATF has said you're right, under the

21    statute the way it's written, Congress didn't cover this

22    device.  And the same thing is true here.  This was

23    specifically designed to not have the characteristics in the

24    statute that Congress prohibited.

10:10:37   25         The other thing Mr. Soskin raised was that these

things are automatic in that they do something to bump fire
that make it flawless and perfectible and that it doesn't
require technique or practice or anything.  I actually had
the opportunity a couple days ago to test fire a bump stock,
and started out trying to just bump fire a rifle, and at
first, it was just one round and one round and then two
rounds, and it took a quite a bit of practice, and I think
the most I was able to get was like a four-round string of
shots.  That was it.  So it certainly requires a lot of
practice and a skill level.  There are people who do it very
well.  But then we went and moved on to the bump stocks and
we tried to do that.  And I wasn't much more successful.  I
think we got seven rounds in a string.

In Staples, one of the things that the Court talks
about is that a machinegun continues to fire until the
trigger is released, or the ammunition supply is exhausted.
Well, we couldn't exhaust the ammunition supply.  We were
trying.  I would have liked to fire all 30 rounds with a
single burst of rapid fire, but I was unable to accomplish
that.  So this idea that a bump stock takes away the human
input or takes away the need for technique and practice and
all of those things is demonstrably wrong, your Honor.

One of the other things counsel raised is that they
admit that the input on a bump stock, the forward pressure,
Mr. Soskin mentioned a person uses his shoulder, uses his

1   hands, uses the bump stock, all of those things in

2   combination.  The argument is that they are still automatic

3   enough -- and this was one of the things Judge Friedrich

4   talked about, and did not have good push back from opposing

10:12:27   5   counsel, from plaintiff's counsel on that, but as we have

6   argued, this is not a question of degree, this is not how

7   much input the Court thinks is enough before it becomes --

8   and still constitute automatically.  The statute is very

9   clear.  The statute says automatically by a single function

10:12:46   10   of the trigger, not automatically by a single function of

11   the trigger and forward input and rearward pressure and all

12   of these other things which government counsel has admitted

13   transpired.  It's just automatically by a single function of

14   the trigger.  If you have to do more to a weapon system to

10:13:05   15   get it to bump fire, that is too much under the statute,

16   according to Congress.

17        One of the other concepts raised was that there is

18   a continuous pressure or constant pressure on a bump stock.

19   And from my experience, that is also not the case, because

10:13:23   20   there is a razor edge of how much pressure you can apply to

21   a bump stock pushing it forward to where you will cause it

22   to stop cycling in bump fire mode.  You have to be right on

23   that, and it's that between each and every shot, and you

24   absorb recoil and then you have to apply that pressure.  And

10:13:43   25   once you get it wrong once, the weapon stops firing, the

trigger will go dead, you will have an ammunition jam,
something like that.  So it's not continuous pressure.
That's the idea that they raise, that it's automatic, the
pressure, that it's just once you dial in your wrist to
whatever the appropriate pressure is and push forward,
everything else just works smoothly, and it's not that way
at all.  There is really nothing different about a bump
stock and any of the other forms of bump fire other than a
bump stock makes it a little easier.  And I finally figured
out why it makes it easier to bump fire with a bump stock
than without, and it's because if you're bump firing with a
belt loop, you actually have to, you hook your thumb through
the trigger guard and through the belt loop, and that belt
loop provides you a fixed position to hold your finger so
that you can then pull the firearm into it.  If you fire
from the shoulder with a bump stock, you have to maintain
that trigger finger in three-dimensional space while the gun
is recoiling and the muzzle is rising, and all of these
things are happening to you.  It is very difficult to
maintain that fixed point in space to allow bump fire.

          With a bump stock, though, it provides that trigger
ledge on the stock, it provides that place that you can put
pressure into your shoulder, on the stock, and grip the hand
guard, and this becomes like a very triangular, fixed,
stable position to then pull the rifle -- I'm sorry, push

1    the rifle forward into the trigger.  And that is, I think,

2    the only difference between a bump stock and any other sort

3    of bump fire is that it provides that platform for the

4    stability of your trigger finger.

