# UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

Deborah S. Hunt
Clerk

100 EAST FIFTH STREET, ROOM 540
POTTER STEWART U.S. COURTHOUSE
CINCINNATI, OHIO 45202-3988

Tel. (513) 564-7000
www.ca6.uscourts.gov

Filed:  March 25, 2021

Mr. James Orange Bardwell
Woodhouse Roden Nethercott
1912 Capitol Avenue, Suite 500
Cheyenne, WY 82001

Mr. Bradley Hinshelwood
Ms. Abby Christine Wright
U.S. Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, DC 20530

Mr. Kerry Lee Morgan
Pentiuk, Couvreur & Kobiljak
2915 Biddle Avenue, Suite 200
Wyandotte, MI 48192

Mr. Robert J. Olson
370 Maple Avenue, W., Suite 4
Vienna, VA 22180-5615

Mr. Ilya Shapiro
Cato Institute
1000 Massachusetts Avenue, N.W.
Washington, DC 20001

Re:  Case No. 19-1298, *Gun Owners of America, Inc., et al v. Merrick Garland, et al*
Originating Case No. : 1:18-cv-01429

Dear Counsel,

The court today announced its decision in the above-styled case.

Enclosed is a copy of the court's opinion together with the judgment which has been entered in conformity with Rule 36, Federal Rules of Appellate Procedure.

Yours very truly,

Deborah S. Hunt, Clerk

Cathryn Lovely
Deputy Clerk

cc:  Mr. Thomas Dorwin

Enclosures

Mandate to issue.

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

No. 19-1298

GUN OWNERS OF AMERICA, INC.; GUN OWNERS
FOUNDATION;   VIRGINIA   CITIZENS   DEFENSE
LEAGUE; MATT WATKINS; TIM HARMSEN; RACHEL
MALONE,

      Plaintiffs - Appellants,

GUN OWNERS OF CALIFORNIA, INC.,

    Movant,

    v.

MERRICK B. GARLAND, in his official capacity as Attorney
General   of   the   United   States;   UNITED   STATES
DEPARTMENT OF JUSTICE; BUREAU OF ALCOHOL,
TOBACCO,   FIREARMS   AND   EXPLOSIVES;   REGINA
LOMBARDO, in her official capacity as Acting Director,
Bureau of Alcohol, Tobacco, Firearms, and Explosives,

    Defendants - Appellees.

> **FILED**
> Mar 25, 2021
> DEBORAH S. HUNT, Clerk

Before:  BATCHELDER, WHITE, and MURPHY, Circuit Judges.

# JUDGMENT

On Appeal from the United States District Court
for the Western District of Michigan at Grand Rapids.

THIS CAUSE was heard on the record from the district court and was argued by counsel.

IN CONSIDERATION THEREOF, it is ORDERED that the judgment of the district court is REVERSED and REMANDED for further proceedings consistent with the opinion of this court.

**ENTERED BY ORDER OF THE COURT**

_____
Deborah S. Hunt, Clerk

RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 21a0070p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————

GUN OWNERS OF AMERICA, INC.; GUN OWNERS
FOUNDATION; VIRGINIA CITIZENS DEFENSE LEAGUE;
MATT WATKINS; TIM HARMSEN; RACHEL MALONE,

*Plaintiffs-Appellants*,

GUN OWNERS OF CALIFORNIA, INC.,

*Movant*,

*v.*

MERRICK B. GARLAND, in his official capacity as
Attorney General of the United States; UNITED STATES
DEPARTMENT OF JUSTICE; BUREAU OF ALCOHOL,
TOBACCO, FIREARMS AND EXPLOSIVES; REGINA
LOMBARDO, in her official capacity as Acting
Director, Bureau of Alcohol, Tobacco, Firearms, and
Explosives,

*Defendants-Appellees*.

No. 19-1298

———————

Appeal from the United States District Court
for the Western District of Michigan at Grand Rapids.
No. 1:18-cv-01429—Paul Lewis Maloney, District Judge.

Argued:  December 11, 2019

Decided and Filed:  March 25, 2021

Before:  BATCHELDER, WHITE, and MURPHY, Circuit Judges.

———————

### COUNSEL

**ARGUED:**  Robert J. Olson, WILLIAM J. OLSON, P.C., Vienna, Virginia, for Appellants.
Brad Hinshelwood, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for
Appellees.  **ON BRIEF:**  Robert J. Olson, WILLIAM J. OLSON, P.C., Vienna, Virginia, Kerry

L. Morgan, PENTIUK, COUVREUR & KOBILJAK, P.C., Wyandotte, Michigan, for Appellants.  Brad Hinshelwood, Abby C. Wright, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellees.  Ilya Shapiro, CATO INSTITUTE, Washington, D.C., James Bardwell, NATIONAL ASSOCIATION FOR GUN RIGHTS, Loveland, Colorado, for Amici Curiae.

BATCHELDER, J., delivered the opinion of the court in which MURPHY, J., joined. WHITE, J. (pp. 38–60), delivered a separate dissenting opinion.

––––––––––––––––––

## OPINION

––––––––––––––––––

ALICE M. BATCHELDER, Circuit Judge.  The question before us is whether a bump stock may be properly classified as a machine gun as defined by 26 U.S.C. § 5845(b).[1]  But this case rests as much on *who* determines the statute's meaning as it does on *what* the statute means.

On December 26, 2018, the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF" or "Agency") promulgated a rule that classified bump stocks as machine guns, reversing its previous position.  *See* Bump-Stock-Type Devices, 83 Fed. Reg. 66,514 (Dec. 26, 2018) (to be codified at 27 C.F.R. pts. 447, 478, 479) ("Final Rule").  Plaintiffs-Appellants—three gun-rights organizations, two individuals who own bump stocks, and one individual who would purchase a bump stock if not for the Final Rule—filed a motion for a preliminary injunction to prevent the Final Rule from taking effect.  After finding that the ATF's interpretation was entitled to *Chevron* deference, the district court held that the Final Rule's classification of bump stocks as machine guns was "a permissible interpretation" of § 5845(b).  Accordingly, the court concluded that Plaintiffs-Appellants were unlikely to succeed on the merits and denied the preliminary injunction.

Because an agency's interpretation of a criminal statute is not entitled to *Chevron* deference and because the ATF's Final Rule is not the best interpretation of § 5845(b), we REVERSE the district court's judgment and REMAND for proceedings consistent with this opinion.

––––––––––––––––––

[1]We will use the modern spelling of "machine gun" as two words unless quoting 26 U.S.C. § 5845(b), which spells "machinegun" as one word.

## I.  Background

## A.  Statutory History of the Machine Gun

For as long as there have been firearms, there have been efforts to make them shoot faster.  *See* JOHN ELLIS, THE SOCIAL HISTORY OF THE MACHINE GUN 9-14 (1986).  The modern-day machine gun dates back to the nineteenth century with Richard Gatling's 1861 invention of the hand-cranked Gatling gun and Hiram Maxim's 1884 invention of the fully automatic Maxim gun.  At first, these technological advances changed only the nature of warfare.  But their impact soon reached the civilian world with the submachine gun becoming the weapon of choice of organized crime during the Prohibition Era.  *See* David T. Hardy, *The Firearms Owners' Protection Act: A Historical and Legal Perspective*, 17 CUMB. L. REV. 585, 589-90 (1987).

Seeking to crack down on the criminal use of concealable, high-powered firearms, Congress passed the National Firearms Act of 1934, Pub. L. No. 73-474, 48 Stat. 1236 (codified as amended in I.R.C. ch. 53).  *See* S. REP. NO. 73-1444, at 1-2 (1934) ("The gangster as a law violator must be deprived of his most dangerous weapon, the machine gun.  Your committee is of the opinion that limiting the bill to the taxing of sawed-off guns and machine guns is sufficient at this time.").  "Representing the first major federal attempt to regulate firearms," that 1934 Act levied a then-steep $200 tax (estimated at over $3,800 in today's dollars) on the purchase of a machine gun.  *Lomont v. O'Neill*, 285 F.3d 9, 11-12 (D.C. Cir. 2002); Ch. 757, 48 Stat. at 1237; *see also National Firearms Act: Hearings on H.R. 9066 Before the H. Comm. on Ways and Means*, 73d Cong. 22-24 (1934) (Attorney General Homer Cummings explaining to the House Ways and Means Committee that the tax provision would permit the federal government to successfully prosecute gangsters with tax evasion, as it had done with Al Capone).  That 1934 Act defined "machine gun":

> The term "machine gun" means any weapon which shoots, or is designed to shoot, automatically or semiautomatically, more than one shot, without manual reloading, by a single function of the trigger.

Ch. 757, 48 Stat. at 1236.

Thirty years later, in response to several high-profile assassinations, including those of President John F. Kennedy, Senator Robert F. Kennedy, and Dr. Martin Luther King, Jr., Congress passed the Gun Control Act of 1968, which, among other restrictions, prohibited felons, drug users, and the mentally ill from purchasing firearms. Pub. L. No. 90-618, 82 Stat. 1213 (amending 18 U.S.C. §§ 921-28 and I.R.C. ch. 53). The 1968 Act's definition of a machine gun largely adopted the 1934 Act's definition but also expanded its scope to include other parts or devices that could convert a weapon into a machine gun:

> The term "machinegun" means any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger. The term shall also include the frame or receiver of any such weapon, any combination of parts designed and intended for use in converting a weapon into a machinegun, and any combination of parts from which a machinegun can be assembled if such parts are in the possession or under the control of a person.

§ 5845(b), 82 Stat. at 1231.

Finally, in 1986, Congress passed the Firearm Owners' Protection Act, which banned civilian ownership of machine guns manufactured after May 1986, as well as any parts used to convert an otherwise legal semiautomatic firearm into an illegal machine gun. Pub. L. No. 99-308, 100 Stat. 449 (1986) (amending 18 U.S.C. §§ 921-29). The 1986 Act amended only the second part of § 5845(b):

> Section 5845(b) of the National Firearms Act (26 U.S.C. 5845(b)) is amended by striking out "any combination of parts designed and intended for use in converting a weapon into a machinegun," and inserting in lieu thereof "any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machinegun."

§ 109(a), 100 Stat. at 460.

Thus, as currently codified, the statutory definition of a machine gun reads:

> The term "machinegun" means any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger. The term shall also include the frame or receiver of any such weapon, any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machinegun, and any combination of parts from

which a machinegun can be assembled if such parts are in the possession or under
the control of a person.

26 U.S.C. § 5845(b) (2019).

While Congress has enacted other legislation during the past 30 years, both expanding
and reducing gun-control measures, no law has amended the definition of a machine gun since
1986.

### B.  Regulatory History of the Bump Stock

Though there are different versions, all bump stocks are devices designed to assist the
shooter in "bump firing," a technique that increases a semiautomatic firearm's rate of fire.  The
bump stock replaces the standard stock of a semiautomatic rifle, *i.e.*, the end of the rifle that rests
against the shooter's shoulder.  In contrast to the standard stock, which is stationary, the bump
stock is a sliding stock that enables the firearm to move backwards and forwards in a
"constrained linear"—*i.e.*, straight—fashion.  Final Rule, 83 Fed. Reg. at 66,518.  To initiate
bump firing, the shooter pulls the trigger once, firing one shot, while maintaining "constant
forward pressure with the non-trigger hand on the barrel-shroud or fore-grip of the rifle."  *Id*. at
66,516.  At the same time, the shooter also maintains constant rearward pressure with his trigger
hand, while keeping his trigger finger stationary.  The recoil energy from the fired shot causes
the firearm to slide backward approximately 1.5 inches.  *Id*. at 66,518.  The forward pressure
applied by the shooter's non-trigger hand, along with the recoil energy channeled by the bump
stock, causes the firearm to then slide forward.  As the firearm slides forward, the trigger
"bumps" against the shooter's stationary trigger finger, causing the trigger to depress and the
firearm to shoot again.  This second fired shot creates recoil energy once again, which again
causes the bump-stock-attached firearm to slide back.  The trigger is released and reset, and the
process repeats.

This cycle will continue until the shooter moves his or her trigger finger, fails to maintain
constant forward pressure with the non-trigger hand, the firearm malfunctions, or the firearm
runs out of ammunition.  As with any semiautomatic weapon, the trigger must be completely
depressed, released, and then reset before it is capable of firing another shot.  Only one shot is

fired each time the trigger is depressed.  The bump stock enables a shooter to complete this depress-release-reset cycle of the trigger faster than would otherwise be possible without the bump stock.

Though the bump-firing technique has been around for as long as there have been semiautomatic firearms,[2] the first patented bump-stock device was invented only 20 years ago. In 1998, William Akins applied for a patent for an "apparatus for accelerating the cyclic firing rate of a semi-automatic firearm."  *Akins v. United States*, No. 8:08-cv-988, 2008 WL 11455059, at *2 (M.D. Fla. Sept. 23, 2008).  Akins received Patent No. 6,101,918 on August 15, 2000, and named his new device the "Akins Accelerator."  *Id*.  In March 2002, Akins asked the ATF whether it would classify the Akins Accelerator as a machine gun.  *Id.*  After some initial confusion, the ATF confirmed that the Akins Accelerator "[did] not constitute a machinegun . . . [nor] a part or parts designed and intended for use in converting a weapon into a machinegun," and Akins began to mass produce and distribute his new device.  *Id.*

In 2006, the ATF opened an investigation and, by its own admission, "overruled" its previous decision that the Akins Accelerator was not a machine gun.  Final Rule, 83 Fed. Reg. at 66,517.  The Agency concluded that the Accelerator's internal spring made the device a machine gun, but stated that if Accelerator owners removed the internal spring from the device, then it "would render the device a non-machinegun under the statutory definition."  *Id*.  Akins sued, arguing that the Agency's reversal was unreasonable, that the reversal violated due process, and that the statutory definition of machine gun was unconstitutionally vague.  *See Akins v. United States*, 312 F. App'x 197, 198 (11th Cir. 2009) (per curiam).  But his suit failed.  *Id.*

Meanwhile, "[b]etween 2008 and 2017, [the] ATF [] issued classification decisions concluding that other bump-stock-type devices were *not* machineguns, primarily because the devices did not rely on internal springs or similar mechanical parts to channel recoil energy." Final Rule, 83 Fed. Reg. at 66,514 (emphasis added).  But, as with the Akins Accelerator, the ATF later reversed course on these nonmechanical bump stocks too.

---

[2]A bump stock device is not needed to facilitate bump firing.  Final Rule, 83 Fed. Reg. at 66,532-33. Rubber bands, belt loops, and even shoestrings can all facilitate bump firing and create the same continuous firing cycle that a bump-stock device creates.  *Id.*

No. 19-1298        *Gun Owners of Am., Inc., et al. v. Garland, et al.*        Page 7

On October 1, 2017, in Las Vegas, Nevada, a gunman from his 32nd-floor hotel room fired down on a crowd of people at a nearby concert for nearly fifteen minutes, killing 58 and wounding over 500.  The gunman used bump-stock devices attached to his semiautomatic rifles to increase his rate of firing, allowing him to inflict heavy casualties in a short period of time.  In response to the shooting, President Trump "direct[ed] the Department of Justice to dedicate all available resources . . . as expeditiously as possible, to propose for notice and comment a rule banning all devices that turn legal weapons into machineguns."  Application of the Definition of Machinegun to "Bump Fire" Stocks and Other Similar Devices, 83 Fed. Reg. 7949 (Feb. 23, 2018).

On March 29, 2018, the Department of Justice ("DOJ") published a notice of proposed rulemaking that reinterpreted the terms "single function of the trigger" and "automatically," as used in 26 U.S.C. § 5845(b), in order to classify bump stocks as machine guns.  Bump-Stock-Type Devices, 83 Fed. Reg. 13,442 (proposed Mar. 29, 2018) (to be codified at 27 C.F.R. pts. 447, 478, 479).  Over 186,000 comments were submitted in response to the notice.  Final Rule, 83 Fed. Reg. at 66,519.  On December 26, 2018, the ATF published the Final Rule, classifying bump stocks as machine guns.  *Id.* at 66,514.  The Final Rule rescinded the ATF's prior classification letters permitting nonmechanical bump stocks and held that all bump stocks must either be surrendered to the government or destroyed by March 26, 2019, in order for bump-stock owners to avoid criminal liability.  *Id.*

## C.  Procedural History

Plaintiffs-Appellants filed suit on December 26, 2018, the same day that the Final Rule was published in the Federal Register.  Plaintiffs-Appellants claimed that the Final Rule violated the Administrative Procedure Act ("APA"), the Fifth Amendment's Takings Clause, and the Fourteenth Amendment's Due Process Clause.  Plaintiffs-Appellants also sought a preliminary injunction to stop the Final Rule from taking effect.  The district court denied the preliminary injunction. *Gun Owners of Am. v. Barr*, 363 F. Supp. 3d 823, 834 (W.D. Mich. 2019).  The court found that the ATF's interpretation was entitled to *Chevron* deference and that the Final Rule's classification of bump stocks as machine guns was "a permissible interpretation" of § 5845(b). *Id.* at 830-32.

While appealing the denial of their preliminary injunction, Plaintiffs-Appellants moved to stay the effective date of the Final Rule.  We denied the requested stay, *Gun Owners of Am., Inc. v. Barr*, No. 19-1298, 2019 WL 1395502, at *1-2 (6th Cir. Mar. 25, 2019), as did the Supreme Court, *Gun Owners of Am., Inc. v. Barr*, No. 18A963, 139 S. Ct. 1406 (2019).  The Final Rule took effect on March 26, 2019.

Before us now is Plaintiffs-Appellants' appeal of the district court's denial of their request for a preliminary injunction.

## II.  Standard of Review

"When deciding whether to issue a preliminary injunction, the district court considers the following four factors:  (1) whether the movant has a 'strong' likelihood of success on the merits; (2) whether the movant would otherwise suffer irreparable injury; (3) whether issuance of a preliminary injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuance of a preliminary injunction." *Leary v. Daeschner*, 228 F.3d 729, 736 (6th Cir. 2000) (citation omitted). The final two factors—assessing the harm to others and weighing the public interest—"merge when the Government is the opposing party." *Wilson v. Williams*, 961 F.3d 829, 844 (6th Cir. 2020) (quoting *Nken v. Holder*, 556 U.S. 418, 435 (2009)).

"When a party appeals the denial of a preliminary injunction, we ask whether the district court abused its discretion—by, for example, applying an incorrect legal standard, misapplying the correct one, or relying on clearly erroneous facts." *Pulte Homes, Inc. v. Laborers' Int'l Union of N. Am.*, 648 F.3d 295, 305 (6th Cir. 2011).  This means that we "review the district court's legal conclusions de novo and its factual determinations for clear error." *Id.* "The district court's determination of whether the movant is likely to succeed on the merits is a question of law and is accordingly reviewed de novo." *Certified Restoration Dry Cleaning Network, LLC v. Tenke Corp.*, 511 F.3d 535, 541 (6th Cir. 2007).

