# UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

<table>
<tr><td>Deborah S. Hunt<br>Clerk</td><td>100 EAST FIFTH STREET, ROOM 540<br>POTTER STEWART U.S. COURTHOUSE<br>CINCINNATI, OHIO 45202-3988</td><td>Tel. (513) 564-7000<br>www.ca6.uscourts.gov</td></tr>
</table>

Filed: December 03, 2021

Mr. James Orange Bardwell
Woodhouse Roden Nethercott
1912 Capitol Avenue
Suite 500
Cheyenne, WY 82001

Mr. Alan Beck
2692 Harcourt Drive
San Diego, CA 92123

Mr. John Cutonilli
P.O. Box 372
Garrett Park, MD 20896

Mr. David M.S. Dewhirst
Office of the Attorney General
of Montana
P.O. Box 201401
Helena, MT 59620-1401

Ms. Kyle T. Edwards
U.S. Department of Justice
Civil Division, Appellate Staff
950 Pennsylvania Avenue, N.W.
Washington, DC 20530

Mr. Joseph Greenlee
Firearms Policy Coalition
1215 K Street
17th Floor
Sacramento, CA 95814

Mr. John I. Harris III
Schulman, LeRoy & Bennett
3310 West End Avenue, Suite 460
Nashville, TN 37203

Mr. Hadan W. Hatch
National Rifle Association
11250 Waples Mill Road
Fairfax, VA 22030-0000

Mr. Bradley Hinshelwood
U.S. Department of Justice
950 Pennsylvania Avenue, N.W.
Room 1252
Washington, DC 20530

Mr. Michael Jean
National Rifle Association
11250 Waples Mill Road
Fairfax, VA 22030-0000

Mr. Kerry Lee Morgan
Pentiuk, Couvreur & Kobiljak
2915 Biddle Avenue, Suite 200
Wyandotte, MI 48192

Mr. Robert J. Olson
Law Office
370 Maple Avenue, W., Suite 4
Vienna, VA 22180-5615

Mr. Richard Abbott Samp
New Civil Liberties Alliance
1225 19th Street, N.W.
Suite 450
Washington, DC 20036

Mr. Ilya Shapiro
Cato Institute
1000 Massachusetts Avenue, N.W.
Washington, DC 20001

Mr. Ian Simmons
O'Melveny & Myers
1625 Eye Street, N.W.
Washington, DC 20006

Mr. Stephen Stamboulieh
Stamboulieh Law
P.O. Box 428
Olive Branch, MS 38654

Mr. Mark B. Stern
U.S. Department of Justice
Civil Division, Appellate Staff
950 Pennsylvania Avenue, N.W.
Washington, DC 20530

Mr. Sebastian Devin Torres
Lewis Brisbois Bisgaard & Smith
250 E. Fifth Street
Suite 2000
Cincinnati, OH 45202

Ms. Abby Christine Wright
U.S. Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, DC 20530

> Re:  Case No. 19-1298*, Gun Owners of America, Inc., et al v. Merrick Garland, et al*
>      Originating Case No. : 1:18-cv-01429

Dear Counsel,

   The attached order designated for full-text publication was filed today in this case.

>                     Yours very truly,
>
>                     Deborah S. Hunt, Clerk
>
>
>                     Cathryn Lovely, Opinions Deputy

cc:  Mr. Thomas Dorwin

Enclosure

Mandate to issue

RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 21a0279p.06

# UNITED STATES COURT OF APPEALS

### FOR THE SIXTH CIRCUIT

───────────────

GUN OWNERS OF AMERICA, INC.; GUN OWNERS
FOUNDATION; VIRGINIA CITIZENS DEFENSE LEAGUE;
MATT WATKINS; TIM HARMSEN; RACHEL MALONE,

            *Plaintiffs-Appellants*,

GUN OWNERS OF CALIFORNIA, INC.,

            *Movant*,

    *v.*

MERRICK B. GARLAND, in his official capacity as
Attorney General of the United States; UNITED STATES
DEPARTMENT OF JUSTICE; BUREAU OF ALCOHOL,
TOBACCO, FIREARMS AND EXPLOSIVES; REGINA
LOMBARDO, in her official capacity as Acting
Director, Bureau of Alcohol, Tobacco, Firearms, and
Explosives,

            *Defendants-Appellees*.

> No. 19-1298

On Petition for Rehearing En Banc.
United States District Court for the Western District of Michigan at Grand Rapids;
No. 1:18-cv-01429—Paul Lewis Maloney, District Judge.

Argued:  October 20, 2021

Decided and Filed:  December 3, 2021

SUTTON, Chief Judge; BATCHELDER, MOORE, COLE, CLAY, GIBBONS,
GRIFFIN, KETHLEDGE, WHITE, STRANCH, DONALD, THAPAR,
BUSH, LARSEN, NALBANDIAN and MURPHY, Circuit Judges.[*]

───────────────

[*]Pursuant to 6 Cir. I.O.P. 35(c), Composition of the En Banc Court, Judge Batchelder, a senior judge of the
court who sat on the original panel in this case, participated in this decision.  Judge Readler recused himself from
participation in this decision.

---

### COUNSEL

**ARGUED:**  Robert J. Olson, WILLIAM J. OLSON, P.C., Vienna, Virginia, for Appellants. Mark B. Stern, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellees.  **ON BRIEF:**  Robert J. Olson, WILLIAM J. OLSON, P.C., Vienna, Virginia, Kerry L. Morgan, PENTIUK, COUVREUR & KOBILJAK, P.C., Wyandotte, Michigan, for Appellants.  Mark B. Stern, Abby C. Wright, Brad Hinshelwood, Kyle T. Edwards, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellees.  Alan Alexander Beck, San Diego, California, Stephen D. Stamboulieh, STAMBOULIEH LAW, PLLC, Olive Branch, Mississippi, Michael T. Jean, Hadan W. Hatch, NATIONAL RIFLE ASSOCIATION OF AMERICA, Fairfax, Virginia, John I. Harris III, SCHULMAN, LEROY & BENNETT PC, Nashville, Tennessee, Sebastian D. Torres, BISGAARD & SMITH LLP, Cincinnati, Ohio, Ilya Shapiro, CATO INSTITUTE, Washington, D.C., Richard A. Samp, NEW CIVIL LIBERTIES ALLIANCE, Washington, D.C., David M. S. Dewhirst, OFFICE OF THE MONTANA ATTORNEY GENERAL, Helena, Montana, Joseph G. S. Greenlee, FIREARMS POLICY COALITION, Sacramento, California, Ian Simmons, O'MELVENY & MYERS LLP, Washington, D.C., John Cutonilli, Garrett Park, Maryland, pro se, for Amici Curiae.

The En Banc Court of the Sixth Circuit Court of Appeals delivered an order.  WHITE, J. (pp. 3–20), in which MOORE, COLE, CLAY, and STRANCH, JJ., joined, and GIBBONS, J. (pg. 21), in which MOORE, COLE, WHITE, and STRANCH, JJ., joined, delivered separate opinions in support of affirming the district court's judgment.  MURPHY, J. (pp. 22–47), delivered a separate dissenting opinion, in which SUTTON, C.J., BATCHELDER, KETHLEDGE, THAPAR, BUSH, LARSEN, and NALBANDIAN, JJ., joined.

---

### ORDER

---

Pursuant to Rule 35 of the Federal Rules of Appellate Procedure and Sixth Circuit Rule 35, a majority of the active judges of this court voted to grant *en banc* review of this case. By published order of the court, entered on June 25, 2021, rehearing en banc was granted and the previous opinion was vacated.  Following argument heard by the court *en banc* on October 20, 2021 and a conference among the judges, the court divided evenly, with eight judges voting to affirm the judgment of the district court and eight judges voting to reverse.  Consequently, the judgment of the district court is AFFIRMED.  *See School Dist., Pontiac v. Secretary, U.S. Dep't. Educ.,* 584 F.3d 253 (6th Cir. 2009), *Goodwin v. Ghee*, 330 F.3d 446 (6th Cir. 2003), and *Stupak-Thrall v. United States*, 89 F.3d 1269 (6th Cir. 1996).  Separate opinions in favor of affirmance and in favor of reversal follow.

---

## OPINION IN SUPPORT OF AFFIRMING THE DISTRICT COURT'S JUDGMENT

---

WHITE, Circuit Judge, writing in support of affirming the district court judgment. Congress defined the term, "machinegun," to mean "any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger."  26 U.S.C. § 5845(b).  "Machinegun" also includes "the frame or receiver of any such weapon" as well as "any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machinegun, and any combination of parts from which a machinegun can be assembled if such parts are in the possession or under the control of a person."  *Id.*

And Congress tasked the Attorney General with administering and enforcing Chapter 53 of Title 26 of the National Firearms Act, in which the definition of "machinegun" appears, and delegated rulemaking authority to the Attorney General to further this end.  26 U.S.C. §§ 7801(a)(2)(A), 7805(a).  Congress also authorized the Attorney General to prescribe "rules and regulations as are necessary to carry out the provisions" of Chapter 44 of Title 18 of the Gun Control Act.  18 U.S.C. § 926(a).  The Gun Control Act makes it unlawful to transfer or possess a "machinegun" as defined in § 5845(b).  18 U.S.C. §§ 921(a)(23), 922(o).

The Attorney General has directed the Director of the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) to administer, enforce, and exercise the functions and powers of the Attorney General with respect to Chapter 44 of Title 18 and Chapter 53 of Title 26. 28 C.F.R. § 0.130(a).  On December 26, 2018, ATF published a rule clarifying that bump-stock-type devices fall within the definition of "machinegun" as defined in the National Firearms Act and the Gun Control Act.[1]  Bump-Stock-Type Devices (Final Rule), 83 Fed. Reg. 66,514, 66,543.[2]

---

[1]The district court succinctly described bump-stock-type devices:

The stock of a rifle is the portion of the weapon behind the trigger and firing mechanism and extends rearward towards the shooter.  The forward part of the stock just behind the trigger

Plaintiffs-Appellants (Gun Owners) filed this action challenging the Final Rule and sought a preliminary injunction to prevent it from going into effect.  *Gun Owners of Am. v. Barr*, 363 F. Supp. 3d 823, 825–26 (W.D. Mich. 2019), *rev'd and remanded sub nom. Gun Owners of Am., Inc. v. Garland*, 992 F.3d 446 (6th Cir. 2021), *reh'g en banc granted, opinion vacated*, 2 F.4th 576 (6th Cir. 2021).   The district court concluded that *Chevron*'s two-step test provides the appropriate standard of review to determine whether injunctive relief is warranted.  *Id.* at 830–31 (citing *Chevron U.S.A., Inc. v. Nat. Res. Def. Council*, 467 U.S. 837, 842–43 (1984)).  First, the district court found that Congress has not directly addressed whether bump stocks are included within the statutory term "machinegun" and that the definitional terms, "automatically" and "single function of the trigger," are ambiguous.  *Id.* at 831.  Second, the district court determined that the Final Rule's interpretations of "automatically" and "single function of the trigger" are permissible and its classification of bump stocks as machineguns is reasonable.  *Id.* at 831–32.  Concluding that Gun Owners failed to demonstrate a likelihood of success on the merits, the district court denied the motion for a preliminary injunction.**3**  *Id.* at 832–33.

---

 provides a grip for the shooting hand.  The rear end of the stock rests against the shooter's shoulder.  A bump stock replaces the standard stock on a rifle.  Bump stocks include an extension ledge or finger rest on which the shooter places his or her trigger finger where it is stabilized.  The shooter then exerts a constant forward pressure on the barrel of the rifle using the non-trigger hand.  As the rifle is pushed forward, the shooter also pulls the trigger, initiating the firing sequence.  The bump stock then harnesses the rearward recoil energy from the shot causing the weapon to slide back into shooter's shoulder separating the trigger finger resting on the ledge and the trigger itself.  The constant forward pressure exerted by the non-trigger hand on the barrel then pushes the weapon forward "bumping" the weapon against the stationary trigger finger.  The back-and-forth sequence allows a shooter to fire a semiautomatic rifle at rates similar to automatic rifles.

*Gun Owners of Am. v. Barr*, 363 F. Supp. 3d 823, 828–29 (W.D. Mich. 2019).

 **2**After a mass shooting in Las Vegas, Nevada, in October 2017, members of Congress and several nongovernmental organizations asked ATF to examine whether bump-stock-type devices constitute machineguns.  Final Rule, 83 Fed. Reg. at 66,516.  The Las Vegas shooter fired several hundred rounds in a short span of time—murdering scores of persons and wounding hundreds more—by using bump-stock-type devices attached to his rifles.  *Id.*

 **3**Before ruling on the motion, the district court correctly concluded that ATF's interpretations are not arbitrary or capricious.  *Gun Owners*, 363 F. Supp. 3d at 832–33.  The Final Rule acknowledges ATF's previous treatment of bump stocks as not meeting the definition of machinegun and sets forth sufficient reasons for the new interpretations.  83 Fed. Reg. 66,514, 66,517–19.  The Final Rule also adequately explains why bump stocks are treated differently than other objects, such as belt loops, that can assist in bump firing, and it sufficiently responds to the concern that semiautomatic guns without bump stocks could be improperly classified as machineguns.  *Id.* at 66,533–34.  Finally, regarding Gun Owners' new assertion that the political outcry following the mass shooting in Las Vegas—the likely cause of then-President Trump's call on ATF to review the matter—somehow tainted the

The district court's judgment should be affirmed. *Chevron* provides the standard of review, even though the law under consideration has criminal applications. Applying *Chevron*, Congress has not spoken to the precise question at issue and, after exhausting the traditional tools of statutory construction, § 5845(b) remains ambiguous. Because ATF's interpretation of § 5845(b) is a permissible construction of the statute and is reasonable, it is entitled to *Chevron* deference. Additionally, even without applying deference, the Final Rule provides the best interpretation of § 5845(b). Accordingly, relief to enjoin the Final Rule from going into effect is not warranted.