10:15:23  5        Government counsel has admitted that Chevron

6    deference is inappropriate here, but then argued that

7    Section 706, arbitrary and capricious deference, which the

8    Eleventh Circuit has called deference, is appropriate.  But

9    as Judge Friedrich and numerous other courts have explained,

10:15:40  10    they are exactly the same analysis.  And if they don't get

11    Chevron deference, I don't see how they get the same

12    deference under Section 706.

13        You had asked government counsel --

14        THE COURT:  Is there any Sixth Circuit law on the

10:15:59  15    equivalence of 706 deference and Chevron deference that

16    you're aware of?

17        MR. OLSON:  Your Honor, I haven't done an

18    exhaustive search, but I haven't found anything.  I mean

19    Apel and Abramski were 2014.  I don't know that there's been

10:16:14  20    a whole lot that's happened since then on this front.  I

21    certainly haven't found anything.

22        THE COURT:  Okay.  Thank you.

23        MR. OLSON:  The government --  You had asked

24    government counsel about a single function becoming single

10:16:26  25    pull in 2006, 2008, and now becoming single pull on

analogous motions and all that goes with it.  As we pointed

out in our reply brief, this is a word that encompasses all

of the different ways a trigger can be activated, and that

word is function.  I think it is so clear that Congress

10:16:45   intended -- Mr. Soskin said that pull is the colloquial

meaning of function, but pull is not in the statute.  It

would have been easy for Congress to use the term "pull."

They chose to use the word "function," and why is that?  Why

didn't they use the colloquial term that everyone would

10:17:02   understand?  I think the question answers itself.

Mr. Soskin noted that the Supreme Court in <u>Staples</u>,

I believe it was Justice Thomas in his footnote, used the

term "single pull."  I would chalk that up to not having a

good editor and not being careful and just sort of falling

10:17:19   into that trap of speaking colloquially.  It wasn't an issue

in the case, it wasn't briefed or argued.

THE COURT:  I can't assume that, can I?

MR. OLSON:  Well, it certainly is dicta, your

Honor.  It wasn't necessary to the outcome of the case.

10:17:31   THE COURT:  I'm not at all sure that a district

judge in the Western District of Michigan can engraft that

sort of intention on, or lack of intention on Justice

Thomas.

MR. OLSON:  Fair enough.  I would say that I don't

10:17:49   think it's -- that that is any sort of binding authority

1    that forecloses any of the arguments that are being made

2    here that single pull and single function are not the same

3    thing.

4         THE COURT:  Is your definition of function

10:18:01  5    intention at all with the definition of trigger?

6         MR. OLSON:  The definition --

7         THE COURT:  Trigger is the mechanism used to

8    initiate a firing sequence, according to the Fleischli case.

9         MR. OLSON:  No.  I don't think it's intention at

10:18:15  10   all, because that still has a trigger mechanical centric

11   focus of how the firearm is operating mechanically.  What

12   the government wants to do is go and look at how the shooter

13   is interacting with the weapon.  Single pull, single push,

14   pressure, all of these concepts are undefined, and they are

10:18:34  15   trying to define them now.  But it's not in the statute.

16   Congress didn't discuss them.  This was not discussed in

17   1934, and I guess I'll --

18        THE COURT:  The commencement of a firing sequence

19   could result in multiple shots being fired, correct?

10:18:52  20   MR. OLSON:  Multiple shots semi-automatically being

21   fired in rapid succession.

22        THE COURT:  The initiation of the firing sequence,

23   which is the first function or the tension on the trigger,

24   right?

10:19:09  25   MR. OLSON:  It's not actually tension on the

1    trigger.  It's just keeping your finger on that extension

2    ledge on the bump stock.  The trigger is activated by

3    forward pressure of the firearm by the support hand, not by

4    any rearward tugging or pulling or drawing or anything like

10:19:25  5    that, your Honor.

6           THE COURT:  So but if you know how to use the

7    device, you are going to get multiple shots, right?

8           MR. OLSON:  You will get multiple semi-automatic

9    shots quickly, which is -- it's exactly the same as if you

10:19:39  10    use your belt loop to do it.  It's multiple shots quickly.

11    Each time a shot is being discharged, the trigger is

12    breaking to the rear and resetting to the front.  It's

13    functioning one time.  And that is the same with all sorts

14    of bump fire and has nothing to do with a bump stock.