### III.  Analysis: *Chevron* Deference

Before determining whether the ATF's interpretation of § 5845(b) prevails, we must determine what deference, if any, we must give to its interpretation.  Plaintiffs-Appellants argue that an agency's construction is not, or should not be, entitled to deference when construing a *criminal* statute.[3]  We agree and conclude that *Chevron* deference categorically does not apply to the judicial interpretation of statutes that criminalize conduct, i.e., that impose criminal penalties.  Because the definition of machine gun in § 5845(b) applies to a machine-gun ban carrying criminal culpability and penalties, we cannot grant *Chevron* deference to the ATF's interpretation.

### A.  *Chevron* Deference

In what turned out to be a landmark decision, *Chevron USA, Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 865 (1984), introduced the concept of "*Chevron* deference": an administering agency's interpretation of a statute "is entitled to deference" from the courts.  "*Chevron* is rooted in a background presumption of congressional intent," that Congress intentionally delegated interpretive authority to the agency by enacting a statute with "capacious terms" rather than "plain terms."  *City of Arlington v. FCC*, 569 U.S. 290, 296 (2013).

Despite becoming "the most-cited administrative law case of all time," Jonathan R. Siegel, *The Constitutional Case for* Chevron *Deference*, 71 VAND. L. REV. 937, 938 (2018), "*Chevron* did not appear at first to be a major decision in administrative law," Paul J. Larkin, Jr., Chevron *and Federal Criminal Law*, 32 J. L. & POL. 211, 215 n.25 (2017).  "That a third of its members were sidelined"—due to the recusals of Justices Marshall, Rehnquist, and O'Connor—

---

[3]Plaintiffs-Appellants also argue that the ATF waived reliance on *Chevron* deference.  *See Martin v. Soc. Sec. Admin. Comm'r*, 903 F.3d 1154, 1161 nn. 48-49 (11th Cir. 2018) (collecting cases from the circuit split as to whether *Chevron* deference is waivable); *see also Guedes v. ATF*, 140 S. Ct. 789, 790 (2020) (Gorsuch, J., concurring in the denial of cert.) (explaining that the Supreme Court "has often declined to apply *Chevron* deference when the government fails to invoke it").  And the ATF agrees, taking the position that, because its interpretation of § 5845(b) is the best interpretation, deference to its interpretation is "unnecessary," so it "does not rely on *Chevron* deference" in this case.  Because we find, and hold, that *Chevron* deference does not apply in this case anyway (because it does not apply to criminal statutes such as we have here), we need not consider or decide the issue of waiver.

"reduces the likelihood that the Court intended to make a tectonic shift in administrative law." *Id.* Regardless of its perceived intent—or lack thereof—*Chevron* did just that. Under its two-step process:

> First, applying the ordinary tools of statutory construction, the court must determine whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court . . . must give effect to the unambiguously expressed intent of Congress. But if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.

*City of Arlington*, 569 U.S. at 296 (quotation marks omitted) (relying on *Chevron*, 467 U.S. at 842-43). Restated a bit more succinctly: (1) is the statutory provision ambiguous and, if so, (2) is the agency's interpretation "permissible" within that ambiguity. If both steps are satisfied, the court must defer to the agency's interpretation regardless of the court's own views of the correct or better interpretation of the provision. *See Chevron*, 467 U.S. at 843-44. Later, in *National Cable & Telecommunications Association v. Brand X Internet Services*, 545 U.S. 967, 982 (2005), the Court explained that *Chevron* deference means that an agency's construction is paramount to even a *prior* judicial construction, thus an agency may effectively overrule court precedent.

## B. Supreme Court Precedent

The *Chevron* Court was clear and unequivocal: "When a court reviews an agency's construction of the statute which it administers . . . [and] th[at] statute is silent or ambiguous with respect to the specific issue[,] . . . [the] court may not substitute its own construction of [that] statutory provision for a reasonable interpretation made by the . . . agency." *Chevron*, 467 U.S. at 842-44 (footnote omitted). *Chevron* did not draw any distinctions or identify any exceptions.

But in 2014, the Court said, "we have *never* held that the Government's reading of a *criminal* statute is entitled to *any* deference." *United States v. Apel*, 571 U.S. 359, 369 (2014) (emphasis added) (citing *Crandon v. United States*, 494 U.S. 152, 177 (1990) (Scalia, J., concurring in the judgment)). "Never" and "any" are absolutes, and the Court did not draw any distinctions, add any qualifiers, or identify any exceptions. A few months later, in *Abramski v.*

*United States*, 573 U.S. 169, 191 (2014), the Court quoted that same statement when rejecting a petitioner's argument that the ATF's former construction of a criminal statute should inform the Court's decision.  The *Abramski* Court explained:

> The critical point is that criminal laws are for courts, not for the Government, to construe.  We think ATF's old position no more relevant than its current one—which is to say, not relevant at all.  Whether the Government interprets a criminal statute too broadly (as it sometimes does) or too narrowly (as the ATF used to [regarding this provision]), a court has an obligation to correct its error.  Here, nothing suggests that Congress—the entity whose voice *does* matter—limited [the provision's] prohibition . . . in the way [the petitioner] proposes.

*Id.* (citation omitted).  Thus, the Court was clear, unequivocal, and absolute in saying that it has "never held that the Government's reading of a criminal statute is entitled to any deference." *Apel*, 571 U.S. at 369; *Abramski*, 573 U.S. at 191.

Unless the Court was mistaken in those two cases or exaggerating for effect, that bold, absolute statement means that none of the Court's prior cases applied *Chevron* deference (or any deference) to an agency's interpretation of a criminal statute.  That merits some discussion.

Start with *Chevron*, which was not a criminal prosecution.  The Environmental Protection Agency (EPA) was the defendant; Chevron was just an intervenor.  *Chevron*, 467 U.S. at 841 n.4.  In implementing the Clean Air Act, which had created a permitting program for "stationary sources" of air pollution and delegated that program to the States, the EPA promulgated regulations "allow[ing] [the] State[s] to adopt a plantwide definition of the term 'stationary source,'" a term the Act had used, but not defined.  *Id*. at 840 (footnote omitted).  The NRDC sued and "[t]he question presented . . . [was] whether EPA's decision to allow States to treat all of the pollution-emitting devices within the same industrial grouping as though they were encased within a single 'bubble' [wa]s based on a reasonable construction of the statutory term 'stationary source.'"  *Id*.  After creating the aforementioned "*Chevron* deference," *id*. at 842-45, the Court determined that the EPA's definition was permissible within the Act's ambiguity, describing it as "an effective reconciliation of the[] twofold ends" of "reducing air pollution [and protecting] economic growth," *id*. at 866 (quotation marks, editorial marks, and citation omitted).

To be sure, the Clean Air Act contains criminal penalties for—among other things such as false reporting and tampering with monitoring devices—a permitted facility's knowing violation of its permit requirements, but the *Chevron* opinion contains no reference to the Act's criminal provisions nor did the case concern the possibility of any criminal sanction.  No reasonable reading of *Chevron* could stand for the proposition that the government's interpretation of a *criminal* statute is entitled to *Chevron* deference.  Whether the Court intended to (silently) exclude the criminal-provision issue or merely did not consider the criminal-provision issue that was not before it, *Chevron* easily falls within the Court's proclamations in *Apel* and *Abramski* that it has never held that the government's reading of a criminal statute is entitled to deference.

The Court's traditional approach, under the modern nondelegation doctrine, has been to allow Congress to delegate to the executive branch the responsibility for defining crimes, but only so long as it speaks "distinctly."  *United States v. Grimaud*, 220 U.S. 506, 519 (1911); *United States v. Eaton*, 144 U.S. 677, 688 (1892).  "This clear-statement rule reinforces horizontal separation of powers . . . [and] compels Congress to legislate deliberately and explicitly before departing from the Constitution's traditional distribution of authority.  *Carter v. Welles-Bowen Realty, Inc.*, 736 F.3d 722, 733 (6th Cir. 2013) (Sutton, J., concurring).  Obviously, *Chevron*—which applies only where there is statutory ambiguity—is the opposite of a "clear statement."

In *Babbitt v. Sweet Home Chapter of Communities for a Great Oregon*, 515 U.S. 687, 690 (1995), the Endangered Species Act made it a crime to "take" an endangered species and the Department of the Interior's (DOI's) regulation said that such "taking" included the modification or degradation of the species' habitat.  Sweet Home sought a declaratory judgment that the statute did not support that regulation, making the regulation facially invalid.  *Id*. at 692.  The Court did not employ a full *Chevron* analysis, though it cited *Chevron* "generally" in announcing that it did "owe some degree of deference to the [DOI]'s reasonable interpretation," due, in part, to the "latitude the [Act] gives to the [DOI] in enforcing the statute."  *Id*. at 703-04; *see also id.* at 708 ("When it enacted the ESA, Congress delegated broad administrative and interpretive power to the [DOI].").  Thus, the Court appears to have been relying on the clear-statement

rule's delegation of authority to the DOI as if the DOI were Congress itself.  The Court also included a footnote addressing the "rule of lenity," in which it emphasized that it was not reviewing a criminal prosecution but rather a facial challenge to an administrative regulation, which did not necessarily invoke the "rule of lenity" just because "the governing statute authorize[d] criminal enforcement." *Id*. at 704 n.18 (distinguishing *United States v. Thompson/ Center Arms Co.*, 504 U.S. 505, 517-18 & n.9 (1992)).  While *Babbitt* certainly cited *Chevron* and used the word deference with regard to the DOI's interpretation, *Babbitt* did not discuss or decide whether *Chevron* applied nor did it analyze the challenge using *Chevron*, just as it did not decide whether the rule of lenity applied or analyze the challenge using the rule of lenity.  "The best that one can say . . . is that in *Babbitt* [] [the Court] deferred, with scarcely any explanation, to an agency's interpretation of a law that carried criminal penalties. . . . *Babbitt*'s drive-by ruling, in short, deserves little weight." *Whitman v. United States*, 574 U.S. 1003 (2014) (Scalia, J., joined by Thomas, J., respecting the denial of cert.).  While *Babbitt* certainly mentioned deference, it did not hold that an agency's interpretation of a criminal statute is entitled to *Chevron* deference, and thus falls within the Court's proclamations in *Apel* and *Abramski* that it had never so held.

In *United States v. O'Hagan*, 521 U.S. 642, 669 (1997), the Securities Exchange Act had criminalized "fraudulent trading," which included the use of "material nonpublic information concerning a pending tender offer," and the Securities and Exchange Commission's (SEC's) rule said that such trading was illegal even if the trader owed no duty to keep that information secret.  When the government convicted O'Hagan of this, he argued that the conviction was invalid because the rule was invalid, because the SEC had exceeded its rulemaking authority. *Id*. at 666-67.  The Court rejected that argument, finding that the statute expressly "delegates definitional and prophylactic rulemaking authority to the [SEC]," *id*. at 667, and explained: "Because Congress has authorized the [SEC] to prescribe legislative rules, we owe the [SEC]'s judgment more than mere deference or weight." *Id*. at 673 (quotation marks and citation omitted).  Although the Court quoted *Chevron* for the proposition that it "must accord the [SEC]'s assessment controlling weight unless it is arbitrary, capricious, or manifestly contrary to the statute," *id*. (editorial and quotation marks omitted), it did not conduct a *Chevron* analysis or present this as "*Chevron* deference."  The Court's analysis relied on the statutory delegation of

authority to the SEC under the clear-statement rule.  *See id*. at n.19; *see also id.* at 679 (Scalia, J., concurring in part) (drawing a distinction for situations "where (as here) no *Chevron* deference is being given to the agency's interpretation").   While *O'Hagan* used the word "deference," it cannot be read to support the proposition that the agency's interpretation of a *criminal* statute receives *Chevron* deference.   *O'Hagan* falls within the Court's proclamations in *Apel* and *Abramski* that it had never so held.

We are not aware of any other Supreme Court opinion that would question the proclamation in *Apel* and *Abramski*, but there are opinions that are consistent with it.  In at least three cases, the Court has indicated that the rule of lenity—the practical opposite of *Chevron* deference—applies to ambiguous statutory provisions that have both civil and criminal applications, thus resolving statutory ambiguities in favor of the criminal defendant rather than the government.  *See, e.g., Leocal v. Ashcroft*, 543 U.S. 1, 11 n.8 (2004); *Thompson/Center Arms Co.*, 504 U.S. at 517-18, 518 nn.9-10 (plurality); *id.* at 519 (Scalia, J., concurring in the judgment); *SWANCC v. U.S. Army Corps of Eng'rs*, 531 U.S. 159, 173-74, 174 n.8 (2001).

Considered altogether, if we take the Court at its word, it has never held that a court must necessarily grant *Chevron* deference to the government's interpretation of an ambiguous *criminal* statute.  More to the point for present purposes, we are aware of no Supreme Court opinion that compels us to apply *Chevron* deference to the ATF's interpretation of § 5854(b) here.

## C.  Circuit Court Precedent

Our review of Sixth Circuit precedent reveals that we generally do not apply *Chevron* deference to an administering agency's interpretation of a criminal statute, as we have explained:

> The special deference required by *Chevron* is based on the expertise of an administrative agency in a complex field of regulation with nuances perhaps unfamiliar to the federal courts.  Unlike environmental regulation or occupational safety, criminal law and the interpretation of criminal statutes is the bread and butter of the work of federal courts.

*Dolfi v. Pontesso*, 156 F.3d 696, 700 (6th Cir. 1998).  But, considered as a whole, Sixth Circuit precedent appears to provide us with no controlling authority as to whether we *must* or *must not* apply *Chevron* deference to the definition of machine gun in § 5845(b).

To be sure, in *Esquivel-Quintana v. Lynch*, 810 F.3d 1019, 1023-24 (6th Cir. 2016), we relied on *Babbit*, 515 U.S. at 704 n.18, to apply *Chevron* deference to the Board of Immigration Appeals' interpretation of an immigration statute with both criminal and civil penalties.  But the Supreme Court reversed that decision based on an alternative analysis and, in so doing, expressly refused to decide the applicability of *Chevron* deference.   *Esquivel-Quintana v. Sessions*, 137 S. Ct. 1562, 1572-73 (2017).  Thus, our opinion in *Esquivel* is at most persuasive authority. *See CIC Servs., LLC v. IRS*, 925 F.3d 247, 257 (6th Cir. 2019), *cert. granted* 140 S. Ct. 2737 (2020) (declining to follow earlier Sixth Circuit precedent that had been reversed on other grounds).

Our reasoning in *Esquivel* was that "[t]he Supreme Court has said that we must follow *Chevron* in cases involving the Board's interpretations of immigration laws."  *Esquivel*, 810 F.3d at 1024 (citations omitted).  But the Supreme Court has not issued similarly on-point opinions involving the definition of "machinegun" in § 5845(b).   The most analogous precedent is *Thompson/Center Arms Company*, 504 U.S. at 517-18 (plurality opinion), in which the Court applied the rule of lenity (not *Chevron* deference) to statutory definitions in the National Firearms Act, 26 U.S.C. § 5845.  *See also id.* at 519 (Scalia, J., concurring in the judgment).

And we have never held that *Chevron* deference applies to an agency's interpretation of a purely criminal statute, such as the ban on possessing a machine gun in 18 U.S.C. § 922(o).  *See Esquivel*, 810 F.3d at 1027 (Sutton, J., concurring in part and dissenting in part) ("But all can agree that . . . *Chevron* has no role to play in the interpretation of criminal statutes."); *United States v. One TRW, Model M14, 7.62 Caliber Rifle*, 441 F.3d 416, 420 & n.3 (6th Cir. 2006) (considering an ATF ruling interpreting § 5845(b), finding the deference question unsettled, and leaving it undecided, but noting that "[t]his matter is further complicated by the fact that [] we are interpreting a criminal statute, and under the rule of lenity ambiguities are generally resolved in favor of the party accused of violating the law, even in a civil proceeding").  Instead, we have found that a court's deferring to an agency's interpretation of a criminal statute would be

problematic, if not prohibited.  *See United States v. Dodson*, 519 F. App'x 344, 349 (6th Cir. 2013) ("The ATF does not have the ability to redefine or create exceptions to Congressional statutes."); *Boettger v. Bowen*, 923 F.2d 1183, 1186 (6th Cir. 1991) ("There is no intermediary to provide further clarification between Congress and the persons who are subject to penalty."); *see also*, *e.g.*, *United States v. Havis*, 907 F.3d 439, 451 (6th Cir. 2018) (Thapar, J., concurring), *rev'd en banc*, 927 F.3d 382 (6th Cir. 2019) ("How is it fair in a court of justice for judges to defer to one of the litigants? . . . Such deference is found nowhere in the Constitution—the document to which judges take an oath."); *Carter*, 736 F.3d at 732 (Sutton, J., concurring) ("*Chevron* describes how judges and administrators divide power.  But power to define crimes is not theirs to divide.").

Since *Apel* and *Abramski*, other federal courts have split as to whether those opinions *mandate* that a court may not, or merely *permit* that it need not, defer to an agency's interpretation of a criminal statute.  *Compare United States v. Kuzma*, 967 F.3d 959, 971 (9th Cir. 2020), *cert. denied*, 2020 WL 7132664 (2020) ("Because criminal laws are for courts, not for the Government, to construe, the Supreme Court has repeatedly rejected the view that the Government's reading of a criminal statute is entitled to any deference." (quotation marks and citations omitted)), *United States v. Balde*, 943 F.3d 73, 83 (2d Cir. 2019) ("[T]he Supreme Court has clarified that law enforcement agency interpretations of criminal statutes are not entitled to deference[.]"), *United States v. Garcia*, 707 F. App'x 231, 234 (5th Cir. 2017) ("The Supreme Court has now resolved this uncertainty, instructing that no deference is owed to agency interpretations of criminal statutes."), *and Gutierrez-Brizuela v. Lynch*, 834 F.3d 1142, 1155 (10th Cir. 2016) (Gorsuch, J., concurring) ("The Supreme Court has expressly instructed us *not* to apply *Chevron* deference when an agency seeks to interpret a criminal statute."), *with Aposhian v. Barr*, 958 F.3d 969, 982 (10th Cir. 2020), *and Guedes v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 920 F.3d 1, 25 (D.C. Cir. 2019), *cert. denied*, 140 S. Ct. 789 (2020) (acknowledging that "the Supreme Court has signaled some wariness about deferring to the government's interpretations of criminal statutes," but distinguishing *Apel* and *Abramski* and holding that *Babbitt* still "govern[s] us here").