## I. *Chevron* Applies

We apply *Chevron* when "Congress delegated authority to the agency generally to make rules carrying the force of law" and "the agency interpretation" in question "was promulgated in the exercise of that authority." *United States v. Mead Corp.*, 533 U.S. 218, 226–27 (2001) ("Delegation of such authority may be shown . . . by an agency's power to engage in . . . notice-and-comment rulemaking, or by some other indication of comparable congressional intent."). Here, Congress expressly delegated rulemaking authority to the Attorney General, who delegated this authority to the director of ATF. 18 U.S.C. § 926(a); 26 U.S.C. §§ 7801(a)(2)(A), 7805(a); 28 C.F.R. § 0.130(a). ATF then promulgated the Final Rule through notice-and-comment rulemaking, expressly invoking § 926(a) (authority to promulgate rules and regulations as are necessary to carry out provisions of the Gun Control Act), § 7801(a)(2)(A) (authority to administer and enforce provisions of the National Firearms Act), and § 7805(a) (authority to promulgate all needful rules and regulations to enforce provisions of the National Firearms Act).[4] Final Rule, 83 Fed. Reg. at 66,515–16; *see also* Bump-Stock-Type Devices, 83 Fed. Reg. 13,442, 13,443–44 (notice of proposed rulemaking). Thus, *Chevron* supplies the standard of

---

rulemaking process, "that is hardly a reason to conclude that the Rule is arbitrary. Presidential administrations are elected to make policy." *Guedes v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 920 F.3d 1, 34 (D.C. Cir. 2019).

   [4]Moreover, when responding to comments submitted in opposition to the proposed rule, ATF described, over several paragraphs, how *Chevron* would apply if the terms "automatically" and "single function of the trigger" were ambiguous, and how ATF's construction of these terms is reasonable under *Chevron*. Final Rule, 83 Fed. Reg. at 66,527. This "exegesis on *Chevron* would have served no purpose unless the agency intended the Rule to be legislative in character." *Guedes*, 920 F.3d at 19. Additionally, all other pertinent indicia of agency intent confirm that the Final Rule is a legislative rule. *Id.* at 18–19; *accord Aposhian v. Barr*, 958 F.3d 969, 980 (10th Cir. 2020).

review for assessing the validity of the Final Rule's classification of bump-stock-type devices as machineguns.[5]

Gun Owners and my colleagues who argue for reversal assert that ATF's delegated authority is too general for *Chevron* deference to apply. Drawing a distinction between explicit and implied delegations to an agency, and relying on pre-*Chevron* cases, they discount precedent applying *Chevron* to regulations that have criminal applications. However, *Chevron* itself does not suggest the distinction between implicit and express delegations of rulemaking authority that underlies the opinion to reverse. 467 U.S. at 843–44 ("The power of an administrative agency to administer a congressionally created . . . program necessarily requires the formulation of policy and the making of rules to fill any gap left, implicitly or explicitly, by Congress. . . . Sometimes the legislative delegation to an agency on a particular question is implicit rather than explicit." (internal quotation marks and citation omitted)). And the Supreme Court has made clear that *Chevron* deference is not eliminated simply because the rulemaking authority conferred the Attorney General (and ATF, by extension) was not specified with exactitude. *Mayo Found. for Med. Educ. & Rsch. v. United States*, 562 U.S. 44, 56–57 (2011) (establishing that *Chevron* deference is appropriate when Congress delegated authority to make rules carrying the force of law generally and the agency interpretation was promulgated in the exercise of that authority, and stating "[o]ur inquiry in that regard does not turn on whether Congress's delegation of authority was general or specific").

Moreover, the Supreme Court has considered—and rejected—the premise that an implicit delegation somehow confers less authority than an explicit delegation. In *City of Arlington v. F.C.C.*, the dissent argued that *Chevron* deference should apply only where a delegation of

---

[5]Gun Owners argues that ATF waived *Chevron* by disclaiming any reliance on it in this litigation. But, if we were to recognize such litigation positions as effective waivers in the context of legislative rules, we would allow agencies to evade the Administrative Procedure Act's requirement to use the same notice-and-comment process to amend or repeal a rule as used to promulgate it. *See Guedes*, 920 F.3d at 22–23. Further, whether to apply *Chevron* is a question for the court to decide, not an agency's lawyers. *SoundExchange, Inc. v. Copyright Royalty Bd.*, 904 F.3d 41, 54 (D.C. Cir. 2018). *HollyFrontier Cheyenne Refinery, LLC v. Renewable Fuels Ass'n*, in which the Supreme Court, in a short paragraph, declined to consider whether *Chevron* deference was due, does not alter this conclusion. 141 S. Ct. 2172, 2180 (2021). *HollyFrontier* dealt only with an agency's attempt to use an unrelated rule, the validity of which was not in dispute, to demonstrate the validity of the unpublished agency orders being challenged. *Id.* That is, the Court did not address whether *Chevron* deference could be waived with respect to a disputed legislative rule. Nor did it hold that courts are prohibited from applying *Chevron* when an agency decides not to rely on it in litigation.

authority covered the "specific provision" before the court.   569 U.S. 290, 322–23 (2013) (Roberts, C.J., dissenting).  The majority rejected this argument, noting that the dissent could not produce "a single case in which a general conferral of rulemaking or adjudicative authority has been held insufficient to support *Chevron* deference for an exercise of that authority within the agency's substantive field."  *Id.* at 306.   The Court declined to adopt this proposed "massive revision of our *Chevron* jurisprudence."   *Id.*  We must do so today.   Applying the statute to determine whether a device constitutes a machinegun is within ATF's substantive field.  *See, e.g.*, *United States v. Dodson*, 519 F. App'x 344, 348 (6th Cir. 2013); *Akins v. United States*, 312 F. App'x 197, 198 (11th Cir. 2009) (per curiam); *F.J. Vollmer Co. v. Higgins*, 23 F.3d 448, 449–50 (D.C. Cir. 1994); *York v. Sec'y of Treasury*, 774 F.2d 417, 419 (10th Cir. 1985). Additionally, the Supreme Court has rejected application of pre-*Chevron* tests in favor of "maintaining a uniform approach to judicial review of administrative action."   *Mayo*, 562 U.S. at 55 (quoting *Dickinson v. Zurko*, 527 U.S. 150, 154 (1999)) (rejecting application of special pre-*Chevron* rules for reviewing Treasury regulations).   Ultimately, the express/implied and specific/general distinctions have no role to play in applying *Chevron* deference.

        Those who argue for reversal also claim that *Chevron* does not apply because the Final Rule may impose criminal sanctions.  However, this is not what the case law says.  *Chevron* itself involved an agency interpretation with criminal applications—at the time, a knowing violation of one of the disputed legislative rule's requirements was punishable by daily $25,000 fines and imprisonment for up to a year—and yet the Supreme Court applied deference. 467 U.S. at 866; *see also* 42 U.S.C. §§ 7502, 7413.  In another case, *Babbitt v. Sweet Home Chapter of Communities for a Greater Oregon*, the Court applied *Chevron* when reviewing a legislative rule that attached criminal penalties.   515 U.S. 687, 703–04 (1995).   And in yet another case, *United States v. O'Hagan*, a criminal case, the Supreme Court applied *Chevron* deference to a legislative rule despite the rule's clear criminal applications and penalties. 521 U.S. 642, 673 (1997).   What these cases make clear is that *Chevron* does not fall away simply because a challenged legislative rule has some criminal applications.[6]

---

[6]*United States v. Apel*, 571 U.S. 359 (2014), and *Abramski v. United States*, 573 U.S. 169 (2014), do not compel a contrary conclusion.  Neither involved a legislative rule and, thus, neither involved agency interpretations

The relevant question is whether Congress delegated to the agency authority to promulgate legislative rules with criminal applications. And, when the statute gives an agency broad power to enforce or administer all provisions of the statute, it is "clear" that the agency has the necessary authority to do so. *See Gonzales v. Oregon*, 546 U.S. 243, 258–59 (2006). Here, Congress broadly tasked the Attorney General with promulgating "such rules and regulations as are necessary to carry out the provisions" of the Gun Control Act—a purely criminal statute— and to "administ[er] and enforce[]" and "prescribe all needful rules and regulations for the enforcement" of the National Firearms Act—a statute with criminal applications. 18 U.S.C. §§ 924(a)(2), 926(a); 26 U.S.C. §§ 5871, 7801(a)(2)(A), 7805(a). This statutory context clearly demonstrates that Congress intended the authority delegated under the Gun Control Act and the National Firearms Act to encompass legislative rules with criminal applications. *Guedes v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 920 F.3d 1, 25–26 (D.C. Cir. 2019).

Further, the rule of lenity does not displace *Chevron* simply because an agency has interpreted a statute carrying criminal penalties. The Supreme Court considered this very question in *Babbitt* and said:

> We have applied the rule of lenity in a case raising a narrow question concerning the application of a statute that contains criminal sanctions to a specific factual dispute . . . where no regulation was present. We have never suggested that the rule of lenity should provide the standard for reviewing facial challenges to administrative regulations whenever the governing statute authorizes criminal enforcement.

515 U.S. at 703–04, 704 n.18 (citation omitted). To be sure, the *Babbitt* Court also hypothesized that a regulation may "provide such inadequate notice of potential liability so as to offend the rule of lenity," but this is simply an acknowledgment that a law imposing criminal sanctions— whether it be a statute or a regulation—must provide fair notice of the prohibited conduct. *Id.* at 704 n.18.

---

that would trigger *Chevron*. Nor do they mention *Chevron*, *Babbitt*, or *O'Hagan* and, thus, *Apel* and *Abramski* should not be read to overrule this precedent. To be sure, there is an implied tension between the two lines of cases, but this is for the Supreme Court to resolve, not us. Until the Court does so, we must follow *Chevron*, *Babbitt*, and *O'Hagan*. *See Esquivel-Quintana v. Lynch*, 810 F.3d 1019, 1023–24 (6th Cir. 2016), *rev'd on other grounds sub nom. Esquivel-Quintana v. Sessions*, 137 S. Ct. 1562 (2017).

The *Babbitt* Court went on to determine that "the 'harm' regulation, which has existed for two decades and gives fair warning of its consequences," was not such a rule-of-lenity-violating regulation.  *Id.*  To read this sentence to mean that a regulation that breaks from a previous interpretation likely offends the rule of lenity is to apply false logic.  Although the Court suggested that a longstanding regulation could hardly be expected to offend the rule of lenity, it did not suggest the converse—that any new, contrary interpretation would, by itself, trigger doubt.  And, based on the remainder of the sentence, fair warning of the regulation's consequences—in and of itself, with no relation to the age of a regulation or whether it effected a reversal in position—would undermine the rule of lenity's applicability.[7]  Further, "[a]gency inconsistency is not a basis for declining to analyze the agency's interpretation under the *Chevron* framework."  *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 981 (2005).

Here, as in *Babbitt*, there is a legislative regulation—the Final Rule—which was promulgated under authority delegated to an agency and involves the interpretation of a statute with criminal applications.[8]  83 Fed. Reg. 66,514; *see also* 18 U.S.C. §§ 924(a)(2), 926(a); 26 U.S.C. §§ 5845(b), 5871, 7801(a)(2)(A), 7805(a); 28 C.F.R. § 0.130(a).  There is no dispute

---

[7]Even if the Final Rule were to be attacked in relation to its application to a specific factual dispute, it underwent the notice-and-comment process and over 186,000 comments were received, including one by Gun Owners on behalf of more than 1.5 million gun owners.  The Final Rule was also published in the Federal Register.  It is doubtful that these procedures provide such inadequate notice of potential liability as to offend the rule of lenity.  *See Guedes*, 920 F.3d at 28.

[8]The circumstances in *Babbitt* are analogous to the circumstances here.  In *Babbitt*, Congress defined the word "take" but did not further define the terms it used to define "take."  515 U.S. at 691.  An agency interpreted one of the definitional terms—"harm"—to include habitat modification.  The plaintiffs challenged that interpretation, arguing that Congress did not intend "take" to mean habitat modification.  *Id.* at 691, 693.  In the instant case, Congress defined "machinegun" using the terms "automatically" and "single function of the trigger" without further defining these terms.  ATF interpreted "automatically" and "single function of the trigger" to mean, in conjunction, "a single pull of the trigger" to initiate "a self-acting or self-regulating mechanism" to allow "continuous firing without additional physical manipulation of the trigger by the shooter," which has the effect of including bump-stock-type devices as machineguns.  Final Rule, 83 Fed. Reg. at 66,553–54.  Gun Owners challenges this interpretation, arguing that Congress did not intend "machinegun" to include bump stocks.  My colleagues favoring reversal distinguish *Babbitt* on the basis that it is an express-delegation case, whereas neither the National Firearms Act nor the Gun Control Act explicitly authorizes the Attorney General to issue regulations with criminal applications.  But, again, when a statute gives an agency broad power to enforce or administer all its provisions, as is the case here, it is "clear" that the agency has the necessary authority to do so.  *See Gonzales*, 546 U.S. at 258–59.

concerning the application of the Final Rule to a specific factual situation.  Thus, under *Babbitt*, it is clear that *Chevron* deference provides the standard of review, not the rule of lenity.

My colleagues in favor of reversal suggest two other reasons why *Chevron* ought not to apply in the context of laws with criminal consequences: deferring to agency expertise may be warranted when interpreting civil statutes but not when agencies interpret laws with criminal penalties; and delegation in the criminal context violates the separation-of-powers principle.  The arguments in support of these rationales are largely based on policy, analogy, and law review articles,[9] but not precedent.

There are many areas where Congress relies on agency expertise to implement laws with criminal applications.  Just to name a few, we have highly technical and complex securities, tax, workplace safety, and environmental-law regimes in which the applicable agency exercises delegated authority to promulgate regulations fleshing out statutory provisions—regulations that have both civil and criminal applications.  And no one contests that criminal law and procedure afford special protections to a criminal defendant that are not accorded to a civil defendant.  But it does not follow that an agency's law-interpreting power falls away in the criminal context where the power was properly delegated to the agency and exercised through legislative rulemaking.  To the extent my colleagues' inclination to cabin agency expertise to civil applications is motivated more by a displeasure with *Chevron*'s continued validity and legislative delegation more broadly, *Chevron* is the law and legislative delegation is a reality.