10:19:58  15           Counsel, once again talked about automatically and

16    the bump stock as being -- as there would be a channeling of

17    recoil energy to the rear and then back to the front.  A

18    bump stock, as we have pointed out, doesn't do that.  I

19    mean, recoil energy, when you fire a round that way, recoil

10:20:22  20    goes this way.  And when you push the firearm back forward,

21    it's going that way.  Bump stock doesn't change any of this.

22    There actually are firearms which do have mechanisms that

23    are self-acting, self-regulating harness recoil energy that

24    will change the direction of recoil.  There's a firearm

10:20:37  25    called the Chris Vector, I think it's a pistol and a rifle,

10:20:53

1    but the recoil starts to the rear, and there is a mechanism
2    which then transitions the recoil downward so that you have
3    less felt recoil and less muzzle rise, and that's not what's
4    happening here. There is nothing in a bump stock that
5    channels energy in some direction.  It's already going
6    backwards, it's already going forwards, and the bump stock
7    certainly doesn't change that at all.

8         The government counsel discussed how they have
9    transitioned from harnessing recoil energy to then saying

10:21:10

10   well, we admit it doesn't actually harness recoil energy, it
11   helps the shooter harness recoil energy.  Well, that's not
12   what the regulation says.  The regulation says harnesses.
13   And then they move to this idea of channeling recoil energy,
14   and Mr. Soskin says that's basically the same thing.  I

10:21:26

15   think it's entirely different than harnessing, your Honor.
16   The analogy we used is a ditch channels water while it just
17   guides it in a particular path, while a damn will harness
18   water, it will store it up, it will have a capacity of
19   energy then to be used.  And that's, when you look at bump

10:21:44

20   stocks, even if a bump stock channeled energy, that's not
21   the language they used.  That's not the test they've set up.
22   It has to harness energy.  And as they've admitted, there's
23   nothing in a bump stock that does that.  If you take a rifle
24   with a bump stock on it and tilt the rifle forward, the bump

10:22:03

25   stock will just slide forward.  If you tilt it backwards,

the bump stock slides backwards.  There's no -- one of the
other concepts they use is there is space created by the
bump stock.  But it's not created by the bump stock, your
Honor, it's created by the shooter applying forward pressure
moving that rifle away from his body to then give it a place
to recoil.  It's the same as if you have it on belt loop,
there's empty space behind you, or if you're firing from the
shoulder, you have to hold it away from your shoulder so it
can recoil, and a bump stock doesn't create that space.  A
bump stock can't be fired with one hand.

          If you take a machinegun out, a two year old could
pull the trigger, because all you have to do is articulate
the trigger once, hold it to the rear and the gun will
continue to fire, that hammer will continue to go forward
and fire additional rounds.  If you try the same thing with
a bump stock and just rested it on a table and pulled the
trigger once, it's going to fire one round.  And that's it.
It requires that added human input of variable pressure
between each shot to keep that sequence going.  And that, as
we argued, is more than the statute permits.

          I think that's all I have at the moment, your
Honor.

          THE COURT:  All right.  Thank you.

          Mr. Soskin, do you want to weigh in as a result of
rebuttal argument?  Go ahead, sir.

1          MR. SOSKIN:  Just one thing, your Honor.  And

2     that's some two year old who can fire a machinegun and keep

3     control of it.

4          Your Honor, we also --

10:23:36  5          THE COURT:  There was a little bit of hyperbole

6     there, Mr. Soskin, and I recognized it as such.

7          Go ahead.

8          MR. SOSKIN:  Your Honor, we also looked for a Sixth

9     Circuit case to which we could point to on the appropriate

10:23:52 10    standard here where Chevron deference is lacking, and we

11    don't have one to cite to you, but we can give you two

12    out-of-circuit Court of Appeals cases to look at.  I can't

13    recall if they are cited in our brief here or not, so I want

14    to highlight them for you.  One is Sierra Club vs. Army

10:24:10 15   Corps of Engineers, it's from the Fourth Circuit last year.