We are not the first circuit court to review the ATF's Final Rule on bump stocks.  The Tenth and D.C. Circuits have each concluded that an administering agency's interpretation of a criminal statute is entitled to *Chevron* deference, and, under that deferential standard of review, found the ATF's Final Rule a permissible interpretation of § 5845(b).  Both of those courts found themselves bound by circuit precedent that an agency's interpretation of a criminal statute is entitled to *Chevron* deference.  *See Aposhian*, 958 F.3d at 982 (rejecting "a general rule against applying *Chevron* to agency interpretations of statutes with criminal law implications" because "controlling [Tenth Circuit] precedent points in the other direction").  The D.C. Circuit found that, in the securities context, it had frequently granted *Chevron* deference to the SEC notwithstanding the fact that violation of securities laws "often triggers criminal liability." *Guedes*, 920 F.3d at 24 (citations omitted).  However, as discussed above, we have no comparable precedent and, in fact, our precedent suggests the opposite.[4]  And, as mentioned, there is already a split among the Circuits on the meaning of *Apel* and *Abramski* and whether the Supreme Court now requires courts *not* to give any deference to agency interpretations of criminal statutes.  With this decision we are joining one side of a circuit split, not creating a circuit split.

### D.  Whether an Agency's Interpretation of a Criminal Statute is Entitled to *Chevron* Deference

Having found that Supreme Court and Sixth Circuit precedent neither require nor foreclose a specific holding, we turn to the merits of the question.  *Chevron* deference is typically justified on two rationales:  (1) an administering agency is more likely than a generalist court to determine the best interpretation of a statute because of the agency's specialized "expertise" in the statute's subject matter; and (2) by employing ambiguous terms rather than clear, specific language when drafting a statute, Congress ostensibly was deliberately delegating its lawmaking responsibilities to the agency.  *Arangure v. Whitaker*, 911 F.3d 333, 341-42 (6th Cir. 2018). Whatever the merits of either rationale with respect to civil statutes, *see Michigan v. EPA*, 576 U.S. 743, 760-64 (2015) (Thomas, J., concurring) (questioning the justifications of *Chevron*

---

[4]We do not hear securities cases as frequently as the D.C. and Second Circuits, and we have never reached the issue of *Chevron* deference to the SEC's interpretation of a criminal statute.  *See, e.g.*, *SEC v. Mohn*, 465 F.3d 647, 650 n.2 (6th Cir. 2006) (noting that the SEC conceded that "*de novo* review is appropriate" in that case).

deference and whether such deference is constitutional), neither holds water with respect to criminal statutes.   Furthermore, deference to the administering agency's interpretation of a criminal statute directly conflicts with the rule of lenity and raises serious constitutional concerns.   Consequently, we must hold that no deference is owed to an agency's interpretation of a criminal statute.

### 1.   Criminal Laws Reflect the Moral Judgments and "Expertise" of the Community

"[P]ractical agency expertise is one of the principal justifications behind *Chevron* deference." *Pension Benefit Guar. Corp. v. LTV Corp.*, 496 U.S. 633, 651-52 (1990) (citing *Chevron*, 467 U.S. at 865).   The Supreme Court's position has been that "agencies are more likely to get the answer right, given their expertise." *Arangure*, 911 F.3d at 341.   For example, the Court justified giving *Chevron* deference to the Social Security Administration's interpretation of the Social Security Act because of "the related expertise of the Agency," "the complexity of [the] administration" of the statute, and "the careful consideration the Agency [gave] the question over a long period of time." *Barnhart v. Walton*, 535 U.S. 212, 222 (2002).

Notwithstanding the ATF's frequent reversals on major policy issues, we understand that the Court would consider the bureaucrats at the ATF as experts in firearms technology.   But that technical knowledge is inapposite to the question of what should be criminally punished and what should not.   Criminal statutes reflect the value-laden, moral judgments of the community as evidenced by their elected representatives' policy decisions.   *See Gregg v. Georgia*, 428 U.S. 153, 175 (1976) ("In a democratic society, legislatures, not courts, are constituted to respond to the will and consequently the moral values of the people." (cleaned up)); *Mullaney v. Wilbur*, 421 U.S. 684, 700 (1975) (noting "the moral force of the criminal law"); *United States v. Bass*, 404 U.S. 336, 348 (1971) ("[C]riminal punishment [] represents the moral condemnation of the community."); OLIVER WENDELL HOLMES, JR., THE COMMON LAW 50 (1881) ("[C]riminal liability . . . is founded on blameworthiness.").   Since our country's founding, it has been understood that the public is both capable of and necessary to the determination of right from wrong legally and morally.   *See, e.g.*, THE FEDERALIST NO. 83, at 433 (Alexander Hamilton) (G.W. Carey and J. McClellan eds., 2001) (explaining why many consider juries in criminal cases to be "essential in a representative republic," a "friendly aspect to liberty," and a necessary

safeguard against "[a]rbitrary impeachments, arbitrary methods of prosecuting pretended offences, [and] arbitrary punishments upon arbitrary convictions"); John Adams, Diary Entry Feb. 12, 1771, *in* THE WORKS OF JOHN ADAMS, VOL. II, at 254 (C.F. Adams, ed., 1850) ("The general rules of law and common regulations of society . . . are well enough known to ordinary jurors. The great principles of the constitution are intimately known; they are sensibly felt by every Briton; it is scarcely extravagant to say they are drawn in and imbibed with the nurse's milk and first air.").

Indeed, our criminal laws continue to reflect the public's moral judgments. *See Kahler v. Kansas*, 140 S. Ct. 1021, 1048 (2020) (Breyer, J., dissenting) (discussing the "deeply entrenched and widely recognized moral principles underpinning our criminal laws"); *Gregg*, 428 U.S. at 183 ("[C]apital punishment is an expression of society's moral outrage at particularly offensive conduct."). Our criminal laws, for example, incorporate gradations of punishment to account for the moral culpability of the defendant and the severity of the crime committed. And legislators have long recognized that we as a community condemn and punish a premeditated murder more harshly than one committed in the heat of passion, which in turn is punished more severely than one unintentionally committed due to negligence. *See Mullaney*, 421 U.S. at 697-98 (explaining that "the criminal law of Maine, like that of other jurisdictions, is concerned not only with guilt or innocence in the abstract but also with the degree of criminal culpability").

The training for such policy determinations does not come from a graduate school education or decades of bureaucratic experience. Rather, one develops the expertise necessary to make moral judgments from sources of a more humble and local origin: one's family and upbringing. This learning is further informed by relationships with friends and neighbors, the practice of one's faith, and participation in civic life. That this education is accessible to everyone and anyone further enhances, not diminishes, the legitimacy of these community-based judgments. That is why, from the founding, the Supreme Court has held that there can be no federal common-law crimes and that only the people's representatives in Congress may enact federal criminal laws. *See United States v. Davis*, 139 S. Ct. 2319, 2325 (2019) (quoting *United States v. Hudson*, 7 Cranch 32, 34 (1812)). And what the Supreme Court has previously said about a federal court's ability to create a crime is equally relevant to a federal agency's ability to

do so: "[B]ecause criminal punishment usually represents the moral condemnation of the community, legislatures and not [agencies] should define criminal activity." *Bass*, 404 U.S. at 348.

Moreover, mastery of one field does not mean mastery of all.  The ATF is not an expert on community morality, so the rationale of deferring to "agency expertise" on this question fails. And there is great risk if the responsibility of making moral condemnations is assigned to bureaucrats in the nation's capital who are physically, and often culturally, distant from the rest of the country.  Federal criminal laws are not administrative edicts handed down upon the masses as if the administrators were God delivering the Ten Commandments to Moses on Mount Sinai.

Whether ownership of a bump-stock device should be criminally punished is a question for our society.  Indeed, the Las Vegas shooting sparked an intense national debate on the benefits and risks of bump-stock ownership.  And because criminal laws are rooted in the community, the people determine for themselves—through their legislators—what is right or wrong.  The executive enforces those determinations.  It is not the role of the executive— particularly the unelected administrative state—to dictate to the public what is right and what is wrong.

The stakes of any determination are significant.  Under the ATF's Final Rule, every bump-stock owner will potentially face not only a loss of liberty in the form of incarceration, but also the stigma and hardships that accompany a felony conviction.  *See McMillan v. Pennsylvania*, 477 U.S. 79, 103 (1986) (Stevens, J., dissenting) (explaining that a "high standard of proof is required because of the immense importance of the individual interest in avoiding both the loss of liberty and the stigma that results from a criminal conviction").  But whether bump-stock owners—heretofore law-abiding citizens—should now potentially be subject to substantial fines, imprisonment, and damning social stigmas is a question to whose answer an expertise in firearms technology contributes nothing.  So, the ATF's firearms expertise is not germane to the question of whether bump-stock ownership *should* be condemned and punished.

Finally, to the extent that the ATF is not determining what *the agency* thinks should be punished but is instead merely interpreting what *Congress* has already decided should be

punished, that determination also wrongfully relies on an expertise that the ATF lacks.  Rather, as we have already explained, interpreting criminal statutes falls within the expertise of the courts.  *Dolfi*, 156 F.3d at 700; *see also Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 57 (1974) ("[T]he resolution of statutory or constitutional issues is a primary responsibility of courts."); *Zipf v. Am. Tel. and Tel. Co.*, 799 F.2d 889, 893 (3d Cir. 1986) ("[S]tatutory interpretation is not only the obligation of the courts, it is a matter within their peculiar expertise.").  Indeed, "we judges are experts on one thing—interpreting the law."  *Wilson v. Safelite Grp., Inc.*, 930 F.3d 429, 442 (6th Cir. 2019) (Thapar, J., concurring) (internal alteration omitted) (quoting *Utah v. Rasabout*, 356 P.3d 1258, 1285 (Utah 2015) (Lee, A.C.J., concurring in part and concurring in the judgment) (emphasis omitted)).  So, the rationale of deferring to agency expertise does not apply here either.

In sum, for criminal statutes, where the primary question is what conduct should be condemned and punished, the first rationale of *Chevron* deference—deferring to an agency's expertise—is unconvincing because the agency's technical specialized knowledge does not assist in making the value-laden judgment underlying our criminal laws.  That judgment is reserved to the people through their duly elected representatives in Congress.

### 2.  Deference in the Criminal Context Violates the Separation of Powers

"The *Chevron* Court justified deference on the premise that a statutory ambiguity represents an 'implicit' delegation to an agency to interpret a 'statute which it administers.'" *Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612, 1629 (2018) (quoting *Chevron*, 467 U.S. at 842, 844). According to the Supreme Court, "*Chevron* thus provides a stable background rule against which Congress can legislate: Statutory ambiguities will be resolved, within the bounds of reasonable interpretation, not by the courts but by the administering agency." *City of Arlington*, 569 U.S. at 296.  Courts ostensibly know that Congress is deliberately intending to delegate some of its legislative responsibilities because "Congress knows to speak in plain terms when it wishes to circumscribe, and in capacious terms when it wishes to enlarge, agency discretion." *Id*.

Notwithstanding Article I's mandate that "[a]ll legislative Powers herein granted shall be vested in a Congress of the United States," U.S. CONST. art. 1, § 1., the Supreme Court has

permitted Congress to delegate some of its lawmaking responsibilities to executive-branch agencies so long as Congress provides an "intelligible principle" to which the administering agency is directed to conform. *Mistretta v. United States*, 488 U.S. 361, 372 (1989) (quoting *J.W. Hampton, Jr., & Co. v. United States*, 276 U.S. 394, 409 (1928)); *see also supra* Part III.B (discussing the "clear statement" rule). The Court is of the opinion that "in our increasingly complex society, replete with ever changing and more technical problems, Congress simply cannot do its job absent an ability to delegate power under broad general directives." *Id.* Generally, the Supreme Court has made this "clear statement" or "intelligible principle" standard a relatively low bar that Congress may overcome with fairly indefinite instructions. *See, e.g.*, *Yakus v. United States*, 321 U.S. 414, 420, 427 (1944) (upholding the Emergency Price Control Act of 1942, which instructed the Price Administrator to fix prices of commodities that are "in his judgment [] generally fair and equitable"); *Nat'l Broad. Co. v. United States*, 319 U.S. 190, 225-26 (1943) (upholding the Communications Act of 1934, which permitted the Federal Communications Commission to grant broadcast licenses "if public convenience, interest, or necessity will be served thereby"); *N.Y. Cent. Sec. Corp. v. United States*, 287 U.S. 12, 24-25 (1932) (upholding the Transportation Act of 1920, which empowered the Interstate Commerce Commission to authorize the acquisition of one railroad by another if it is in the "public interest"). At the same time, the Supreme Court has made clear that "Congress is not permitted to abdicate or to transfer to others the essential legislative functions with which it is thus vested . . . if our constitutional system is to be maintained." *A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495, 529-30 (1935) (quoting *Pan. Ref. Co. v. Ryan*, 293 U.S. 388, 421 (1935)).

Therefore, a court's deferring to an executive-branch agency's interpretation of a congressional statute naturally raises separation-of-powers concerns. *See, e.g.*, *Arangure*, 911 F.3d at 338 (explaining that "[w]hen courts find ambiguity where none exists, they are abdicating their judicial duty," "impermissibly expand[ing] an already-questionable *Chevron* doctrine," and "abrogat[ing the] separation of powers") (citations omitted); *Havis*, 907 F.3d at 452 (Thapar, J., concurring) ("[D]eference [that] would allow the same agency to make the rules and interpret the rules . . . is contrary to any notion the founders had of separation of powers."); *Lynch*, 810 F.3d at 1023-24 ("Left unchecked, deference to agency interpretations of laws with

criminal applications threatens a complete undermining of the Constitution's separation of powers."). These separation-of-powers concerns have even greater force in the criminal context. *See, e.g.*, *Davis*, 139 S. Ct. at 2325.

The "separate and distinct exercise of the different powers of government" is "essential to the preservation of liberty." THE FEDERALIST NO. 51, at 268 (James Madison or Alexander Hamilton). The separation of powers serves as "the great security against a gradual concentration of the several powers in the same department." *Id*. In addition to "protect[ing] each branch of government from incursion by the others," most importantly, "[t]he structural principles secured by the separation of powers protect the individual as well." *Bond v. United States*, 564 U.S. 211, 222 (2011).

Each branch's role and responsibility with regard to criminal statutes is clear. First, "[o]nly the people's elected representatives in the legislature are authorized to 'make an act a crime.'" *Davis*, 139 S. Ct. at 2325 (quoting *Hudson*, 7 Cranch at 34). Next, the executive is responsible for enforcing criminal statutes, and it retains "exclusive authority and absolute discretion to decide whether to prosecute a case." *United States v. Nixon*, 418 U.S. 683, 693 (1974) (citing *Confiscation Cases*, 74 U.S. 454 (1868)). Finally, it is for the courts to "say what the law is," including the criminal law. *Marbury v. Madison*, 1 Cranch 137, 177 (1803).

Even under a well-balanced system, the power of the federal government, particularly the executive branch, is formidable. No matter how well-prepared a defendant may be, his defense will pale in comparison to the resources, institutional knowledge, and personnel available to the federal government. If we defer to the federal prosecutor's interpretation of a criminal statute, this imbalance becomes even more lopsided. Whatever separation-of-powers issues are created by the delegation of civil lawmaking, the problems are much more profound when the matter involves criminal legislation. Specifically, deferring to the executive branch's interpretation of a criminal statute presents at least three serious separation-of-powers concerns: (1) it puts individual liberty at risk by giving one branch the power to both write the criminal law and enforce the criminal law; (2) it eliminates the judiciary's core responsibility of determining a criminal statute's meaning; and (3) it reduces, if not eliminates, the public's ability to voice its

moral judgments because it transfers the decision-making from elected representatives in the legislature to unaccountable bureaucrats in the executive's administrative agencies.

First, giving one branch the power to both draft and enforce criminal statutes jeopardizes the people's right to liberty. The concern over the potential abuse of power if the executive can define crimes predates our nation's founding. *See* THE FEDERALIST NO. 47, at 251 (James Madison) (quoting Baron de Montesquieu that "[t]here can be no liberty where the legislative and executive powers are united in the same person, or body of magistrates"); 1 WILLIAM BLACKSTONE, COMMENTARIES *146 (1753) ("In all tyrannical governments, the supreme magistracy, or the right of both *making* and of *enforcing* the laws, is vested in one and the same man, or one and the same body of men; and wherever these two powers are united together, there can be no public liberty."); JOHN LOCKE, SECOND TREATISE OF CIVIL GOVERNMENT § 143, pp. 324-25 (T. Hollis ed., 1764) (1690) ("[I]t may be too great a temptation to human frailty, apt to grasp at power, for the same persons, who have the power of making laws, to have also in their hands the power to execute them, whereby they may exempt themselves from obedience to the laws they make, and suit the law, both in its making, and execution, to their own private advantage, and thereby come to have a distinct interest from the rest of the community, contrary to the end of society and government."); *Case of Proclamations*, 12 Co. Rep. 74, 75 (K.B. 1611) ("[T]he King cannot change any part of the common law, nor create any offence by his proclamation, which was not an offence before, without Parliament.").

The executive branch plays an important role in upholding the rule of law and making society safer. But the immense power necessary to achieve those virtuous ends necessarily means that that power is at risk of being abused. If the executive branch wants to prosecute someone for something that is not yet a crime, it could use *Chevron* deference to interpret a statute so as to criminalize the activity and then prosecute an individual for doing it. *See Whitman v. United States*, 135 S. Ct. 352, 353 (2014) (Scalia, J., concurring in denial of cert.) ("With deference to agency interpretations of statutory provisions to which criminal prohibitions are attached, federal administrators can in effect create (and uncreate) new crimes at will, so long as they do not roam beyond ambiguities that the laws contain.").

Second, it is for the judiciary to "say what the law is," *Marbury*, 1 Cranch at 177, and this remains equally, if not especially, true for criminal laws.  *See Abramski*, 573 U.S. at 191 ("[C]riminal laws are for courts, not for the Government, to construe.").  It is well-established that "the resolution of statutory or constitutional issues is a primary responsibility of courts." *Alexander*, 415 U.S. at 57.  Notwithstanding this principle, the question of *Chevron* deference considers whether the judiciary or the executive should have the final say on an indeterminate statute's meaning.  The implications of each possibility are clear.  Granting the executive the right both to determine a criminal statute's meaning and to enforce that same criminal statute poses a severe risk to individual liberty.  Entrusting the interpretation of criminal laws to the judiciary, and not the executive, mitigates that risk and protects against any potential abuses of government power.  *See* BLACKSTONE at *268 ("[T]he public liberty . . . cannot subsist long in any state unless the administration of common justice be in some degree separated both from the legislative and also from the executive power.").