That legislative delegation is permissible undermines the separation-of-powers rationale as well.  The Supreme Court has recognized Congress's delegation authority in the criminal context for over a century.  For example, in *United States v. Grimaud*, 220 U.S. 506 (1911), Congress delegated to the Secretary of Agriculture the power to promulgate rules—with criminal penalties—to preserve certain forest reserves.  *Id.* at 507–09.  The Secretary issued a rule prohibiting livestock grazing near these reserves without a permit.  *Id.* at 509.  The defendant sheep farmers were indicted for violating this rule.  *Id.*  They argued that the rule was

---

[9]For an article expressing a contrary view, see Sanford N. Greenberg, *Who Says It's a Crime:* Chevron *Deference to Agency Interpretations of Regulatory Statutes That Create Criminal Liability*, 58 U. PITT. L. REV. 1 (1996), especially Section III.

unconstitutional because Congress could not "mak[e] it an offense to violate rules and regulations made and promulgated by the Secretary of Agriculture," since doing so would "delegate its legislative power to an administrative officer." *Id.* at 513. Although Congress had not declared, "in express terms," that it was unlawful to graze sheep on a forest reserve, the Supreme Court rejected the challenge. *See id.* at 521 (rejecting the argument that the rules were invalid merely "because the violation thereof is punished as a public offense").

In the ensuing decades, several Supreme Court decisions recognized that Congress may delegate legislative authority in the criminal context. *See, e.g.*, *J.W. Hampton, Jr. & Co. v. United States*, 276 U.S. 394, 406–07 (1928) ("The field of Congress involves all and many varieties of legislative action, and Congress has found it necessary to use officers of the executive branch within defined limits, to secure the exact effect intended by its acts of legislation, by vesting discretion in such officers to make public regulations interpreting a statute and directing the details of its execution, even to the extent of providing for penalizing a breach of such regulations." (citing *Grimaud*, 220 U.S. at 518) (other citations omitted)); *Yakus v. United States*, 321 U.S. 414, 418, 423–25 (1944) (upholding delegation of authority to agency to issue price-limit regulations under Emergency Price Control Act even though violating the regulations carried criminal penalties, and rejecting non-delegation and separation-of-powers challenges by criminal defendants convicted of violating those regulations); *United States v. Mistretta*, 488 U.S. 361, 371–74, 394–96 (1989) (upholding delegation of authority to Sentencing Commission to define criminal sentencing ranges and rejecting non-delegation and separation-of-powers challenges by criminal defendant).

In *Touby v. United States*, 500 U.S. 160, 164–69 (1991), the Supreme Court upheld a delegation of legislative authority to the Attorney General (and the Attorney General to the Drug Enforcement Administration) to temporarily schedule substances under the Controlled Substances Act—a determination that carried criminal implications—and rejected arguments that this delegation violated the non-delegation doctrine or the separation of powers. The petitioners, who were convicted for manufacturing a temporarily scheduled substance, argued that because the delegated authority contemplated regulations with criminal sanctions, Congress was required to provide more specific direction than the intelligible principle normally required. *Id.*

at 165–66.  They also argued that allowing the Attorney General to both schedule particular drugs and prosecute individuals for manufacturing them—rather than designating a different executive to temporarily schedule the substances—violated the separation-of-powers doctrine. *Id.* at 167.  Finally, the petitioners claimed that the Attorney General improperly delegated his temporary scheduling power to the DEA.  *Id.* at 169.  The Court rejected all three arguments.  *Id.* It concluded that under any standard the statute meaningfully constrains the Attorney General's discretion to define criminal conduct and that the separation-of-powers doctrine was not violated. *Id.* at 167–69.  Similarly, in *United States v. Stevenson*, 676 F.3d 557, 565 (6th Cir. 2012), we held that the "Attorney General was properly delegated authority by Congress to enact [a] substantive rule" providing that a federal sex-offender registration statute—which imposed criminal penalties—applied retroactively to those convicted of sex crimes prior to the statute's passage.  *See id.* at 563 n.3 (rejecting defendants' argument "that Congress lacked the constitutional authority to delegate this power to the Attorney General").

No one asserts that the National Firearms Act or the Gun Control Acts lacks an intelligible principle or that the Attorney General improperly delegated power to ATF.  And to the extent that it is argued that Congress cannot give the Attorney General the power to implement a criminal statute through rulemaking and also enforce it, this is inconsistent with *Touby*.  500 U.S. at 167–68.

In sum, the district court correctly determined that *Chevron* provides the standard of review by which to assess the Final Rule.

## II.  Applying *Chevron*

The *Chevron* framework consists of two steps.  At step one, we ask whether the intent of Congress is clear and, if so, "that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress."  *Chevron*, 467 U.S. at 842–43.  If, on the other hand, the court determines Congress has not directly addressed the precise question at issue and the statute is ambiguous with respect to the issue, then, at step two, we ask if the agency's interpretation is "based on a permissible construction of the statute."  *Id.* at 843.

## A.  Step One

"Machinegun" is defined in the National Firearms Act and the Gun Control Act as "any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger."  26 U.S.C. § 5845(b); 18 U.S.C. § 921(a)(23).  The Final Rule defines "automatically" to mean "functioning as the result of a self-acting or self-regulating mechanism that allows the firing of multiple rounds through a single function of the trigger" and "single function of the trigger" to mean "a single pull of the trigger and analogous motions."  83 Fed. Reg at 66,553.  As a result, the Final Rule defines the term "machinegun" to include bump-stock-type devices.  *Id.*

To determine whether Congress has spoken directly to the precise question at issue— whether "machinegun" includes bump-stock devices—or whether the statute is silent or ambiguous regarding this issue, we employ traditional tools of statutory construction.[10] *Chevron*, 467 U.S. at 843 n.9.  Beginning with the statutes themselves, neither the National Firearms Act nor the Gun Control Act defines "automatically" or "single function of the trigger." When considering the statutory context, dictionary definitions, and everyday situations, however, both terms admit of more than one interpretation—that is, they are ambiguous.  *See All. for Cmty. Media v. F.C.C.*, 529 F.3d 763, 777 (6th Cir. 2008).

The phrase "single function of the trigger" is capable of two readings: one favoring the government (the "shooter-focused" reading), the other favoring Gun Owners (the "mechanical"

---

[10]The rule of lenity is a canon of construction.  However, as discussed, it does not foreclose *Chevron* deference in the context of legislative rules interpreting statutes with criminal applications.  Additionally, it "only serves as an aid for resolving an ambiguity," meaning that it "comes into operation at the end of the process of construing what Congress has expressed" and only "when the ordinary canons of statutory construction have revealed no satisfactory construction."  *Lockhart v. United States*, 577 U.S. 347, 361 (2016); *Callanan v. United States*, 364 U.S. 587, 596 (1961).  As such, perhaps the rule of lenity would have a role to play if a permissible construction of Congress's intent could not be found by the end of the *Chevron* analysis.  *See Maracich v. Spears*, 570 U.S. 48, 76 (2013).  But this is not the case here.

My colleagues in favor of reversal suggest that *Solid Waste Agency of N. Cook Cnty. v. Army Corps of Eng'rs* stands for the proposition that the rule of lenity must be applied at the outset to determine if the statute is unambiguous.  *Solid Waste* says no such thing.  In fact, its only reference to the rule of lenity comes when the Supreme Court expressly *declines* to consider the argument that the rule of lenity displaces *Chevron*.  *See* 531 U.S. 159, 174 n.8 (2001).  It is true that the Court declined to apply *Chevron*, but this was because the agency's interpretation of its own jurisdiction would have potentially extended beyond the outer bounds of Congress's Commerce Clause authority and created federalism—not fair notice—concerns.  *Id.* at 173-74.

reading).  The shooter-focused reading corresponds to a single "pull" of the trigger—i.e., a single human action upon the trigger that initiates a rapid-fire sequence.  Under this reading, a bump-stock-equipped rifle constitutes a machinegun because a single human action—the initial "pull" of the trigger—initiates a rapid firing sequence.  The mechanical reading takes the phrase "single function of the trigger" to mean "single *depression* of the trigger."  Under this view, a bump-stock-equipped rifle is not a machinegun because each bullet fired is initiated by a separate depression of the trigger, albeit one generated by the weapon's recoil.  *Accord Guedes*, 920 F.3d at 29.

Both readings are plausible.  "The word 'function' focuses on the 'mode of action' . . . by which the trigger operates.  But that definition begs the question [] whether 'function' requires our focus upon the movement of the trigger, or the movement of the trigger finger.  The statute is silent in this regard."  *Aposhian*, 958 F.3d at 986 (quoting 4 OXFORD ENGLISH DICTIONARY 602 (1933));[11] *see also* WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 920-21 (1967) (defining "function" as an "action").  Because neither reading is "unambiguously 'compel[led]' by the statute, to the exclusion of the other one," the statute "contains a 'gap for the agency to fill.'"  *Guedes*, 920 F.3d at 29–30 (quoting *Chevron*, 467 U.S. at 843, 860)).

The word "automatically" is also ambiguous.  The statute provides that a machinegun is a "weapon which shoots . . . *automatically* more than one shot, without manual reloading, by a single function of the trigger."  26 U.S.C. § 5845(b) (emphasis added).  Here, too, there are competing interpretations, and the text does not unambiguously foreclose either of them.

Gun Owners argues that the phrase "automatically" must mean by itself with little or no direct human control and, because a shooter must exert constant pressure to cause a bump-stock-equipped rifle to continue firing, these devices do not create weapons that shoot automatically.  The government argues that "automatically" means self-acting or self-regulating.  In the

---

[11]*Accord Guedes*, 920 F.3d at 29 ("A mechanical perspective, for instance, might focus on the trigger's release of the hammer, which causes the release of a round.  From that perspective, a 'single function of the trigger' yields a single round of fire when a bump-stock device moves the trigger back and forth.  By contrast, from the perspective of the shooter's action, the function of pulling the trigger a single time . . . yields multiple rounds of fire. . . .  Neither of those interpretations is compelled (or foreclosed) by the term 'function' in 'single function of the trigger.'  The word 'function' focuses our attention on the 'mode of action' . . . by which the trigger operates.  But the text is silent on the crucial question of *which perspective* is relevant."  (citations omitted)).

government's view, a bump-stock-equipped rifle is "self-acting" in the sense that once the shooter establishes the conditions necessary to begin the firing process—pulling the trigger, placing a finger on the extension ledge, and applying pressure on the barrel-shroud or fore-stock with the other hand—the bump stock "eliminate[s] the need for the shooter to manually capture, harness, or otherwise utilize [the recoil] energy to fire additional rounds."  Final Rule, 83 Fed. Reg. at 66,532.

According to dictionary definitions at the time the National Firearms Act was enacted, the word "automatically"—the adverbial form of the word "automatic"—means "[h]aving a self-acting or self-regulating mechanism that performs a required act at a predetermined point in an operation[.]"  WEBSTER'S NEW INTERNATIONAL DICTIONARY 187 (2d ed. 1934); *see also* 1 OXFORD ENGLISH DICTIONARY 574 (1933) (defining "Automatic" as "[s]elf-acting under conditions fixed for it, going of itself").  The focus on a "self-regulating *mechanism*" cuts against the suggestion that the word "automatically" requires complete, as opposed to partial, automation, and lends support to ATF's classification.  Further, the argument that bump-stock-equipped weapons do not fire "automatically" because they require constant forward pressure is belied by common usage of the word "automatic."  For example, "an 'automatic' sewing machine still 'requires the user to press a pedal *and* direct the fabric.'"  *Guedes*, 920 F.3d at 30 (citation omitted)).  And an "automatic" car shifts gears on its own, but only if the driver maintains enough constant pressure on the gas pedal to reach a speed that triggers a gear shift.

As other courts have recognized, the ultimate question is how much human input is contemplated by the word "automatically."  That is a question of degree that the statute's text does not definitively answer.  The D.C. Circuit's explanation captures this point well:

> The term "automatically" does not require that there be *no* human involvement to give rise to "more than one shot."  Rather, the term can be read to require only that there be *limited* human involvement to bring about more than one shot.  *See, e.g.*, Webster's New International Dictionary 157 (defining "automatically" as the adverbial form of "automatic"); *id.* at 156 (defining "automatic" as "self-acting or self-regulating," especially applied to "machinery or devices which perform *parts* of the work formerly or usually done by hand" (emphasis added)).  But how much human input in the "self-acting or self-regulating" mechanism is too much?
>
> . . . .  [T]he phrase "by a single function of the trigger" . . . can naturally be read to establish only the preconditions for setting off the "automatic" mechanism,

without foreclosing some further degree of manual input such as the constant forward pressure needed to engage the bump stock in the first instance. And if so, then the identified ambiguity endures. How much further input is permitted in the mechanism set in motion by the trigger? The statute does not say.

*Guedes*, 920 F.3d at 30-31. Thus, "automatically" is also ambiguous.

In sum, because neither party's interpretation of either term is unambiguously compelled by the statute, the statutory definition of "machinegun" contains two central ambiguities, which ATF has attempted to resolve. This leads to step two of the analysis under *Chevron*.

## B.  Step Two

When employing the *Chevron* framework, we do not ask if the agency's construction is the best reading of the statute. *Id.* at 843 n.11. The question is whether ATF's interpretations of "single function of the trigger" and "automatically" are permissible. *Mead*, 533 U.S. at 229.

Since 2006, ATF has interpreted "single function of the trigger" to mean "single pull of the trigger," a reading that is "consonant with the statute and its legislative history." *Akins*, 312 F. App'x at 198. When the National Firearms Act was enacted in 1934, the president of the National Rifle Association testified in a congressional hearing that any gun capable of firing more than one shot by a single pull of the trigger was a machinegun, and the House Report accompanying the bill that became the National Firearms Act said the same. *See* H.R. Rep. No. 73-1780, at 2 (1934); Final Rule, 83 Fed. Reg. at 66,518. Thus, ATF's interpretation of "single function of the trigger" is a permissible construction. *Accord Aposhian*, 958 F.3d at 988; *Guedes*, 920 F.3d at 31. Further, ATF's focus on the single human action upon the trigger is reasonable. The practical effect of the bump-stock device is to turn a semiautomatic firearm into a rapid-fire firearm that only requires the person firing the gun to pull the trigger once.