16    The cite on that is 909 F.3d 635.  And it runs through

17    whether Chevron deference is applicable, whether Skidmore

18    deference is applicable.  And then if neither is applicable,

19    there's also a DC circuit case, In Re:  Polar Bear

10:24:39 20   Endangered Species Listing, and the cite for that is 709

21    F.3d 1, it's from 2013.  And it explains that an agency

22    interpretation not entitled to Chevron deference gets only

23    its power to persuade, which of course is the standard

24    sometimes labeled as Skidmore deference in which I think

10:24:56 25   academics have tied themselves in knots trying to understand

1   whether the power to persuade involves deference or is just

2   essentially the natural function of a brief.

3          So with those in mind, if you would like to hear

4   from Mr. Glover on any of the other issues, I would turn

10:25:16  5   things over to him.

6          THE COURT:  Okay.  Go ahead, Mr. Glover.  Thank

7   you.

8          MR. GLOVER:  Thank you, your Honor.  And I want to

9   echo Mr. Soskin's sentiment, we are thankful the Court

10:25:27  10  invited us here, and really appreciate the U.S. Attorney's

11  Office and their support.

12         I would just like to touch on a couple points, and

13  one, Mr. Soskin closed with in his initial argument, which

14  was that ATF may not have been consistent since the Akins

10:25:42  15  accelerator.  But as the Court knows, an agency is allowed

16  to change positions in what's called often a State Farm or a

17  swerve case so long as the agency supplies reasoned decision

18  making.  And the Sixth Circuit has recognized, and we cited

19  this Metropolitan Hospital case in our brief, that the

10:25:59  20  understanding of a safety issue is one reason an agency

21  might change position.  Here, the final rule provides such

22  reason to decision making and provides a straight forward

23  reason that they looked again at the definitions of single

24  function of the trigger, it automatically and reversed prior

10:26:16  25  ATF classifications.  You know, the rule states that it was,

1    "enacted pursuant" --  My apologies.  My apologies.  The

2    rule states that, "It was enacted to provide the best

3    definition of those terms and to clarify these undefined

4    terms."

10:26:34   5         Opposing counsel suggested that the rule making

6    was, I guess, predetermined or had a political directive to

7    reach this outcome.  But again, the final rule states that

8    it's trying to provide the best definition, it's trying to,

9    based on additional experience, look at these terms and

10:26:51  10    provide a definition for automatically in forced single

11    function of the trigger.  The President's directive was to

12    follow the law.  He said he was still adhering to the rule

13    of law.  And we cited in our brief <u>FCC vs. Fox</u> in which the

14    Supreme Court majority rebutted Justice Breyer, who was in

10:27:09  15    dissent, suggesting that for the FCC, an independent

16    commission, political branches like Congress and the

17    President shouldn't be influencing their decision making.

18    And here, you know, you also have comments from members of

19    Congress, etcetera, suggesting why don't you look at this

10:27:22  20    again, and we don't have an independent agency, we have a

21    core executive branch agency, the Department of Justice.  So

22    we think there is nothing wrong with considering public

23    experience and considering, you know, the request of the

24    President and the request of members of Congress to look at

10:27:37  25    this.

                    I'd next like to, I guess, talk briefly about the

balance of the equities.  I know opposing counsel didn't

raise that.  So if the Court is happy with the briefing on

that, I don't need to go into great detail.  But we have a

10:27:57   footnote in our brief, I believe it's at Page 11 citing the

Great Lakes Brewing case from the Sixth Circuit discussing

the Winter factors.  And our position continues to be that

while the Sixth Circuit said that as long as there is a

likelihood of success on the merits, the factors should be

10:28:13   balanced, and they are not tallied.  That requires a

significant showing of likelihood of success on the merits,

not just merely the possibility of success on the merits.

And our position continues to be that the Winter factor, you

know, reading Winter, the Court seems to suggest you need a

10:28:28   significant showing on every single one of these factors.

                    As we made clear in our brief, we concede that they

have shown irreparable harm.  But as to the last two

factors, the balance of the equities and the public

interest, these merge when the government is a defendant.

10:28:44   And the government has put forward, I guess, three main

rationals for this rule.  First, public safety; the second

being the safety of law enforcement; and the third, carrying

out Congress' intent in the National Firearms Act and the

Gun Control Act in banning machineguns and weapons that fire

10:29:07   at a high rate.