Third, because it is the public's responsibility to determine what conduct should be condemned, *see supra* Part III.D.1, "[o]nly the people's elected representatives in Congress have the power to write new federal criminal laws."  *Davis*, 139 S. Ct. at 2323.  Indeed, "Congress alone has the institutional competence, democratic legitimacy, and (most importantly) constitutional authority to revise statutes in light of new social problems and preferences."  *Wis. Cent. Ltd. v. United States*, 138 S. Ct. 2067, 2074 (2018).  However, *Chevron* deference, in this context, empowers *the agency* rather than Congress to define the scope of what should be criminalized.  *Cf. Abramski*, 573 U.S. at 191 (emphasizing that "Congress," not the ATF, is "the entity whose voice *does* matter").  If Congress were "to hand responsibility for defining crimes to relatively unaccountable [public officials]," it would "erod[e] the people's ability to oversee the creation of the laws they are expected to abide" and would "leave people with no sure way to know what consequences will attach to their conduct."  *Davis*, 139 S. Ct. at 2323, 2325.

Of all the separation-of-powers concerns identified, perhaps this is the most troubling: the bureaucrats at the agency are unaccountable to the public.  If the agency adopts an interpretation contrary to the will of the people, what recourse does the public have?  Unlike legislators, agency bureaucrats are not subject to elections and are often further protected from

removal by civil-service restrictions.  Even when an agency implements the will of the public correctly, that determination may still violate the separation of powers.  Because the community has the right to determine what moral wrongs should be punished—a practice that predates our Constitution—that responsibility may be entrusted to only the branch most accountable to the people:  the legislature.  And it may not be blithely delegated away.  *See* LOCKE, § 141, at 322 ("The legislative cannot transfer the power of making laws to any other hands: for it being but a delegated power from the people, they who have it cannot pass it over to others.").

Because such deference in the criminal context would violate the Constitution's separation of powers and poses a severe risk to individual liberty, we must hold that an administering agency's interpretation of a criminal statute is not entitled to *Chevron* deference.

### 3.  Fair Notice and the Rule of Lenity

We have established that the two principal justifications for *Chevron* deference in the civil context—deferring to an agency's subject-matter expertise and respecting Congress's delegation of its lawmaking powers—are unpersuasive in the criminal context.  Nor does a third justification for *Chevron* deference fit into this criminal context: the "background presumption" of statutory interpretation that Congress means for federal agencies to resolve the ambiguities that it leaves in its statutes.  *City of Arlington*, 569 U.S. at 296.  Some have suggested that this interpretive presumption makes sense in light of the judiciary's traditional mandamus practices.  *See, e.g.*, *United States v. Mead Corp.*, 533 U.S. 218, 241-43 (2001) (Scalia, J., dissenting).  Whether or not true in the civil context, *cf.* Aditya Bamzai, *The Origins of Judicial Deference to Executive Interpretation*, 126 YALE L.J. 908 (2017), the judiciary's historical interpretive principles in no way support *Chevron*'s background presumption in the criminal context.  To the contrary, ambiguities in criminal statutes have always been interpreted against the government, not in favor of it.  As Chief Justice Marshall noted, "[t]he rule that penal laws are to be construed strictly, is perhaps not much less old than construction itself."  *United States v. Wiltberger*, 18 U.S. 76, 95 (1820).  So we would be remiss if we did not acknowledge that *Chevron* deference to an agency's interpretation of criminal statutes conflicts with the rule of lenity and raises serious concerns.

The rule of lenity instructs courts that "ambiguity concerning the ambit of criminal statutes should be resolved in favor of lenity." *Rewis v. United States*, 401 U.S. 808, 812 (1971) (citation omitted). Unlike descriptive canons of statutory interpretation that help to resolve indeterminacies about a statute's intended meaning, the rule of lenity is a "purely normative" canon rooted in fair-notice concerns. CALEB NELSON, STATUTORY INTERPRETATION 110 (2011); *see also McBoyle v. United States*, 283 U.S. 25, 27 (1931) ("Although it is not likely that a criminal will carefully consider the text of the law before he murders or steals, it is reasonable that a fair warning should be given to the world in language that the common world will understand, of what the law intends to do if a certain line is passed."). "The rule 'applies only when, after consulting traditional canons of statutory construction, we are left with an ambiguous statute.'" *Shular v. United States*, 140 S. Ct. 779, 787 (2020) (quoting *United States v. Shabani*, 513 U.S. 10, 17 (1994)).

We have long accepted that deference in the criminal context conflicts with the rule of lenity and raises serious fair-notice concerns. *See*, *e.g.*, *Lynch*, 810 F.3d at 1023-24 (explaining that "[t]he rule of lenity ensures that the public has adequate notice of what conduct is criminalized, and preserves the separation of powers by ensuring that legislatures, not executive officers, define crimes" and that if "[l]eft unchecked, deference to agency interpretations of laws with criminal applications threatens a complete undermining of the Constitution's separation of powers"); *Carter*, 736 F.3d at 729-736 (Sutton, J., concurring) (discussing how and why *Chevron* deference to agency interpretations of criminal statutes "offends the rule of lenity"); *Dodson*, 519 F. App'x at 349 n.4 ("Statutes that require agency action to clarify their terms may raise fair notice and vagueness concerns."); *One TRW, Model M14, 7.62 Caliber Rifle*, 441 F.3d at 420 n.3 (noting that giving *Chevron* deference to the ATF's interpretation is "further complicated by the fact that [] we are interpreting a criminal statute, and under the rule of lenity ambiguities are generally resolved in favor of the party accused of violating the law").

Returning to our prior consideration of *Babbitt*, 515 U.S. at 704 n.18 ("We have never suggested that the rule of lenity should provide the standard for reviewing facial challenges to administrative regulations whenever the governing statute authorizes criminal enforcement."), we must recognize that the Supreme Court has never expressly reaffirmed that footnote and has

indeed undercut it in subsequent cases.  *See*, *e.g.*, *Leocal*, 543 U.S. at 11 n.8 ("Because we must interpret the statute consistently, whether we encounter its application in a criminal or noncriminal context, the rule of lenity applies.").  Moreover, the scope of the *Babbitt* footnote certainly appears limited.   The Court admitted that there might "exist regulations whose interpretations of statutory criminal penalties provide such inadequate notice of potential liability as to offend the rule of lenity," but that the regulation before it (in *Babbitt*) "cannot be one of them" because that regulation had "existed for two decades," which was enough time to "give[] a fair warning of its consequences."  *Babbitt*, 515 U.S. at 704 n.18.   What if the agency's regulation is not nearly so longstanding?  Or, as in this case, what if the agency is reversing a longstanding policy?  *See Guedes v. ATF*, 140 S. Ct. 789, 790 (2020) (Gorsuch, J., concurring in denial of cert.) ("How, in all this, can ordinary citizens be expected to keep up—required not only to conform their conduct to the fairest reading of the law they might expect from a neutral judge, but forced to guess whether the statute will be declared ambiguous; to guess again whether the agency's initial interpretation of the law will be declared 'reasonable'; and to guess *again* whether a later and opposing agency interpretation will *also* be held 'reasonable'?").  Here, the ATF had a regulation, unaltered for nearly two decades:  nonmechanical bump stocks were *not* machine guns.  *See* Final Rule, 83 Fed. Reg. at 66,531.  The *Babbitt* footnote did not specify how longstanding a regulation must be in order to satisfy fair-notice concerns or whether this standard changes when an agency reverses a previous position.  Thus, we face the scenario opposite to that addressed in the *Babbitt* footnote.  In the end, we need not decide those questions today because we find on other grounds, for the reasons discussed *supra*, that the ATF's interpretation of § 5845(b) is not entitled to *Chevron* deference.

## E.  Summary

Whatever the merits of giving *Chevron* deference to an agency's interpretation of *civil* statutes, the principal rationales behind that policy cannot be extended to support giving deference to an agency's interpretation of *criminal* statutes.  Declining to grant *Chevron* deference to agency interpretations of criminal statutes respects the community's responsibility to make value-laden judgments on what should be criminalized, upholds the separation of powers, complies with the rule of lenity, and avoids fair-notice concerns.  Because the ATF's

interpretation of § 5845(b) is not entitled to *Chevron* deference, we must determine the best meaning of the criminal statute and whether a bump stock falls within the statutory definition of a machine gun.

## IV.  Analysis: Statutory Interpretation

It is a "'fundamental canon of statutory construction' that words generally should be 'interpreted as taking their ordinary, contemporary, common meaning . . . at the time Congress enacted the statute.'"  *Wis. Cent. Ltd.*, 138 S. Ct. at 2074 (quoting *Perrin v. United States*, 444 U.S. 37, 42 (1979)).  The separation of powers requires that we interpret the statute "as written," and "we may not rewrite the statute simply to accommodate [a] policy concern." *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 139 S. Ct. 524, 529, 531 (2019).

Whether a bump stock falls within § 5845(b)'s definition of a machine gun is a question of statutory interpretation, and "[t]he starting point for any question of statutory interpretation is the language of the statute itself."  *United States v. Coss*, 677 F.3d 278, 283 (6th Cir. 2012) (internal quotation marks and citation omitted).  In determining the meaning of a statute, we have several interpretative tools at our disposal, including contemporaneous dictionaries, the structure and context of the rest of the statute, and descriptive canons of statutory interpretation, such as *ejusdem generis*, *expressio unius*, and *noscitur a sociis*.  *See Keen v. Helson*, 930 F.3d 799, 802-04 (6th Cir. 2019); *Arangure*, 911 F.3d at 339-40.  For the following reasons, we find that a bump stock does not fall within the statutory definition of a machine gun.

### A.  "Single Function of the Trigger"

The parties dispute the meaning of the phrase "single function of the trigger," as used in § 5845(b).  Plaintiffs-Appellants argue that the phrase "refers to the mechanical process through which the trigger goes (what the firearm is doing)" as opposed to "what the shooter is doing." The ATF argues (at least at the moment) that it means "a single pull of the trigger and analogous motions."  Final Rule, 83 F.R. at 66,553.  The ATF claims that "function" does not refer to "the precise mechanical operation of a specific type of trigger," but rather "the action that enables the weapon to shoot," *i.e.*, "the shooter's initial pull of the trigger."

Put differently, the question is whether "function" is referring to the mechanical process (*i.e.*, the act of the trigger's being depressed, released, and reset) or the human process (*i.e.*, the shooter's pulling, or otherwise acting upon, the trigger).[5]  Under the former, a bump stock does not fundamentally change the mechanical process:  in order for a single shot to be fired, the trigger must be depressed, released, and reset before another shot may be fired.  Under this interpretation, the bump-stock-attached semiautomatic firearm clearly is not a machine gun as it is not capable of firing more than one shot for each depressed-released-reset cycle the trigger completes.

Under the latter interpretation, the bump stock requires that the shooter pull—as in physically bend his or her finger and apply force to pull the trigger—once.  After the shooter pulls the trigger once, the bump stock enables the continuous firing cycle to begin and continue without requiring the shooter to physically move his or her finger and pull the trigger again; indeed, a bump stock is successfully operated when the shooter keeps his or her trigger finger stationary.  Under this interpretation, the bump-stock-attached semiautomatic firearm would be a machine gun because the firearm shoots multiple shots despite the shooter's pulling the trigger only once.

We have not previously addressed the meaning of the phrase "single function of the trigger" as used in § 5845(b).[6]  The district court concluded that both interpretations were reasonable and, because it was operating under a *Chevron*-deference framework, upheld the

---

[5]We agree with both parties that a firearm's trigger does not necessarily need to be "pulled" in order to constitute a trigger or for the firearm to constitute a machine gun.  As the Final Rule aptly explains, automatic firearms can have multiple types of triggers, such as a button that is pushed or an electric switch that is flipped. Bump-Stock-Type Devices, 83 Fed. Reg. 66,534, 66,518 n.5 (Dec. 26, 2018).  We employ the term "pull" because that is the most common action used to act upon a trigger.  Indeed, the parties' dispute does not center on whether "function" includes the operation of a trigger that is pulled or a trigger that is pushed; both parties agree that the term encompasses both.  The question is whether the statute is referring to the mechanical action of the trigger itself or the shooter's physical acting upon the trigger (regardless of the specific action the trigger requires in order to be acted upon).

[6]We have interpreted other parts of § 5845(b).  *See, e.g.*, *Dodson*, 519 F. App'x at 348-49 (discussing the change of § 5845(b) from banning only a "combination" of parts under the Gun Control Act of 1968 to banning "any" part as amended in 1986); *United States v. Carter*, 465 F.3d 658, 663-64 (6th Cir. 2006) (discussing whether the defendant could be charged with possessing a machine gun under § 5845(b) due to his possession of machine gun parts, if he was not charged with possessing a trigger mechanism); *One TRW, Model M14, 7.62 Caliber Rifle*, 441 F.3d at 419-25 (interpreting the meaning of "designed to shoot" and "can be readily restored" as used in § 5845(b)).

Final Rule as a permissible interpretation.[7]  *Gun Owners of Am.*, 363 F. Supp. 3d at 832.  But having determined that *Chevron* deference is not applicable in this context, we must decide the *best* meaning of the statute without putting a thumb on the scale in the government's favor.

"When interpreting the words of a statute, contemporaneous dictionaries are the best place to start."  *Helson*, 930 F.3d at 802.  We begin by looking to dictionaries contemporaneous with the passage of the Gun Control Act of 1968.[8]  However, the dictionary definition of "function" lends support to both interpretations.  *See Webster's Third New International Dictionary* 920-21 (1967) (defining "function" as an "action"); *Webster's Seventh New Collegiate Dictionary* 338 (1967) (defining "function" as "the acts or operations expected of a . . . thing" and the "characteristic action of a . . . manufactured or created thing").  That is to say, because "function" means "action," dictionaries alone do not reveal whether the statute is referring to the mechanical "act" of the trigger's being depressed or the physical "act" of the

---

[7]The D.C. Circuit likewise found the ATF's interpretation to be "permissible," though it did not need to decide whether the ATF's interpretation was the *best* interpretation because the court was also operating within the *Chevron*-deference framework.  *See Guedes*, 920 F.3d at 31-32; *see also Akins*, 312 F. App'x at 200 (finding that the ATF's interpretation of "single function of the trigger" meaning "single pull of the trigger" was consistent enough with the statute's text and legislative history so as to survive the APA's arbitrary-and-capricious standard).

[8]We note that the Final Rule, the district court, and the D.C. Circuit all relied on dictionaries contemporaneous with the passage of the Firearms Act of 1934.  *See* Final Rule, 83 Fed. Reg. at 66,519; *Gun Owners of Am.*, 363 F. Supp. 3d at 831-32; *Guedes*, 920 F.3d at 29.  However, with the Gun Control Act of 1968, Congress chose to redraft 26 U.S.C. § 5845(b) in its entirety—albeit with nearly identical language to the National Firearms Act of 1934.  And because we interpret the statute's meaning relying on dictionaries contemporaneous with the provision's most recently enacted language, in this case we must rely on dictionaries contemporaneous with the Gun Control Act of 1968.  *See Sandifer v. U.S. Steel Corp.*, 571 U.S. 220, 226-28 (2014) (relying on the 1950 meaning of "clothes" because Congress amended the Fair Labor Standards Act in 1949, eleven years after its initial passage).

To be sure, the 1986 Gun Owners' Protection Act amended some language of § 5845(b), but Congress left the first part of the statutory definition of a machine gun untouched (including the terms "single function of the trigger" and "automatically").  *See* Pub. L. 99-308, 100 Stat. 449 (amending 18 U.S.C. §§ 921-29).  Moreover, the 1986 Act expressly detailed which specific parts of § 5845(b) were being amended as opposed to the 1968 Act's enacting a new (albeit similarly worded) definition.  Because these terms were not amended, reenacted, or otherwise affected by the 99th Congress in 1986, we will not look to dictionaries from 1986 to determine their meaning.  *See United States v. Melvin*, 948 F.3d 848, 852 n.1 (7th Cir. 2020) (explaining that the court will rely on 1984 dictionaries for a 1984 statute that had since been amended because "the relevant portion of the statute remains the same").

Instead, we rely on 1968 dictionaries for assistance in determining the meaning of "single function of the trigger," though we do not see a material change in the meaning of "function" from 1934 to 1968 to 1986.  *Cf.* 4 *Oxford English Dictionary* 602 (1933) (defining "function" as "mode of action"); *Webster's New International Dictionary* 876 (1933) (defining "function" as "natural . . . action"); *Webster's Third New International Dictionary* 920-21 (1968) (defining "function" as an "action"); *Webster's Third New International Dictionary* 920-21 (1986) (same).

shooter's pulling the trigger.  *See Guedes*, 920 F.3d at 29 (finding that "function" means "action" but that "the text is silent on the crucial question of *which perspective* is relevant").

We next consider the phrase in the context of the rest of the statute to see if that illuminates which meaning of "function" Congress intended when drafting § 5845(b).  *See Helson*, 930 F.3d at 803-04 (after reviewing contemporaneous dictionaries, next considering "the context provided by the rest of the statute" as "[a]nother tool of interpretation").  "Statutory interpretation is a 'holistic endeavor'—the structure and wording of other parts of a statute can help clarify the meaning of an isolated term."  *Id*. at 803 (quoting *United Sav. Ass'n v. Timbers of Inwood Forests Assocs., Ltd.*, 484 U.S. 365, 371 (1988)).  Here, the statutory context weighs heavily in Plaintiffs-Appellants' favor.

First, the phrase plainly refers only to the "single function *of the trigger*," § 5845(b) (emphasis added), not "the trigger finger."  And if "function" is understood to mean "action," then the most natural reading of § 5845(b) would not be to read "single action of the trigger" to mean "single action of the trigger finger."  Rather the best, most natural reading would be that § 5845(b) refers to the trigger itself.

Second, this interpretation is further supported by the fact that the rest of § 5845(b)'s statutory definition of a machine gun describes the firearm, not the shooter, the shooter's body parts, or the shooter's actions.  Indeed, the entire definition focuses exclusively on the firearm's design and capability.  At no point does the definition mention the shooter or the shooter's actions.  Nothing in the statute suggests that the phrase "single function of the trigger" refers to the shooter's pulling the trigger rather than the trigger itself.