ATF's interpretation of "automatically" as "self-acting or self-regulating" is permissible as well. Although this interpretation allows for some measure of human involvement, it accords with the everyday understanding of the term and relevant dictionary definitions from when "machinegun" was first defined in 1934 by the National Firearms Act and later slightly altered in 1968 by the Gun Control Act. For example, understanding "automatic" to allow for some human involvement, not complete autonomy, is commonplace. *Guedes*, 920 F.3d at 31; *Aposhian*,

958 F.3d at 989 ("The bump stock performs *part* of the work usually done by hand at a predetermined point in the operation, under conditions fixed for it by the shooter."). Additionally, Webster's New International Dictionary defined "automatic" as "[h]aving a self-acting or self-regulating mechanism," and dictionaries from 1965 and 1967 do the same. Webster's New International Dictionary 187 (2d ed. 1934); Webster's Third New International Dictionary 148 (1965); Webster's Seventh New Collegiate Dictionary 60 (1967).   ATF's interpretation of "automatically" is therefore a permissible construction. *Accord Aposhian*, 958 F.3d at 988–89; *Guedes*, 920 F.3d at 31–32.   It is also reasonable to read "automatically" to require only partial self-regulation—i.e., a mechanism that allows for an integral part of a process to be performed autonomously.   Because bump-stock-type devices harness the recoil energy from each shot so that the trigger resets and continues firing without additional physical manipulation of the trigger by the shooter, they can reasonably be understood to produce more than one shot, automatically.

In sum, § 5845(b) is ambiguous and ATF's construction of it is permissible and reasonable.  The court must therefore defer to ATF's interpretation.

### III.  Assuming *Chevron* Does Not Apply

Assuming arguendo that *Chevron* does not apply, the district-court judgment should still be affirmed.  Because ATF has been entrusted to administer both the National Firearms Act and the Gun Control Act, and its views "constitute a body of experience and informed judgment to which courts . . . may properly resort for guidance," its construction of § 5845(b) is not "outside the pale of any deference whatever."  *Mead*, 533 U.S. at 227–28, 234 (quoting *Skidmore v. Swift Co.*, 323 U.S. 134, 140 (1944)).  The Final Rule may warrant *Skidmore* deference, depending "upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control."  *Id.* at 228 (quoting *Skidmore*, 323 U.S. at 139–40); *see also id.* ("[C]ourts have looked to the degree of the agency's care, its consistency, formality, and relative expertness[.]" (footnotes omitted)).

In ten letter rulings issued between 2008 and 2017, ATF applied its "single pull of the trigger" interpretation to other bump-stock-type devices but ultimately concluded that the devices were not machineguns because they did not "automatically" shoot more than one shot with a single pull.  Final Rule, 83 Fed. Reg. at 66,517.  None of them, however, extensively examined the meaning of "automatically."  *Id.*  Moreover, this position was inconsistent with the position taken by ATF in 2006, when it concluded that one such bump-stock-type device—the Akins Accelerator, which allowed the shooter to initiate an automatic firing cycle by pulling the trigger once, thereby harnessing the recoil energy of the rifle to fire more than one shot without further human input by means of internal springs within the device—was a machinegun.  *Id.*  After the 2017 mass shooting in Las Vegas, Nevada, ATF recognized that its earlier letter rulings failed to provide substantial or consistent legal analysis regarding the meaning of the term "automatically" and deviated from its 2006 position defining a bump-stock-type device as a machinegun,[12] which the Final Rule sets out to correct.  *Id.* at 66,517–18.

ATF unquestionably has abundant experience and expertise in determining which devices constitute machineguns.  Additionally, the Final Rule went through the highly formal process of notice and comment.  And, in promulgating the Final Rule, ATF responded to over 186,000 comments—including one by Plaintiff Gun Owners on behalf of more than 1.5 million gun owners—and provided expansive reasoning for why bump stocks are machineguns, demonstrating a great degree of care in considering the issue.  These factors—together with the validity of ATF's reasoning—entitle ATF's interpretation to at least *Skidmore* deference.

Finally, ignoring all deference, ATF's interpretation of the statute is the best one.  According to Gun Owners and my colleagues favoring reversal, Congress meant only to prohibit weapons capable of firing more than one shot with a single mechanical depression of the trigger.

---

[12]Although the bump-stock-type devices described in the Final Rule harness the recoil energy of a rifle differently than the Akins Accelerator—by means of a sliding stock that allows the weapon to slide back into the shooter's shoulder after the discharge of a round and then forward into the stationary trigger finger by maintaining pressure on the barrel-shroud or fore-grip of the rifle, rather than internal springs—both are designed to the same end.  They each harness a rifle's recoil energy to produce an automatic firing cycle beginning with a single pull of the trigger and continuing without additional manipulation of the trigger or significant manipulation of the firearm by the shooter until the trigger finger is withdrawn, the weapon malfunctions, or the ammunition supply is exhausted.  83 Fed. Reg. at 66,517–18.  The absence of significant manipulation of the firearm distinguishes the bump stock from the pump-action shotgun.

This interpretation would exclude semiautomatic rifles with bump stocks attached because they fire only a single shot each time the trigger is depressed—notwithstanding that the trigger is depressed by the operation of the bump stock and the bump stock allows the shooter to fire semiautomatic rifles at the rapid rates of automatic weapons with one activation of the trigger. However, this reading neglects to account for how "automatically" and "single function of the trigger" work together as a practical matter, and therefore fails to give full meaning to the statutory definition.

When reading the key statutory terms of "machinegun" in conjunction with each other— "any weapon which shoots," "automatically more than one shot," "by a single function of the trigger"—the definition refers to any weapon that is capable of discharging multiple rounds by means of a mechanism set in motion by a single function of the trigger.  Courts have recognized "single function" to mean "single pull," as this is "consonant with the statute and its legislative history," *Akins*, 312 F. App'x at 200; and "automatically" to refer to a self-acting mechanism set in motion by a single pull of the trigger to discharge multiple rounds, *United States v. Olofson*, 563 F.3d 652, 658 (7th Cir. 2009).  Moreover, as mentioned above, understanding "automatically" and "single function" to refer to, respectively, a self-regulating mechanism and a single human action is consistent with dictionary definitions from the relevant timeframe.

Thus, the best interpretation of § 5845(b) is that Congress, in defining "machinegun" as it did, intended to prohibit weapons capable of discharging multiple rounds continuously by means of a self-regulating mechanism initiated by a single human input on the trigger.  This is precisely the interpretation the Final Rule provides. And, as the Final Rule thoroughly explains, this is exactly how a bump stock operates: after a shooter gets into position, a single pull of the trigger by the shooter initiates a sequence in which the bump stock harnesses and directs the firearms' recoil energy so that the firearm fires continuously without additional physical manipulation of the trigger by the shooter or any manual reloading.  83 Fed. Reg. at 66,516.

Thus, not only does ATF's interpretation warrant *Skidmore* deference, but, in the absence of all deference, and simply as a matter of statutory interpretation, it also embodies the best reading of the statute.

No. 19-1298            *Gun Owners of Am., Inc. v. Garland*            Page 20

* * *

In sum, the rule of lenity is inapplicable. The *Chevron* framework applies to ATF's legislative regulation—the Final Rule; and because the statute is ambiguous and ATF's construction is permissible and reasonable, it warrants deference. Alternatively, ATF's interpretation of the statute is entitled to *Skidmore* deference. Finally, simply as a matter of statutory interpretation, the Final Rule embodies the best interpretation of the statute and operates to provide fair notice of that interpretation. The district court's judgment should be affirmed.

No. 19-1298                    *Gun Owners of Am., Inc. v. Garland*                    Page 21

---

### OPINION IN SUPPORT OF AFFIRMING THE DISTRICT COURT'S JUDGMENT

---

GIBBONS, Circuit Judge, writing in support of affirming the district court judgment. I agree with Judge White's assertion that *Chevron* applies to statutes with criminal penalties and her conclusion of the outcome under *Chevron*. I write separately, as Judge White ultimately concludes in the alternative, because *Chevron* application is unnecessary here. The ATF's interpretation of "single function of the trigger" and "automatically" is unambiguously the best interpretation of the Gun Control Act using ordinary tools of statutory construction. Congress specifically prohibited "any part designed and intended solely and exclusively . . . for use in converting a weapon into a machinegun." 26 U.S.C. § 5845(b). As a part designed to convert a semiautomatic gun into a gun with machinegun functionality that "automatically" allows for multiple shots with a "single function of the trigger," a bump stock is unambiguously a machinegun. When a shooter pulls the trigger of a firearm fitted with a bump stock, the gun, through "a self-acting or self-regulating mechanism," 83 Fed. Reg. 246, 66514, 66519 (Dec. 26, 2018), fires "more than one shot, without manual reloading, by a single function of the trigger." 26 U.S.C. § 5845(b). Indeed, that is precisely what a bump stock is designed to allow a gun to do, and that is why people purchase bump stocks. Holding otherwise would allow gun manufacturers to circumvent Congress's longtime ban on machineguns by designing parts specifically intended to achieve machinegun functionality with a single pull of the trigger so long as the part also requires some minutia of human involvement.

————————————

### DISSENT

————————————

MURPHY, Circuit Judge, dissenting.  Since the early days of our Republic, it has been a bedrock legal principle that our government cannot criminalize conduct and send people to prison except through democratically passed laws that have made it through both Houses of Congress and been signed by the President.  *See United States v. Hudson*, 11 U.S. 32, 34 (1812).  Yet the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF) has sought to ban "bump stocks" in a far different way: through a regulation adopted by a federal agency alone.  Bump-Stock-Type Devices, 83 Fed. Reg. 66,514 (Dec. 26, 2018) ("Bump-Stock Rule").  By an equally divided vote, our court affirms a decision rejecting a legal challenge to the ATF's Bump-Stock Rule.  I must respectfully dissent from this judgment.  Nothing in Congress's two relevant statutes delegates to the ATF such broad power to expand a crime's scope through this sort of regulatory lawmaking.

In 1986, Congress amended the Gun Control Act of 1968 to make it a crime to possess a "machinegun," 18 U.S.C. § 922(o)(1), a term defined in the National Firearms Act of 1934, 26 U.S.C. § 5845(b).  *Gun Owners of Am., Inc. v. Garland*, 992 F.3d 446, 450–51 (6th Cir. 2021).  For years, the ATF asserted that private parties could lawfully possess the bump stocks at issue in this case because these devices did not fall within Congress's "machinegun" definition.  Bump-Stock Rule, 83 Fed. Reg. at 66,516.  So Americans bought millions of dollars' worth of bump stocks.  *Id.* at 66,547.  Then the ATF changed its position.  In the Bump-Stock Rule, the ATF agreed that the possession of bump stocks had been lawful in the past but asserted that the devices would become illegal "machineguns" on the rule's effective date.  *Id.* at 66,525.  There thus can be no doubt that the Bump-Stock Rule creates a new crime.

Judge Batchelder's panel opinion persuasively explained that neither the Gun Control Act nor the National Firearms Act gives the ATF the power to expand the law banning machine guns through this legislative shortcut.  *Gun Owners*, 992 F.3d at 454–74.  I write to add a few more thoughts on why bump stocks are not "machineguns" under these laws and why we cannot fall back on "*Chevron* deference" to save the ATF's rule.  *See Chevron, U.S.A., Inc. v. Nat. Res. Def.*

*Council, Inc.*, 467 U.S. 837 (1984).  Many people, I suspect, would not understand why anyone would want to own a bump stock, a device that helps a person shoot semiautomatic rifles at rapid rates approaching those of automatic weapons.  But this case has nothing to do with the policy debate over whether Congress should have banned bump stocks after the tragic Las Vegas shooting in 2017.  Despite the introduction of multiple bills, Congress opted not to pass such legislation.  And while the burdensome legislative process may seem "unworkable" in today's polarized age, it is a core component of our separation of powers designed to protect the liberty of all Americans—not just bump-stock owners.  *INS v. Chadha*, 462 U.S. 919, 959 (1983).  Whether one favors or disfavors a policy banning bump stocks, we should all be concerned with the way in which the federal government has enacted that policy into law.

I

This case implicates administrative-law questions with significance for many statutes.  At bottom, though, it raises a pure question of statutory interpretation: Are rifles fitted with bump stocks "machineguns" under the definition in 26 U.S.C. § 5845(b)?  We have long described this type of question as "the bread and butter of the work of federal courts."  *Dolfi v. Pontesso*, 156 F.3d 696, 700 (6th Cir. 1998).  I do not find it particularly difficult to answer.

The parties largely agree on the "basic" facts.  *U.S. Bank Nat'l Ass'n v. Vill. at Lakeridge, LLC*, 138 S. Ct. 960, 966 (2018).  Many rifles are either "automatic" or "semiautomatic."  An "automatic" rifle continuously fires shots with one activation of the trigger, so a shooter must release the trigger to stop firing.  *See Webster's Ninth New Collegiate Dictionary* 118 (1984); *Webster's New International Dictionary of the English Language* 187 (2d ed. 1934) ("*Webster's Second*").  A "semiautomatic" rifle fires only one shot with one activation of the trigger, so a shooter must release and reengage the trigger for each shot.  *See Webster's Second*, *supra*, at 2274.