1           They have suggested that the balance of the

2    equities tips in their favor and the public interest tips in

3    their favor because there's an interest in requiring the

4    Department of Justice and ATF to adhere to the language of

10:29:23  5    the statute, but that merely presumes that they are correct

6    about the underlying merits of the statute, and any APA

7    challenge or, I guess, any -- let me back up -- any

8    preliminary injunction alleging an agency has exceeded

9    statutory authority would have that same argument.  I'm not

10:29:38  10   aware of the Sixth Circuit saying you automatically win on

11   these factors merely because you've alleged that the

12   government has exceeded their statutory authority.

13           I'm happy to address the factors otherwise, but we

14   would also be happy to rest on our brief.  I appreciate the

10:29:52  15   Court has been very generous with your time.

16           THE COURT:  Well, let me hear from Mr. Olson on the

17   subject, and I may call on you again.

18           Go ahead, Mr. Olson.

19           MR. OLSON:  Your Honor, one of the interesting

10:30:08  20   things here is that the government says they, we presume we

21   are correct that the statute needs to be interpreted the way

22   Congress wrote it.  But their counter argument is that, as

23   counsel just stated it, to carry out Congress' intent.  And

24   that has time and again been what ATF claims it's trying to

10:30:30  25   do in this case is carry out Congressional intent rather

than the law.  They are trying to expand the statute to
cover devices that were never covered by Congress because
they think that's what Congress would have wanted them to
do.  That is not a legitimate government interest here.

10:30:48    As for public safety, law enforcement safety, we
have pointed out we have discovery issues pending with the
government about looking at the Las Vegas firearms and their
reports on that.  The FBI has never released any detailed
report about the firearms which ones were used, which ones
10:31:09  weren't used, whether some of them were actual machineguns,
had machinegun parts, had auto sears, binary triggers, all
of these things that can make a firearm function rapidly.
ATF, once or twice in their briefing, has suggested that
these rifles with bump stocks were used in the Las Vegas
10:31:28  shooting.  We can't find any government source to confirm
that.  Judge Friedrich even in her opinion was very careful
to say ATF claims they were used, but we have had three or
four informal confirmations that ATF never has got to
examine these firearms.  They have never done a ballistics
10:31:47  test to see which ones were fired, which ones match up with
bullets that were recovered, whether any had been cleaned,
were unfired, whether the bump stocks were in fixed
positions so they would only function semi-automatically.
And the only thing ATF has ever done that we can tell with
10:32:05  these rifles is they had one agent who was allowed in the

room when the FBI was there doing their initial examination,
and they said you can't touch them, you can't break them
apart, you can't look at them, you can take a picture of
them, and that's it.  So they took a picture, and they have
-- they actually came up with a report.  I think they felt
they were obligated, but the report doesn't say anything.
It says -- it uses the term "appears to be" like 15 times.
It says, "this appears to be an AR-15 with what appears to
be bump stock on it."  Nothing else, because they have never
examined these things, yet they claim that they're
protecting public safety, and there is zero evidence -- I'm
not saying it's not true, I'm just saying it is an unproven
assertion that these things were used in Las Vegas and that
there's any public safety risk.  There's never been any
allegation that bump stocks have ever been used in any crime
anywhere in the country.  There is actually two pending FOIA
requests in DC from plaintiffs' counsel in some of the other
bump stock cases seeking that information, and ATF has not
turned over anything, and neither has the FBI to indicate
that there's ever been a crime committed with one of these.

        And as we pointed out, a rubber band is actually
far more effective at bump firing at -- in rapid trigger
manipulation than a bump stock is.  And there's, you know,
you can fire from the hip, you can fire a whole host of
other ways.  You can get a binary trigger, or if you're

1    Stephen Paddock, you can buy a legal machinegun.  The guy

2    was reportedly a millionaire and had nothing on his record,

3    so there's nothing that would have stopped him from doing

4    what he did if these things had been banned, and there is no

10:33:43  5    evidence that they have ever been a threat to anyone in any

6    other context.  So I think the public safety, law

7    enforcement safety rationale there, your Honor, is very

8    thin.

9          On the other hand, you have a half million

10:33:58  10    Americans who own these things, have relied on ATF, have

11    spent their hard earned money to acquire these things, and

12    as is unfortunately far too common with ATF, they later come

13    in and say oops, we were just kidding.  Now everybody get

14    rid of them.  And I think that certainly weighs in the

10:34:18  15    balance of the equities in plaintiffs' favor to at least

16    stop this thing until a decision on the merits can be

17    reached.