Third, the Final Rule's interpretation that "single function of the trigger" means "single pull of the trigger and analogous motions," Final Rule, 83 Fed. Reg. at 66,554, necessarily refers to the *trigger* and not to the shooter or the shooter's act of pulling.  The ATF's Rule does not interpret the phrase to mean "single pull *by* the trigger finger" or "*the shooter's* single pull of the trigger."  Instead, as with the statute, the Final Rule's language refers only to the "trigger" itself without any mention of the shooter or the shooter's actions.

Finding that "function" refers to the mechanical process, we conclude that a bump stock cannot be classified as a machine gun under § 5845(b).  We recognize that a bump stock increases a semiautomatic firearm's rate of firing, possibly to a rate nearly equal to that of an automatic weapon.  With a bump stock attached to a semiautomatic firearm, however, the trigger still must be released, reset, and pulled again before another shot may be fired.  A bump stock may change *how* the pull of the trigger is accomplished, but it does not change the fact that the semiautomatic firearm shoots only one shot for each pull of the trigger.  *Guedes*, 920 F.3d at 48 (Henderson, J., concurring in part and dissenting in part).  This remains true regardless of whether the shooter's finger is stationary (when operating a bump-stock-attached semiautomatic firearm) or is moving (when operating a semiautomatic firearm without a bump stock). And it likewise remains true regardless of whether the physical force depressing the trigger comes from the shooter's trigger finger's pushing the trigger or the recoil energy of the firearm's pushing the trigger against the shooter's trigger finger.  With or without a bump stock, a semiautomatic firearm is capable of firing only a single shot for each pull of the trigger and is unable to fire again until the trigger is released and the hammer of the firearm is reset.

Indeed, to the extent that the Supreme Court has spoken on the meaning of § 5845(b), its interpretation is supportive of the interpretation we adopt today.  *See Staples v. United States*, 511 U.S. 600, 602 n.1 (1994) ("As used here, the terms 'automatic' and 'fully automatic' refer to a weapon that fires repeatedly with a single pull of the trigger. That is, once its trigger is depressed, the weapon will automatically continue to fire until its trigger is released or the ammunition is exhausted. Such weapons are 'machineguns' within the meaning of the Act.").  The Supreme Court's language may not necessarily foreclose the ATF's interpretation.  *See Guedes*, 920 F.3d at 30 (finding that *Staples* does not "compel a particular interpretation of 'single function of the trigger'").  But the Court's focus on whether the "trigger is depressed" and how many times the firearm is capable of firing until the "trigger is released" strongly suggests that the Court understood § 5845(b) as referring to the mechanical process of the depress-release-reset cycle of the trigger.  *See Staples*, 511 U.S. at 602 n.1.

Given that the first bump-stock-type invention was not patented until well over a decade after the most recent amendment to § 5845(b), it would be impossible to say definitively whether

the 90th Congress in 1968 or the 99th Congress in 1986 would or would not have intended to ban bump stocks as automatic weapons.  "But the fact that Congress might have acted with greater clarity or foresight does not give courts a *carte blanche* to redraft statutes in an effort to achieve that which Congress is perceived to have failed to do."  *United States v. Locke*, 471 U.S. 84, 95 (1985).  And the statutory definition of a machine gun, as amended, excludes bump stocks because bump-stock devices do not fundamentally change the line Congress drew to distinguish automatic firearms from semiautomatic ones.

Congress could amend the statute tomorrow to criminalize bump-stock ownership, if it so wished; indeed, some states have done just that.  *See*, *e.g.*, DEL. CODE ANN. tit. 11 § 1444(a)(6) (2020); R.I. GEN. LAWS ANN. § 11-47-8(d) (2020); WASH. REV. CODE ANN. §§ 9.41.010(3), 9.41.190, 9.41.220 (2020); N.Y. PENAL LAW §§ 265.00(26-27); 265.10, 265.01-c (2019); NEV. REV. STAT. ANN. § 202.274 (2019); CAL. PENAL CODE §§ 16930, 32900 (2019); MD. CODE ANN., CRIM. LAW §§ 4-301(f), 4-305.1, 4-306 (2019); N.J. STAT. ANN. §§ 2C:39-3(l), 39-9(j) (2019); FLA. STAT. ANN. § 790.222 (2018); HAW. REV. STAT. § 134-8.5 (2018); MASS. GEN. LAWS ANN. ch. 140, §§ 121, 131 (2018); VT. STAT. ANN. tit. 13, § 4022 (2018).

But as judges, we cannot amend § 5845(b).  *See Henson v. Santander Consumer USA Inc.*, 137 S. Ct. 1718, 1726 (2017) ("[T]he proper role of the judiciary . . . [is] to apply, not amend, the work of the People's representatives.").  And neither can the ATF.  *See Dodson*, 519 F. App'x at 349 ("The ATF does not have the ability to redefine or create exceptions to Congressional statutes.").  This is because the separation of powers requires that any legislation pass through the legislature, no matter how well-intentioned or widely supported the policy might be.  *See INS v. Chadha*, 462 U.S. 919, 954 (1983) ("Amendment and repeal of statutes, no less than enactment, must conform with Art. I.").  To allow otherwise would put individual liberty at serious risk.  *Id*. at 950 (citing THE FEDERALIST NO. 51 (James Madison or Alexander Hamilton)).

In sum, based on the text and context of § 5845(b), and further supported by the Supreme Court's interpretation in *Staples*, we conclude that the phrase "the single function of the trigger" refers to the mechanical process of the trigger, not the shooter's pulling of the trigger.  Consequently, a bump stock cannot be classified as a machine gun under § 5845(b).

## B.  "Automatically"

Our holding that a bump stock does not fall within the statutory definition of a machine gun because a bump stock does not cause a firearm to fire more than one shot by a single function of the trigger is sufficient to resolve this appeal.  Consequently, we need not address or decide whether the ATF or Plaintiffs-Appellants have the better interpretation of "automatically" as used in 26 U.S.C. § 5845(b).[9]

## V.  Remaining Preliminary Injunction Factors

Having determined that Plaintiffs-Appellants are likely to prevail on the merits, we address the three remaining factors of a preliminary injunction:  (1) whether Plaintiffs-Appellants will suffer irreparable injury without an injunction; (2) whether the issuance of a preliminary injunction would cause substantial harm to others; and (3) whether the issuance of a preliminary injunction would serve the public interest.  *Leary*, 228 F.3d at 736 (citation omitted).  The final two factors—assessing the harm to others and weighing the public interest—"merge when the Government is the opposing party."  *Wilson*, 961 F.3d at 844 (quoting *Nken*, 556 U.S. at 435).  The government conceded in the district court that Plaintiffs-Appellants would suffer irreparable harm without an injunction.  *Gun Owners of Am.*, 363 F. Supp. 3d at 833.  And, as we stated in Part III.D.1, the Final Rule will cause bump-stock owners to either surrender or destroy their devices (the ATF estimates that the loss of property will exceed $100 million, *see* Final Rule, 83 Fed. Reg. at 66,515) or face serious fines and imprisonment.  The ATF claims that the

---

[9]Courts have identified varying interpretations of "automatically" as used in § 5845(b).  *Compare Aposhian*, 958 F.3d at 986-88 (finding that the term "automatically" "does not require there be *no* human involvement"), *and Guedes*, 920 F.3d at 170-72 (finding that "the term [automatically] can be read to require only that there be *limited* human involvement to bring about more than one shot"), *with Aposhian*, 958 F.3d at 996-98 (Carson, J., dissenting) (accepting the ATF's interpretation of "automatically" as meaning "self-acting" and "self-regulating," but finding that the terms "are self-explanatory—they exclude *any* manual human involvement by their very definitions," and explaining that "nonmechanical bump stocks require manual human involvement at all times as part of their underlying mechanisms"), *and Guedes*, 920 F.3d at 43-45 (Henderson, J., concurring in part and dissenting in part) (concluding that the ATF's interpretation "misreads" the term "automatically" because the "constant forward pressure with the non-trigger hand" necessary for the bump-stock-attached firearm to operate means that something more than just a single function of the trigger is needed to fire multiple shots, and because the ATF's interpretation fails to "maintain[] the longstanding distinction between 'automatic' and 'semiautomatic' in the firearms context").  *See also Aposhian*, 958 F.3d at 992 n.1 (Carson, J., dissenting) (explaining that mechanical bump stocks, such as the Akins Accelerator, use internal springs instead of constant forward pressure to propel the firearm forward and thus function differently from nonmechanical bump stocks, which require constant forward pressure).

bump-stock ban will further public safety, which may be true, but that claim is undercut by the ATF's admission that "there may not have been a number of violent acts committed with bump stocks," notwithstanding the half-million bump-stock devices in circulation across the country. Final Rule, 83 Fed. Reg. at 66,538.  Without an injunction, Plaintiffs-Appellants will suffer immediate, quantifiable, and serious irreparable harm, while the impact of the issuance of an injunction on public safety is only speculative based on the evidence that the ATF has provided to us and the public.  And Plaintiffs-Appellants are likely to prevail on the merits.  Weighing these factors together, we hold that the district court should have granted Plaintiffs-Appellants a preliminary injunction and, therefore, we reverse the district court's judgment.

However, we do not decide the scope of the injunction, except to say that the scope may not exceed the bounds of the four states within the Sixth Circuit's jurisdiction and, of course, encompasses the parties themselves.  Though we disagree with the ATF's position, the ATF prevailed before the Tenth Circuit, as well as the D.C. Circuit Court, from which decision the Supreme Court denied certiorari.  *See Guedes*, 920 F.3d at 6, *cert. denied* 140 S. Ct. 789 (2020).  If we were to permit a universal injunction (also frequently called a "nationwide injunction"), we would create an absurd situation in which the ATF must prevail in every single case brought against the Final Rule in order for its interpretation to prevail.  We do not think that it is within our authority to overrule the decision of a sister circuit (or for a district court within our circuit to do so).  *See Nixon*, 76 F.3d at 1388 (holding that we are not bound by "the views of our sister circuits").

While this will create a circuit split on the meaning of § 5845(b), there is value in having legal issues "percolate" in the lower courts.  *See CASA de Md., Inc. v. Trump*, 971 F.3d 220, 260 (4th Cir. 2020) ("[N]ationwide injunctions limit valuable 'percolation' of legal issues in the lower courts. . . . And the value of percolation is at its apex where, as here, 'a regulatory challenge involves important or difficult questions of law.'" (quoting *L.A. Haven Hospice, Inc. v. Sebelius*, 638 F.3d 644, 664 (9th Cir. 2011)).  The Supreme Court has noted that it is often "preferable to allow several courts to pass on a given [issue] in order to gain the benefit of adjudication by different courts in different factual contexts."  *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979).  Indeed, Justice Gorsuch, in his concurrence in the denial of certiorari for the

*Guedes* case, stated that: "[O]ther courts of appeals are actively considering challenges to the same regulation. Before deciding whether to weigh in, we would benefit from hearing their considered judgments[.]" *Guedes*, 140 S. Ct. at 791 (Gorsuch, J., concurring in denial of cert.). The short-term uncertainty and disunity created by percolation is justified by its producing a more thorough review of the issue, which in turn should provide a stable, more accurate body of law in the long run. *See CASA de Md.*, 971 F.3d at 260 ("Nationwide injunctions limit dialogue in the lower courts, favoring quick and uniform answers to the more deliberate—and likely more accurate—method of doctrinal development that is intended under our judiciary's very design."). For these reasons, we would not purport to issue a universal or nationwide injunction, and we otherwise leave the issue of the scope of the injunction to be briefed by the parties and decided by the district court.

## VI.  Conclusion

Consistent with our precedent and mandated by separation-of-powers and fair-notice concerns, we hold that an administering agency's interpretation of a criminal statute is not entitled to *Chevron* deference. Consequently, the district court erred by finding that the ATF's Final Rule, which interpreted the meaning of a machine gun as defined in 26 U.S.C. § 5845(b), was entitled to *Chevron* deference.  And because we find that "single function of the trigger" refers to the mechanical process of the trigger, we further hold that a bump stock cannot be classified as a machine gun because a bump stock does not enable a semiautomatic firearm to fire more than one shot each time the trigger is pulled.  Accordingly, we find that Plaintiffs-Appellants are likely to prevail on the merits and that that their motion for an injunction should have been granted.

Therefore, we REVERSE the judgment of the district court and REMAND for proceedings consistent with this opinion.

---

### DISSENT

---

WHITE, Circuit Judge, dissenting.  I respectfully disagree with the majority's conclusion that *Chevron* never applies to laws with criminal applications.  The Supreme Court has applied *Chevron* in the criminal context in three binding decisions—*Chevron* itself, *Babbitt*, and *O'Hagan*[1]—and has never purported to overrule those cases.  Although comments in subsequent decisions may create tension with these cases, they remain binding.  Thus, I would apply *Chevron*.  And because the statutory phrase here is ambiguous and the ATF's interpretation of that phrase is reasonable, it is entitled to deference under *Chevron*.

### I.  *Chevron* Applies

*Chevron* applies here.  First, the ATF's Bump-Stock Rule is the type of "legislative" rule that usually triggers *Chevron*'s two-step framework.  Second, that framework is not waivable.  Third, the framework applies even though the rule carries criminal consequences.  And fourth, the majority's normative arguments to the contrary are not persuasive.

### A.  The ATF's Rule is "Legislative"

The Administrative Procedure Act draws a "central distinction" between legislative and interpretive rules.  *Azar v. Allina Health Servs.*, 139 S. Ct. 1804, 1814 (2019) (quoting *Chrysler Corp. v. Brown*, 441 U.S. 281, 301 (1979)).  That "distinction centrally informs the applicability of *Chevron*."  *Guedes v. Bureau of Alcohol, Tobacco, Firearms, and Explosives*, 920 F.3d 1, 17 (D.C. Cir. 2019).  Legislative rules typically trigger *Chevron*, *Atrium Med. Ctr. v. U.S. Dep't of Health & Hum. Servs.*, 766 F.3d 560, 566 (6th Cir. 2014), while interpretive rules, in general, "enjoy no *Chevron* status as a class," *United States v. Mead Corp.*, 533 U.S. 218, 232 (2001).

Legislative rules "have the 'force and effect of law.'"  *Tenn. Hosp. Ass'n v. Azar*, 908 F.3d 1029, 1042 (6th Cir. 2018) (quoting *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 96

---

[1]*Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984); *Babbitt v. Sweet Home Chapter of Cmtys. for a Great Or.*, 515 U.S. 687 (1995); *United States v. O'Hagan*, 521 U.S. 642 (1997).

(2015)).  "[I]nterpretive rules do not," *id.*, and are instead meant only "'to advise the public of the agency's construction of the statutes and rules which it administers,'" *Shalala v. Guernsey Mem'l Hosp.*, 514 U.S. 87, 99 (1995) (citation omitted).  Legislative rules must be promulgated through the APA's notice-and-comment procedures, but interpretive rules need not be.  *Tenn. Hosp.*, 908 F.3d 1042; 5 U.S.C. § 553(b).

A rule is "legislative" if it "'intends to create new law, rights, or duties.'"  *Tenn. Hosp.*, 908 F.3d at 1042 (citation omitted).  A rule is "interpretive" if it instead "'simply states what the administrative agency thinks the statute means, and only reminds affected parties of existing duties.'"  *Id.* (citation omitted).  "Because interpretive rules cannot 'effec[t] a substantive change in the regulations,' a rule that 'adopt[s] a new position inconsistent with any'" of the agency's existing regulations "is necessarily legislative."  *Id.* (alterations in original) (quoting *Guernsey Mem'l Hosp.*, 514 U.S. at 100).  Congress's authorization of an agency to "proceed through notice-and-comment rulemaking" is a "'very good indicator' that Congress intended" rules passed through that procedure "to carry the force of law."  *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2125 (2016).

The ATF's rule is "legislative."  *See* Bump-Stock-Type Devices, 83 Fed. Reg. 66,514 (Dec. 26, 2018).  To start, it went through formal notice-and-comment rulemaking, *id.* at 66,517, a strong sign that the agency intended to speak with the force of law, *Encino Motorcars*, 136 S. Ct. at 2122, 2125.  It also adopted a position inconsistent with previous interpretations of "machinegun."  From 2008 to 2017, several ATF classification letters said that certain bump-stock devices were not "machineguns" because they "did not rely on internal springs or similar mechanical parts to channel recoil energy."  83 Fed. Reg. at 66,516.  The Bump-Stock Rule treats these devices as "machineguns," *id.* at 66,531, creating new obligations that previously did not exist, *see id.* at 66,516 (noting that previously, "[i]ndividuals . . . have been able to legally purchase these devices").  Although the 2008-2017 interpretations were issued through classification letters, not legislative regulations, this change still strongly suggests that the ATF meant to create new rights or duties.  *Cf. Tenn. Hosp.*, 908 F.3d at 1042.

Further, as the D.C. Circuit recently observed, "[a]ll pertinent indicia of agency intent confirm that the Bump-Stock Rule is a legislative rule."  *Guedes*, 920 F.3d at 18.  The rule's text

evinces an intent to change rights and obligations.  At several points, it speaks in terms of prospective, post-enactment changes in the law.  *See, e.g.*, 83 Fed. Reg. at 66,514 (warning that bump-stock devices "will be prohibited when this rule becomes effective"); *id.* at 66,523 ("Anyone currently in possession of a bump-stock-type device is not acting unlawfully unless they fail to relinquish or destroy their device after the effective date of this regulation.").  The rule also expressly invoked *Chevron*, *id.* at 66,527, and relied on several statutory provisions delegating legislative authority to the Attorney General, *id.* at 66,515, 66,527 (citing 18 U.S.C. § 926(a); 26 U.S.C. §§ 7801(a)(2)(A) & 7805(a)); *see also Guedes*, 920 F.3d at 18-19 (reasoning that the ATF's discussion of *Chevron* and invocation of these statutory provisions strongly signal that the ATF meant to use its legislative authority).  "When an agency acts pursuant to an express delegation that directs the agency to issue regulations or set permissible standards, the resulting rule is generally . . . considered to be legislative." *Tenn. Hosp.*, 908 F.3d at 1043.  The ATF did that here, and its rule is legislative.

Because the rule is legislative, it is the type of rule to which *Chevron*'s two-step framework typically applies.  We apply *Chevron* when "Congress delegated authority to the agency generally to make rules carrying the force of law" and "the agency interpretation" in question "was promulgated in the exercise of that authority." *Mead*, 533 U.S. at 226-27.  Both prerequisites are satisfied here.  Congress expressly delegated rulemaking authority to the Attorney General, *see* 18 U.S.C. § 926(a); 26 U.S.C. §§ 7801(a)(2)(A) & 7805(a), and the ATF exercised that authority through notice-and-comment rulemaking, *see Encino Motorcars*, 136 S. Ct. at 2125 ("When Congress authorizes an agency to proceed through notice-and-comment rulemaking, that 'relatively formal administrative procedure' is a 'very good indicator' that Congress intended the regulation to carry the force of law, so *Chevron* should apply." (quoting *Mead*, 533 U.S. at 229-30)).[2]  The Bump-Stock Rule is "firmly within *Chevron*'s domain." *Guedes*, 920 F.3d at 21.