Automatic weapons usually fire at greater speeds than semiautomatic weapons because the shooter can hold down the trigger to keep firing and need not repeatedly release and reengage it.  *See* Bump-Stock Rule, 83 Fed. Reg. at 66,516.  But experts can "bump fire" semiautomatic rifles at rates approaching those of some automatic firearms.  An ATF official described bump

firing as "rapid manual trigger manipulation to simulate automatic fire," Letter, R.1-4, PageID 34; the Bump-Stock Rule describes it as a "technique that any shooter can perform with training or with everyday items such as a rubber band or belt loop," 83 Fed. Reg. at 66,532. A shooter who bump fires relies on the recoil energy from the rifle's discharge to push the gun slightly backward away from the trigger finger, which remains stationary. The rifle's trigger resets as it separates from the trigger finger. The shooter then uses the non-trigger hand placed on the rifle's fore-end to push the gun (and thus the trigger) slightly forward. The trigger "bumps" into the still-stationary trigger finger, discharging a second shot. The recoil energy from each additional shot combined with the shooter's forward pressure with the non-trigger hand allows the rifle's backward-forward cycle to repeat itself rapidly. A shooter may also use a belt loop to bump fire by sticking the trigger finger inside the loop and shooting from waist level to keep the rifle more stable. *See id.* at 66,533.

A bump stock also helps a shooter engage in rapid bump firing. It replaces a semiautomatic rifle's standard stock with one that allows the rifle to slide back and forth within the stock by about 1.5 inches. *Id.* at 66,516, 66,518. This bump stock channels the recoil energy from the rifle's discharge in "constrained linear rearward and forward paths" and relieves the shooter of the need to "manually capture and direct" the recoil energy. *Id.* at 66,532. Yet a shooter still must use the non-trigger hand to put forward pressure on the fore-end so that the rifle and trigger move forward after the recoil. *Id.* at 66,518. When the shooter's manual pressure pushes the trigger forward, it bumps into the trigger finger and discharges a second shot. The process repeats itself rapidly in the same general manner that it would were the shooter to bump fire without a bump stock. *Id.*

Given these facts, a bump stock does not qualify as a "machinegun." 26 U.S.C. § 5845(b); 18 U.S.C. § 921(23). Congress defined the word to cover both a weapon that "shoots" "automatically more than one shot" "by a single function of the trigger" and a "part" that is "designed" "exclusively" "for use in converting a weapon into a machinegun":

> The term "machinegun" means any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger. The term shall also include the frame or receiver of any such weapon, any part designed and intended solely

and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machinegun, and any combination of parts from which a machinegun can be assembled if such parts are in the possession or under the control of a person.

26 U.S.C. § 5845(b).  For a bump stock to be a "machinegun" under this definition, a rifle fitted with that device must qualify as one.  Yet such a "bump-stock rifle" does not qualify.

To begin with, a bump-stock rifle does not shoot "more than one shot" "by a single function of the trigger."  A "function" of a tangible thing is the "natural and proper action" that it performs.  *Webster's Second*, *supra*, at 876; *American Heritage Dictionary of the English Language* 533 (1969).  Put another way, a thing's "function" is "the action for which [the] . . . thing is specially fitted or used or for which [the] thing exists[.]"  *Webster's Ninth*, *supra*, at 498.  And putting a bump stock on a semiautomatic rifle does not change the "function" of its "trigger": to discharge one round per depression.  All agree that a bump-stock rifle's trigger must be released and "re-engage[d]" between shots—just as occurs with ordinary bump firing.  83 Fed. Reg. at 66,516; *United States v. Alkazahg*, __ M.J. __, 2021 WL 4058360, at *5 (N-M Ct. Crim. App. Sept. 7, 2021).  The firearm thus shoots one shot per trigger function.  If this trigger fired more than one shot per activation, a person would more naturally refer to that result as a "malfunction" of the trigger than a "function" of it.  *Cf. United States v. Olofson*, 563 F.3d 652, 658–59 (7th Cir. 2009).

Further, the discharge of more than one shot "by a single function of the trigger" does not alone make a firearm a "machinegun."  The firearm must also do so "automatically."  That is, it must operate "in a manner essentially independent of external influence or control," *American Heritage*, *supra*, at 90, or in a "self-acting or self-regulating" manner, *Webster's Ninth*, *supra*, at 118.  What type of weapon might shoot multiple shots "by a single function of the trigger" but not do so "automatically"?  The Bump-Stock Rule gave an example.  A certain pump-action shotgun fires multiple shots with one trigger depression if the shooter pumps the shotgun with the non-trigger hand to load and shoot additional shells.  83 Fed. Reg. at 66,534.  Although this shotgun shoots more than one shot per trigger function, it does not do so "automatically" because the shooter must manually pump it.  *Id.*  This logic also disqualifies rifles equipped with bump stocks.  They will fire only one shot if a shooter presses the trigger and uses no "external

influence" with the non-trigger hand.  *American Heritage, supra*, at 90; *Aposhian v. Wilkinson*, 989 F.3d 890, 896 (10th Cir. 2021) (en banc) (Tymkovich, C.J., dissenting).  To fire additional shots, a shooter must exert manual force so that the trigger repeatedly pushes into the trigger finger.  Vasquez Decl., R.7, PageID 146.

Lastly, this interpretation fits the context.  The statutory text defines the word "machinegun."  *See Johnson v. United States*, 559 U.S. 133, 140 (2010); *Solid Waste Agency of N. Cook Cnty. v. Army Corps of Eng'rs* (*SWANCC*), 531 U.S. 159, 171–72 (2001).  And this interpretation matches how an "appropriately informed" user of the English language would distinguish a "machinegun" from an ordinary rifle.  *See Van Buren v. United States*, 141 S. Ct. 1648, 1657 (2021) (citation omitted).  A "machine gun" is typically viewed as "an automatic gun[.]"  *Webster's Ninth, supra*, at 713; *Webster's Second, supra*, at 1474.  And the difference between an "automatic" and a "semiautomatic" weapon has long turned on a mechanical feature of its trigger.  If the gun automatically reloads *and* refires with one trigger activation, it is a machine gun.  If it automatically reloads the next cartridge but requires "another pressure of the trigger for each successive shot," it is a semiautomatic gun.  *Webster's Ninth, supra*, at 1069; *see also id.* at 118; *Webster's Second, supra*, at 187, 2274.  Because a bump-stock rifle's trigger must be reengaged for each shot, it is not a machine gun under the ordinary understanding of that term.  *See Guedes v. Bureau of Alcohol, Tobacco, Firearms and Explosives*, 920 F.3d 1, 44–45 (D.C. Cir. 2019) (per curiam) (Henderson, J., concurring in part and dissenting in part).

*

The ATF's contrary view commits two errors.  It rewrites the phrase "by a single function of the trigger."  And it interprets the adverb "automatically" out of context.

*By a Single Function of the Trigger*.  Although the ATF does not dispute that a bump-stock rifle's trigger must be released and reengaged for each shot, it says that the rifle shoots multiple shots "by a single function of the trigger."  Its logic for this head-scratching result starts by rewriting "single function of the trigger" to mean "single pull of the trigger."  Bump-Stock Rule, 83 Fed. Reg. at 66,518.  From there, it says that a shooter need only "pull" the trigger once

because additional shots result from the trigger pushing against the stationary trigger finger.  *Id.* at 66,519.

This reading conflicts with basic interpretive principles.  To rewrite "function" to mean "pull," the ATF cites a Supreme Court footnote and a snippet of legislative history.  *See id.* at 66,518.  It should have started with the word's ordinary meaning.  *See Encino Motorcars, LLC v. Navarro*, 138 S. Ct. 1134, 1140 (2018).  Nobody would define "function" as "pull."  A thing's "function" is the "action" it "is specially fitted" to perform.  *Webster's Ninth*, *supra*, at 498.  The ATF's use of the word "pull" wrongly changes the focus from the firearm's mechanical perspective (how does the firearm work?) to the shooter's operational perspective (how does a shooter shoot the gun?).  *Gun Owners*, 992 F.3d at 470–71.  Although a shooter may "pull" a trigger, it is unnatural to say that the shooter "functions" the trigger.  But it is perfectly natural to say that the semiautomatic trigger properly "functions" if it shoots one shot per activation.

The ATF's sources do not help it.  In *Staples v. United States*, 511 U.S. 600 (1994), the Court distinguished automatic and semiautomatic weapons in a footnote discussing background facts.  *Id.* at 602 n.1.  The decision otherwise addressed an issue not relevant here: whether the crime of possessing an unregistered machine gun has a *mens rea* element.  *Id.* at 604–20.  This footnote described an automatic weapon as one that "fires repeatedly with a single pull of the trigger," noting that "once its trigger is depressed, the weapon will automatically continue to fire until its trigger is released or the ammunition is exhausted."  *Id.* at 602 n.1.  Yet *Staples* did not offer a conclusive reading of the "machinegun" definition; it "merely 'offer[ed] commonsense explanations'" to distinguish the weapons.  *Olofson*, 563 F.3d at 658 (citation omitted).  In *Olofson*, the government itself took this view of *Staples*.  There, the defendant read *Staples* as if it were a statute.  He argued that his rifle shot only three rounds per trigger pull and so was not a machine gun because it did not keep shooting until the trigger was released or the ammunition exhausted.  *Id.* at 658–59.  When rejecting this argument, the Seventh Circuit refused to replace the statute with the footnote.  *Id.* at 659.  I would do the same.

The ATF next turns to legislative history.  The President of the National Rifle Association noted that a firearm "which is capable of firing more than one shot by a single pull of the trigger, a single function of the trigger, is properly regarded, in my opinion, as a machine

gun." *National Firearms Act: Hearings on H.R. 9066 Before the H. Comm. on Ways & Means*, H.R. 9066, 73rd Cong. 40 (1934). "But legislative history is not the law." *Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612, 1631 (2018). And the law uses the word "function."

Congress had good reason for this word choice. Even the ATF cannot stick with its own "pull" test. It recognizes that this word might exclude from the "machinegun" definition weapons that repeatedly shoot with one *push* of a button. Bump-Stock Rule, 83 Fed. Reg. at 66,534. So the ATF expands its interpretation of "function of the trigger" to cover not just a "pull" but also "analogous motions." *Id.* This change should disqualify rifles fitted with bump stocks. The shooter's act of pushing the trigger into the trigger finger is an "analogous motion" for each shot of such a rifle. The rifle thus does not shoot multiple shots by a shooter's single "pull" of or other "motion" on the trigger.

*Automatically*. The ATF agrees that "automatically" means operating "as the result of a self-acting or self-regulating mechanism[.]" 83 Fed. Reg. at 66,519. And, as the ATF recognized for a decade, shooters must use *manual* force with the non-trigger hand to reengage the trigger between each shot of a bump-stock rifle. *See id.* at 66,532. But the ATF now says that this rifle acts "automatically" because its bump stock mechanically channels the recoil energy, so shooters need not "manually capture and direct recoil energy" themselves. *Id.*

This view reads the word "automatically" in isolation, not in context. *See Johnson*, 559 U.S. at 139–40. "Automatically" does not modify the phrase "capture the recoil energy"; it modifies the phrase "shoots" "by a single function of the trigger." Just because one part of a rifle's operation is "automatic" does not mean that it automatically shoots by a single function of its trigger. Even semiautomatic rifles have some "automatic" features (hence their name). They use the "force of recoil and mechanical spring action to eject the empty cartridge case after the first shot and load the next cartridge" without human action. *Webster's Ninth*, *supra*, at 1069. But they do not shoot multiple shots "automatically" "by a single function of the trigger" because a shooter must use manual force to reengage the trigger for each shot. The same is true of bump-stock rifles.

The ATF's reading also leaves the statute entirely unclear concerning the amount of human involvement necessary to distinguish a "machinegun" from an ordinary firearm.  I would read the statute to set a rule: a gun shoots automatically by a single function of the trigger as long as the shooter need only manually cause the trigger to engage in a "single" function in order to fire multiple shots.  *See Guedes*, 920 F.3d at 46–47 (Henderson, J., concurring in part and dissenting in part); *Aposhian*, 989 F.3d at 896 (Tymkovich, C.J., dissenting).  So a typical machine gun qualifies even though the shooter pulls the trigger *and* keeps it pressed down because that combined external influence still does no more than result in one action of the trigger.  I am, by contrast, at a loss over the amount of human influence that disqualifies a weapon as a machine gun under the ATF's view that "function" really means "pull."  All agree that the shooter must exert "external influence" *in addition to* a single pull of the trigger. *American Heritage*, *supra*, at 90.  So why does the bump-stock rifle shoot more automatically than the pump-action shotgun that also requires further human input?  And why does the manual capturing of recoil energy render ordinary bump firing nonautomatic?  The answers to these questions cannot be found in the amorphous law that the ATF has attempted to draft.

The ATF lastly claims that my reading conflicts with caselaw addressing a redesigned semiautomatic rifle that allows a shooter to press a switch to keep the rifle firing until the release of the switch.  ATF Supp. Br. 11–12 (citing *United States v. Camp*, 343 F.3d 743 (5th Cir. 2003)).  But this caselaw holds only that a traditional rifle trigger need not be the "trigger" under § 5845(b) and that the *switch* can qualify as this rifle's trigger.  *Camp*, 343 F.3d at 745.  Here, the ATF agrees there is just one trigger—the traditional one.  A conclusion that bump stocks do not turn ordinary semiautomatic rifles into machine guns says nothing about whether these other devices qualify.

In sum, a shooter manually reengages the trigger of a bump-stock rifle after each shot, so the rifle does not "automatically" shoot more than one shot "by a single function of the trigger."

II

The circuit courts that have upheld the Bump-Stock Rule have not suggested that the ATF's contrary view "is the better reading of the statute."  *Guedes*, 920 F.3d at 30.  Indeed, they

have not even felt the need to *ask* which is the better reading.  *Id.*  They have instead held that they must review the ATF's reading under *Chevron*'s "two-step" approach.  *Id.* at 17–28; *Aposhian v. Barr*, 958 F.3d 969, 979–84 (10th Cir. 2020).  At step one, these courts find that "automatically" and "single function of the trigger" are sufficiently ambiguous to require courts to defer to the ATF's reading.  *Aposhian*, 958 F.3d at 988–89; *Guedes*, 920 F.3d at 29–31.  At step two, they hold that the ATF's reading is "permissible."  *Aposhian*, 958 F.3d at 984–88; *Guedes*, 920 F.3d at 31–32.