18          Thank you.  That's all I have.

19          THE COURT:  Thank you.

10:34:28  20          Mr. Glover, go ahead.

21          MR. GLOVER:  Just briefly.

22          As to my friend on the other side's discussion of

23    the Las Vegas shooting, the issue is whether ATF, which

24    stated in the rule, they were looking at public safety and

10:34:42  25    concerned about public safety is furthering the public

safety, and so there may not have been a number of violent

acts committed with bump stocks, but ATF, in its expertise,

thinks that these are dangerous.  One of the things they do,

as Mr. Soskin explained in his opening, is allow an average

10:34:58  person to shoot at a high rate of speed.

Now opposing counsel, I think, has experience with

these, and provided some context on that, but that sort of

ability to shoot a high rate of speed allows you to put down

suppressive fire, if you were faced with law enforcement,

10:35:11  and so again, ATF is focused on public safety.  They are

focused on protecting law enforcement personnel.

Opposing counsel also, I think, pointed out or

complained that the rubber band would be more effective, or

you might be able to buy a legal machinegun, but just

10:35:28  because there are other ways to, you know, assert public

safety or other ways to prevent this sort of rapid fire

doesn't mean that the final rule isn't focused on it and

trying to promote public safety.

I'd just like to close by -- or unless the Court

10:35:43  has further questions -- clarifying a point that Mr. Soskin

or an exchange that you had with Mr. Soskin related to

Chevron.

My apologies, my notes are all a mess.

THE COURT:  That's all right.  Take your time.

10:35:58  MR. GLOVER:  You asked Mr. Soskin if we were

1      relying on <u>Chevron</u> here, and he agreed that we were not

2      relying on <u>Chevron</u>.   And I think your phrasing was that the

3      department seemed to be counting votes on <u>Chevron</u>.   I just

4      wanted to clarify that the solicitor general has to set the

10:36:14  5      department's policy as to <u>Chevron</u>, and I believe there is a

6      pending Supreme Court case related to our deference, which

7      is not directly <u>Chevron</u>, but it may be a species a little

8      even more differential, I believe it's called <u>Wilke vs.</u>

9      <u>Department of Veterans Affairs</u>, so the solicitor general's

10:36:29 10      brief there would be the best place to look for the

11      department's current thinking on <u>Chevron</u>.

12             THE COURT:   Justice Gorsuch's opinion in the

13      railroad case was, you know, kind of broke new ground, I

14      think.

10:36:42 15             MR. GLOVER:   Absolutely understandable.  I didn't

16      want Mr. Soskin or I to be quoted outside of the court as if

17      we had changed the department's position or purported to put

18      it forth.

19             THE COURT:   I understand the solicitor general

10:36:54 20      makes those calls.

21             MR. GLOVER:   Thank you, your Honor.

22             THE COURT:   Thank you.

23             Mr. Olson, anything further?

24             MR. OLSON:   Nothing further, your Honor.

10:37:00 25             THE COURT:   All right.   Thank you.

1          Well, thank you for your presentations here today,

2     and I'll get an opinion out as quick as I can.  I know we

3     are up against a late March date, so we will do the best we

4     can to get it out.

10:37:16   5          Thank you.

6          COURT CLERK:  All rise, please.

7          Court is in recess.

8       (At 10:37 a.m. proceedings concluded.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3                    C E R T I F I C A T E

4

5       I, Kathleen S. Thomas, Official Court Reporter for the

6   United States District Court for the Western District of

7   Michigan, appointed pursuant to the provisions of Title 28,

8   United States Code, Section 753, do hereby certify that the

9   foregoing is a true and correct transcript of proceedings

10   had in the within-entitled and numbered cause on the date

11   hereinbefore set forth; and I do further certify that the

12   foregoing transcript has been prepared by me or under my

13   direction.

14

15

16                         /s/

17   _____

                         Kathleen S. Thomas, CSR-1300, RPR
18                       U.S. District Court Reporter
                         410 West Michigan
19                       Kalamazoo, Michigan   49007

20

21

22

23

24

25