---

[2]As the Fourth Circuit recently put it, "[w]hen an agency's interpretation 'derives from notice-and-comment rulemaking,' it will 'almost inevitably receive *Chevron* deference.'" *Sierra Club v. U.S. Army Corps of Eng'rs*, 909 F.3d 635, 644 (4th Cir. 2018) (citation omitted).  We have frequently said the same. *See, e.g.*, *Zurich Am. Ins. Grp. v. Duncan ex rel. Duncan*, 889 F.3d 293, 301-02 (6th Cir. 2018) ("Section 718.305(b)(2) was adopted after notice-and-comment rulemaking, and therefore is analyzed under the two-step framework that the Supreme Court articulated in *Chevron*[.]" (citations omitted)); *Sierra Club v. Env't Prot. Agency*, 793 F.3d 656, 665 (6th Cir. 2015) ("Where petitioner challenges an agency's interpretation of a statute promulgated after notice-and-comment

But two issues remain.  First, Plaintiffs argue that the government has "waived" *Chevron*.  Second, the majority concludes that *Chevron* does not apply in criminal contexts.  Neither issue precludes *Chevron* deference because *Chevron* is not waivable, and the Supreme Court has applied *Chevron* to legislative rules with criminal applications.

### B.  *Chevron* Cannot Be Waived

The government disclaims any reliance on *Chevron*.  *See* Appellees' Br. at 15-16 ("Plaintiffs' extended discussion of *Chevron* deference . . . likewise fails to advance their claims.  Deference is unnecessary where, as here, the Rule properly interprets the statute . . . .  The government thus does not rely on *Chevron* deference, but if this Court were to employ that framework, plaintiffs would still not be entitled to a preliminary injunction.").  Plaintiffs argue that the government waived *Chevron* here.  The D.C. Circuit addressed a similar claim in *Guedes*, 920 F.3d at 21-23, and persuasively explained that *Chevron* may not be waived in this context.[3]

There are several problems with concluding that *Chevron* can be waived.  To start, *Chevron* is not a right or privilege that belongs to a party; it is a standard of review, as we have repeatedly recognized.[4]  It is well-established that a "'party cannot waive the proper standard of review by failing to argue it.'"  *Hubbell v. FedEx SmartPost, Inc.*, 933 F.3d 558, 571 (6th Cir.

---

rulemaking, we assess the lawfulness of the interpretation under the familiar two-step *Chevron* framework."); *Sierra Club v. ICG Hazard, LLC*, 781 F.3d 281, 287 (6th Cir. 2015) ("[W]e defer to the agency's interpretation, provided that interpretation was promulgated via notice-and-comment rulemaking or a formal adjudication . . . ." (citations omitted)); *Spectrum Health Continuing Care Grp. v. Anna Marie Bowling Irrevocable Trust Dated June 27, 2002*, 410 F.3d 304, 319 (6th Cir. 2005) ("[A]gency action resulting from notice-and-comment rule-making or formal adjudications is entitled to judicial deference." (citing *Mead*, 533 U.S. at 230)); *Owensboro Health, Inc. v. Sec'y of Health & Hum. Servs.*, 706 F. App'x 302, 306 (6th Cir. 2017) ("When an agency engages in statutory interpretation with the force of law, such as through notice-and-comment rulemaking, we afford the agency deference." (citing *Chevron*, 467 U.S. 837 (1984)).

[3]The Supreme Court has not yet addressed this issue.  At least one Justice disagrees with the waiver analysis in *Guedes*.  *See Guedes v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 140 S. Ct. 789, 790 (2020) (Gorsuch, J., concurring in denial of certiorari) (arguing that the D.C. Circuit's conclusion on *Chevron* waiver "was mistaken").

[4]*See, e.g.*, *Keeley v. Whitaker*, 910 F.3d 878, 885 (6th Cir. 2018) (describing *Chevron* as a "standard of review"); *Nat'l Truck Equip. Ass'n v. Nat. Highway Traffic Safety Admin.*, 711 F.3d 662, 668 (6th Cir. 2013) (same); *Estate of Gerson v. Comm'r.*, 507 F.3d 435, 438 (6th Cir. 2007) (same); *TNS, Inc. v. NLRB*, 296 F.3d 384, 393 (6th Cir. 2002) (same); *United States v. Hopper*, 941 F.2d 419, 421-22 (6th Cir. 1991) (same).

2019) (citation omitted).  "Such a determination remains for this court to make for itself."  *K&T Enters., Inc. v. Zurich Ins. Co.*, 97 F.3d 171, 175 (6th Cir. 1996).  That same principle applies to *Chevron*.

Allowing *Chevron* to be waived would also contravene "basic precepts of administrative law."  *Guedes*, 920 F.3d at 22.  When a legislative rule is passed through notice-and-comment rulemaking, an agency may not reverse that rule without once more undergoing the notice-and-comment process.  *See Perez*, 575 U.S. at 101 ("[A]gencies [must] use the same procedures when they amend or repeal a rule as they used to issue the rule in the first instance.").  Likewise, if an agency seeks to reverse its position, that decision will be reviewed for arbitrariness. 5 U.S.C. § 706(2)(A).  A "waiver regime" would allow for an end-run around these requirements:

> A waiver regime, moreover, would allow an agency to vary the binding nature of a legislative rule merely by asserting in litigation that the rule does not carry the force of law, even though the rule speaks to the public with all the indicia of a legislative rule.  Agency litigants then could effectively amend or withdraw the legal force of a rule without undergoing a new notice-and-comment rulemaking. That result would enable agencies to circumvent the Administrative Procedure Act's requirement "that agencies use the same procedures when they amend or repeal a rule as they used to issue the rule in the first instance." [*Perez*, 575 U.S. at 101].  And an agency could attempt to secure rescission of a policy it no longer favors without complying with the Administrative Procedure Act, or perhaps could avoid the political accountability that would attend its own policy reversal by effectively inviting courts to set aside the rule instead.

*Guedes*, 920 F.3d at 22-23.

Thus, we must independently determine whether *Chevron* applies.[5]

---

[5]Our decision in *Commodity Futures Trading Comm'n v. Erskine*, 512 F.3d 309, 314 (6th Cir. 2008) does not compel a contrary result.  In *Erskine*, the CFTC sued the defendants under the Commodity Exchange Act, which gave the CFTC jurisdiction over "futures contracts" involving certain foreign exchange transactions.  *Id.* at 310-13. The key issue was whether the statutory term "futures contracts" encompassed the type of transaction at issue in the CFTC's lawsuit.  *Id.* at 313.  The CFTC never issued any type of rule or formal adjudication defining the term, and in the district court, it made no *Chevron* argument.  *Id.* at 314.  But on appeal, its lawyers argued that their interpretation of the term was entitled to *Chevron* deference.  *Id.*  The defendants responded with three arguments: (1) the CFTC "waived any reliance on *Chevron* deference by failing to raise it to the district court"; (2) Congress never delegated to the CFTC the power to define the term, and *Chevron* depends on delegation; and (3) the CFTC had never defined the term in "a rule-making or in an adjudication, which would provide for *Chevron* deference, but has merely asserted its preferred definition during the course of litigation," a position that could not garner *Chevron*

## C.  *Chevron* and Criminal Laws

The majority concludes that *Chevron* never applies to laws with criminal applications. It first determines that the relevant caselaw leaves the question open and then puts forth three normative reasons why *Chevron* ought not apply.  I disagree with the majority's discussion of the caselaw and with its proffered rationales.

### 1.  The Caselaw

To start, *Chevron* itself involved an agency interpretation that had criminal implications. The issue in *Chevron* was the meaning of the term "stationary source" in the Clean Air Act. 467 U.S. at 840.  Under the statutory regime, private parties in certain states had to obtain a permit when they added a new "major stationary source" of air pollution.  *Id.*  The EPA issued a regulation providing that industrial plants did not add a new "source" when they added new pieces of pollution-emitting equipment unless the alteration increased the total emissions in the plant.  *Id*.  The National Resources Defense Council sued, arguing that a new permit was needed whenever a new pollution-emitting device emitting over 100 tons of pollutants was added.  *Id*. at 841 n.3, 859.  At the time, knowing violation of the permit requirement was punishable by daily $25,000 fines and imprisonment for up to a year.  42 U.S.C. § 7502(a)(1), (b)(6) (1982); *id.* § 7413(c)(1) (1982).  Still, the Court applied deference.  *Chevron*, 467 U.S. at 866.

In *United States v. O'Hagan*, 521 U.S. 642, 667, 673 (1997), a criminal case, the Court applied *Chevron* deference to an SEC regulation that carried criminal penalties.  There, a lawyer was convicted of seventeen counts of fraudulent trading in connection with a tender offer, in violation of § 14(e) of the Exchange Act and SEC Rule 14e–3(a), after engaging in several stock transactions based on material non-public information he obtained through his firm's assistance

---

deference due to lack of "administrative formality."  *Id.* (citations omitted).  In a single sentence, we stated that we agreed with the defendants on each point: "We agree with [defendants] on each of [their] points and conclude that the CFTC is not entitled to *Chevron* deference on this issue."  *Id.*

Although *Erskine* appears to voice agreement with the suggestion that *Chevron* arguments may be forfeited, it offered no discussion on the issue.  More importantly, the issue was not necessary to its holding and thus constituted dictum.  *See Freed v. Thomas*, 976 F.3d 729, 738 (6th Cir. 2020) ("[D]ictum is anything 'not necessary to the determination of the issue on appeal.'" (quoting *United States v. Swanson*, 341 F.3d 524, 530 (6th Cir. 2003))).  The *Erskine* court found that the prerequisite to *Chevron*—congressional delegation—was absent, and it also found that the agency had not taken any actions that could have triggered *Chevron* to begin with.  Thus, the panel's unarticulated acceptance of the defendant's waiver argument was not necessary to its conclusion.

with a tender offer.  *Id.* at 647-49.  The Supreme Court rejected his challenge to the scope of Rule 14e–3(a), and applied *Chevron* to the rule, despite its clear criminal applications.  *See id.* at 673 ("Because Congress has authorized the Commission, in § 14(e), to prescribe legislative rules, we owe the Commission's judgment 'more than mere deference or weight.'. . .  [W]e must accord the Commission's assessment 'controlling weight unless [it is] arbitrary, capricious, or manifestly contrary to the statute.'" (second alteration in original) (quoting *Chevron*, 467 U.S. at 844) (other citation omitted)).**[6]**

---

**[6]**The majority suggests that *O'Hagan* did not apply *Chevron* deference, yet it also recognizes that the Court (1) cited *Chevron*, (2) while citing *Chevron*, recognized that the agency's legislative rule was entitled to "more than mere deference or weight," and (3) applied deference to the rule.  Majority Op. at 13-14.  The *O'Hagan* court cited *Chevron*, held that the SEC's regulation was entitled to "controlling weight" unless it was "manifestly contrary to the statute," determined that the regulation was *not* contrary to the statute, and applied deference.  521 U.S. at 673.  If that does not count as applying *Chevron* deference, what does?  *See also Mead*, 533 U.S. at 230 & n.12 (stating that the "overwhelming number of our cases applying *Chevron* deference have reviewed the fruits of notice-and-comment rulemaking or formal adjudication," and listing *O'Hagan* among the "rulemaking cases" where *Chevron* deference applied); *Valenzuela Gallardo v. Barr*, 968 F.3d 1053, 1060 (9th Cir. 2020) (noting that the Court "grant[ed] *Chevron* deference" in *O'Hagan*); *Guedes*, 920 F.3d at 24 (same); Thomas W. Merrill & Kristin E. Hickman, *Chevron's Domain*, 89 GEO. L.J. 833, 874 n.220 (2001) (same).

The majority also tries to distinguish *O'Hagan* on the basis that it did not involve a purely criminal statute.  *See* Majority Op. at 14.  ("While *O'Hagan* used the word 'deference,' it cannot be read to support the proposition that the agency's interpretation of a *criminal* statute receives *Chevron* deference." (emphasis in original)).  This point relies on the assumption that the ATF's Bump-Stock Rule only interpreted a purely criminal statute.  Throughout its opinion, the majority appears to repeatedly make this assumption.  *See, e.g., id.* at 13 ("While *Babbitt* certainly mentioned deference, it did not hold that an agency's interpretation of a criminal statute is entitled to *Chevron* deference . . . ."); *id.* at 15 ("[W]e have never held that *Chevron* deference applies to an agency's interpretation of a purely criminal statute, such as the ban on possessing a machine gun in 18 USC. § 922(o).").  That assumption is incorrect.  Although Congress, in 1986, criminally banned private individuals from possessing machineguns not already lawfully possessed before May 19, 1986, 18 U.S.C. § 922(o), the Bump-Stock Rule does not purport to interpret this criminal provision.  Rather, it interprets the word "machinegun" in the definition section of 26 U.S.C. § 5845(b)—a definition that has both civil and criminal applications.  *See Guedes*, 920 F.3d at 40 & n.7 (Henderson, J., concurring in part and dissenting in part) ("[T]he 26 U.S.C. § 5845(b) definition of 'machinegun' has both civil and criminal enforcement implications."); *Aposhian v. Barr*, 958 F.3d 969, 982 (10th Cir. 2020) (the ATF's bumpstock regulation "carrie[s] both civil and criminal implications"); *id.* at 998-99 (Carson, J., dissenting) (same).  For example, § 922(o)'s criminal ban has exceptions for those making transfers "under the authority of" any department or agency of the United States.  18 U.S.C. § 922(o)(2)(A).  This exception allows certain arms dealers to possess and transfer machineguns when they intend to sell them to police departments or government agencies.  *See* 27 C.F.R. § 179.105 (discussing requirements for such dealers); *United States v. Ardoin*, 19 F.3d 177, 178 (5th Cir. 1994) ("In 1989, Ardoin also became a Colt distributor for law enforcement agencies.  As a distributor, he was able to sell to law enforcement agencies any class of weapons, including machineguns, as long as he maintained his Class III license.").  For those exempted, § 5845(b)'s definition of "machinegun" carries civil implications as well.  *See United States v. Hamblen*, 239 F. App'x 130, 133 (6th Cir. 2007) (noting registered machinegun dealers must pay "a special occupation tax"); *Guedes*, 920 F.3d at 40 & n.7 (Henderson, J., concurring in part and dissenting in part) (pointing out that § 5845(b) has civil forfeiture and tax implications (citing 26 U.S.C. § 5872(a))).

Neither *Chevron* nor *O'Hagan* addressed the interaction between *Chevron* and the rule of lenity, but the Court squarely addressed the issue in *Babbitt v. Sweet Home Chapter of Cmtys. for a Great Or.*, 515 U.S. 687 (1995). There, the Court reviewed a regulation interpreting the definition of the word "take" in the Endangered Species Act (ESA). *Id.* at 690. The ESA made it illegal to "take" certain endangered species and attached criminal penalties for knowingly doing so. *Id.* at 691-93, 696 n.9. Congress defined "take" to include several verbs, including "harm," but did not define what "harm" meant. *Id.* at 691. The Department of Interior promulgated a regulation defining "harm" to include habitat degradation. *Id.* The plaintiffs challenging the regulation argued that *Chevron* deference was improper because the ESA included criminal penalties and, therefore, the rule of lenity should apply instead. *Id.* at 704 n.18. The Court rejected the argument and applied *Chevron*, despite the statute's criminal penalties. *Id.* at 703-04, 704 n.18.[7]

---

[7] As with *O'Hagan*, the majority asserts that *Babbitt* did not "discuss or decide whether *Chevron* applied nor did it analyze the challenge using *Chevron* . . . ." Majority Op. at 13. That is incorrect. The *Babbitt* Court reversed a split decision of the D.C. Circuit and vindicated the view of the dissenting appellate judge, who applied *Chevron*. *Babbitt*, 515 U.S. at 694-95. From the start of its discussion onward—after recognizing that the ESA failed to define the word "harm," *id.* at 691—the Court framed the question as whether the Department of Interior's regulation was *reasonable* or *permissible*, a question that only makes sense if the Court was operating within *Chevron*'s domain, *see, e.g., id.* at 696 n.9 (framing discussion by noting that the Court was "assessing the reasonableness of the regulation"); *id.* at 697 ("The text . . . provides three reasons for concluding that the Secretary's interpretation *is reasonable*." (emphasis added)); *id.* at 699 (noting that Congressional intent "supports the *permissibility* of the Secretary's 'harm' regulation" (emphasis added)); *id.* at 700 (noting that "the Secretary's definition of 'harm' is reasonable"); *id.* at 702 (stating that the regulation "permissively interprets" the word "harm"). If any doubt was left, the Court cleared it on page 703 of the opinion, where it (1) recognized that Congress had not "unambiguously" defined the word "harm" (*Chevron* Step One); (2) concluded that the DOI's interpretation was reasonable (*Chevron* Step Two); and (3) found it unnecessary to decide if the DOI's interpretation was the best one, because the fact that the interpretation was reasonable "suffice[d] to decide this case:"

> We need not decide whether the statutory definition of "take" compels the Secretary's interpretation of "harm," because our conclusions that Congress did not unambiguously manifest its intent to adopt respondents' view and that the Secretary's interpretation is reasonable suffice to decide this case. *See generally Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984).

*Id.* at 703. The Court repeated its invocation of *Chevron* when summarizing its conclusion at the end of the opinion. *Id.* at 708. It was also clear to the three dissenting Justices that the majority was applying *Chevron*. *See id.* at 715 (Scalia, J., dissenting) ("In my view petitioners must lose—the regulation must fall—even under the test of *Chevron* . . ., so I shall assume that the Court is correct to apply *Chevron*."). Numerous subsequent courts and commentators—including the Supreme Court—have recognized the same. *See, e.g., Mead*, 533 U.S. at 230 & n.12 (listing *Babbitt* as a case that "appl[ied] *Chevron* deference" to "the fruits of notice-and-comment rulemaking"); *Guedes*, 920 F.3d at 27 (describing *Babbitt* as applying *Chevron*); *Aposhian*, 958 F.3d at 982 (same); *see also Valenzuela Gallardo*, 968 F.3d at 1060; *Competitive Enter. Inst. v. United States Dep't of Transp.*, 863 F.3d 911, 915 n.4 (D.C. Cir. 2017); *United States v. Atandi*, 376 F.3d 1186, 1189 (10th Cir. 2004); *United States v. Kanchanalak*, 192 F.3d 1037, 1047 n.17 (D.C. Cir. 1999); 33 Wright and Miller, Federal Practice and

*Chevron*, *Babbitt*, and *O'Hagan* all involved "legislative" regulations issued through notice-and-comment rulemaking—i.e., regulations that trigger *Chevron*'s deferential framework.[8]  In two 2014 cases that did *not* involve legislative regulations, the Court made statements that could be taken to question whether *Chevron* applies in the criminal context. *United States v. Apel*, 571 U.S. 359, 369 (2014) ("[W]e have never held that the Government's reading of a criminal statute is entitled to any deference."); *Abramski v. United States*, 573 U.S. 169, 191 (2014) ("[C]riminal laws are for the courts, not for the Government, to construe. . . . We think ATF's old position no more relevant than its current one—which is to say, not relevant at all.  Whether the Government interprets a criminal statute too broadly (as it sometimes does) or too narrowly (as the ATF used to . . .), a court has an obligation to correct its error." (citing *Apel*, 571 U.S. at 369)).  These statements are at the core of the majority's argument.