I find three problems with this approach.  *First*, the courts justify their use of *Chevron* with irrelevant cases that interpret statutes expressly delegating power to an agency to enact criminal regulations.  *Second*, the courts wrongly expand *Chevron*'s domain by holding that Congress impliedly delegated to the Attorney General the power to interpret a criminal law merely because it gave him a general authority to enact regulations.  *Third*, even under *Chevron*'s regime, the courts improperly find ambiguity without attempting to figure out the statute's meaning.

    A.  The circuit courts wrongly allow a federal agency to create a regulatory crime without an express delegation of criminal policymaking power from Congress.

The circuit courts that uphold the Bump-Stock Rule justify their reliance on "*Chevron* deference" by citing cases that permit Congress to *expressly* delegate to an agency the power to create a regulatory standard backed by criminal penalties.  *Guedes*, 920 F.3d at 24, 28 (citing *United States v. O'Hagan*, 521 U.S. 642 (1997); *Touby v. United States*, 500 U.S. 160 (1991)).  Yet the deference that I view as "*Chevron* deference" traditionally arises when an agency claims that Congress has *impliedly* delegated to the agency the power to interpret the law.  The use of this express-delegation caselaw in this case's implied-delegation context sets a hazardous precedent.

When Congress regulates private parties, it sometimes expressly gives a federal agency a policymaking power to adopt the governing standard of conduct.  As one example, Congress told the Attorney General that he may add to the list of "controlled substances" that cannot be sold. 21 U.S.C. § 811; *Touby*, 500 U.S. at 162–64.  As another, Congress told the SEC to define the

"acts" that are "fraudulent" during a tender offer.   15 U.S.C. § 78n(e); *O'Hagan*, 521 U.S. at 667.

A party can challenge these express delegations in various ways.   *See United States v. Mead Corp.*, 533 U.S. 218, 227 & n.6 (2001).   Most notably, Congress may not give away its legislative power, so these policy-laden regulations raise separation-of-powers concerns.   *Touby*, 500 U.S. at 165.   For better or worse, however, the Supreme Court has rebuffed challenges to these rules under the nondelegation doctrine, even when Congress has made it a crime to violate them.   *See id.* at 165–68; *United States v. Grimaud*, 220 U.S. 506, 518–22 (1911); *cf. Gundy v. United States*, 139 S. Ct. 2116, 2133–48 (2019) (Gorsuch, J., dissenting).   Apart from a nondelegation challenge, a party might also argue that the agency's policy choice violates the Administrative Procedure Act because it is procedurally arbitrary or substantively contrary to Congress's instructions about the policies that the agency should adopt.   *See O'Hagan*, 521 U.S. at 673; 5 U.S.C. § 706(2).

Critically, though, a party may not challenge this type of regulation on the ground that Congress did not give the agency the power to adopt it in the first place.   Of course it did.   Its *express* delegation leaves this statutory-interpretation question with an unambiguous answer. But that express delegation does not trigger "*Chevron* deference."   *Cf. Cuozzo Speed Techs., LLC v. Lee*, 136 S. Ct. 2131, 2148 (2016) (Thomas, J., concurring).   Well before *Chevron*, the Supreme Court noted that it should defer to a regulation with "legislative effect" when Congress expressly delegated policymaking authority to the agency.   *Batterton v. Francis*, 432 U.S. 416, 425 (1977); Thomas W. Merrill & Kristin E. Hickman, *Chevron's Domain*, 89 Geo. L.J. 833, 833 n.2 (2001) (collecting cases).   "*Chevron* deference" instead comes into play when a statute *lacks* an express delegation.   *Chevron* held that a statutory ambiguity can represent Congress's "implicit" delegation to an agency to resolve the ambiguity.   467 U.S. at 844; *King v. Burwell*, 576 U.S. 473, 485 (2015).   And it distinguished laws with these implicit delegations from those that "explicitly left a gap for the agency to fill[.]"   467 U.S. at 843–44 & 844 n.12; *see Mead*, 533 U.S. at 229.

These express-delegation cases thus are irrelevant to whether the Gun Control Act and the National Firearms Act contain implied delegations to the Attorney General.   (The Acts

identify the Attorney General as the enforcing official, and he has designated the ATF to act on his behalf.  28 C.F.R. § 0.130(a)(1)–(2).)  Unlike in *O'Hagan* (in which Congress gave the SEC the power to define "fraudulent" acts), these Acts do not expressly give the Attorney General the power to define "machinegun."  And unlike in *Touby* (in which Congress gave the Attorney General the ability to add to the list of "controlled substances"), the Acts do not expressly give the Attorney General the ability to add to a list of "machineguns."  Congress instead defined "machinegun" itself.

\*

If anything, the use of this express-delegation precedent in *Chevron*'s implied-delegation context marks a sharp break from past practice.  The cases allowing agencies to create criminal regulations come with an important safeguard: Congress *itself* must "make[] the violation of regulations a criminal offense and fix[] the punishment[.]"  *Loving v. United States*, 517 U.S. 748, 768 (1996).  So when a statute left unclear whether Congress gave an agency the power to create regulatory crimes, the Supreme Court refused to interpret the statute as granting this power.  *See United States v. Eaton*, 144 U.S. 677, 687–88 (1892).  Congress must act "distinctly"—i.e., clearly—if it wants to allow agencies to enact criminal rules with the force of law.  *Id.* at 688; *Grimaud*, 220 U.S. at 519.  This clear-statement rule established a presumption against "which Congress legislates" well before *Chevron*.  *Singer v. United States*, 323 U.S. 338, 350–51 (1945) (Frankfurter, J., dissenting); Thomas W. Merrill & Kathryn Tongue Watts, *Agency Rules with the Force of Law: The Original Convention*, 116 Harv. L. Rev. 467, 499–502 (2002).  The statute in *O'Hagan*, for example, expressly made it a crime to violate "any provision of this chapter" or "any rule or regulation thereunder the violation of which is made unlawful or the observance of which is required under the terms of this chapter[.]"  15 U.S.C. § 78ff(a); *O'Hagan*, 521 U.S. at 677 n.23.

The clear-statement rule is "not a judicial sport."  *Singer*, 323 U.S. at 350 (Frankfurter, J., dissenting).  It reinforces a fundamental separation-of-powers principle.  *Carter v. Welles-Bowen Realty, Inc.*, 736 F.3d 722, 733 (6th Cir. 2013) (Sutton, J., concurring).  The Constitution allows only Congress to create crimes.  *See United States v. George*, 228 U.S. 14, 22 (1913).  The Supreme Court cannot create common-law crimes, *Hudson*, 11 U.S. at 34, and the President

cannot create administrative crimes, *George*, 228 U.S. at 22.  This principle promotes liberty by barring the government from forcing Americans to change their behavior on threat of imprisonment unless their representatives pass a bill that survives the arduous journey through both Houses of Congress and their President signs this bill into law.  *See Bond v. United States*, 564 U.S. 211, 222 (2011).

The circuit courts that use the express-delegation precedent to invoke *Chevron* flout this clear-statement rule and the separation-of-powers principle that it protects.  The Bump-Stock Rule creates a new regulatory crime that bars the possession of bump stocks.  Yet it does so allegedly pursuant to only an implied (not a distinct) congressional delegation of power.

The courts all agree that the Bump-Stock Rule purports to be a legislative rule that creates a new crime with the "force and effect of law"; it does not claim to be an interpretive rule that merely construes the "machinegun" ban in 18 U.S.C. § 922(o)(1).  *See, e.g.*, *Guedes*, 920 F.3d at 18 (citation omitted).  The crime's effective date shows as much.  For a decade before the Bump-Stock Rule, the ATF issued advisory letters indicating that the bump stocks at issue here are not machine guns.  Bump-Stock Rule, 83 Fed. Reg. at 66,516.  Its position nurtured the creation of an entire bump-stock industry, complete with manufacturers, retailers, and consumers.  *Id.* at 66,545–48.  By the time of the Bump-Stock Rule, consumers had bought some $100 million worth of bump stocks.  *Id.* at 66,515.  If this rule merely interpreted § 922(o)(1)'s "machinegun" ban, the people who owned bump stocks during this time would all along have been committing felonies (on the ATF's advice).  *See* 18 U.S.C. § 924(a)(2).  Yet the ATF did not seek to throw these bump-stock owners into prison.  The Bump-Stock Rule instead purports to criminalize behavior that was *previously* lawful: "Anyone currently in possession of a bump-stock-type device is not acting unlawfully unless they fail to relinquish or destroy their device after the effective date of this regulation."  83 Fed. Reg. at 66,523; *see also id.* at 66,525, 66,530.

To enact this new regulatory crime, the ATF (the Attorney General's designee) must identify a statutory provision "distinctly" empowering the Attorney General to do so.  *Eaton*, 144 U.S. at 688.  But the ATF points to no such provision.  That is why the circuit courts must rely on *Chevron*.  *Chevron* deference applies when Congress "implicitly" delegates to an agency

the power to interpret a statute.  467 U.S. at 843–44.  But an implicit delegation is not a distinct
one.  *Carter*, 736 F.3d at 733 (Sutton, J., concurring).  Under traditional principles, then, the
ATF lacks the power to make criminal what was lawful.  And reliance on *Chevron* throws
overboard what has long been a critical check on an agency's ability to enact criminal rules:
Such rules "must have clear legislative basis."  *George*, 228 U.S. at 22; *cf. Whitman v. United
States*, 574 U.S. 1003, 1004 (2014) (Scalia, J., respecting the denial of certiorari).  The Bump-
Stock Rule does not.

To be sure, Congress gave the Attorney General the general power to issue "such rules
and regulations as are necessary to carry out the provisions" of the Gun Control Act.  18 U.S.C.
§ 926(a).  And it gave the Attorney General the general power to "prescribe all needful rules and
regulations for the enforcement of" the National Firearms Act.  26 U.S.C. §§ 7805(a),
7801(a)(2)(A)(i).  But these grants of general rulemaking power (which exist in most statutes)
are not express delegations of power to adopt substantive criminal rules like those in *O'Hagan*
and *Touby*.  To the contrary, a grant of general rulemaking authority can show only Congress's
*implied* delegation to an agency to resolve ambiguities under *Chevron*.  *See Mayo Found. for
Med. Educ. & Rsch. v. United States*, 562 U.S. 44, 57 (2011).  The law in *Chevron* itself allowed
the EPA administrator to "prescribe such regulations as are necessary to carry out his functions
under this chapter."  42 U.S.C. § 7601(a)(1).  An assertion that the Attorney General's general
rulemaking power also qualified as an express delegation to establish regulatory crimes with the
force of law would swallow *Chevron*'s distinction between express and implied delegations.  *See*
467 U.S. at 843–44.  Because these grants of rulemaking power do not "distinctly" show
Congress's intent to allow the Attorney General to create a new crime (as the Bump-Stock Rule
purports to do), they do not satisfy the clear-statement rule.  *Eaton*, 144 U.S. at 688; *cf. George*,
228 U.S. at 20–21, 20 n.†.

Further, no other provision gives the Attorney General the power to issue a criminal rule
implementing the Gun Control Act's "machinegun" ban, 18 U.S.C. § 922(o)(1), or the
"machinegun" definition that it incorporates from the National Firearms Act, *id.* § 921(a)(23);
26 U.S.C. § 5845(b).  This omission is telling.  When the Gun Control Act permits the Attorney
General to enact rules backed by criminal sanctions, it says so expressly.  Section 923, for

example, requires licensed firearms distributors to keep such records "as the Attorney General may by regulations prescribe" and makes it a misdemeanor for licensees to violate its recordkeeping provisions "or the regulations promulgated thereunder."   18 U.S.C. §§ 922(m), 924(a)(3)(B).   Yet the Act otherwise "contains no power authorizing [the Attorney General] to promulgate criminal regulations," such as regulations implementing § 922(o)(1)'s "machinegun" ban.  Stephen P. Halbrook, *Firearms Law Deskbook* § 4:6, Westlaw (database updated Oct. 2021).   Likewise, the National Firearms Act authorizes the Attorney General to issue regulations about, for example, licensing or registration requirements.   26 U.S.C. §§ 5812(a), 5822, 5841(c), 5842–44; *see also id.* §§ 5851(b), 5852(f), 5853(c), 5854.  The Act also makes a violation of its own "provisions" a crime.  *Id.* §§ 5861, 5871.  But nothing in it allows the Attorney General to issue a legislative rule that changes the scope of its "machinegun" definition.   Under normal interpretive principles, we should view the express inclusions and omissions of regulatory authority as intentional legislative choices.  *See Gonzales v. Oregon*, 546 U.S. 243, 262–63 (2006); *Russello v. United States*, 464 U.S. 16, 23 (1983); Merrill & Watts, *supra*, at 471–72, 487.

One last point.  For those persuaded by such things, the Gun Control Act's original drafters discarded a provision that would have given the Attorney General the power to adopt legislative rules backed by criminal sanctions.  One version of the Act would have broadly attached criminal penalties to a violation of any rule or regulation promulgated under the Act. *See* S. 917, 90th Cong. § 924(a) (as reported by Senator McClellan, Apr. 29, 1968).  But Senator Griffin of Michigan led the charge in opposition to this language, explaining that "if there is one area in which we should not delegate our legislative power, it is in the area of criminal law." 114 Cong. Rec. 14,792 (1968).  Senator Baker of Tennessee also explained how problematic it would be to allow a future administration to "change or alter a rule or a regulation" that is criminal "and thus place in the hands of an executive branch administrative official the authority to fashion and shape a criminal offense to his own personal liking[.]"  *Id.*  These senators successfully persuaded Congress to omit this "rules or regulations" catchall from what is today the penalty section in 18 U.S.C. § 924(a).  *See id.* at 14,793.  We disrespect its choice if we uphold a regulation like the Bump-Stock Rule that purports to create a new regulatory felony that did not exist before.

    B.  The circuit courts wrongly find in a generic grant of rulemaking authority an implied delegation permitting an agency to authoritatively interpret criminal laws.