But *Apel* and *Abramski* never mention *Chevron*, *Babbitt*, or *O'Hagan*.  Nor would they be expected to because neither involved agency interpretations that would trigger *Chevron* to begin with.  *Abramski* involved informal agency guidance (ATF "circulars").  573 U.S. at 183 n.8, 191; *id.* at 198 n.3, 202 (Scalia, J., dissenting).  And *Apel* involved internal guidance documents (DOJ manuals and Air Force JAG opinions) that the Court expressly noted were "not intended to be binding."  571 U.S. at 368.[9]  Thus, the Court's statements in both cases do not undermine *Chevron*'s applicability here because the agency guidance documents were not

---

PROCEDURE § 8427 n.12 (2d ed. Oct. 2020) (describing *Babbitt* as "applying *Chevron* deference to the Secretary's definition of 'take' under the Endangered Species Act"); William N. Eskridge & Lauren E. Baer, *The Continuum of Deference: Supreme Court Treatment of Agency Statutory Interpretations From* Chevron *to* Hamdan, 96 GEO. L.J. 1083, 1135-36 n.178 (2008) (listing *Babbitt* as an example of a "prominent *Chevron* case[]"); Note, *Justifying the* Chevron *Doctrine: Insights From the Rule of Lenity*, 123 HARV. L. REV. 2043, 2062 (2010) ("In a later case, [*Babbitt*,] the Court did grant *Chevron* deference to an agency interpretation of the Endangered Species Act, despite the fact that the Act could be both civilly and criminally enforced.").

[8]In *Chevron*, the regulation at issue was an EPA "final rule" promulgated after notice and comment. 467 U.S. at 840-41; 46 Fed. Reg. 50766, 50767-68 (Oct. 14, 1981).  *O'Hagan* also involved a "final rule," promulgated by the SEC after a notice-and-comment period.  521 U.S. at 668; 45 Fed. Reg. 60410, 60410-11 (Sep. 12, 1980)).  The same goes for the rule in *Babbitt*.  515 U.S. at 691 n.2; 40 Fed. Reg. 44412, 44413 (Sep. 26, 1975); 46 Fed. Reg. 54748, 54748 (Nov. 4, 1981).

[9]*See id.* at 368-69 (quoting portion of DOJ's U.S. Attorneys' Manual stating, "'The Manual provides only internal Department of Justice guidance. It is not intended to, does not, and may not be relied upon to create any rights, substantive or procedural, enforceable at law . . . .'" (citation omitted)); *id.* at 369 (quoting preface to Air Force internal guidance—opinions from the Judge Advocate General—stating that the opinions "'are good starting points but should not be cited as precedence [sic] without first verifying the validity of the conclusions by independent research.'" (alteration in original) (citation omitted)).

entitled to *Chevron* deference in the first place.  *See Atrium Med. Ctr.*, 766 F.3d at 567 ("'[I]nterpretations contained in policy statements, agency manuals, and enforcement guidelines, all of which lack the force of law' and were not promulgated via notice and comment rulemaking, 'do not warrant *Chevron*-style deference.'" (quoting *Christensen v. Harris County*, 529 U.S. 576, 587 (2000))).

Because the statements in *Apel* and *Abramski* "were made outside the context of a *Chevron*-eligible interpretation," *Guedes,* 920 F.3d at 25, they do not resolve our question. Rather, *Chevron*, *O'Hagan*, and *Babbitt* control.  Those cases demonstrate that when the Court has considered legislative rules promulgated through notice and comment, it has applied *Chevron* even when the rules have criminal implications.  *See id*. (noting that in *Babbitt*, "[w]hen directly faced with the question of *Chevron*'s applicability to an agency's interpretation of a statute with criminal applications through a full-dress regulation, the Court adhered to *Chevron*." (citation omitted)); *Aposhian*, 958 F.3d at 984 ("*Babbitt* . . . govern[s] here, where ATF has promulgated a regulation through formal notice-and-comment proceedings.").

The majority recognizes that in *O'Hagan* and *Babbitt*, the Supreme Court applied deference to regulations with criminal applications, Majority Op. at 12-14, but insists that neither case applied *Chevron* deference.  As noted above, that is mistaken.  *See supra* at 44-46 nn.6-7.[10] The majority also cites three pre-2014 cases that, it suggests, "indicated that the rule of lenity—the practical opposite of *Chevron* deference—applies to ambiguous statutory provisions that

---

[10]Although it never fully articulates the point, the majority also appears to suggest that *O'Hagan* and *Babbitt* relied on a purported "clear-statement" rule—rather than *Chevron*—to apply deference. Majority Op. at 12-14.  It is clear that neither *Babbitt* nor *O'Hagan* relied on any clear-statement rule to apply deference. Neither opinion ever mentions a "clear-statement rule," and nothing in either opinion suggests that the decision to apply deference was based on any such rule. The majority cites nothing to support its assertion that *Babbitt* "appears to have been relying on the clear-statement rule's delegation of authority to the DOI as if the DOI were Congress itself." *Id.* at 12-13. As to *O'Hagan*, the majority cites a footnote from the opinion that says nothing about relying on a "clear-statement rule." *Id.* at 13-14 (citing *O'Hagan*, 521 U.S. at 673 n.19).

Rather, the *Babbitt* and *O'Hagan* Courts simply recognized that Congress had delegated legislative authority to the agencies in question.  Delegation is a necessary prerequisite to *Chevron* deference, but it is not a sufficient condition for deference.  Otherwise, an agency could issue any regulation—even one completely contrary to the statute—so long as Congress clearly delegated authority to that agency.  That, of course, is not the law, and nothing about *O'Hagan* or *Babbitt* suggests that the Court viewed proper delegation as sufficient on its own to trigger deference.

No. 19-1298          *Gun Owners of Am., Inc., et al. v. Garland, et al.*          Page 48

have both civil and criminal applications."  Majority Op. at 14.  However, none of those cases says that the rule of lenity trumps *Chevron*—a position that *Babbitt* expressly rejected.

For example, the majority cites *United States v. Thompson/Center Arms Co.*, 504 U.S. 505, 517-18 nn.9-10 (1992), which applied the rule of lenity to an ambiguous provision of the National Firearms Act.  But in *Thompson/Center* there was no agency regulation that addressed the statutory "question presented" in the case—a point the opinion explicitly noted, *id.* at 518 n.9—so the Court never had to choose between *Chevron* and the rule of lenity.  Indeed, *Babbitt* later distinguished *Thompson/Center Arms* on that very basis:

> We have applied the rule of lenity in a case raising a narrow question concerning the application of a statute that contains criminal sanctions to a specific factual dispute—whether pistols with short barrels and attachable shoulder stocks are short-barreled rifles—*where no regulation was present.  See United States v. Thompson/Center Arms Co.*, 504 U.S. 505, 517-18, and n.9 (1992).  We have never suggested that the rule of lenity should provide the standard for reviewing facial challenges to administrative *regulations* whenever the governing statute authorizes criminal enforcement.

515 U.S. at 704 n.18 (emphasis added).  *Babbitt*'s discussion of *Thompson/Center Arms* makes clear that cases discussing the rule of lenity where no regulation is present are of little relevance here, and that when a case *does* involve a legislative regulation, *Chevron* applies.[11]

---

[11] *See also Guedes*, 920 F.3d at 26 ("*Babbitt* later made clear that the Court in *Thompson/Center* had no occasion to apply *Chevron*[.]. . .  *Babbitt* implies that *Chevron* should apply in a case—like this one—involving an interpretation of the National Firearms Act where a regulation *is* present."); *Aposhian*, 958 F.3d at 983 (*Babbitt*'s discussion of *Thompson/Center* suggests that "where a regulation *is* at issue, . . . *Chevron*, not the rule of lenity, should apply.").

The other two pre-2014 cases the majority cites are also inapposite.  The first, *Leocal*, never mentions *Chevron*, did not involve a regulation, and only discussed the rule of lenity in dictum.  *Leocal v. Ashcroft*, 543 U.S. 1, 11 n.8 (2004); *see also Esquivel-Quintana v. Lynch*, 810 F.3d 1019, 1024 (6th Cir. 2016) (noting that *Leocal*'s discussion of the rule of lenity was dictum and declining to follow it in light of *Babbitt*'s holding), *rev'd on other grounds sub nom. Esquivel-Quintana v. Sessions*, 137 S. Ct. 1562 (2017).  The second, *SWANCC v. U.S. Army Corps of Eng'rs*, is also inapposite.  It declined to apply *Chevron* on an unrelated basis: there, the agency's interpretation of its own jurisdiction under the Clean Water Act would have potentially extended beyond the outer bounds of Congress's Commerce Clause authority and would have created federalism concerns.  531 U.S. 159, 173-74 (2001).  The opinion's only reference to the rule of lenity comes when the Court expressly *declines* to consider the argument that the rule of lenity displaces *Chevron*.  *See id.* at 174 n.8 ("Because violations of the [Clean Water Act] carry criminal penalties, petitioner invokes the rule of lenity as another basis for rejecting the [agency's] interpretation of the CWA.  We need not address this alternative argument." (citations omitted)).

On its way to distinguishing *Chevron*, *O'Hagan*, and *Babbitt*, the majority suggests that *Apel* and *Abramski* "unequivocal[ly]" establish that the Court has never applied deference to an agency's interpretation in the criminal context.[12] Majority Op. at 11. But as discussed, *Apel* and *Abramski* do not resolve the issue because neither involved *Chevron*-triggering regulations; and without such regulations, no deference is warranted. Further, because neither decision even mentioned *Chevron*—or *Babbitt* or *O'Hagan*—they should not be read to overrule the Court's holdings in those cases.

The same is true of the other Supreme Court cases the majority cites. Aside from *SWANCC*—which did not discuss the issue presented here other than in declining to address it—none of the cited cases mentions *Chevron*, *O'Hagan*, or *Babbitt*. At most, their statements, like those in *Apel* and *Abramski*, create an implied tension with *Chevron*, *Babbitt*, and *O'Hagan*. In essence, the majority—and Plaintiffs—seem to argue that this tension allows us to disregard the earlier binding authority.[13]

But it is the Supreme Court's prerogative, not ours, to deem one of its decisions overruled by implication. *See Rodriguez de Quijas v. Shearson/Am. Exp., Inc.*, 490 U.S. 477, 484 (1989) ("If a precedent of this Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions."); *Agostini v. Felton*, 521 U.S. 203, 237-38 (1997) (directing lower courts not to "conclude our

---

[12]The majority asserts that *Apel* and *Abramski*'s "absolute statement means that none of the Court's prior cases applied *Chevron* deference (or any deference)" to an agency's regulations in the criminal context. Majority Op. at 11. But right after making that assertion, the majority recognizes that the Court has done just that. *See id.* at 12-14 (recognizing that *Babbitt* and *O'Hagan* applied deference to regulations carrying criminal penalties). It is difficult to reconcile these dissonant statements, unless we assume that *Apel* and *Abramski* silently revised the historical fact that the Court applied deference in *Babbitt*, *O'Hagan*, and *Chevron*. As a subordinate federal court, we may not make that kind of assumption. *See infra* at 49-50.

[13]*See* Majority Op. at 12-14, 27-28 (recognizing that *O'Hagan* and *Babbitt* applied deference in criminal contexts, but later suggesting that the Supreme Court has "undercut [*Babbitt*] in subsequent cases"); Appellants' Br. at 18 (arguing that the *Guedes* opinion incorrectly "relies on cases decided in the 1990's," while "*Apel* and *Abramski* represent the Supreme Court's most recent pronouncements in this area that is continually evolving further away from agency deference and towards exclusive judicial review"). The dissent in *Guedes* did the same. *See* 920 F.3d at 41 (Henderson, J., concurring in part and dissenting in part) (noting that *Babbitt* is not "the last word on this topic," and adding that the Court's "most recent decisions indicate" that it would not apply *Chevron* to statutes or rules with criminal sanctions).

more recent cases have, by implication, overruled an earlier precedent" (citing *Rodriguez de Quijas*, 490 U.S. at 484)); *Hohn v. United States*, 524 U.S. 236, 252-53 (1998) ("Our decisions remain binding precedent until we see fit to reconsider them, regardless of whether subsequent cases have raised doubts about their continuing vitality."). *Abramski* and *Apel* "did not purport to overrule" *Babbitt* or *O'Hagan*, and "[i]n situations like this, where an advocate insists . . . new Supreme Court decision[s] undermine[] . . . previous decision[s], the earlier decision[s] stand[] until the Court says otherwise." *United States v. Bradley*, 969 F.3d 585, 591 (6th Cir. 2020) (citation omitted).

We hewed to that rule in *Esquivel-Quintana*, 810 F.3d at 1023-24, the only published opinion from our Circuit to directly address the apparent tension between these two groups of cases.[14] *See id.* (noting that, despite an increasingly prominent view (based on statements from cases like *Abramski*) that the rule of lenity ought to trump *Chevron* in the criminal context, "the Supreme Court has not made it the law," and "[t]o the contrary, . . has reached the opposite conclusion" in *Babbitt*); *id.* at 1024 ("[W]e do not read dicta in *Leocal* and subsequent cases as overruling *Babbitt*, or requiring that we apply the rule of lenity here . . . .  As an 'inferior' court, our job is to adhere faithfully to the Supreme Court's precedents.").[15]

---

[14] The majority correctly notes that *Esquivel-Quintana*—reversed on other grounds—is no longer binding. But it "continues to be entitled to (at the very least) persuasive weight." *CIC Servs., LLC v. Internal Revenue Serv.*, 936 F.3d 501, 507 (6th Cir. 2019) (Thapar, J., dissenting from denial of rehearing en banc).  We routinely cite cases that have been vacated or reversed on other grounds as persuasive precedent. *See, e.g. United States v. Ruffin*, 783 F. App'x 478, 483 (6th Cir. 2019); *Youngblood v. Dalzell*, 925 F.2d 954, 959 n.3 (6th Cir. 1991); *Meeks v. Ill. Cent. Gulf R.R.*, 738 F.2d 748, 751 (6th. Cir. 1984).

[15] In *Dolfi v. Pontesso*, 156 F.3d 696, 700 (6th Cir. 1998), we discussed *Chevron*'s applicability to criminal laws in a way that supports the majority's view.  *See id.* ("Judicial deference under *Chevron* in the face of statutory ambiguity is not normally followed in criminal cases.  The rule of lenity requires a stricter construction of 'ambiguity in a criminal statute,' not deference." (citations omitted)).  But this statement was dictum.  Before making it, we noted that the agency regulations in that case were "as silent on the [legal] issue as the statute itself." *Id.*  Because there was no regulation purporting to interpret the statutory ambiguity, *Dolfi*'s brief discussion of *Chevron* was unnecessary to its holding.  *Dolfi* also never mentioned *O'Hagan* or *Babbitt*.  Perhaps for those reasons, neither of the two opinions in *Esquivel-Quintana* mentioned *Dolfi*, despite the in-depth discussions both opinions offered on this issue.  *See Esquivel-Quintana*, 810 F.3d at 1023-24; *id.* at 1027-32 (Sutton, J., concurring in part and dissenting in part).

### 2.  The Majority's Independent Rationales Against Applying *Chevron*

Concluding that the question remains open, the majority provides three independent reasons why *Chevron* ought not apply in this context.  I disagree with its proffered rationales.

### a.  The "Community Expertise" Rationale

The majority first reasons that because criminal laws involve moral judgments, agency expertise is irrelevant when laws have criminal penalties.  Instead, the majority asserts, the true "experts" are community members who have learned morality from their faith and families, as opposed to "bureaucrats" with graduate degrees.  Majority Op. at 18-21.**[16]**

But there are many areas where agency expertise is relevant to laws with criminal applications.  For example, we have highly technical and complex tax, securities, and environmental-law regimes (which sometimes carry criminal penalties), where individuals' morality, faith, or family values do not provide the same expertise as does a technical background in the area.  *Cf. Gutierrez-Brizuela v. Lynch*, 834 F.3d 1142, 1156 (10th Cir. 2016) (Gorsuch, J., concurring) (observing that agency interpretations of statutes with both civil and criminal applications fall within a "category that covers a great many (most?) federal statutes today").  The majority fails to account for the vast regulatory frameworks created by Congress, which are replete with highly technical and complex regulations that may carry criminal punishments.

The dispute here is highly technical: the issue is whether a firearm can only constitute a "machinegun" if it fires a rapid stream of bullets with a single depression of the trigger, or whether a firearm can also be a "machinegun" if it is equipped with a device that allows it to fire a rapid stream of bullets with a single pull of the trigger, despite involving a separate trigger

---

**[16]** *See id.* at 18-19 ("[W]e understand that the [Supreme] Court would consider bureaucrats at the ATF as experts in firearms technology.  But that technical knowledge is inapposite to the question of what should be criminally punished and what should not.  Criminal statutes reflect the value-laden, moral judgments of the community as evidenced by their elected representatives' policy decisions. . . . .  Since our country's founding, it has been understood that the public is both capable of and necessary to the determination of right from wrong legally and morally. . . .  The training for such policy determinations does not come from a graduate school education or decades of bureaucratic experience.  Rather, one develops the expertise necessary to make moral judgments from sources of a more humble and local origin: one's family and upbringing.  This learning is further informed by relationships with friends and neighbors, practicing one's faith, and participation in civic life.").

depression for each bullet fired.  That is a question focused on mechanics, not morals.  The majority never explains how this issue involves morality, other than noting in the abstract that criminal laws involve "value-laden, moral judgments."  Majority Op. at 18.