Apart from their disregard of the clear-statement rule that predates *Chevron*, the circuit courts that uphold the Bump-Stock Rule wrongly rely on *Chevron*'s implied-delegation presumption even on that case's own terms.  They apply its presumption solely because (1) the Attorney General has general rulemaking power under the Gun Control Act and the National Firearms Act, 18 U.S.C. § 926(a); 26 U.S.C. § 7805(a), and (2) the ATF (the Attorney General's designee) issued the Bump-Stock Rule under that power.  *See Aposhian*, 958 F.3d at 979–81.  I disagree.  While a generic rulemaking provision might sometimes show an implied delegation that allows an agency to resolve a statutory ambiguity through a regulation, *Mayo*, 562 U.S. at 57, such a provision does not always do so.  And it falls well short of showing an implied delegation here.

Start with some background.  Before *Chevron*, the Supreme Court applied a totality-of-the-circumstances test "on a statute-by-statute basis" to decide whether a statute impliedly delegated power to an agency to interpret an ambiguous provision.  Antonin Scalia, *Judicial Deference to Administrative Interpretations of Law*, 1989 Duke L.J. 511, 516; Stephen Breyer, *Judicial Review of Questions of Law and Policy*, 38 Admin. L. Rev. 363, 365–72 (1986).  *Chevron* might have been read to dramatically depart from this approach.  Some viewed it as creating a broad rule that Congress impliedly delegated to agencies the power to resolve all ambiguous provisions across all statutes.  Scalia, *supra*, at 516; *cf. City of Arlington v. FCC*, 569 U.S. 290, 296 (2013).

Yet the Court has not adopted that absolutist view.  Rather, before proceeding through *Chevron*'s two-step test, it has repeatedly conducted a threshold inquiry (what some have labeled *Chevron* "step zero") that requires us to ask whether the specific statute at issue leaves the specific interpretive question for the agency or the courts to resolve.  Merrill & Hickman, *supra*, at 836, 873–89.  As the Court has noted, "different statutes present different reasons for considering respect for the exercise of administrative authority or deference to it."  *Mead*, 533 U.S. at 238.  The Court thus will reject *Chevron* deference when a law is best read not to

give the agency the power to resolve a particular question of statutory interpretation.  That is true even if (as in this case) the agency issued a regulation answering that question pursuant to its general rulemaking authority.

Two examples prove my point.  The Court has rejected *Chevron*'s implied-delegation presumption for "major questions" about a statute.  *See King*, 576 U.S. at 485–86; *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 159–60 (2000).  "In extraordinary cases" involving important questions, it has noted, "there may be reason to hesitate before concluding that Congress has intended such an implicit delegation." *Brown & Williamson*, 529 U.S. at 159 (citing Breyer, *supra*, at 370).  Take *King*.  It addressed whether the Affordable Care Act allowed individuals who bought health insurance on federal exchanges to obtain tax subsidies.  576 U.S. at 479.  The agency issued a regulation answering this question under a grant of rulemaking authority.  *Id.* at 483.  Yet the Court refused to give *Chevron* deference to this regulation.  *Id.* at 485–86.  The Court reasoned that the question was of "deep 'economic and political significance,'" so it presumed that Congress would not have impliedly given the agency the power to resolve it.  *Id.* at 486 (citation omitted).

The Court has also rejected *Chevron* deference for statutory issues that have traditionally fallen within the courts' interpretive domain.  *See Adams Fruit Co. v. Barrett*, 494 U.S. 638, 649 (1990); *see also Smith v. Berryhill*, 139 S. Ct. 1765, 1778–79 (2019); *Epic*, 138 S. Ct. at 1629.  Take *Adams Fruit*.  There, the agency issued a regulation under its rulemaking authority that narrowly interpreted a cause of action allowing private parties to sue.  494 U.S. at 649.  The Court held that *Chevron* deference did not apply to this interpretation because "the scope of the judicial power vested by the statute" was for the courts, not the agency, to decide.  *Id.* at 650.

Identical logic extends to the criminal laws, so these decisions make this case easy at *Chevron*'s threshold step.  The Gun Control Act bans "machineguns" and imposes a potential 10-year prison sentence for violations.  18 U.S.C. §§ 922(o)(1), 924(a)(2).  I would not interpret Congress's grant of rulemaking authority in the Gun Control Act (18 U.S.C. § 926(a)) or the National Firearms Act (26 U.S.C. § 7805(a)) as impliedly delegating to the Attorney General the "extraordinary authority" to invent new gun crimes.  *Gonzales*, 546 U.S. at 262.  Even more so than the cause of action in *Adams Fruit*, "criminal laws are for courts, not for the Government, to

construe." *Abramski v. United States*, 573 U.S. 169, 191 (2014).   Whatever the merits of *Chevron*'s implied-delegation presumption in the civil context, even a *Chevron* proponent calls it "preposterous" "to say that when criminal statutes are ambiguous, the Department of Justice is permitted to construe them as it sees fit[.]" Cass R. Sunstein, *Chevron Step Zero*, 92 Va. L. Rev. 187, 210 (2006).   Two of our foundational principles—the separation of powers and due process—should lead us to adopt the opposite presumption.   Congress does *not* impliedly delegate to the Attorney General our duty to interpret the criminal laws.   *See Gun Owners*, 992 F.3d at 464–68.

As an initial matter, a presumption that Congress impliedly gave the Attorney General the power to interpret the criminal laws would further undercut our separation of powers.   The Constitution ensures that the government cannot imprison a person without a consensus from all three branches.   *See Gun Owners*, 992 F.3d at 464; Caleb Nelson, *Adjudication in the Political Branches*, 107 Colum. L. Rev. 559, 561 (2007).   Congress must enact a criminal law, the Attorney General must initiate a prosecution, and a court must adjudicate the case.   The clear-statement rule that I have already discussed ensures that the Attorney General does not usurp *Congress's* role in this process—to enact criminal bans.   *George*, 228 U.S. at 22.   We should likewise adhere to canons of interpretation that ensure that the Attorney General does not usurp the *judiciary's* role—to say what the criminal laws mean.   *Marbury v. Madison*, 5 U.S. 137, 177 (1803).   Yet *Chevron*'s presumption that agencies get to construe ambiguous laws would allow the Attorney General to do just that by combining the prosecutorial and adjudicative powers.   *See* Sunstein, *supra*, at 210.

Admittedly, it is our duty to say what civil laws mean too.   But there would be nothing unusual about refusing to extend *Chevron*'s civil presumption to this criminal setting.   Criminal laws have the most serious repercussions for individuals, potentially depriving them of their liberty or lives.   *See United States v. Bass*, 404 U.S. 336, 348 (1971).   So our legal traditions include many safeguards unique to that context.   To name two, prosecutors must prove their case beyond a reasonable doubt (rather than by a preponderance of the evidence), *see In re Winship*, 397 U.S. 358, 361–64 (1970), and they cannot force defendants to testify when their testimony might subject them to criminal (as opposed to civil) liability, *see United States v. Balsys*,

524 U.S. 666, 671–72 (1998).  Notably, therefore, the Supreme Court has not incorporated other civil principles that are in tension with the separation of powers into the criminal domain. Although agencies may engage in fact-finding in some civil proceedings subject to deferential judicial review, *Atlas Roofing Co. v. Occupational Safety & Health Rev. Comm'n*, 430 U.S. 442, 455 & n.13 (1977), this agency fact-finding power falls away in "criminal matters," *N. Pipeline Constr. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 70 n.24 (1982) (plurality opinion); Nelson, *supra*, at 610.  The same logic should apply here.  *Chevron* sometimes allows agencies to interpret ambiguities in civil statutes subject to deferential judicial review.  *See City of Arlington*, 569 U.S. at 296.  Yet an agency's law-interpreting power should likewise fall away in criminal matters.  *See Esquivel-Quintana v. Lynch*, 810 F.3d 1019, 1030 (6th Cir. 2016) (Sutton, J., concurring in part and dissenting in part), *rev'd sub nom. Esquivel-Quintana v. Sessions*, 137 S. Ct. 1562 (2017).

In addition, *Chevron*'s presumption that Congress impliedly gave the Attorney General the power to interpret the criminal laws conflicts with a preexisting due-process presumption that has long affected the courts' interpretation of those laws.  *See United States v. Davis*, 139 S. Ct. 2319, 2325 (2019).  Courts presume that Congress means for criminal laws to give ordinary people "fair warning" of the conduct that the laws proscribe.  *McBoyle v. United States*, 283 U.S. 25, 27 (1931).  When faced with the task of choosing between two plausible "readings of what conduct Congress has made a crime," then, a court will reject the "harsher alternative" in favor of the more lenient one.  *Jones v. United States*, 529 U.S. 848, 858 (2000) (quoting *United States v. Universal C.I.T. Credit Corp.*, 344 U.S. 218, 221–22 (1952)).  Unlike *Chevron*, this rule of lenity "is perhaps not much less old than construction itself."  *United States v. Wiltberger*, 18 U.S. 76, 95 (1820).  The rule allows parties to organize their affairs confident that they can rely on the existing law until their elected representatives change it through the legislative process.  *See Bass*, 404 U.S. at 348.

*Chevron*'s implied-delegation presumption (which dates to 1984) conflicts with this fair-notice presumption (which dates to the Founding).  For one thing, it would require us to presume that Congress meant to give the Attorney General the power to expand the scope of an ambiguous criminal law by adopting the "harsher alternative" without the "clear and definite"

statement that we usually expect.  *Jones*, 529 U.S. at 858 (citation omitted).  It thus "would turn the normal construction of criminal statutes upside-down, replacing the doctrine of lenity with a doctrine of severity."  *Crandon v. United States*, 494 U.S. 152, 178 (1990) (Scalia, J., concurring in the judgment).  For another, it would allow an agency to depart from its longstanding interpretation of a criminal law merely for policy reasons associated with a change in presidential administrations and merely by going through the notice-and-comment process.  *See Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 981–82 (2005).  Such a policy-laden expansion of the scope of prohibited conduct has no place in this criminal sphere.  "[A] criminal conviction ought not to rest upon an interpretation reached by the use of policy judgments rather than by the inexorable command of relevant language."  *M. Kraus & Bros., Inc. v. United States*, 327 U.S. 614, 626 (1946).

Lastly, imagine what it would mean if, as the D.C. Circuit found, the Attorney General's general rulemaking authority in 18 U.S.C. § 926(a) allows him to issue authoritative interpretations of the many crimes in § 922.  *See Guedes*, 920 F.3d at 26.  The Supreme Court recently interpreted the statute banning the possession of firearms by felons to require defendants to know that they are, in fact, felons.  *See Rehaif v. United States*, 139 S. Ct. 2191, 2194 (2019); 18 U.S.C. §§ 922(g), 924(a)(2).  Suppose that the Attorney General later issues a regulation readopting the view long held by all of the circuit courts that the statute lacked this intent element.  *Rehaif*, 139 S. Ct. at 2201 (Alito, J., dissenting).  If *Rehaif* is best read as endorsing one side of a debate about an ambiguous statute, would the Court have to defer to the Attorney General's regulation and return the criminal law back to a world without this *mens rea*?  *See Brand X*, 545 U.S. at 982–83; *cf. United States v. Home Concrete & Supply, LLC*, 566 U.S. 478, 487–90 (2012) (plurality opinion).

Courts have also struggled to interpret the Armed Career Criminal Act, which imposes an enhanced sentence on those who illegally possess firearms and have three prior "violent felony" convictions.  18 U.S.C. § 924(e); *see, e.g.*, *Borden v. United States*, 141 S. Ct. 1817, 1821 (2021) (plurality opinion).  Perhaps this was all just wasted effort.  If § 926(a) gives the Attorney General the power to issue a binding regulation listing every offense that qualifies as a "violent felony," must courts defer to the Attorney General's view?  I doubt any judge would take these

claims seriously.  But they are no different from the claim that *Chevron* applies in this case simply because § 926(a) gives the Attorney General general rulemaking authority.

In sum, the generic grants of rulemaking power on which other circuit courts have relied do not provide the "clear indication" that courts should demand before construing a criminal law to delegate our interpretive authority to the Attorney General.  *SWANCC*, 531 U.S. at 172.

*

The circuit courts that take the opposite view suggest that *Babbitt v. Sweet Home Chapter of Communities for a Great Oregon*, 515 U.S. 687 (1995), supports their conclusion that a grant of general rulemaking authority can trigger *Chevron* deference for criminal laws.  *See Aposhian*, 958 F.3d at 982–83; *Guedes*, 920 F.3d at 24.  *Babbitt* addressed provisions of the Endangered Species Act that made it unlawful for a party to "take" an endangered species and imposed criminal and civil penalties for violations of this ban.  515 U.S. at 690–91, 696 n.9 (quoting 16 U.S.C. §§ 1538(a)(1)(B), 1540(a)(1), 1540(b)(1)).  The statute itself defined the word "take" to include "harm," and the Secretary of the Interior issued a regulation broadly interpreting the word "harm."  *Id.* at 691.  When rejecting the claim that this regulation misread the statute, the Court gave deference to the Secretary's reading despite its criminal applications.  *Id.* at 703–04, 704 n.18.

Yet *Babbitt* confirms that *Chevron*'s implied-delegation presumption does not apply here. While *Babbitt* cited *Chevron* in passing, it did not "rest on *Chevron*'s fiction that ambiguity in a statutory term is best construed as an implicit delegation of power to an administrative agency to determine the bounds of the law."  *Cuozzo*, 136 S. Ct. at 2148 (Thomas, J., concurring).  Rather, *Babbitt* is better read as an express-delegation case.  The Court noted that the Secretary's regulation was entitled to "some degree of deference" not because the "take" definition was ambiguous (and so subject to *Chevron*'s presumption), but because of the "latitude" that the Act gave "the Secretary in enforcing the statute[.]"  *Babbitt*, 515 U.S. at 703–04.  As its support for this sentence, *Babbitt* even cited an article by Justice Breyer criticizing an implied-delegation presumption as "seriously overbroad, counterproductive and sometimes senseless."  Breyer, *supra*, at 373; Sunstein, *supra*, at 239–40.  Notably, moreover, Secretary Babbitt's enforcement

"latitude" consisted of far more authority than the generic power to issue regulations. Most relevantly, the Act authorized civil and criminal penalties against those who violated "any regulation issued in order to implement" the "take" prohibition. *Compare* 16 U.S.C. § 1540(f), *with id.* § 1540(a)(1) and (b)(1). Congress thus expressly gave the Secretary the power to issue regulations to "implement" that specific ban and expressly made a violation of those regulations a crime. *Id.* § 1540(b)(1). This unambiguous delegation to enact criminal legislative rules that implement the "take" provision cannot be described as an "implicit" delegation. It would meet even *Eaton*'s clear-statement rule.