But morality cannot explain why *Chevron* deference is permissible in civil, but not criminal, contexts.  One could just as easily argue that all laws, criminal or civil, reflect value-laden moral judgments.  *See generally* Cass R. Sunstein & Adrian Vermeule, *The Morality of Administrative Law*, 131 HARV. L. REV. 1924 (2018); *cf. Barnes v. Glen Theatre, Inc.*, 501 U.S. 560, 569 (1991) ("'The law . . . is constantly based on notions of morality . . . .'" (citation omitted)); *Veazie v. Williams*, 49 U.S. 134, 154 (1850) ("'All laws stand on the best and broadest basis, which go to enforce moral and social duties.'" (citation omitted)).  The majority's morality-based reasoning fails to coherently explain why *Chevron* applies to civil but not criminal contexts.  Extended to its logical conclusion, it simply amounts to an attack on the validity of *Chevron* and legislative delegation more broadly.  *Cf. Gutierrez-Brizuela*, 834 F.3d at 1156 (Gorsuch, J., concurring) ("[T]ry as I might, I have a hard time identifying a principled reason why the same rationale[s] [for declining *Chevron* in the criminal context do not] also apply to statutes with purely civil application.").  But *Chevron* is still the law, and legislative delegation is a reality.

### b.  The Separation of Powers Rationale

The majority next argues that delegation in the criminal context violates the separation of powers.  Majority Op. at 24-26.  The Supreme Court and our Circuit have held that it does not.

The Supreme Court has recognized Congress's delegation authority in the criminal context for over a century.  For example, in *United States v. Grimaud*, 220 U.S. 506 (1911), Congress delegated to the Secretary of Agriculture the power to promulgate rules—with criminal penalties—to preserve certain forest reserves.  *Id.* at 507-09.  The Secretary issued a rule prohibiting livestock grazing near these reserves without a permit.  *Id.* at 509.  The defendants, sheep farmers, were indicted for violating this rule.  *Id.*  They argued that the rule was unconstitutional because Congress could not "mak[e] it an offense to violate rules and regulations made and promulgated by the Secretary of Agriculture," since doing so would

"delegate its legislative power to an administrative officer." *Id.* at 513.  The Supreme Court rejected the challenge.  *See id.* at 521 (rejecting the argument that the rules were invalid merely "because the violation thereof is punished as a public offense").

In the ensuing decades, several Supreme Court decisions recognized that Congress may delegate legislative authority in the criminal context.  *See, e.g.*, *J.W. Hampton, Jr. & Co. v. United States*, 276 U.S. 394, 406-07 (1928) ("The field of Congress involves all and many varieties of legislative action, and Congress has found it necessary to use officers of the executive branch within defined limits, to secure the exact effect intended by its acts of legislation, by vesting discretion in such officers to make public regulations interpreting a statute and directing the details of its execution, even to the extent of providing for penalizing a breach of such regulations." (citing *Grimaud*, 220 U.S. at 518) (other citations omitted)); *Yakus v. United States*, 321 U.S. 414, 418, 423-25 (1944) (upholding delegation of authority to agency to issue price-limit regulations under Emergency Price Control Act even though violating the regulations carried criminal penalties, and rejecting non-delegation and separation-of-powers challenges by criminal defendants convicted of violating those regulations); *United States v. Mistretta*, 488 U.S. 361, 371-74, 394-96 (1989) (upholding delegation of authority to Sentencing Commission to define criminal sentencing ranges, rejecting non-delegation and separation-of-powers challenges by criminal defendant).

In *Touby v. United States*, 500 U.S. 160, 164-69 (1991), the Court upheld a delegation of legislative authority to the Attorney General to schedule substances under the Controlled Substances Act—a determination that carried criminal implications—and rejected arguments that this delegation violated the non-delegation doctrine or the separation of powers.  And in *United States v. Stevenson*, 676 F.3d 557, 565 (6th Cir. 2012), we held that the "Attorney General was properly delegated authority by Congress to enact [a] substantive rule" providing that a federal sex-offender registration statute—which imposed criminal penalties—applied retroactively to those convicted of sex crimes prior to the statute's passage.  *See id.* at 563 n.3 (rejecting defendants' argument "that Congress lacked the constitutional authority to delegate this power to the Attorney General").

The majority acknowledges some of these decisions, Majority Op. at 22, yet still concludes that it would violate the separation of powers "[i]f Congress were 'to hand responsibility for defining crimes to relatively unaccountable [public officials]'. . . .  Because the community has the right to determine what moral wrongs should be punished . . . that responsibility may be entrusted to only the branch most accountable to the people: the legislature.  And it may not be blithely delegated away."  *Id.* at 25-26 (citations omitted).**17** Whatever the merits of that view, it is not in accord with the holdings of the Supreme Court and our Circuit.

### c.  The Rule of Lenity and Fair Notice Rationale

Finally, the majority argues that ambiguous statutes with criminal penalties ought to be subject to the rule of lenity, rather than *Chevron*.  Majority Op. at 26-28.  If we were writing on a blank slate, this argument might carry some weight.   But the Supreme Court rejected it in *Babbitt*; no case has purported to overrule *Babbitt*; and as a subordinate court, we must follow *Babbitt*.

Further, I disagree with the suggestion that applying *Chevron* would offend the fair notice that the rule of lenity promotes.  The D.C. Circuit persuasively rejected this argument:

> *Chevron* promotes fair notice about the content of criminal law.  It applies only when, at Congress's direction, agencies have followed "relatively formal administrative procedure tending to foster the fairness and deliberation that should underlie a pronouncement of such force."  *Mead*, 533 U.S. at 230.  Importantly, such procedures, which generally include formal public notice and publication in the Federal Register, do not "provide such inadequate notice of potential liability as to offend the rule of lenity."  *Babbitt*, 515 U.S. at 704 n.18. . . . [I]f the [ATF's] Rule is a valid legislative rule, all are on notice of what is prohibited.

*Guedes*, 920 F.3d at 28.  The notice-and-comment process in this case clearly functioned to inform the public of the intended prohibition.  The ATF received over 186,000 comments regarding the proposed rule before it went into effect.  83 Fed. Reg. at 66,519.  One of the

---

**17**The majority is not consistent on this point.  *Compare* Majority Op. at 12 ("The Court's traditional approach, under the modern nondelegation doctrine, has been to allow Congress to delegate to the executive branch the responsibility for defining crimes . . . .") *with id.* at 26 ("Because the community has the right to determine what moral wrongs should be punished . . . that responsibility may be entrusted to only the branch most accountable to the people: the legislature.  And it may not be blithely delegated away.").

plaintiffs in this case—Gun Owners of America—submitted a comment challenging this rule before it went into effect on behalf of "more than 1.5 million gun owners."**18**  Ample notice was provided by the notice-and-comment process.

In sum, I would apply *Chevron*.  *Chevron* itself involved a law with criminal penalties, as did *O'Hagan* and *Babbitt*.  The only way to get out from under the weight of these binding decisions is to suggest that *Abramski* and *Apel* silently overruled them.  However, only the Supreme Court may do that.  And we certainly may not depart from those binding precedents based on normative disagreements with them.

## II.  Applying *Chevron*

The *Chevron* framework consists of two steps.  First, if the statute is unambiguous—i.e., "if 'Congress has directly spoken to the precise . . . issue' in the text of the statute"—we apply the statute's clear meaning.  *Hernandez v. Whitaker*, 914 F.3d 430, 433 (6th Cir. 2019) (quoting *Chevron*, 467 U.S. at 842-43)).  If the statute is ambiguous, we ask if the agency's interpretation is "'based on a permissible construction of the statute.'"  *Id*. (quoting *Chevron*, 467 U.S. at 843).

### A.  The Statute is Ambiguous

A statutory phrase is ambiguous when its terms "admit of two or more reasonable ordinary usages."  *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 989 (2005); *see also All. for Cmty. Media v. F.C.C.*, 529 F.3d 763, 777 (6th Cir. 2008) (noting that a statutory phrase is ambiguous "when 'to give th[e] phrase meaning requires a specific factual scenario that can give rise to two or more different meanings of the phrase.'" (alteration in original) (quoting *Beck v. City of Cleveland*, 390 F.3d 912, 920 (6th Cir. 2004))).  The statutory phrase at issue here—the definition of "machinegun," as applied to bump-stocks—is capable of two or more meanings.

---

**18** *See* Gun Owners of Am., Comment Letter on the Proposed Rulemaking Entitled "Application of the Definition of Machinegun to 'Bump Fire' Stocks and Other Similar Devices" (received Jan. 12, 2018), https://www.regulations.gov/document?D=ATF-2018-0001-4434.

The statute defines "machinegun" as follows:

> The term "machinegun" means any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger.  The term shall also include the frame or receiver of any such weapon, any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machinegun, and any combination of parts from which a machinegun can be assembled if such parts are in the possession or under the control of a person.

26 U.S.C. § 5845(b).  As the majority observes, there are two key sources of dispute over the statute's meaning: first, the phrase "single function of the trigger," and second, the word "automatically."  Both are ambiguous.

   **"*Single Function of the Trigger*."**  I agree that the phrase "single function of the trigger" is capable of two readings: one favoring the government (the "shooter-focused" reading), the other favoring Plaintiffs (the "mechanical" reading).  The shooter-focused reading corresponds to a single "pull" of the trigger—i.e., a single human action upon the trigger that initiates a rapid-fire sequence.  Under this reading, a bump-stock-equipped rifle constitutes a machinegun because a single human action—the initial "pull" of the trigger—initiates a rapid firing sequence.  The mechanical reading takes the phrase "single function of the trigger" to mean "single *depression* of the trigger."  Under this view, a bump-stock-equipped rifle is not a machinegun because each bullet fired is initiated by a separate depression of the trigger, albeit one generated by the weapon's recoil.  *Accord Guedes*, 920 F.3d at 29; Majority Op. at 30.

   Both readings are plausible.  "The word 'function' focuses on the 'mode of action' . . . by which the trigger operates.  But that definition begs the question of whether 'function' requires our focus upon the movement of the trigger, or the movement of the trigger finger.  The statute is silent in this regard."  *Aposhian*, 958 F.3d at 986 (quoting 4 OXFORD ENGLISH DICTIONARY 602 (1933)).[19]  *See also* Majority Op. at 31-32 (looking to contemporaneous dictionaries from around

---

   [19]*See also Guedes*, 920 F.3d at 29 ("A mechanical perspective, for instance, might focus on the trigger's release of the hammer, which causes the release of a round.  From that perspective, a 'single function of the trigger' yields a single round of fire when a bump-stock device moves the trigger back and forth.  By contrast, from the perspective of the shooter's action, the function of pulling the trigger a single time . . . yields multiple rounds of fire. . . .  Neither of those interpretations is compelled (or foreclosed) by the term 'function' in 'single function of the

1968—when the Gun Control Act of 1968 was passed—and finding that the "dictionary definition of 'function' lends support to both interpretations. . . .  [B]ecause 'function' means 'action,' dictionaries alone do not reveal whether the statute is referring to the mechanical 'act' of the trigger's being depressed or the physical 'act' of the shooter's pulling the trigger." (citing WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 920-21 (1967); WEBSTER'S SEVENTH NEW COLLEGIATE DICTIONARY 338 (1967))).

Because the statutory text is ambiguous, "the statute contains a 'gap for the agency to fill.'"  *Guedes*, 920 F.3d at 29 (quoting *Chevron*, 467 U.S. at 843)).  The majority reasons that § 5845(b)'s statutory context shows that the mechanical reading is the better interpretation, emphasizing its focus on the word "trigger," overall focus on the gun's design and parts, and lack of comparable reference to the shooter.  Majority Op. at 32-33.  But "[a]t *Chevron*'s first step, we do not ask which . . . interpretation[] is the better reading of the statute.  Rather, we ask whether either of those interpretations is unambiguously 'compel[led]' by the statute, to the exclusion of the other one." *Guedes*, 920 F.3d at 30 (alteration in original) (quoting *Chevron*, 467 U.S. at 860).  Here, "the answer is no."  *Id.*

**"*Automatically.*"**  The word "automatically" is also ambiguous.  The statute provides that a machinegun is a "weapon which shoots . . . *automatically* more than one shot, without manual reloading, by a single function of the trigger."  26 U.S.C. § 5845(b) (emphasis added).  Here, too, there are competing interpretations, and the text does not unambiguously foreclose either of them.

Plaintiffs argue that the phrase "automatically" must mean "'by itself with little or no direct human control.'"  Appellants' Br. at 24 (citation omitted).  They reason that since a shooter must exert constant pressure to cause a bump-stock-equipped rifle to continue firing, these devices do not create a weapon that "shoots automatically." *Id.* 23-25.  The government responds that "automatically" means "self-acting or self-regulating."  Appellees' Br. at 28.  In the government's view, a bump-stock-equipped rifle is "self-acting" in the sense that once the shooter establishes the conditions necessary to begin the firing process—pulling the trigger,

---

trigger.'  The word 'function' focuses our attention on the 'mode of action' . . . by which the trigger operates.  But the text is silent on the crucial question of *which perspective* is relevant."  (citations omitted)).

placing a finger on the extension ledge, and applying "pressure on the barrel-shroud or fore-stock with the other hand"—the "bump stock . . . [can] repeatedly perform its basic purpose: 'to eliminate the need for the shooter to manually capture, harness, or otherwise utilize th[e] [recoil] energy to fire additional rounds.'"  *Id.* at 28-29 (second and third alterations in original) (quoting 83 Fed. Reg. at 66,532)).

According to dictionary definitions at the time the National Firearms Act was issued, the word "automatically"—the adverbial form of the word "automatic"—means "[h]aving a self-acting or self-regulating mechanism that performs a required act at a predetermined point in an operation[.]"  WEBSTER'S NEW INTERNATIONAL DICTIONARY 187 (2d ed. 1934); *see also* 1 OXFORD ENGLISH DICTIONARY 574 (1933) (defining "Automatic" as "[s]elf-acting under conditions fixed for it, going of itself").  The focus on a "self-regulating *mechanism*" cuts against the suggestion that the word "automatically" requires complete, as opposed to partial, automation, and lends support to the government's view.  Further, Plaintiffs' argument that bump-stock-equipped weapons do not fire "automatically" because they require constant forward pressure is belied by common usage of the word "automatic."  For example, "an 'automatic' sewing machine still 'requires the user to press a pedal *and* direct the fabric.'"  *Guedes*, 920 F.3d at 30 (citation omitted)).  And an "automatic" car shifts gears on its own, but only if the driver maintains enough constant pressure on the gas pedal to reach a speed that triggers a gear shift.

As other courts have recognized, the ultimate question is how much human input is contemplated by the word "automatically."  That is a question of degree that the statute's text does not definitively answer.  The D.C. Circuit's explanation captures this point well:

> The term "automatically" does not require that there be *no* human involvement to give rise to "more than one shot."  Rather, the term can be read to require only that there be *limited* human involvement to bring about more than one shot.  *See, e.g.*, Webster's New International Dictionary 157 (defining "automatically" as the adverbial form of "automatic"); *id.* at 156 (defining "automatic" as "self-acting or self-regulating," especially applied to "machinery or devices which perform *parts* of the work formerly or usually done by hand" (emphasis added)).  But how much human input in the "self-acting or self-regulating" mechanism is too much?
>
> . . . .  [T]he phrase "by a single function of the trigger" . . . can naturally be read to establish only the preconditions for setting off the "automatic" mechanism, without foreclosing some further degree of manual input such as the constant

forward pressure needed to engage the bump stock in the first instance.  And if so, then the identified ambiguity endures.  How much further input is permitted in the mechanism set in motion by the trigger?  The statute does not say.

*Guedes*, 920 F.3d at 30-31.  Thus, this term is also ambiguous.

### B.  The ATF's Interpretation Is Reasonable

At the second step of the *Chevron* analysis, we ask whether "the agency's [reading] is based on a permissible construction of the statute."  *Chevron*, 467 U.S. at 843.  The ATF's interpretation of both phrases—"single function of the trigger" and "automatically"—are permissible constructions, and they are reasonable.

The ATF's shooter-focused interpretation of "single function of the trigger" is reasonable.  The ATF has viewed the phrase to mean "single *pull* of the trigger" since 2006, when it determined that a spring-coiled bump-stock—the "Akins Accelerator"—was a "machinegun."  83 Fed. Reg. at 66,517.  In 2009 the Eleventh Circuit held that this reading was "consonant with the statute and its legislative history."  *Akins v. United States*, 312 F. App'x 197, 200 (11th Cir. 2009); *see also Aposhian*, 958 F.3d at 988 (agreeing with *Akins* that this reading is permissible); *Guedes*, 920 F.3d at 31 (same).  In 1934, when the National Firearms Act was enacted, the president of the National Rifle Association testified in a congressional hearing that the term "machine gun" included any gun "'capable of firing more than one shot by a single pull of the trigger, a single function of the trigger.'"  83 Fed. Reg. at 66,518 (citation omitted).  The House Report accompanying the bill that became the National Firearms Act said that the bill "'contains the usual definition of a machine gun as a weapon designed to shoot more than one shot . . . by a single pull of the trigger.'"  *Guedes*, 920 F.3d at 31 (quoting H.R. Rep. No. 73-1780, at 2 (1934)).  Further, the ATF's focus on the human factor is reasonable.  The practical effect of the bump-stock device is to turn a semi-automatic firearm into a rapid-fire firearm that only requires the person firing the gun to pull the trigger once.

The ATF's interpretation of "automatically" is also reasonable.  It allows for *some* human involvement, but that "accords with the everyday understanding of the word 'automatic.'"  *Id.* The interpretation also fits within some of the relevant dictionary definitions that existed at the time the National Firearms Act was enacted in 1934—first defining "machinegun"—and when

the Gun Control Act of 1968 slightly altered that definition.[10]   In 1934, Webster's New International Dictionary defined "automatic" as "[h]aving a self-acting or self-regulating *mechanism*."   WEBSTER'S NEW INTERNATIONAL DICTIONARY 187 (2d ed. 1934) (emphasis added).   Dictionaries from 1965 and 1967 do the same.   *See* WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 148 (1965); WEBSTER'S SEVENTH NEW COLLEGIATE DICTIONARY 60 (1967).   It is reasonable to read the phrase "automatically" as requiring only a *partial* self-regulation—i.e., a mechanism that allows for an integral *part* of a process to be performed autonomously.

***

In sum, *Chevron* deference applies to the ATF's legislative regulation, the statute is ambiguous, and the ATF's construction is reasonable and warrants deference.   I therefore respectfully dissent.

---

[10]The 1968 definition dropped the word "semiautomatically" from the 1934 definition and added references to various parts that, together, could convert a firearm into a machinegun.   *See* Majority Op. at 4.