In this case, by contrast, the Bump-Stock Rule attempts to "rest on *Chevron*'s fiction" by suggesting that Congress "implicitly left" to the Attorney General the power to interpret the "machinegun" definition. *Cuozzo*, 136 S. Ct. at 2148 (Thomas, J., concurring); Bump-Stock Rule, 83 Fed. Reg. at 66,527. Unlike the Endangered Species Act in *Babbitt*, however, the Gun Control Act and the National Firearms Act do not delegate to the Attorney General the specific power to issue regulations to "implement" the "machinegun" ban in 18 U.S.C. § 922(o)(1) or expressly make a violation of those implementing regulations a crime. That is why the courts that have upheld the Bump-Stock Rule rely only on the grants of general rulemaking authority in those Acts. *See Guedes*, 920 F.3d at 20–21. But those grants are not express delegations to pass criminal rules, and the enforcement "latitude" that *Babbitt* found important is absent here. 515 U.S. at 703–04.

I disagree with the other circuit courts' competing interpretation of *Babbitt*. These courts have read that decision as instead holding that—while *Chevron*'s implied-delegation presumption does not apply for pure criminal laws—it can apply when a law has "both civil and criminal implications." *Aposhian*, 958 F.3d at 982–83. This case shows that any distinction between "pure" criminal laws and "hybrid" criminal-civil laws is a mirage. If the Court reads *Babbitt* as triggering *Chevron*'s presumption, it will reach nearly all criminal laws.

To begin with, although the "take" regulation in the Endangered Species Act has many civil applications, *see, e.g.*, 16 U.S.C. § 1540(g), the Bump-Stock Rule has "predominately criminal" ones, *Aposhian*, 989 F.3d at 905 (Eid, J., dissenting). The Gun Control Act makes it a crime to possess machine guns except those transferred or possessed under the authority of a

government or those possessed before 1986.  18 U.S.C. § 922(o).  No bump stocks existed in 1986, so the grandfather provision does not apply.  Bump-Stock Rule, 83 Fed. Reg. at 66,535.  And I doubt many governments supply their agents with bump-stock rifles.  So if the Bump-Stock Rule's potentially small number of civil applications triggers *Chevron*'s implied-delegation presumption, most criminal laws will trigger it too.  After all, "[s]ince the earliest years of this Nation, Congress has authorized the Government to seek parallel in rem civil forfeiture actions and criminal prosecutions based upon the same underlying events."  *United States v. Ursery*, 518 U.S. 267, 274 (1996).  Today, many laws include civil-forfeiture provisions that accompany their criminal bans.  The Gun Control Act, for example, authorizes the Attorney General to seek forfeiture of weapons for most violations of its prohibitions.  *See* 18 U.S.C. § 924(d)(1).  Would this forfeiture provision trigger *Chevron*'s presumption for, say, a regulation issued by the Attorney General interpreting the prohibition on possessing a firearm in furtherance of a "crime of violence"?  *Id.* § 924(c)(1)(A).

In addition, *Babbitt* emphasized that the "take" regulation had "existed for two decades" largely unchanged from near the time of the Act's passage and so had provided "a fair warning of its consequences."  515 U.S. at 690, 691 n.2, 704 n.18.  Giving some deference to this regulation, *id.* at 703, comports with the respect that courts have shown "longstanding and contemporaneous executive interpretations of law[.]"  Aditya Bamzai, *The Origins of Judicial Deference to Executive Interpretation*, 126 Yale L.J. 908, 916 (2017) (emphasis omitted).  The same cannot be said for a decision to apply *Chevron*'s presumption here because the Bump-Stock Rule departed from the ATF's decade-long view.  83 Fed. Reg. at 66,516.  The Americans who invested in the bump-stock industry in reliance on that prior position might be skeptical of the claim that the ATF offered them a "fair" warning.  *Babbitt*, 515 U.S. at 704 n.18; *cf. EEOC v. Arabian Am. Oil Co.*, 499 U.S. 244, 257–58 (1991).  This case thus shows that if *Chevron* extends to the criminal context, it would extend in full.  The Attorney General could change the criminal laws for pure policy reasons.  *See Brand X*, 545 U.S. at 981–82.  *Babbitt* should not be read to require these results.

C. The circuit courts do not attempt to construe the statutory "machinegun" definition using traditional canons of construction before deferring to the ATF's view.

Even if *Chevron*'s two-step test applied, the circuit courts that have upheld the Bump-Stock Rule wrongly find ambiguity in the "machinegun" definition at step one without even attempting to interpret the statute themselves.  *See Aposhian*, 958 F.3d at 979–81; *Guedes*, 920 F.3d at 20–21.  *Chevron* does not require such judicial obsequiousness to a federal agency.

At *Chevron* step one, a court must ask whether the relevant statutory text is "ambiguous with respect to the specific issue" before the court.  467 U.S. at 843.  If the text conveys an "unambiguously expressed" meaning, the court must apply it as written.  *Id.*; *see, e.g.*, *MCI Telecomms. Corp. v. Am. Tel. & Tel. Co.*, 512 U.S. 218, 225–29 (1994).  If the text conveys no unambiguous answer, the court must proceed to *Chevron*'s second step by asking whether the agency's reading reasonably resolves the ambiguity.  467 U.S. at 843; *see, e.g.*, *Brand X*, 545 U.S. at 989–97.  Like the rule of lenity, however, *Chevron* "leaves open the crucial question— almost invariably present—of how much ambiguousness constitutes an ambiguity."  *United States v. Hansen*, 772 F.2d 940, 948 (D.C. Cir. 1985) (Scalia, J.).

Both the Supreme Court and our court have explained how to answer this crucial ambiguity question.  A finding of ambiguity can occur only at the end of our usual interpretive process.  In other words, a court must do its "best to determine the statute's meaning before giving up, finding ambiguity, and deferring to the agency."  *Arangure v. Whitaker*, 911 F.3d 333, 338 (6th Cir. 2018).  When engaging in this ordinary interpretive process, the court should employ the "traditional tools of statutory construction" that it would otherwise rely on when reviewing a statutory provision without agency input.  *Epic*, 138 S. Ct. at 1630 (quoting *Chevron*, 467 U.S. at 843 n.9); *see Kisor v. Wilkie*, 139 S. Ct. 2400, 2415 (2019).  So a court must give the relevant words their ordinary meaning.  *See MCI Telecomms.*, 512 U.S. at 225–28. If a word is susceptible to more than one meaning, the court must place it in its context and consider it within the statutory structure as a whole.  *See Pereira v. Sessions*, 138 S. Ct. 2105, 2113, 2114–15, 2117 (2018); *Esquivel-Quintana*, 137 S. Ct. at 1570, 1572.  Similarly, the court must account for the many canons of construction that routinely offer clues on the meaning of an

ambiguous text.  *Arangure*, 911 F.3d at 339–40 (collecting cases).  The Supreme Court, for instance, has held that the canon of constitutional avoidance can render an otherwise ambiguous statute unambiguous for *Chevron* purposes.  *See SWANCC*, 531 U.S. at 172–74; *Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 575–76 (1988).

After employing all of the traditional tools of construction in this case, I would find that the statutory "machinegun" definition unambiguously excludes bump stocks for the reasons I identified at the outset.  The circuit courts that find this statutory definition ambiguous, by contrast, violate two of the Supreme Court's interpretive principles at this stage of *Chevron*.

*First*, these circuit courts give the type of "reflexive deference" to the ATF that the Supreme Court has rejected when deciding whether a statute is unambiguous under *Chevron*. *Pereira*, 138 S. Ct. at 2120 (Kennedy, J., concurring); *cf. Kisor*, 139 S. Ct. at 2415.  These courts identify an ambiguity and defer to the ATF based on an "interpretive puzzle" that they identify but do not even attempt to solve.  *Epic*, 138 S. Ct. at 1630.  Consider, for example, the reasons why the D.C. Circuit found the phrase "single function of the trigger" ambiguous.  *Guedes*, 920 F.3d at 29–31.  The court suggested that this phrase "admits of more than one interpretation" because it could refer to the mechanical actions of the trigger or the human actions of the shooter.  *Id.* at 29.  From there, however, the court made little effort to discern which of the two meanings best fits the context using any, much less all, of our traditional tools of interpretation. *Id.* at 29–31; *see Pereira*, 138 S. Ct. at 2116–18.  The court thus did not ask whether one of the two possible perspectives better comports with the way in which the word "function" is normally used or with the statutory definition as a whole (both of which point to the trigger's mechanical perspective as the proper reading).  *See Gun Owners*, 992 F.3d at 471; *cf. Kisor*, 139 S. Ct. at 2415.

A comparison of this "cursory analysis" to recent Supreme Court decisions shows the stark conflict in approaches.  *Pereira*, 138 S. Ct. at 2120 (Kennedy, J., concurring); *see, e.g.*, *SAS Inst. Inc. v. Iancu*, 138 S. Ct. 1348, 1354–58 (2018); *Esquivel-Quintana*, 137 S. Ct. at 1568–72. In *Pereira*, for example, the relevant statute's meaning turned in part on the preposition "under." *See* 138 S. Ct. at 2117.  Like the D.C. Circuit, the Court readily admitted that this "chameleon"

word could convey many distinct meanings, some of which favored the government and some of which favored the private party.  *Id.* (citation omitted).  Unlike the D.C. Circuit in *Guedes*, however, the Court did not call it a day at that point.  Rather, it recognized that a careful textual parsing of the statute as a whole pointed to one unambiguous meaning.  *Id.*; *see id.* at 2114–16.  The circuit courts that found the Bump-Stock Rule ambiguous should have done the same.

   *Second*, these circuit courts wrongly throw out the rule of lenity when interpreting the statutory "machinegun" definition at *Chevron* step one.  *See Aposhian*, 958 F.3d at 982–84; *Guedes*, 920 F.3d at 27–28.  The Supreme Court has told us that we must use the standard canons of construction to decide whether a statute is unambiguous at this stage.  *See Epic*, 138 S. Ct. at 1630; *SWANCC*, 531 U.S. at 173–74.  And the rule of lenity is one of the most traditional tools in our interpretive "toolkit."  *Kisor*, 139 S. Ct. at 2415; *see Wiltberger*, 18 U.S. at 95.  Well before *Chevron*, for example, the Supreme Court refused to follow a regulatory interpretation of a law with civil and criminal applications because the agency's reading would have done "violence to the well-established principle that penal statutes are to be construed strictly."  *FCC v. Am. Broad. Co.*, 347 U.S. 284, 296 (1954).  Within the *Chevron* framework, moreover, if a canon of construction such as the rule of lenity "resolves a statutory doubt in one direction, an agency may not reasonably resolve it in the opposite direction."  *Carter*, 736 F.3d at 731 (Sutton, J., concurring).  Ambiguity "in this situation is a congressional choice" in favor of a narrow interpretation of the criminal law, "not a delegation to the agency."  *Arangure*, 911 F.3d at 342.  So even assuming that any ambiguity remained in the statutory "machinegun" definition, the rule of lenity would resolve that ambiguity against the Bump-Stock Rule's broad reading.

   The courts that take the opposite view rely on a footnote from *Babbitt* that rejected the use of the rule of lenity when deferring to the Secretary's regulation implementing the "take" prohibition in the Endangered Species Act.  515 U.S. at 704 n.18; *see Guedes*, 920 F.3d at 27.  Recall, however, that this Act includes an express delegation of criminal rulemaking authority to the Secretary to implement this prohibition.  16 U.S.C. § 1540(a)(1), (b)(1).  Thus, *Babbitt* is best read as an express-delegation case, not as one that "rest[ed] on *Chevron*'s fiction" that Congress intends to give agencies interpretive authority over ambiguous texts.  *Cuozzo*, 136 S. Ct. at 2148 (Thomas, J., concurring).  For that type of express delegation, perhaps the rule of lenity should

kick in later to govern the interpretation of the agency's implementing regulation (as *Babbitt* seemed to suggest). *See* 515 U.S. at 704 n.18; *see also M. Kraus & Bros.*, 327 U.S. at 622. But we need not decide how the rule of lenity interacts with such express delegations. This case involves *Chevron*'s fiction, not an express delegation. And the logic of the Supreme Court's precedent leaves no doubt that traditional canons of construction like the rule of lenity apply at *Chevron*'s first step. *SWANCC*, 531 U.S. at 173–74; *Arangure*, 911 F.3d at 343–44.

\* \* \*

By continuously firing at rapid speeds with one activation of the trigger, machine guns can inflict great harm in short periods. And no doubt many people believe that rifles equipped with bump stocks share the same dangerous traits that led Congress to ban machine guns. Bump-Stock Rule, 83 Fed. Reg. at 66,520. So even though these newer devices might not fall "within the letter" of the statutory "machinegun" ban, courts may be tempted to treat them as covered anyway because they fall within its underlying "spirit." *Holy Trinity Church v. United States*, 143 U.S. 457, 459 (1892). In a country with a fluid separation of powers between the branches of government, this judicial approach of enlarging a statute through "equitable" interpretation rather than legislation might not be problematic. *See* John F. Manning, *Textualism and the Equity of the Statute*, 101 Colum. L. Rev. 1, 8 (2001). In our country, however, the judiciary has long had a narrower duty: "to apply, not amend, the work of the People's representatives." *Henson v. Santander Consumer USA Inc.*, 137 S. Ct. 1718, 1726 (2017). This duty leaves the policy debate over whether to ban bump stocks where it belongs—with the legislative branch accountable to the people. And since that branch has not seen fit to ban bump stocks or give a federal agency the power to do so, I must respectfully dissent from our judgment affirming the district court's decision in this case.

ENTERED BY ORDER OF THE COURT

Deborah S. Hunt, Clerk